## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, and ALLSTATE FIRE & CASUALTY INSURANCE COMPANY** | § § § § § § § § | |
| **Plaintiffs** | § § | |
| **vs.** | § § | **Civil Action No. _____** |
| **AKASH BHAGAT, D.O., EMERGENCY HEALTHCARE PARTNERS, L.P. (d/b/a MEMORIAL HEIGHTS EMERGENCY ROOM, d/b/a MEMORIAL HEIGHTS EMERGENCY CENTER), MEMORIAL HEIGHTS EMERGENCY CENTER MVA FACILITY ADMINISTRATION, LLC (d/b/a MEMORIAL HEIGHTS MVA - FACILITY), MEMORIAL HEIGHTS EMERGENCY CENTER MVA PROFESSIONAL ADMINISTRATION, LLC (d/b/a MEMORIAL HEIGHTS MVA - PHYSICIAN), BHAGAT INVESTMENTS, INC., ELIZABETH FAIR, M.D., SOUTHERN EMERGENCY PHYSICIANS LTD LLP, RUBEN VELOZ, M.D., PEDRAM BEHZADI, M.D., TAREK DEFRAWI, M.D., ANDREA MARCONI, D.O., SARA READER, M.D., JASON MASVERO, R.N., and LEIA ENGLAND** | § § § § § § § § § § § § § § § § § § § § § § § | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| **Defendants** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Come now Allstate Indemnity Company, Allstate Property & Casualty Insurance Company,

Allstate County Mutual Insurance Company, and Allstate Fire & Casualty Insurance Company,

hereinafter referred to as "Plaintiffs" and file this Original Complaint and complain of Akash Bhagat, D.O., Emergency Healthcare Partners, L.P. (d/b/a Memorial Heights Emergency Room, d/b/a Memorial Heights Emergency Center), Memorial Heights Emergency Center MVA Facility Administration, LLC (d/b/a Memorial Heights MVA – Facility), Memorial Heights Emergency Center MVA Professional Administration, LLC (d/b/a Memorial Heights MVA – Physician), Bhagat Investments, Inc., Elizabeth Fair, M.D., Southern Emergency Physicians Ltd LLP, Ruben Veloz, M.D., Pedram Behzadi, M.D., Tarek Defrawi, M.D., Andrea Marconi, D.O., Sara Reader, M.D., Jason Masvero, R.N., and Leia England (collectively, "Defendants") and for such action would show the Court as follows:

## I.
## PREDICATE

1.     Defendants are associated with Memorial Heights Emergency Center, a freestanding emergency room facility. Plaintiffs seek to recover money that the Defendants fraudulently obtained from the Plaintiffs by preparing and submitting medical billings for unnecessary and unreasonable emergency room services, emergency room diagnostics, and emergency room physician fees, concerning persons seen at the facility between August 8, 2018 and November 30, 2022. These medical bills, with related reports and other treatment documents, were submitted to Plaintiffs as part of claims for personal injuries.

2.     Memorial Heights Emergency Center opened in 2009, in a small strip center west of downtown Houston, and operated as a normal freestanding emergency room through mid-2018.

3.     In August 2018, one of Memorial Heights Emergency Center's owners, Akash Bhagat, D.O., formed two new entities—Memorial Heights Emergency Center MVA Facility Administration, LLC and Memorial Heights Emergency Center MVA Professional Administration, LLC. These entities facilitated a personal injury fraud scheme.

4.      Not coincidentally, also around August 2018, personal injury law offices began referring their automobile accident clients to Memorial Heights Emergency Center. Memorial Heights Emergency Center treated these patients under letters of protection.[1] Memorial Heights Emergency Center unleashed a volley of expensive, unnecessary treatment on these patients. For example, it greatly increased use of computerized tomography (CT) scans and coding of emergency room facility charges at the highest (and most expensive) CPT 99285 level. Memorial Heights Emergency Center even adopted an entirely separate chargemaster, which set far higher charges for automobile accident patients treating under letters of protection (i.e., the patients referred from the law offices referenced above) than for other patients under the existing chargemaster.

5.      As admitted by Elizabeth Fair, M.D. (another of Memorial Heights Emergency Center's owners and physicians) in a December 5, 2022 sworn petition filed in Harris County District Court, claimants' attorneys provide letters of protection to the two 'MVA' entities, and then send their clients "involved in accidents and alleged to have suffered personal injuries to be evaluated and treated by healthcare providers at the [Memorial Heights] Emergency Center." In Texas court deposition testimony, Dr. Bhagat admitted that attorneys refer their clients to Memorial Heights Emergency Center to treat under letters of protection, and Memorial Heights Emergency Center MVA Facility Administration, LLC, and Memorial Heights Emergency Center MVA Professional Administration are used only for these letter of protection patients. Dr. Bhagat would not deny a separate chargemaster had been adopted, but claimed he did not know.

6.      Just a relatively small number of law firms represented the personal injury claimants at issue. These claimants generally lived more than 10 miles by car from Memorial Heights, often

---

[1]      A letter of protection, or "LOP," is an agreement by a patient's personal injury attorney, promising to pay a healthcare provider from the proceeds of any settlement or recovery of the patient's tort claim or lawsuit.

more than 20 miles from the facility, and at times over 30 or 40 miles away. They bypassed hospital emergency rooms and other freestanding emergency rooms along the freeways and major thoroughfares they took to reach this inconspicuous facility located between a bank and restaurant. Conversely, few of the claimants resided under 10 miles by car from Memorial Heights Emergency Center, and almost none within 5 miles of the facility. Often, these claimants presented for "emergency" care two or more days after the accident.

7.      Claimants arrived by private automobile and walked into the facility. Although purportedly requiring "emergency" care, usually including CT scans and CPT 99285 level billings, Memorial Heights Emergency Center treatment records show triage-to-discharge times often under 60 minutes and sometimes under 30 minutes.

8.      Instruction by a personal injury attorney or law office employee to a client to present to an emergency room does not fit the definition of emergency care under Texas law. The law offices sent these claimants to Memorial Heights Emergency Center for unnecessary emergency room treatment to bolster the claimants' personal injury claims. Memorial Heights Emergency Center's unnecessary, trumped-up services enhanced these claims, as it allowed attorneys to represent that the claimants were injured to the extent that emergency treatment was sought and necessary. Defendants benefited by receiving money through the unnecessary treatment of these patients. The number of patients seen at Memorial Heights Emergency Center skyrocketed after the scheme began, with daily volume doubling or more.

9.      Because of Defendants' conduct, Plaintiffs have been damaged by the payment of sums concerning emergency treatment regarding the claims at issue. To obtain just compensation for this organized fraudulent activity, Plaintiffs seek treble damages, plus interest thereon, and the costs of this suit, including reasonable attorneys' fees, pursuant to Title 18, United States Code,

Sections 1962 (c) and (d), and Section 1964 ("RICO"). Plaintiffs also seek compensatory and exemplary damages under applicable Texas state law.

## II.
## JURISDICTION AND VENUE

10.     Pursuant to Title 28, United States Code, Section 1331, this Court has subject matter jurisdiction over the claims alleged in Counts One and Two because such claims arise under the laws of the United States, specifically Title 18, United States Code, Sections 1962(c) and (d), and Section 1964(c). Pursuant to Title 28, United States Code, Section 1367, this Court has subject matter jurisdiction over the state common law fraud, conspiracy, unjust enrichment, and money had and received claims alleged in Counts Four through Seven, because they are so related to the RICO claims they form part of the same case or controversy.

11.     Venue is proper in this District pursuant to Title 28, United States Code, Section 1391(b) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District, and Defendants reside in this District.  Venue is also proper pursuant to Title 18, United States Code, Section 1965.

## III.
## PARTIES

### A.     Plaintiffs

12.     Plaintiff, **Allstate Indemnity Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

13.     Plaintiff, **Allstate Property & Casualty Insurance Company,** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

14.     Plaintiff, **Allstate County Mutual Insurance Company,** is a corporation incorporated under the laws of Texas, with its principal place of business in Texas.

15.     Plaintiff **Allstate Fire & Casualty Insurance Company** is a corporation incorporated under the laws of Illinois, with its principal place of business in Illinois.

**B.     Defendants**

16.     Defendant, **Akash Bhagat, D.O.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or wherever he may be found.

17.     Defendant, **Emergency Healthcare Partners, L.P.** (d/b/a Memorial Heights Emergency Room, d/b/a Memorial Heights Emergency Center), is a limited partnership organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. Emergency Healthcare Partners, L.P. may be served through its registered agent for service Jared C. Johnson, 7600 W. Tidwell Rd., suite 210, Houston, Texas, or wherever it may be found.

18.     Defendant, **Memorial Heights Emergency Center MVA Facility Administration, LLC** (d/b/a Memorial Heights MVA – Facility) is a limited liability company organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. Memorial Heights Emergency Center MVA Facility Administration, LLC may be served through its registered agent for service Jared C. Johnson, 7600 W. Tidwell Rd., suite 210, Houston, Texas, or wherever it may be found.

19.     Defendant, **Memorial Heights Emergency Center MVA Professional Administration, LLC** (d/b/a Memorial Heights MVA – Physician) is a limited liability company organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. Memorial Heights Emergency Center MVA Professional Administration, LLC may be served through its registered agent for service Jared C. Johnson, 7600 W. Tidwell Rd., suite 210, Houston, Texas, or wherever it may be found.

20.     Defendant, **Bhagat Investments, Inc.** is a corporation organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.  Bhagat Investments, Inc. may be

served through its registered agent for service, Akash Bhagat, at 11660 Arrowwood Circle, Houston, Texas, or wherever it may be found.

21.     Defendant, **Elizabeth Fair, M.D.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or wherever she may be found.

22.     Defendant, **Southern Emergency Physicians Ltd LLP** is a limited liability company organized under the laws of the State of Texas, with its principal place of business in Houston, Texas. Southern Emergency Physicians Ltd LLP may be served through its registered agent for service Loren R. Cook & Associates Ltd, LLC, 12505 Memorial Dr., No. 330 Houston, Texas, or wherever it may found.

23.     Defendant, **Ruben Veloz, M.D.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or wherever he may be found.

24.     Defendant, **Pedram Behzadi, M.D.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or wherever he may be found.

25.     Defendant, **Tarek Defrawi, M.D.** is a citizen and resident of the State of Texas, and may be served 4000 Washington Avenue, suite 100, Houston, Texas, or wherever he may be found.

26.     Defendant, **Andrea Marconi, D.O.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or wherever she may be found.

27.     Defendant, **Sara Reader, M.D.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, Suite 100, Houston, Texas, or whatever she may be found.

28.     Defendant, **Jason Masvero, R.N.** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or whatever he may be found.

29.     Defendant, **Leia England** is a citizen and resident of the State of Texas, and may be served at 4000 Washington Avenue, suite 100, Houston, Texas, or whatever she may be found.

# IV.
# STATEMENT OF FACTS COMMON
# TO ALL CAUSES OF ACTION

**A.      Freestanding Emergency Medical Care Facilities**

30.      In 2009, Texas enacted legislation allowing for licensing of Freestanding Emergency

Medical Care facilities ("FEMC facilities"). Texas started issuing FEMC facility licenses in 2012.

The statutes and regulations governing FEMC facilities are contained in Texas Health & Safety

Code Chapter 254 and 25 Tex. Admin Code Chapter 131.

31.      FEMC facilities are commonly referred to as 'freestanding emergency rooms.' FEMC

facilities are emergency facilities and *are not* 'urgent care' offices or general medical practice

offices. Texas law defines a FEMC facility as "a facility, structurally separate and distinct from a

hospital, that receives an individual *and provides emergency care*" as defined by statute and rule.[2]

(emphasis added). FEMC facilities bill emergency services under the same Current Procedural

Terminology (CPT) codes (99281-99285) utilized by hospital emergency rooms.[3] The attending

physician may also bill a professional fee separately, using the same codes.

32.      In contrast, urgent care facilities and regular physician's offices utilize CPT codes 99201-

99205 for new patient visits. The reasonable charge for these CPT codes is less than the CPT

99281-99285 emergency service codes, and the physician does not bill a sperate professional fee.

33.      FEMC facilities are required to be continually open, 24 hours a day each day of the year.

FEMC facilities are required to have x-ray, computed tomography ("CT") scan, and sonogram

---

[2]      Tex. Health & Safety Code §254.001(2).  25 Tex. Admin Code §131.2 gives the same
definition.

[3]      The CPT coding system was developed and is published by the American Medical
Association.  The 5-digit codes allow providers to identify the services, and level of service, they
provide to a patient, and are commonly utilized in medical billings. The fifth digit designates the
level of service, with CPT 99281 being the lowest level and 99285 the highest level.

equipment.[4] FEMC facilities must have an agreement with a nearby hospital concerning transfer of patients whose needs are beyond those of the FEMC facility to provide care.[5]

34.     A FEMC facility license is issued for the premises and person (or governmental unit) named in the application.[6] "A [FEMC] *facility license authorizes only emergency care services and those procedures that are related to providing emergency care*."[7] (emphasis added). "Emergency" care is defined by Texas law as health care services provided in a hospital emergency facility, FEMC, or comparable emergency facility, "… to evaluate and stabilize a medical condition of a recent onset and severity, including severe pain, psychiatric disturbances, or symptoms of substance abuse, *that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that the person's condition, sickness, or injury is of such a nature that failure to get immediate medical care* could result in:

(1) placing the person's health in serious jeopardy;
(2) serious impairment to bodily functions;
(3) serious dysfunction of a bodily organ or part;
(4) serious disfigurement; or
(5) in the case of a pregnant woman, serious jeopardy to the health of the woman or fetus."[8]

(emphasis added).

**B.     Formation of Emergency Healthcare Partners, L.P. and the Opening of Memorial Heights Emergency Center**

35.     Dr. Akash Bhagat graduated from osteopathic medical school in June 2003 and completed an emergency medicine residency at Texas Tech University in El Paso in June 2006. Dr. Ruben Veloz graduated from medical school in June 2003 and completed an emergency medicine residency at Texas Tech University in El Paso in January 2006. Dr. Elizabeth Fair graduated from

---

[4] 25 Tex. Admin Code §131.50
[5] 25 Tex. Admin Code §§131.66, 131.67
[6] 25 Tex. Admin Code §131.219(c)(2)
[7] 25 Tex. Admin Code §131.219(c)(4)
[8] Tex. Health & Safety Code §254.001(5); Tex. Bus & Comm Code §17.464; 25 Tex. Admin Code §131.2(12)

medical school in June 2001 and completed an emergency medicine residency at Eastern Virginia Medical School in October 2004.

36.     On March 16, 2009, the certificate of formation of Emergency Healthcare Partners, L.P. ("EHP") was filed with the Texas Secretary of State. Ownership interests were:

| | |
|---|---|
| Akash Bhagat, DO | 52 percent |
| Robert Phelan, MD | 22 percent |
| Elizabeth Fair, MD | 10 percent |
| Ruben Veloz, MD | 10 percent |
| Michael Stonestreet, RN | 5 percent |
| Emergency Healthcare Management-Uptown, LLC | 1 percent |

37.     Emergency Healthcare Management – Uptown, LLC has been the sole general partner of EHP since 2009. It was formed with Dr. Bhagat and Michael Stonestreet as members on July 3, 2008, with Dr. Bhagat as the 90 percent owner.

38.     On July 2, 2009, EHP filed an assumed name certificate with the Texas Secretary of State to do business as "Memorial Heights Emergency Room."

39.     On July 23, 2009, the certificate of formation of Emergency Medicine Physicians of Texas, PLLC ("EMPT") was filed.

40.      In or around November 2009, EHP began operating a facility at 4000 Washington Avenue, Suite 100, in Houston. While EHP's assumed name certificate was in the name "Memorial Heights Emergency Room," the facility has operated under the name "Memorial Heights Emergency Center" (the facility is hereinafter referred to as "Memorial Heights").

**C.      The Memorial Heights Facility**

41.     Memorial Heights is on the ground floor of a small strip center on the north side of Washington Avenue, about two miles west of downtown Houston, and about a half mile south of

IH-10. From west to east on the ground floor, there is a bank, Memorial Heights, and then a restaurant.[9] The second and third stories of the strip center house offices of other businesses.





---

[9]     While the names of the bank and restaurant have changed at various points, there has consistently been a bank and restaurant at these locations before and during the period at issue.

42.     Memorial Heights cannot be seen from IH-10. The north-south street along the eastern side of the center, Leverkuhn Street, immediately dead ends at Center Street, a two-lane road behind the center. The street along the western side, Bonner Street, goes one block further north of Center Street before ending.  Therefore, there is no direct north-south access to Memorial Heights from the freeway. One would have to drive along Washington Avenue to see Memorial Heights.

43.     Memorial Heights' signage has been inconspicuous. Since before the period at issue, there has been an "Emergency Center" sign above the entrance, with a red cross to its left with an inscribed "24 HR." The "Memorial Heights" signs on the glass entrance doors are not visible from the street. By 2018, the center's sign on the corner of Washington Avenue and Bonner Street included a small section reading "Emergency Center" flanked by crosses, one containing a small "ER" and the other a small "24/7." There is no signage, for any business, at the back of the building facing Center Street.



**D.      Operations of Memorial Heights Emergency Center through Mid-2018**

44.      In 2012, the State of Texas began issuing FEMC facility licenses. In January 2012, EHP submitted its initial license application to do business as "Memorial Heights Emergency Center." Dr. Bhagat was listed as Medical Chief of Staff and Michael Stonestreet as Director of Nursing. The initial FEMC facility license for EHP issued on April 9, 2012.

45.      Memorial Heights appears to have operated as a normal FEMC facility through July 2018. There was no focus on seeking or treating patients in auto accidents. While some patients did go to Memorial Heights following auto accidents, on information and belief, their numbers were low. The number of personal injury claimants making claims to Plaintiffs, who had gone to Memorial Heights for automobile accidents was low.

46.      Through mid-2018, Memorial Heights did not routinely order or conduct CT scans for automobile accident patients.  And for those automobile accident patients that Memorial Heights did treat during this time, Memorial Heights billed few of them at the highest-level emergency room service—CPT 99285.

47.      On information and belief, in this period Memorial Heights generally saw about eight patients total (non-auto accident and auto accident) in a 24-hour day.

48.      Around July 2013, Jason Masvero, R.N. started working at Memorial Heights. By April 2014, Masvero had replaced Stonestreet as Memorial Heights's facility administrator.

49.      Leia England initially started working at Memorial Heights as a front desk employee. In 2014, England became the office manager for Memorial Heights.

50.      In early 2018, Stonestreet sold his five percent interest in EHP to Dr. Phelan or one of Phelan's entities. Masvero became head of nursing, in addition to facility administrator.

51.     The physician partners of EHP—Bhagat, Phelan, Fair, and Veloz—performed some of the shifts seeing patients at Memorial Heights. By late 2016, the following physicians regularly performed 24-hour shifts seeing patients at Memorial Heights:

> Pedram Behzadi, M.D.
> Tarek Defrawi, M.D
> Andrea Marconi, D.O.
> Sara Reader, M.D.

52.     By 2016, x-rays and CTs done at Memorial Heights were electronically sent to vRad, a company headquartered in Minnesota. Radiologists contracted by vRad interpret the images remotely, and forward reports stating their findings electronically to Memorial Heights.

53.      Outside billing companies generated all Memorial Heights bills for patient services in this period. These included Win and Associates Medical Billing Services, and then Roundtable Medical Consultants. The bills were addressed to the patient, and had a portion which could be returned with payment. The listed contact numbers for questions were Win's or Round Table's telephone numbers.

54.     The bills for facility services (the basic CPT 99281 - 99285 ER service charge, any testing, etc.) instructed payment to be made to "Memorial Heights Emergency Center," the assumed business name of EHP. The bills for the physician's professional fee instructed payment to be made to "Emergency Medicine Physicians" (i.e., EMPT).

55.     During this period, Memorial Heights charges for automobile accident patients were the same as its charges for other patients. Examples of charges in July 2018 included:

| | | |
|---|---|---|
| Head-Brain CT without contrast | CPT 70450 | $2,678.64 |
| Cervical CT without contrast | CPT 72125 | $3,218.95 |
| Lumbar CT without contrast | CPT 72131 | $3,831.60 |
| | | |
| Cervical x-rays   (2-3 views) | CPT 72040 | $539.04 |
| Lumbar x-rays    (2-3 views) | CPT 72100 | $765.32 |
| | | |
| 3-level ER service | CPT 99283 | $ 1,336.04 |
| 4-level ER service | CPT 99284 | $ 2,000.00 |

**PLAINTIFFS' ORIGINAL COMPLAINT   Page 14**

|                    |             |           |
|--------------------|-------------|-----------|
| 5-level ER service | CPT 99285   | $ 3,500.00 |

In July 2018, the charges for CPT 99284 and CPT 99295 had only recently increased, from $1,669.80 (CPT 99284) and $2,226.40 (CPT 99285).

**E.      Formation of New Entities for Use with Personal Injury / Letter of Protection Patients (August 2018)**

56.      On August 8, 2018, the certificates of formation for (1) Memorial Heights Emergency Center MVA Facility Administration, LLC and (2) Memorial Heights Emergency Center MVA Professional Administration, LLC were filed with the Texas Secretary of State by attorney Simon Hendershot. Hendershot was the designated registered agent of the two entities (hereinafter referred to as "MVA Facility," "MVA Physician," or collectively "the MVA Entities").

57.      Dr. Bhagat was listed in these filings as the sole manager and sole member of the MVA Entities. His address in those capacities was listed as 4000 Washington Avenue, Suite 100, Houston, the address of Memorial Heights.

58.      On September 10, 2018, Dr. Bhagat filed an Assumed Name Certificate with the Texas Secretary of State for Memorial Heights Emergency Center MVA Facility Administration, LLC to do business as "Memorial Heights MVA – Facility." The same day, he filed an Assumed Name Certificate for Memorial Heights Emergency Center MVA Professional Administration, LLC to do business as "Memorial Heights MVA – Physician." The MVA Entities' principal office address was listed as 4000 Washington Avenue, Suite 100, Houston, Texas.

59.      On information and belief, the MVA Entities were formed around the time or just after agreements were reached by Dr. Bhagat and possibly other defendants with various personal injury attorneys. The attorneys would refer automobile accident clients to Memorial Heights. These clients would be seen under letters of protection ("LOPs"). As previously noted, an LOP is an agreement by a patient's attorney, promising to pay a healthcare provider from the proceeds of any settlement

of the patient's tort claim or recovery in a lawsuit. In return, the provider does not seek immediate payment.

60.     In a 2022 deposition, Dr. Bhagat characterized the MVA Entities as in-house billing entities, admitting that they were involved only in "automobile accident and LOP-type cases" or cases "under LOP or referred via other methods besides billing traditional insurance." He testified that Leia England was the head of the department for billing automobile accident patients.

61.     The MVA Entities obtained tax identification numbers separate from EHP. On information and belief, the MVA Entities also opened one or more separate bank accounts from EHP and EMPT.

62.     When the MVA Entities were formed, Memorial Heights' bills for automobile accident patients fundamentally changed. While the outside billing company, Round Table, continued to bill for treatment of non-accident patients and some automobile accident patients apparently not referred by attorneys, the MVA Entities began issuing Memorial Heights' bills for automobile accident patients treating under letters of protection. MVA Facility bills the facility fees for these patients, and MVA Physician bills the physician fees.

63.     The MVA Entity issued bills were initially under the letterhead:

> **Memorial Heights Emergency Center**
> MVA Facility Administration, LLC
>
> **Memorial Heights Emergency Center**
> MVA Physician Administration, LLC

The billing letterhead was then changed to:

> **Memorial Heights MVA - Facility**
> MVA Facility Administration, LLC– Tax ID 832013678
>
> **Memorial Heights MVA – Physician**
> MVA Physician Administration, LLC – Tax ID 832002449

Both variants have the "Memorial Heights Emergency Center" logo under the letterhead.

64.     Rather than directing payment to "Memorial Heights Emergency Center" or the licensed partnership EHP for facility fees (as had previously been Memorial Heights' practice), or to Emergency Medicine Physicians (EMPT) for the physician's fee, the MVA Entity bills direct payment be made to "Memorial Heights MVA – Facility" and "Memorial Heights MVA – Physician."

65.     Memorial Heights office manager Leia England also became the billing supervisor for the MVA Entities. England is listed on the MVA Entity bills as the contact person for inquiries.

66.     England and Jason Masvero also began to act as liaisons with the law offices referring clients to Memorial Heights. On information and belief, England also acted as a marketer to law offices and maintained monthly statistics on number of patients referred to Memorial Heights by the law offices.

67.     After Dr. Bhagat formed the MVA Entities in August 2018 and, on information and belief, Memorial Heights formed referral relationships with personal injury attorneys, several aspects of Memorial Heights' operations changed:

    a.  *First*, the number of automobile accident patients presenting for treatment at Memorial Heights increased. On information and belief, the number of patients seen per day at Memorial Heights generally doubled, from around eight patients per day to sixteen or more per day, due to the increase in auto accident patents.

    b.  *Second*, Memorial Heights began performing far more CTs on automobile accident patients, especially CTs of the cervical, thoracic, and lumbar spine. It became routine for adult automobile accident patients to receive one to three CTs.

    c.  *Third*, Memorial Heights also began billing the highest-level CPT code for emergency room visits, CPT 99285, far more frequently for automobile accident patients. That code

became the most common facility charge billed for automobile accident patients.[10] Memorial Heights began to generally bill the separate physician's professional fee as CPT 99284, the second highest level for emergency room services.[11]

    d.  In apparent violation of Texas law, Memorial Heights instituted a dual charge list or chargemaster. The existing rates continued for non-automobile accident patients, and some automobile accident patients (on information and belief, those who were not referred by attorneys to treat under LOPs) who were billed through the outside billing service. Memorial Heights billed a new, higher rate for auto accident patients treating under letters of protection, billed by the MVA Entities, for which Defendants anticipated payments from automobile insurers.[12]

68.    A comparison of the July 2018 charges, and subsequent charges on MVA Entity bills includes:

|  |  | July 2018 | August 2018 |
|---|---|---|---|
| Head-Brain CT without contrast | CPT 70450 | $2,678.64 | $8,035.92 |
| Cervical CT without contrast | CPT 72125 | $3,218.95 | $9,656.85 |
| Lumbar CT without contrast | CPT 72131 | $3,831.60 | $11,494.80 |
| Cervical x-rays (2-3 views) | CPT 72040 | $539.04 | $1,617.12 |
| Lumbar x-rays (2-3 views) | CPT 72100 | $765.32 | $2,295.96 |
| 3-level ER service | CPT 99283 | $ 1,336.04 | $4,008.12 |

---

[10] According to the AMA definition for CPT 99285, "Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function."

[11] According to the AMA definition for CPT 99284, "Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function."

[12] Such a dual chargemaster would appear to violate Texas Insurance Code §552.003 "Charging Different Prices; Offense," which states a person commits an offense if they knowingly or intentionally charge two different prices for providing the same product or service and "the higher price charged is based on the fact that an insurer will pay all or part of the price of the product or service."

| 4-level ER service | CPT 99284 | $ 2,000.00 | $6,000.00 |
| 5-level ER service | CPT 99285 | $ 3,500.00 | $10,500.00 |

69.   In a 2022 deposition, concerning a plaintiff who presented at Memorial Heights in September 2018 and was billed through the MVA Entities, Dr. Bhagat *did not deny* a dual chargemaster was used, but claimed that he was unable to answer questions concerning the issue. For example:

> Q.   Was there ever a time when there was a separate Chargemaster for the -- the letter of protection patients treating under the MVA Facility entity?
>
> A.   I -- I -- I don't recall if there was a different charge master.

70.   This theme of lack of knowledge of how their own facility operated pervaded deposition testimony of Memorial Heights' operators. For example, in the same 2022 deposition, Dr. Bhagat similarly claimed he did not know the answer to the following questions:

> a.   If a non-automobile accident patient had come to Memorial Heights during September 2018 and was provided a CPT 99285 ER service, if that patient would have been charged $10,500 or a lower amount. He stated he would have to look at other bills from that time period to answer.
>
> b.   If before August 2018, EHP was billing cervical and lumbar CTs at under $4,000, or if charges increased after the MVA Entities were formed. He stated he would have to look at records of the time to answer.
>
> c.   If the CPT 99284 service charged for his own physician fee at $2,400 had been charged at under $1,000 before the MVA Entities were formed. Dr. Bhagat stated he "would have to look at a bill from prior to the MVA entities" to answer.

71.   And in a 2022 deposition in the same case, Leia England denied there were separate chargemasters in use after August 2018. She was then shown bills issued by Round Table for July 2018 services, with substantially lower charges than the MVA Entities billed for the

September 2018 services. Even with the bills in front of her, England testified she did not know whether, if the plaintiff had come to Memorial Heights in July 2018 rather than September 2018, the charges for CTs would have been a third of what were billed. She could not state if a non-automobile accident patient coming to Memorial Heights around the same time as plaintiff in September 2018 would have been billed $9,656 or $3,218 for a cervical CT.

72.     Also, in 2022 and 2023 depositions, Dr. Bhagat, other Memorial Heights physicians and England claimed they could not state how many patients generally presented to Memorial Heights per day, or how many were automobile accident patients:

a.   In a 2022 deposition, Dr. Bhagat testified he did not know how many patients were seen a day at Memorial Heights, or whether 12 patients would be normal. He could not recall how many patients presented the last occasion he worked a shift at Memorial Heights.

b.   In a 2022 deposition, England also testified she could not state how many patients were seen a day as the number "ranges." She could not state if the number of automobile accident patients increased after the MVA Entities were formed.

c.   In a 2023 deposition, Dr. Behzadi also testified he could not state how many patients were seen a day, or what percentage were automobile accident patients, because the number "varies." Although he had worked the 24-hour shift at Memorial Heights the day before the deposition, he claimed he could not remember how many patients he had seen that day, or what percentage were automobile accident patients.

73.     In a 2022 deposition, Dr. Reader also testified the number of patients she saw per shift "varies," and she did not know the percentage of patients that were automobile accident patients or if such patients were the majority of patients.  However, she did admit that during the last 24-hour shift she had worked at Memorial Heights, around 22 patients presented to the facility. While Dr. Reader stated she did not know if the number of automobile accident patients started to increase

around August 2018, she did admit it seemed that the number had increased at some point since she has been at Memorial Heights.

74.     In a 2024 deposition, Dr. Marconi testified that on some shifts he sees between 20 and 35 patients. In his last shift at Memorial Heights, a 12-hour rather than a 24-hour shift, he had seen about 15 or 16 patients.

75.     In May 2019, attorney Hendershot filed a lawsuit on behalf of EHP and its general partner Emergency Healthcare Management – Uptown, LLC against Dr. Phelan alleging that he diverted patients to another FEMC facility he owned. Dr. Phelan filed a counterclaim and third-party petition against Dr. Bhagat and the MVA Entities. Among other matters, Dr. Phelan alleged that the MVA Entities were formed without his knowledge "to run a personal injury accident clinic" from Memorial Heights, Dr. Bhagat had entered into letter of protection agreements with attorneys (identifying 19 such attorneys or law offices) who referred their clients to Memorial Heights for "non-emergent" injuries, the number of patients seen a day thereafter doubled, and these automobile accident patients were billed at rates greater than EHP charged usual Memorial Heights patients.

76.     The lawsuit was resolved by October 2019, and Dr. Phelan left EHP. On information and belief, Dr. Bhagat acquired Dr. Phelan's interests in EHP around that time. The physician partners of EHP became Dr. Bhagat, Dr. Fair, and Dr. Veloz.

77.     Subsequently, on information and belief, at some point prior to July 28, 2020, Dr. Bhagat transferred his interest in EHP to his Bhagat Investments, Inc. ("Bhagat Investments"), and Dr. Fair transferred her interest in EHP to her Southern Emergency Physicians Ltd., LLP. ("Southern Emergency Physicians"). In a December 5, 2022 Texas Rule 202 Petition filed in Harris County by Southern Emergency Physicians and verified by Dr. Fair, Southern Emergency Physicians described itself as a limited partner of EHP.

78.     Beginning around August 2019, charges on the MVA Entities' bills began to decrease and reached new levels by the end of 2019. This coincided with enactment of Texas Business & Commerce Code §17.464 ("Unconscionable Price for Care at Emergency Facility"), which became effective on September 1, 2019. Section 17.464 allows the Texas Attorney General to file an action against an emergency facility if its charges are 200 percent or more above the average charge for the same or substantially similar care by other emergency rooms in the same county.

79.     However, charges by the MVA Entities did not return to Memorial Heights' July 2018 levels, and remained considerably higher than the July 2018 charges. For example:[13]

|                   | July 2018    | Late 2019    |
|-------------------|--------------|--------------|
| Lumbar CT         | $ 3,831.60   | $ 6,820.25   |
| Cervical CT       | $ 3,218.95   | $ 5,568.78   |
| Head CT           | $ 2,678.64   | $ 4,986.50   |
|                   |              |              |
| Cervical x-rays   | $ 539.04     | $ 879.98     |
| Lumbar x-rays     | $ 765.32     | $ 1,107.64   |

80.     Also, the use of CTs and CPT code 99285 to bill ER facility services for automobile accident patients did not decrease.

**F.      The MVA Entities Operate as an Unlicensed FEMC**

81.     Neither of the MVA Entities has obtained a license to operate a FEMC facility. However, they functionally act as a separate, unlicensed FEMC within the Memorial Heights facility.

82.     As noted above, in deposition testimony Dr. Bhagat characterized the MVA Entities as just billing entities.

83.     However, the MVA Entities have their own tax identification numbers and, on information and belief, bank accounts. On information and belief, payments obtained from

---

[13] In a 2023 deposition, Dr. Behzadi revealed that Memorial Heights also has a self-pay rate it offers, with five levels based on services performed.  He understood the level 1 rate is $275, level 2 is $500, level 3 is $975, level 4 is $1,475 and level 5 is $2,100.

settlement of claims by automobile insurers, including Plaintiffs (via the personal injury attorneys), is collected in those accounts. The MVA Entities' bills are unlike those of the outside billing companies that were employed by EHP, and direct payment to be made to the MVA Entities.

84.     On December 1, 2022, Dr. Fair executed the verification under oath for a sworn Texas Rule of Civil Procedure 202 Petition filed in Harris County District Court, by her Southern Emergency Physicians requesting the deposition of Dr. Bhagat individually and as managing member of the MVA Entities.[14] Dr. Fair attested the statements within the petition were within her personal knowledge and true and correct. These statements of fact included that, after issuing letters of protection to the MVA Entities, attorneys arrange for their accident clients who are alleging personal injury to go to Memorial Heights:

> "In 2018, Bhagat formed the MVA Entities which began accepting patients for treatment at the Emergency Center pursuant to letters of protection provided by those patients' attorneys to the MVA Entities.  After issuing a letter of protection, the patients' attorneys arrange for clients who were involved in accidents and alleged to have suffered personal injuries to be evaluated and treated by healthcare providers at the Emergency Center."

85.     Dr. Fair also swore under oath in this petition that the MVA Entities used Memorial Heights's facility, personnel, and equipment to treat these patients under letters of protection. The petition did not state Dr. Fair had not known of this arrangement or disapproved of it. Rather, it stated the depositions were requested to investigate whether the MVA Entities were fully reimbursing EHP for use of EHP's facility, personnel, and equipment.

## G.     The Memorial Heights Physicians

86.     As noted above, Dr. Behzadi, Dr. Defrawi, Dr. Marconi, and Dr. Reader all started working at Memorial Heights by the end of 2016. Dr. Marconi started working at Memorial Heights around 2012, and Dr. Behzadi started working at Memorial Heights in 2014. In other words, like the

---

[14]     *Petition of Southern Emergency Physicians Ltd LLP Requesting Depositions to Investigate Potential Claim*, Cause No. 2022-78649, 234th District Court of Harris County.

Memorial Heights partner physicians seeing patients at Memorial Heights (Dr. Bhagat, Dr. Fair, and Dr. Veloz), they had experience at Memorial Heights for two years or more before the MVA Entities were formed, the mass referral of automobile accident patients began, and use of CTs for automobile accident patients greatly increased.

87.     As noted in paragraphs 84 and 85 above, Dr. Fair was fully aware of the referral arrangement with attorneys, and that letters of protection are issued before the automobile accident patients present to Memorial Heights. Dr. Fair expressed no misgiving about these matters, but seemed only concerned that EHP, of which she or her Southern Emergency Physicians is a partner, was fully paid regarding the treatment of these patients at Memorial Heights.  In a 2022 deposition, Dr. Bhagat testified that Dr. Fair knew he was forming the MVA Entities.

88.     As noted in paragraphs 72 through 73 above, in 2022 and 2023 depositions Dr. Reader and Dr. Behzadi claimed a lack of knowledge of the number of patients seen per shift and the percentage that were automobile accident patients, although Dr. Reader did admit that about 22 patients had presented during her last shift at Memorial Heights. In a 2024 deposition, Dr. Marconi testified he sees up to 35 patients on some shifts. Dr. Reader, Dr. Behzadi, and Dr. Marconi knew attorneys referred persons to Memorial Heights, as they admitted patients had advised them that their attorneys sent them to the facility.[15]

89.     Both Dr. Reader and Dr. Behzadi claimed in these depositions that they did not know who paid them for their work at Memorial Heights. However, both did testify that in addition to their regular pay they also received a "productivity bonus" (Dr. Reader) or "incentive pay" or "productivity bonus" (Dr. Behzadi). In a 2024 deposition, Dr. Marconi initially denied there were

---

[15] Memorial Heights had an attorney appear to represent Dr. Reader, Dr. Behzadi, and Dr. Marconi at their depositions. Unusually, Memorial Heights's attorney also examined Dr. Reader and Dr. Behzadi during the depositions attempting, often with leading questions, to elicit testimony defending Memorial Heights' documentation in the cases.

productivity bonuses, then later testified a productivity bonus was paid to the physician for a 24-hour shift in which the number of patients presenting to the facility reached 25 or 30 patients.

90.     Obviously, these physicians seeing patients at Memorial Heights were aware of changes that occurred beginning around August 2018 and of Memorial Heights' conversion into what amounted to a largely personal injury clinic.  However, they elected to stay and work for this new enterprise.

## V.
## DEFENDANTS' OPERATIONS
### Relevant to all Causes of Action)

91.     From August 2018 through the present, Memorial Heights has continued to treat patients seeking emergency care other than patients involved in automobile accidents, including patients treating under health care insurance plans. Memorial Heights's website states it sees patients for all types of emergency conditions, including allergic reactions, burns, sports injuries, and work injuries. Motor vehicle collision is just briefly referenced with these other conditions.  In a 2022 deposition, Dr. Bhagat testified the MVA Entities bill for most automobile accident patients, with an outside billing company billing for other patients treating under medical insurance. However, as noted in paragraphs 56 through 85 above, since August 2018 there has been an emphasis on treating automobile accident patients referred by personal injury attorneys under letters of protection.

92.     Generally, there is one physician, one nurse, and one radiology technician on duty at Memorial Heights at any given time.  While Jason Masvero sometimes is the duty nurse, he is also on premises at other times as facility administrator.

## A.     Referral of Automobile Accident Claimants to Memorial Heights

93.     As set forth above in paragraphs 56 through 85, in August 2018 the MVA Entities were formed for use in automobile accident claims, in which personal injury attorneys refer clients to Memorial Heights to be treated under letters of protection.

94.     In a 2022 deposition, Dr. Bhagat admitted the MVA Entities are used only in "Automobile accident and LOP-type cases." He defined a letter of protection: "It's cases where, you know, if it -- where the patient involves an attorney and we bill the patient on a delayed basis and we collect sometime in the future."

95.     As set forth in paragraphs 41 through 43 above, Memorial Heights is located at 4000 Washington Avenue, about two miles west from downtown Houston. The facility is inconspicuous, located between a bank and a restaurant in a small strip center. The facility is not visible from any freeway.  The facility is not located at a major intersection and the north-south streets on either side quickly end north of Washington Avenue. Memorial Heights' signage is small and not easily noticed from Washington Avenue or the side streets.  There is no signage at the rear of the building.

96.     However, since August 2018, hundreds of persons involved in automobile accidents, who subsequently made personal injury claims to Plaintiffs, have come to Memorial Heights to be seen regarding automobile accidents.

97.     On information and belief, the claimants at issue were directed to Memorial Heights by a personal injury attorney or the attorney's law office staff, either when the claimant called the law office after the accident, or initially presented to the law office.

98.     Concerning the claimants described in the attached Appendix A, none were transported by ambulance to Memorial Heights. On occasions when a police accident report was generated for a particular accident, the claimant's injury severity was almost always reported by the responding police officer as "N," for "Not Injured."

99.     Many of the automobile accident patients presenting to Memorial Heights resided considerable distances from Memorial Heights.  For example:

    a.  In a 2022 deposition of Dr. Bhagat, it was shown the plaintiff in the case resided 18.4 miles by car from Memorial Heights.

b. In a 2022 deposition of Dr. Reader, it was shown the plaintiff resided 16.5 miles by car from Memorial Heights. Dr. Reader agreed the patient would have passed by hospital emergency rooms and other FEMC facilities on the way to Memorial Heights.

c. In a 2023 deposition of Dr. Behzadi, it was shown the patients resided in Katy, 24.9 miles by car from Memorial Heights. Dr. Behzadi admitted they lived close to Memorial Hermann Hospital Katy and had to pass by a number of other hospital emergency rooms and FEMC facilities on the route to Memorial Heights.

100.    Concerning the claimants described in the attached Appendix A, according to the MVA Entities' records they generally resided more than ten miles by car away from Memorial Heights. Claimants commonly resided more than twenty miles by car from Memorial Heights, with some residing more than thirty miles away.

101.    Some claimants resided in municipalities as far away as Cleveland, Magnolia, Conroe, Texas City, Baytown, Cypress, Katy, Tomball, and Sugar Land. Two claimants represented by Marcos & Associates lived in Port Arthur and presented at Memorial Heights together two weeks after the accident that occurred in Jefferson County. Two other claimants lived in or near Beaumont, and came to Memorial Heights days after accidents that occurred in Jefferson County. The Beaumont claimants were both represented by the same law office, The Smith Law Firm.

102.    Examples of the distances between claimants' residences, as documented on the MVA Entity bills, and Memorial Heights include the following claimants listed in Appendix A:

a. Claimants 68 and 69 (RO and JO) presented at Memorial Heights on July 24, 2019, thirteen days after the accident that occurred in Jefferson County. These claimants resided in Port Arthur, about 92 driving miles from Memorial Heights.

b. Claimant 266 (CR) presented at Memorial Heights on December 7, 2020, two days after the accident that occurred in Jefferson County. This claimant resided in Sour Lake, about 83 driving miles from Memorial Heights.

c. Claimant 502 (RG) presented at Memorial Heights on January 27, 2022, three days after the accident that occurred in Jefferson County. This claimant resided in Beaumont, about 81 driving miles from Memorial Heights.

d. Claimants 252 and 253 (FC and MM) presented at Memorial Heights on November 24, 2020, nineteen days after the accident. These claimants resided in Magnolia, about 40 and 41 driving miles respectively from Memorial Heights.

e. Claimant 134 (PS) presented at Memorial Heights on February 8, 2020, the day after the accident. This claimant resided in Conroe, about 41 driving miles from Memorial Heights.

f. Claimants 302, 303, 304, 306, 307, and 308 (JM, JM, MR, AM, JM, and LL) presented at Memorial Heights on February 13, 2021, two days after the accident. These claimants resided in Conroe, about 37 driving miles from Memorial Heights.

g. Claimant 420 (TT) presented at Memorial Heights on September 13, 2021, ten days after the accident. This claimant resided in Cypress, about 29 driving miles from Memorial Heights.

h. Claimants 336 and 337 (SM and AC) presented at Memorial Heights on April 20, 2021, three days after the accident. These claimants resided in Baytown, about 27 driving miles from Memorial Heights.

i. Claimant 191 (AS) presented at Memorial Heights on July 4, 2020, two days after the accident. This claimant resided in Tomball, about 27 driving miles from Memorial Heights.

j.  Claimant 211 (JS) presented at Memorial Heights on August 20, 2020, eleven days after the accident.  This claimant resided in Richmond, about 27 driving miles from Memorial Heights.

k.  Claimant 475 (MA) presented at Memorial Heights on December 20, 2021, four days after the accident. This claimant resided in Friendswood, about 26 driving miles from Memorial Heights.

l.  Claimant 219 (WT) presented at Memorial Heights on August 31, 2020, one day after the accident. This claimant resided in Crosby, about 25 driving miles from Memorial Heights.

m.  Claimant 309 (RS) presented at Memorial Heights on February 25, 2021, four days after the accident. This claimant resided in Humble, about 24 driving miles from Memorial Heights.

n.  Claimant 272 (KE) presented at Memorial Heights on December 9, 2020, one day after the accident. This claimant resided in Katy, about 24 driving miles from Memorial Heights.

o.  Claimant 81 (LR) presented at Memorial Heights on September 20, 2019, two days after the accident. This claimant resided in Humble, about 24 driving miles from Memorial Heights.

p.  Claimants 423 and 424 (DG and AG) presented at Memorial Heights on September 20, 2021, three days after the accident. These claimants resided in Spring, about 23 driving miles from Memorial Heights.

q.  Claimant 218 (PT)  presented at Memorial Heights on August 31, 2020, two days after the accident. This claimant resided in Humble, about 23 driving miles from Memorial Heights.

r.   Claimant 139 (MS)  presented at Memorial Heights on February 19, 2020, one day after the accident. This claimant resided in Spring, about 23 driving miles from Memorial Heights.

s.   Claimant 173 (KH) presented at Memorial Heights on May 25, 2020, one day after the accident.  This claimant resided in Manvel, about 23 driving miles from Memorial Heights.

t.   Claimant 225 (PS) presented at Memorial Heights on September 8, 2020, one day after the accident. This claimant resided in Cypress, about 21 driving miles from Memorial Heights.

u.   Claimant 100 (DA) presented at Memorial Heights on November 2, 2019, one day after the accident.  This claimant resided in Pasadena, about 20 driving miles from Memorial Heights.

v.   Claimant 209 (BL) presented at Memorial Heights on July 30, 2020, one day after the accident. This claimant resided in Sugar Land, about 18 driving miles from Memorial Heights.

103.    In contrast, comparatively few of the claimants at issue resided less than ten driving miles from Memorial Heights. Almost none resided in what might be considered the neighborhood of Memorial Heights, within five driving miles of the facility.

104.    Most of the claimants at issue did not appear for supposed emergency care at Memorial Heights soon after the accident, or even the day of the accident. Claimants often presented to Memorial Heights a considerable amount of time after the accident date. In a 2022 deposition of Dr. Bhagat, it was established the patient came to Memorial Heights five days after the accident.

105.    Most of the claimants at issue presented to Memorial Heights one to five days after the accident. Some claimants did not present to Memorial Heights until even longer after the accident.

Concerning the claimants described in the attached Appendix A, examples of the amount of time that elapsed between the accident and the claimant's presentation at Memorial Heights include:

    a.  Claimant 371 (MIT) presented at Memorial Heights seventeen days after the accident.

    b.  Claimant 211 (JS) presented at Memorial Heights eleven days after the accident.

    c.  Claimant 288 (JR)  presented at Memorial Heights ten days after the accident.

    d.  Claimant 352 (IR) presented at Memorial Heights ten days after the accident.

    e.  Claimant 420 (TT)  presented at Memorial Heights ten days after the accident.

    f.  Claimant 299 (OB)  presented at Memorial Heights nine days after the accident.

    g.  Claimant 254  (GM)  presented at Memorial Heights seven days after the accident.

    h.  Claimant 79 (MM) presented at Memorial Heights seven days after the accident.

    i.  Claimant 255  (IS)  presented at Memorial Heights five days after the accident.

    j.  Claimant 70 (MF) presented at Memorial Heights five days after the accident.

    k.  Claimant 133 (GM) presented at Memorial Heights five days after the accident.

    l.  Claimant 456 (RM) presented at Memorial Heights five days after the accident.

    m.  Claimant 309 (RDS) presented at Memorial Heights four days after the accident.

    n.  Claimant 428 (MV) presented at Memorial Heights four days after the accident.

106.    At times, claimants involved in the same accident, represented by the same attorney, presented to Memorial Heights for supposed emergency care together, days after the accident. For example, concerning the claimants described in the attached Appendix A:

    a.  Claimants 252 and 253 (FC and MM) presented at Memorial Heights nineteen days after the accident.

    b.  Claimants 68 and 69 (RO and JO) presented at Memorial Heights thirteen days after the accident.

    c.  Claimants 300 and 301 (JC and ML) presented at Memorial Heights twelve  days after the accident.

    d.  Claimants 73 and 74 (EV and MN) presented at Memorial Heights eleven days after the accident.

    e.  Claimants 452 and 453 (SC and HC), presented at Memorial Heights five days after the accident.

    f.  Claimants 390, 391, and 392 (SP, MP, EP), presented at Memorial Heights three days after the accident.

107.   Some claimants who did present to Memorial Heights the day of the accident presented hours after accidents that occurred a considerable distance from Memorial Heights, and according to the MVA Entity bills resided near, or in the direction of, the accident location. For example, concerning the claimants described in the attached Appendix A:

    a.  Claimant 38 (JA) presented at Memorial Heights over five hours after the accident occurred in Liberty County, some 46 miles from Memorial Heights. This claimant resided in Cleveland, about 45 driving miles from Memorial Heights.

    b.  Claimant 146 (MS) presented at Memorial Heights after an accident that occurred in Montgomery County. This claimant resided in Conroe, about 40 driving miles from Memorial Heights.

    c.  Claimants 319 and 320 (SR and BB) presented at Memorial Heights about nine hours after the accident on Gulf Freeway. These claimants resided in Dickinson and Texas City, about 31 and 44 driving miles respectively from Memorial Heights.

    d.  Claimant 258 (JA)  presented at Memorial Heights after the accident that occurred some ten hours earlier in Fort Bend County. This claimant resided in Katy, about 25 driving miles from Memorial Heights.

e.  Claimant 286 (KP) presented at Memorial Heights around two hours after the accident that occurred in Fort Bend County. This claimant resided about 21 driving miles northward from Memorial Heights.

f.  Claimant 443 (HG) presented at Memorial Heights after the accident that occurred earlier in the day near Pearland. This claimant also resided near Pearland, about 21 driving miles from Memorial Heights.

g.  Claimant 190 (KE) presented at Memorial Heights hours after an accident in Fort Bend County. This claimant resided about 19 driving miles northwest from Memorial Heights.

h.  Claimant 164 (FC) presented at Memorial Heights about four and a half hours after the accident that occurred in Humble. This claimant resided about 14 driving miles northeast from Memorial Heights.

108.  The claimants at issue were represented by a relatively small number of personal injury attorneys. In particular, 169 of the claimants described in the attached Appendix A were represented by one law office  - - Javier Marcos & Associates.

109.  In a 2022 deposition, Dr. Bhagat admitted law offices send clients to Memorial Heights to be treated there under a letter of protection. When asked if Javier Marcos & Associates refers patients to Memorial Heights, Dr. Bhagat responded "We have seen patients that Javier Marcos has evaluated."

110.  Testimony in other 2022, 2023, and 2024 depositions has also established that personal injury attorneys send patients to Memorial Heights:

a.  In a 2022 deposition, Leia England testified that attorneys, including Marcos & Associates, refer automobile accident patients to Memorial Heights. England also testified some patients have brought their attorney's letter of protection to Memorial Heights themselves.

b. In a 2022 deposition, Dr. Sara Reader testified that some patients she has seen at Memorial Heights told her their attorneys sent them to Memorial Heights.

c. In a 2023 deposition, Dr. Pedram Behzadi likewise testified that some patients he has seen at Memorial Heights told him their attorneys sent them to the facility.

d. In a 2024 deposition, Dr. Andrea Marconi also testified that some patients he has seen at Memorial Heights told him their attorneys sent them to the facility.

111.    As referenced above, on December 1, 2022, Dr. Fair executed a verification under oath for a sworn Texas Rule of Civil Procedure 202 Petition filed in Harris County, attesting the statements within the petition were within her personal knowledge and true and correct. These statements of fact included that, *after* issuing letters of protection to the MVA Entities, attorneys send clients who are alleging personal injury to Memorial Heights:

> "In 2018, Bhagat formed the MVA Entities which began accepting patients for treatment at the Emergency Center pursuant to letters of protection provided by those patients' attorneys to the MVA Entities.  After issuing a letter of protection, the patients' attorneys arrange for clients who were involved in accidents and alleged to have suffered personal injuries to be evaluated and treated by healthcare providers at the Emergency Center."

112.    EHP, doing business as Memorial Heights Emergency Center, is a licensed FEMC facility. Aside from a radiology license, this is the only facility license EHP holds. As referenced in paragraphs 81 through 85, the MVA Entities are not licensed facilities.

113.    A FEMC facility license authorizes only "emergency care" services and those procedures that are related to providing "emergency care."[16] "Emergency care" is defined as health care services provided in the FEMC, "… to evaluate and stabilize a medical condition of a recent onset and severity, including severe pain, psychiatric disturbances, or symptoms of substance abuse, *that would lead a prudent layperson possessing an average knowledge of medicine and health to believe*

---

[16] 25 Tex. Admin Code §131.219(c)(4).

*that the person's condition, sickness, or injury is of such a nature that failure to get immediate medical care* could result in:

    (1) placing the person's health in serious jeopardy;

    (2) serious impairment to bodily functions;

    (3) serious dysfunction of a bodily organ or part;

    (4)  serious disfigurement; or

    (5) in the case of a pregnant woman, serious jeopardy to the health of the woman or fetus."[17]

(emphasis added).

114.    Clearly, prudent laypersons who had been involved in an automobile accident, who truly believed their condition or injury was of such a nature that failure to get immediate medical care could result in placing their health in serious jeopardy, serious impairment to bodily functions, serious dysfunction of a bodily organ or part, etc., would not travel distances in excess of 10, 20, and even 30 miles to seek emergency evaluation and treatment, bypassing other nearby hospital emergency rooms and FEMCs to somehow find the inconspicuous Memorial Heights facility.

115.    It is also clear that such prudent lay persons would not wait days after the accident to seek emergency evaluation and treatment.

116.    A patient presenting at a FEMC facility because their personal injury attorney directed them to go to that facility clearly does not qualify as "emergency care" under Texas law. As described above, Defendants clearly know that attorneys are referring these patients to the facility.

---

[17] Tex. Health & Safety Code §254.001(5); Tex. Bus & Comm Code §17.464; 25 Tex. Admin Code §131.2(12)

**B.      Presentation at Memorial Heights**

117.    The patients virtually always arrive at Memorial Heights by private automobile. Almost all Memorial Heights nurse reports initially state, "Arrived by private vehicle." Often, the physician report will also note, "Arrived – by private vehicle." The claimants often drive themselves to Memorial Heights.

118.    At times, two or more persons who occupied the same vehicle in a particular accident, represented by the same personal injury attorney,  present to Memorial Heights together.

119.    Before August 2018, patients who presented to Memorial Heights concerning an automobile accident were given various intake documents to complete. These included documents such as:

    a.   A card that included spaces to list the patient's name, birthdate, telephone number, time of arrival, reason for visit, and date of accident if the patient was coming in due to an automobile accident.

    b.   A Patient Registration form, which included spaces for information such as name, address, telephone number, emergency contact, employer, occupation and healthcare insurer information. There was a small section to complete if the patient was presenting for a motor vehicle accident or worker's compensation.  The form also has a section for the referral source. This included pre-printed options and an 'other' blank for the referral course such as a former patient, a doctor's office, family or friend, and certain urgent care facilities.

    c.   A Financial Information sheet, which starts by advising the patient that Memorial Heights is not an urgent care but an emergency room, and will collect the emergency room co-pay at the time services are rendered.  The form advises the patient they are financially responsible for costs not covered by their health insurance.  The patient is asked about other health insurance coverage that may cover the emergency room visit. Elsewhere, the form advises the patient an admission deposit or verification of acceptable hospitalization insurance is required for admission to Memorial Heights.

    d.   A Consent for Treatment form, which includes initial spaces for authorization for treatment, assignment of benefits and causes of action, and acknowledgement that liens will be filed by Memorial Heights under section 55.005 of the Texas Property Code (the hospital lien statute).

    e.   A form that includes an Accident Questionnaire, asking for a brief description of where and how any automobile, work, or other accident took place.

      f.   A Motor Vehicle Accident form requesting information such as the claim number, insured name, adjuster name, etc.  There are lines for attorney name and contact number.

120.    Some automobile accident patients treating after August 2018 were still provided these types of intake documents. On information and belief, this was the case when the patient was unrepresented by an attorney and came to Memorial Heights on their own decision or their bills were to be issued by the regular billing company and not through the MVA Entities.

121.    However, these intake questionnaires and documents appear to not be provided to the automobile accident patients billed through the MVA Entities. Such documents are not included in demand packages provided by the patients' attorneys to Plaintiffs. In claims in which lawsuits are filed, such documents are not included with business records affidavits provided by Memorial Heights or the MVA Entities, or produced in response to subpoenas requesting patient documents.

122.    *Not providing automobile accident patients with such intact documents clearly benefits the enterprise*. Patients arriving on direction of their attorney could be 'scared off' if presented forms advising them a co-pay would be due that day, or a deposit would be required, or Memorial Heights intended to file a hospital lien against them. Forms completed by a claimant revealing the "referral source" as a personal injury attorney would be detrimental to Defendants' scheme.

123.    Regarding hospital liens, EHP (as "Memorial Heights Emergency Center") and EMPT filed hospital liens for treatment dates from late 2016 to late 2018 concerning automobile accident patients. After the MVA Entities were formed in August 2018, EHP and EMPT continued for a time to file some liens for automobile accident patients, apparently those not billed through the MVA Entities. However, on information and belief, EHP and EMPT did not file any hospital liens for patients billed through the MVA Entities. And the MVA Entities themselves did not file hospital liens. Clearly, filing such liens would be detrimental to the relationship between Defendants and the

attorneys referring accident clients to Memorial Heights, as it would hinder the attorneys' effort to settle the claims.

124.     Memorial Heights prepared both nurse reports and physician reports for the patients. Those reports contain the patient's name, an "MR#," and a date and time in the header or footer. The time is the same in both reports. On information and belief, this is the patient's arrival time to Memorial Heights.  Dr. Marconi testified these listed times were the patient's "registration" time.

### C.     Treatment of Letter of Protection Patients at Memorial Heights

125.     Documentation produced in personal injury claims and lawsuits of the evaluation and treatment of the automobile accident patients is minimal. As noted above, there is no intake documentation. The entire emergency room encounter for these patients is recorded in just a few pages of Memorial Heights records:

- A "Clinical Report – Nurses" usually no more than two pages.

- A "Physician Clinical Report" usually between one-and-a-half pages and two pages.

- An "Order Sheet" recording lab and diagnostic study orders and the times ordered, that is generally one page.

- On occasion, a brief lab report sheet, usually concerning results of pregnancy tests.

- A one-page release instructions form stating the diagnosis, any prescribed medication, etc. signed by the nurse.

126.     The patient file will also contain a vRad radiology report for each CT or x-ray evaluated by the remote vRad radiologist. These reports are generated by vRad and electronically transmitted to Memorial Heights.

127.     However, in a 2024 deposition, Dr. Andrea Marconi revealed that there are documents in which hand-written information and findings are made by the nurse and physician while evaluating patients. The notations in these records include recording information about complaints, patient

history, the impact, pain levels, and other information. Dr. Marconi stated the nurse later entered information from these documents into the computer to generate printed reports.

128.    Dr. Marconi also testified these records generated contemporaneously with the encounters with the patients are not scanned or otherwise preserved. Instead, he testified the documents are shredded.

### *Nurse Triage and Assessment*

129.    Memorial Heights' printed nurse reports are generally no more than two pages long. As noted above, the reports almost always state the patient "arrived by private vehicle."

130.    On these reports, the "acuity" of the patient's condition (the Emergency Severity Index) is generally listed as level four, and sometimes level three. The Index scale runs from one to five in urgency. Level one is the highest level and is reserved for patients requiring immediate life-saving care. Level two patients have a high-risk situation such as severe pain or disorientation. Level four anticipates use of just one ER resource, such as a CT or an x-ray. Patients classified as levels four or five require care within 30 minutes. Level three anticipates use of more than one ER resource and that the patient requires care within 15 minutes.

131.    The nurse reports note the chief complaint is "MOTOR VEHICLE COLLISION." A brief description of the accident is given such as whether the patient was a driver or passenger, that they were wearing a lap belt and harness, and whether the air bag deployed. It is rarely reported that the air bag deployed, and the majority of the nurse reports state "The air bag did not deploy." Generally, the nurse report states "Patient was ambulatory at the scene." Few, if any, indicate the patient was not ambulatory at the scene.

132.    Vital signs are reported. Generally, vital signs are only taken once during the time the claimant was at Memorial Heights. When done, the Glasgow Coma Score (used to measure levels of consciousness) is generally reported as 15, the most responsive.

133.    A brief medical history is cited.

134.    Much of these brief nurse reports are devoted to matters such as social history (concerning smoking, drinking, drug use, recent foreign trips), "self harm assessment," "abuse assessment," "nutritional risk assessment," "functional assessment,"   "learning needs assessment," "fall risk assessment," "skin integrity assessment."  A typical report example states:

> SOCIAL HX:  Never Smoker. No alcohol or drug use. He has not travelled outside the U.S. Infectious disease exposure: No infectious disease exposure.
>
> SELF HARM ASSESSMENT:  Self Harm assessment was performed.  The patient answered "no" to the following question(s) "Have you recently felt down, depressed, or hopeless?"
>
> ABUSE ASSESSMENT: Abuse assessment. No report of abuse.
>
> NUTRITIONAL RISK ASSESSMENT: The nutritional risk assessment revealed no deficiencies.
>
> FUNCTIONAL ASSESSMENT:  Functional assessment: no impairments noted.
>
> LEARNING NEEDS ASSESSMENT: The learning needs assessment revealed no barriers.
>
> FALL RISK ASSESSMENT:  Fall risk assessment completed.  No risk factors identified.
>
> SKIN INTEGRITY ASSESSMENT:  Skin integrity risk assessment complete.  No skin integrity risk identified.

135.    These assessments appear to be largely 'filler' in the nurse reports, as virtually every nurse report sets forth the results of the various assessments as above. No deficiencies, impairments, etc., are noted.

136.    The self-harm assessment often has a different question or combination of questions, such as "Do you have a plan for harming or killing yourself?" "Do you have thoughts of harming or killing yourself?" "Have you recently had thoughts about harming or killing others?" "Are you here because you tried to hurt yourself?" "Have you noticed less interest or pleasure in doing things?" "Do you have any dangerous items in your possession?" Sometimes all these questions

are documented as being asked. However, the questions are always reported as being answered "No."

137.    The "Physical Assessment" portion of the nurse reports are brief, usually around just one-fourth of a page in length. Typical report examples (all from cases in which two CTs were performed), include:

**PHYSICAL ASSESSMENT**
[time and date] Ambulatory to room.
GENERAL / NEURO / PSYCH: Alert.  Oriented x 4. Appears in no acute distress.
HEENT: No facial asymmetry noted. Head non-tender. Pupils equal, round and reactive to light and light.EOM intact. Right ear within normal limits. Left ear within normal limits. Nares within normal limits. Mouth within normal limits upon inspection. Pharynx within normal limits. Voice within normal limits. Neck: tenderness. No swelling of head. No dental injury noted. Mucous membranes are pink.
RESPIRATORY: Respirations not labored. Chest nontender. Breath sounds within normal limits.
CVS: Normal sinus rhythm noted. Pulses within normal limits. Capillary refill less than 2 seconds.
GI / GU: Abdomen soft and nontender.  Pelvis is stable.
EXTREMITIES: Extremities exhibit normal ROM. Neuro-vascular status intact to the extremity.
SKIN: Skin intact.  Skin is warm and dry.
BACK:   Soft tissue tenderness in the back.  [time and nurse identification]


**PHYSICAL ASSESSMENT**
Ambulatory to room.
GENERAL / NEURO / PSYCH: Alert.  Oriented x 4.
HEENT: Pupils equal, round and reactive to light.  Mucous membranes are pink.
RESPIRATORY: Respirations not labored. Chest nontender. Breath sounds within normal limits.
CVS: Normal sinus rhythm noted. Capillary refill less than 2 seconds.
EXTREMITIES: Neuro-vascular status intact to the extremity.
SKIN: Skin intact.  Skin is warm and dry.  [time and nurse identification]

**PHYSICAL ASSESSMENT**
[time and date]
GENERAL / NEURO / PSYCH: Alert.  Oriented x 4. Appears in no acute distress. Glasgow Coma Scale: 15- eyes open spontaneous (4); best verbal response – orientated (5); best motor response – obeys commands (6).
HEENT: No signs of head trauma. Mucous membranes are pink.
RESPIRATORY: No respiratory distress. Respirations not labored. Chest nontender.
CVS: Pulses within normal limit. Capillary refill less than 2 seconds.
GI / GU: Abdomen soft and nontender.
EXTREMITIES: Extremities exhibit normal ROM. Neuro-vascular status intact to the extremity. Normal gait.
SKIN: Skin intact.  Skin is warm and dry.
BACK:  Soft tissue tenderness in back. [time and nurse identification]

**PHYSICAL ASSESSMENT**
 Ambulatory to room.
 GENERAL / NEURO / PSYCH: Alert.  Oriented x 4.
 HEENT: No signs of head trauma. Neck: tenderness. Mucous membranes are pink.
 RESPIRATORY: Respirations not labored.
 CVS: Normal sinus rhythm noted. Pulses within normal limits.
 GI / GU: Abdomen soft.  Pelvis is stable.
 EXTREMITIES: Extremities exhibit normal ROM. Neuro-vascular status intact to the extremity.
 SKIN: Skin intact.  Skin is warm and dry.
 BACK:   Back: tenderness located in the mid lumbar area. [time and nurse identification]

138.    Most nurse reports have a brief "Nursing Progress Notes" paragraph stating that patient identifiers were checked, reassurance was given to the patient, the plan of care was discussed with the patient, that the patient was placed in a bed or chair, and/or that the call light was placed in reach.

139.    The nurse reports document the times of certain events. This will usually include the triage time.  Other events documented by time generally include recording of vital signs and weight, the time to treatment room, the time the nurse inquires of history or current medications, physical assessment, skin integrity assessment, and disposition / discharge. In some reports, the times the patient is walked to and from the radiology section are documented.

140.    Some of the nurse reports also document the time when "Patient ready for evaluation – ED physician notified" or when "ED physician at the patient bedside." Some note a time for "No significant family medical history" with the physician's name by the entry.  However, many of the nurse reports document no time relating to the physician.

 *Physician Assessment*

141.    The Memorial Heights physician reports are also brief, generally under two pages. Usually, the reports do not document any event times.

142.    Often, the physician reports note the patient arrived by private vehicle.

143.     The physician reports contain a brief "History of Present Illness" section. The chief complaint was reported as "MOTOR VEHICLE COLLISION." The Location of injuries" was stated simply as neck, lower back, etc. Usually, the reports simply state that the accident "Occurred on a street." In most cases, there was a statement concerning neck pain or lack of neck pain, often one of the two following statements (verbatim):

> "The patient complains of moderate pain.  No blow to the head, loss of consciousness or seizure.  The patient complains of neck pain.  Not dazed."

> "The patient complains of moderate pain.  The patient complains of neck pain."

This was followed by brief mechanism details. Often, it was related, "Patient was driving the vehicle and was wearing a lap belt and a shoulder harness."  It was also often related that "The air bag did not deploy" and "Patient was ambulatory at the scene."

144.     This was followed by a brief "Review of Systems" section, noting no symptoms such as vision loss or hearing, nausea or vomiting, breathing difficulty, abdominal pain, fever, laceration, urinary problems, etc. At times, it was noted the patient "has had" headaches or pain.

145.     The physician reports reference the nurse report for the "Past History" section, usually just stating "See nurses notes."  The "Additional Notes" section stated "The nursing notes have been reviewed."

146.     The actual "Physical Exam" portion of the physician reports are again brief. Some typical examples, in cases in which two or three spinal CTs were performed, stated:

> **PHYSICAL EXAM**
> Appearance:  Alert. Oriented X3.
> Head: No swelling of head.
> Eyes: EOM intact.
> Neck: (ttp over paraspinal region, L trapezius).
> Respiratory:  No respiratory distress.
> Back: ROM normal. (ttp over upper T spine).
> Extremities: Extremities atraumatic.
> Neuro: Oriented X 3. No motor deficit. No sensory deficit.

**PHYSICAL EXAM**

Appearance:  Alert. Oriented X3. No acute distress.

Head: Head non-tender. No swelling of head.

Eyes: Pupils equal, round and reactive to light. EOM intact.

ENT: No dental injury.  Pharynx normal.

Neck: Painless ROM.  Non-tender.

Respiratory: Painless Inspiration.  Breath sounds normal. Chest nontender.

Abdomen: No visible injury. Soft and nontender.  Bowel sounds normal.

Back: Back tenderness present. Moderate tenderness in the right mid and lower and left mid and lower thoracic area and right upper and mid and left upper and mid lumbar area.  ROM normal.

Skin:  Skin intact.  Skin warm. Normal skin color. Normal skin turgor.

Extremities: Normal inspection. Pelvis stable. Extremities atraumatic.

**PHYSICAL EXAM**

Vital Signs:  Have been reviewed and appear to be correct. Glasgow Coma Scale: 15 – eyes open- spontaneous (4); best verbal response – oriented (5); best motor response – obeys commands (6).

Appearance:  Alert. Oriented X3.

Head: Head non-tender. No swelling of head.

Eyes: EOM intact.

Neck: (ttp over L trapezius/paraspinal region,  nl rom).

Respiratory:  Breath sounds normal. Chest nontender.

Back: (ttp over mid t/L spine).

Skin:  Skin intact.  (no seatbelt sign)

Extremities: Normal inspection. Pelvis stable. Extremities atraumatic.

**PHYSICAL EXAM**

Appearance:  Alert. Oriented X3. No acute distress.

Head: Head non-tender.

Eyes: Pupils equal, round and reactive to light. EOM intact.

ENT: No dental injury.  Pharynx normal.

Neck: Painful ROM in the neck. Moderate pain in the neck upon turning the head to the right and turning the head to the left. Tenderness present or present. Moderate vertebral tenderness of the mid and lower cervical spine.

CVS: Heart sounds normal. Pulses normal.

Respiratory: Breath sounds normal. Chest nontender.

Abdomen: No visible injury. Soft and nontender.

Back: Back tenderness present. Moderate soft-tissue tenderness in the right mid and left mid lumbar area.

Skin:  Skin intact.  Skin warm. Normal skin color.

Extremities: Normal inspection. Pelvis stable.

Neuro:  Oriented X 3.  No motor deficit.  No sensory deficit.

The reports' entries appear templated. At times, as shown in some of the examples above, statements appear in parentheses.

147.     The physician reports have a brief "Labs, X-Rays, and EKG" section with a short statement concerning the vRad radiologist's findings, such as "CT Head: No acute disease." Oddly, there are sometimes statements in the *subsequent* "Progress and Procedures" section of the report that the imaging *will be* obtained.

148.     The physician reports conclude with a brief instructions section. This will note any prescriptions. Prescriptions were stated to be prescribed for almost all claimants. Generally, the prescriptions were for one of the following combinations: Flexeril 10 mg x 15 and ibuprofen 600 mg x 30 or Flexeril 10 mg x 15 and Biofreeze gel (Lidocaine 4% patches). However, there are almost never prescriptions in the records or indication the prescriptions were called in to any pharmacy.

149.     Generally, there will be a statement about returning to the emergency department if not better, or following up with the patient's own doctor. Often, the report states "Follow up with your healthcare provider and a physical therapist" or "Follow up with doctor physical therapy." Often, the report states to follow up with a pain management clinic, or a pain management clinic and a physical therapist.

### CTs and X-Rays

150.     CTs, and sometimes x-rays, are generally ordered for adult claimants. Usually, the adult claimants received two or three CTs or x-rays.

151.     The CTs or x-rays are performed at Memorial Heights. The images are then sent electronically to a remote radiologist through the vRad service. The radiologist may be in Texas or in another state. The radiologist will evaluate the images, complete a report for each CT or x-ray series, and return the report electronically to Memorial Heights.

152.     The orders for CTs and x-rays is documented in the Order Sheet. The reason for the imaging is usually listed simply as "Trauma." Sometimes, the reason listed is "shoulder pain," "neck pain," back pain," etc. The Order Sheet will list the time the imaging is ordered.

153.     The Order Sheet typically represents that the physician entered the order for the imaging. But at times, the Order Sheet states the nurse or radiology technician entered the order for the imaging on the verbal order of the physician.

154.     Medical necessity for CTs is generally not documented in the nurse and physician reports. Accepted criteria for ordering the imaging, such as NEXUS (National Emergency X-Radiography Utilization Study), the Canadian C-Spine Rule (CCR), the Canadian CT Head Injury Rule (CCHR), and the New Orleans CT Head Injury Rule (NOC) are not used.

155.     At times, there are brief statements that the patient is experiencing vertebral tenderness. However, cervical, thoracic, and lumbar CTs are often ordered when the physician's report has only findings of soft tissue tenderness or muscle spasm. For example:

     "Neck:  No vertebral tenderness. (right paraspinal tenderness)."

     "Neck:  Moderate muscle spasm of the right posterior neck."

     "Back: Back tenderness present. Moderate tenderness in the right mid and left mid lumbar area. ROM normal"

     "Neck: Painless ROM. Non-tender."

     "Back: (ttp over mid t/L spine)."

     "Neck: (ttp over L trapezius/paraspinal region, nl rom)"

     "Back: Back tenderness present. Moderate tenderness in the right upper and mid and left upper and mid lumbar area.  ROM normal."

At times, head CTs were ordered when the physician's report references headache but no dizziness, etc., and the Physical Exam section simply states "No swelling of head" or "Head non-tender."

156.     In a 2023 deposition, Dr. Behzadi testified that cervical and head CTs were ordered in that case because the patient had "blunt trauma" and reported a headache and neck pain.  However, Dr. Behzadi defined "blunt trauma" as meaning just that the patient had been in an automobile accident.

157.     At times, the time the CTs or x-rays were ordered, as documented on the Order Sheet, is before any documentation of the physician seeing the patient. At other times, the CTs or x-rays were documented as ordered before the documented triage time or other first action by the nurse.

158.     At times, the imaging, as documented by the vRad radiologist in their own report, was done before the time the physician saw the patient, or done before the documented triage time or other first action by the nurse.

159.     Pregnancy tests are sometimes ordered on the Order Sheet with the CTs or x-rays. However, at times the "run" time for the tests is documented as after a CT or x-ray had already been done.

### *Other Services*

160.     While Defendants purported to provide emergency care to these claimants involved in automobile accidents, aside from CTs and x-rays, few other services were provided to the claimants at issue in addition to the ER service.  For example, claimants very rarely received any type of collar or sling.

161.     Likewise, virtually none of the claimants at issue received any wound repair such as stiches or staples.

162.     Other than occasional pregnancy tests, almost no other lab work was performed on any of the claimants at issue.

163.     Only a small number of the claimants at issue were provided oral or injected pain medication while on the premises of Memorial Heights.

164.     Further, very few if any of the claimants at issue required transport from Memorial Heights to its associated hospital, due to treatment being beyond Memorial Height's ability.

165.     However, on information and belief, at times the referring law office is contacted concerning treatment. In a case pending in Harris County, the vRad radiologist recommended a MRI. The physician at Memorial Heights initiated transfer to a Memorial Hermann hospital and the hospital accepted the transfer. However, Masvero contacted the Marcos & Associates office and was told the patient should be discharged AMA (against medical advice) to go to another facility for the MRI. Concerning Claimant 355 (KR), vRad recommended a cervical MRI. KR, also represented by Marcos & Associates, signed an AMA form and went to the same facility noted above for MRI.

### *Billing of ER Facility Fees and Physician Fees*

166.     Since August 2018, the MVA Facility entity has billed almost all adult car wreck patients at the highest levels of ER facility service charges, CPT 99284 or CPT 99285, with most of those billed the highest CPT 99285 level. In the period at issue, according to American Medical Association guidelines, use of the CPT 99285 coding required (1) a comprehensive history, (2) a comprehensive examination, and (3) medical decision making of high complexity. According to the definition, "[u]sually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function." Use of the 99284 required (1) a detailed history, (2) a detailed examination, and (3) medical decision making of moderate complexity. According to the definition, "[u]sually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function."

167.     Since August 2018, physician fees are generally billed as CPT 99284 by the MVA Physician entity.

168.     The examination documentation, and total amounts of evaluation and treatment time, generally do not support the billing of these high-level emergency room services. The letter of protection automobile accident claimants are 'walk in' patients. The nurse and physician reports

give no indication that the claimants required assistance from their vehicles into the facility, for example. The nurse reports state the patients are ambulatory to the treatment room. On occasions when the nurse reports document the time that the patient was walked to the radiology area and back, there is no indication that they needed assistance. There is no documentation of continued monitoring of the patients. Almost always, vital signs and Glasgow coma tests (when done) are performed only once.

169.    As noted herein below, in cases where CPT 99285 is billed, the recorded patient departure time is often less than an hour after the triage time or other recorded first action by Memorial Heights, and at times *less than 30 minutes*.

170.    There is no separate bill from vRad in regard to the CTs and x-rays. The MVA Facility entity bills the technical portion of these  services in its own bill.

### *Total Evaluation and Treatment Time at Memorial Heights*

171.    The total evaluation and treatment of MVA patients, as documented by the triage time or other first recorded action and the departure time, is often completed within one hour. This purportedly includes triage, the taking of weight and vitals, calculating Glasgow coma score, ascertaining current medication and allergies, taking a medical history, questioning and evaluating the patient in regard to the various assessments (such as nutritional risk assessment, functional assessment, self-harm assessment, etc.), the nurse's physical assessment, the ER physician's examination and assessment, the determination of need for imaging, the taking of CTs and x-rays, sending the images to vRad, awaiting the results from vRad, and explaining imaging results and other discharge matters with the patient. The facility fee is generally billed as CPT 99285, the highest-level ER service.

172.    At times, the total evaluation and treatment of the MVA patients, from the time of the triage or other first recorded action to patient departure, occurs in about a half an hour.

a. In a 2022 deposition, Dr. Reader agreed the documented times in the nurse report showed 33 minutes elapsed from triage to the time the patient was discharged. In that period, there was triage, decisions to have CTs and x-rays performed, the CTs and x-rays were performed and sent to a radiologist who then returned them, and then final instructions were given to the patient and the patient departed.

b. In a 2023 deposition, Dr. Behzadi stated he electronically signed and locked his physician report about the time he informed the patient of the results of his imaging, 32 minutes after triage. He agreed that all evaluations and determinations concerning the patient occurred in around 32 minutes.

173.   Concerning the claimants described herein below, examples of the amount of time that elapsed between triage or other first documented action and the patient's documented discharge time from Memorial Heights include:

a. Claimant 32 (CR): Triage was documented as 12:35 p.m. Departure time was recorded as 12:50 p.m., just 15 minutes later. Treatment included a Toradol injection.  The facility fee was billed as CPT 99284.

b. Claimant 266 (CR): Triage was documented as 6:34 p.m. Departure time was recorded as 6:53 p.m., just 19 minutes later. Dr. Defrawi's report stated he saw the patient at 6:47 p.m. Treatment included cervical and thoracic CTs. The facility fee was billed as CPT 99285. This claimant resided about 83 driving miles from Memorial Heights, and presented for an accident that occurred in Beaumont.

c. Claimant 192 (JC): The first actions in the nurse's report were documented as occurring at 10:47 a.m. Departure time was recorded as 11:09 a.m., just 22 minutes later. Treatment included cervical and head CTs. The facility fee was billed as CPT 99285.

d. Claimant 173 (KH): The first actions in the nurse's report were documented as occurring at 9:48 p.m. Departure time was recorded as 10:11 p.m., just 23 minutes later. Treatment included cervical and head CTs. The facility fee was billed as CPT 99285. The accident occurred a day earlier, and the claimant resided in Manvel, about 23 miles away.

e. Claimant 442 (AJ): The first actions in the nurse's report were documented as occurring at 9:21 p.m. Departure time was recorded as 9:46 p.m., just 25 minutes later. Treatment included lumbar and thoracic CTs. The facility fee was billed as CPT 99285.

f. Claimants 423 and 424 (DG and AG), both teens: Triage was documented as 3:38 p.m. for both claimants. Departure times were recorded as 3:56 p.m. and 3:57 p.m., just 18 and 19 minutes later. The accident had occurred three days earlier, and both claimants resided in Spring, about 23 miles away.

g. Claimant 439 (TD): The first actions in the nurse's report were documented as occurring at 8:03 p.m. Departure time was recorded as 8:31 p.m., just 28 minutes later. Treatment included cervical and head CTs. The facility fee was billed as CPT 99285.

h. Claimant 386 (GG): Triage time was documented as occurring at 7:33 p.m. Departure time was recorded as 8:01 p.m., just 28 minutes later. Treatment included wrist x-rays.

i. Claimant 212 (JS): The first actions in the nurse's report were documented as occurring at 1:00 p.m. Departure time was recorded as 1:31, just 31 minutes later. Billed treatment included cervical CT and shoulder x-ray.

j. Claimants 198 and 199 (ER and BG): The first actions in the nurse's report were documented as occurring at 3:19 p.m. and 3:22 p.m. Departure time was recorded as 3:55 and 3:56 respectively, just 36 and 34 minutes later. Treatment for ER included cervical and lumbar CTs and for BG included head CT and cervical x-ray. The facility fees were billed as CPT 99285.

k.  Claimant 213 (NG):  Triage time was documented as occurring at 8:34 p.m. Departure time was recorded as 9:09 p.m., just 35 minutes later. Treatment included head and thoracic CTs. The facility fee was billed as CPT 99285.

l.  Claimant 138 (ED):  Triage time was documented as occurring at 5:27 p.m. Departure time was recorded as 6:02 p.m., just 35 minutes later. Treatment included head and cervical CTs. The facility fee was billed as CPT 99285.

m.  Claimant 190 (KE): Triage time was documented as occurring at 8:43 p.m. Departure time was recorded as 9:19 p.m., just 36 minutes later. Treatment included a cervical CT. The facility fee was billed as CPT 99285.

n.  Claimant 345 (JM): Triage time was documented as occurring at 11:22 p.m. Departure time was recorded as 12:00 p.m., just 38 minutes later. Treatment included cervical and lumbar CTs. The facility fee was billed as CPT 99285.

o.  Claimant 164 (FC): The first actions in the nurse's report were documented as occurring at 7:27 p.m. Departure time was recorded as 8:08 p.m., 41 minutes later. Billed treatment included cervical and lumbar CTs.  The facility fee was billed as CPT 99285.

p.  Claimant 314 (KS): The first actions in the nurse's report were documented as occurring at 7:07 p.m. Departure time was recorded as 7:48 p.m., 41 minutes later. Billed treatment included cervical and head CTs.  The facility fee was billed as CPT 99285.

q.  Claimant 371 (MT): The first actions in the nurse's report were documented as occurring at 7:14 p.m. Departure time was recorded as 7:58 p.m., 44 minutes later. Billed treatment included cervical and lumbar CTs and shoulder x-rays. The facility fee was billed as CPT 99285.

174.    At times, multiple claimants presenting together are all purportedly evaluated, have imaging, and depart within an hour of triage or the first nurse action.  For example:

a. Claimants 353 and 354 (MI and GB) an adult and minor: Triage times were documented as occurring at 4:27 p.m. and 4:29 p.m. Departure time for the adult was recorded as 5:02 p.m., just 35 minutes later. Treatment included two CTs for the adult claimant. The facility fees were billed as CPT 99285 for the adult and CPT 99283 for the minor.

b. Claimants 73 and 74 (MN and EV), an adult and a teen: Triage times were documented as 5:33 p.m. and 5:35 p.m. Departure times were recorded as 6:16 p.m. and 6:17 p.m., just 42 and 43 minutes after triage. Treatment included one CT and an x-ray for the adult. The facility fees were billed as CPT 99285 for the adult and CPT 99283 for the teen.

c. Claimants 412, 414, 417 and 418 (MC, JC, JC and AC), two adults and two children: The four triage times were 11:25 a.m., 11:28 a.m., 11:30 a.m., and 11:32 a.m., with the two adults first. Departure times for the adults were recorded as 12:23 p.m. and 12:24 p.m., 58 and 56 minutes after their respective triage began. Treatment included one CT and an x-ray for one adult and a CT for the other adult. The facility fees were billed as CPT 99285 and 99284 for the adults and CPT 99283 for the minor claimants.

d. Claimants 328, 329, and 330 (AE, AL, and AL): an adult and two children: Triage times were documented as occurring at 3:43 p.m. through 3:50 p.m. Departure time for the adult was recorded as 4:36 p.m., about 53 minutes after triage began. Treatment for the adult included two CTs. The facility fees were billed as CPT 99285 for the adult and 99283 for the minor claimants.

e. Claimants 193, 194, 195, and 196 (VM, GB, BB, and BC), an adult and three teens: Triage times were documented as occurring at 2:56 p.m. through 3:03 p.m. Departure times were documented as 3:52 p.m. through 3:56 p.m., the last being 60 minutes after the first triage time. Treatment for all four claimants included a cervical CT, and the

adult also had thoracic x-rays. The facility fees were billed as CPT 99285 for the adult and 99284 for the teen claimants.

**D.     Minor Patients**

175.    Most teens and children accompanying their parents or other adults to Memorial Heights concerning an auto accident receive only CPT 99283 facility services and physician's fees, with no CTs or x-rays.

176.    The nurse and physician reports do not vary for the younger patients, which illustrates the 'canned' nature of the reports. Thus, the nurse reports will note young children and toddlers as "Never smoker. No alcohol use or drug use."  In the "Self Harm Assessment" section of the nurse reports, young children are reported as answering "no" to the questions, including at times questions concerning feeling depressed or harming or killing themselves or others. Concerning minor claimants described in Appendix A, examples include:

   a.   The nurse and physician reports for claimant 169 (AR) stated the patient was two years old. The nurse report stated: "The patient answered 'no' to the question(s) "Have you recently felt down, depressed or hopeless?", "Do you have thoughts of harming or killing yourself?", "Do you have a plan for harming or killing yourself?", "Have you recently had thoughts about harming or killing others?", "Do you have any dangerous items in your possession?",  "Have you noticed less interest or pleasure in doing things?", "Are you here because you tried to hurt yourself?"

   b.   The nurse and physician reports for claimants 329 and 330 (AL and AL) stated the patients were two and three years old. The nurse report for each stated: "The patient answered 'no' to the question(s) "Are you here because you tried to hurt yourself?"

c.  The nurse and physician reports for claimant 67 (AC) stated the patient was five years old. The nurse report stated: "The patient answered 'no' to the question(s) "Have you recently had thoughts about harming or killing others?"

d.  The nurse and physician reports for claimants 306 and 307 stated the two minor patients were four years and *two months* old. Dr. Marconi reported the infant denied pain. The nurse reports for both stated: "The patient answered 'no' to the question(s) "Have you recently felt down, depressed or hopeless?"

177.    At times, it is noted that the child or teen reported and/or exhibited no pain or complaints. However, CPT 99283 facility and physician services were billed, and acuity level was listed as level 4 (anticipating at least one ER service such as a CT). Concerning minor claimants described in the attached Appendix A, examples include:

a.  The nurse report for claimant 170 (AR) stated the two-year-old patient's mother said the child had no complaints, and the child was jumping on the bed with no signs of pain or discomfort. There was no headache, neck pain, or back pain.

b.  The nurse reports for claimants 329 and 330 (AL and AL) stated the two patients—ages two and three—were brought in for an accident that happened the day before and were active and in no apparent distress. Dr. Veloz's one-page reports stated for each that "[t]he patient denies pain" and the patient had not been acting differently.

**E.    Discharge and Departure**

178.    The nurse report concludes with a "Disposition/Discharge" paragraph. This states the time of patient departure. The paragraph generally stated: "The goals identified in the patient's plan of care were met," and that discharge instructions and medications were reviewed with the patient.

179.    There is no indication in the nurse reports that automobile LOP claimants required any assistance after discharge to get to their vehicle. The claimants at issue were virtually always

reported as being discharged home, and "left ambulatory and via  private automobile." Usually, it is noted the patient is driving.

180.     Almost none of the claimants were provided with an off-work or work restriction sheet.

181.     While the physician reports and discharge sheets reflect prescriptions, almost none of the records contained a prescription script. There was no indication of prescriptions being sent directly to a pharmacy. The demand packages sent by the claimants' attorneys generally do not reflect claims for the charges of the prescriptions reportedly issued by Memorial Heights.

**F.      Claim Presentation**

182.     After the Memorial Height's visit, Memorial Heights or the MVA Entities forwarded the claimants' medical records and billings to the patient's personal injury attorney. These records included Memorial Heights nurse and physician reports, the order sheet, sometimes a lab report, the release instruction form, and the vRad radiology reports. The provided records also included the MVA Facility and MVA Physician bills.

183.     At times, Defendants provided the same types of records through business records affidavits. Defendants also at times provided Texas Civil Practice & Remedies Code section 18.001 affidavits, attaching the MVA Facility and MVA Physician bills and attesting the services provided were necessary and the charges for the services were reasonable. Jason Masvero executed most of these affidavits in the claims at issue.

184.     None of the records provided by Defendants reveal that the claimant was directed to go to Memorial Heights by their personal injury attorney.

185.      Defendants provided these records to the law offices, knowing the documents would be included in settlement demand packages forwarded to Allstate, for executing the scheme, in violation of 18 U.S.C. §1341. Defendants understood the records falsely inflated the value of the patient's personal injury claim.

186.    The law offices then prepared settlement demand letters. The law offices enclosed these letters, Memorial Heights' reports and other records, and Memorial Heights' facility and physician fee bills into demand packages.  The law offices forwarded these demand packages to Plaintiffs.

187.    The attorney demand letters almost always invoked the Texas *Stowers* doctrine. *G.A. Stowers Furniture Co. v American Indemnity Co.,* 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved). These demand letters cite the *Stowers* opinion, and at times state they are a "*Stowers* Demand." Pursuant to *Stowers*, an automobile insurer has a common-law duty to settle third-party claims against its insureds when it is reasonably prudent to do so. *In re Farmers Tex. Cty. Mut. Ins. Co.*, 621 S.W.3d 261, 264 (Tex. 2021). The duty arises when (1) the third party's claim against the insured is within the scope of coverage; (2) the settlement demand is within policy limits; and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment. *Id.* An automobile insurer can be subject to substantial liability if it fails to accept such a demand. The demand letters generally state a limited time for Plaintiff's to accept the demand and settle the claim, such as 14, 20, or 30 days, before the offer expires.

188.    In claims in which litigation was filed, Defendants again provided the same records through business records affidavits, and provided bills through Texas Civil Practice & Remedies Code section 18.001 affidavits attesting the services provided were necessary and the charges for the services were reasonable.  Jason Masvero executes most of these affidavits.  On occasions, Dr. Bhagat executes the affidavits.

189.    The Memorial Heights records that were produced in the demand packages, including the reports and bills, made misrepresentations concerning the claimants, including:

    a.  The claimant's presenting condition was of such high severity that comprehensive emergency medical examinations and evaluations were required, justifying billing CPT 99285 and 99284 emergency services;

  b. High level emergency room examinations and services were in fact provided as represented in the bills;

  c. Orders for diagnostic testing such as x-rays and CTs were reasonable and necessary due to the patients' condition and evaluation; and

  d. Emergency room facility and emergency room physician charges were reasonable.

190. There is no indication in any of Memorial Heights' records submitted to Plaintiffs that the claimants were referred to Memorial Heights by an attorney, rather than coming to Memorial Heights on their own decision. The records therefore misrepresented that the claimants were acting as prudent laypersons who believed their condition or injury was of such a nature that they should seek immediate medical care at an emergency facility, in accordance with Texas' definition of emergency care and the bounds of Memorial Heights' license to treat patients.

191. Dr. Marconi has testified that documents including hand-written entries generated during the evaluation of patients are not preserved and are destroyed. The full nature of these medical records and the information they contained is therefore not known to Plaintiffs.

192. The Defendants also employ fraudulent billing practices, that greatly inflated the charges of the unnecessary evaluations, treatment, and diagnostic testing, as outlined in paragraphs 56 through 181 above.  This included use of a dual chargemaster, with far higher rates for auto accident patients than other patients seen at Memorial Heights.

193. Further, the MVA Entities operated as an unlicensed FEMC facility. The MVA Entities purport to be mere 'billing companies,' as represented by Dr. Bhagat and Leia England in their 2022 deposition testimony. However, as later revealed by Dr. Fair's attestation for the December 2022 sworn petition, the MVA Entities use Memorial Heights' facility, personnel, and equipment to evaluate and treat personal injury claimants referred to Memorial Heights by attorneys, and reimburse the licensed entity—EHP d/b/a Memorial Heights Emergency Center. As attested by Dr. Fair, letters of protection are issued by the attorneys to the MVA Entities.

194.    Allstate issued checks in settlement of the claims set forth herein below.  These checks were forwarded to the law offices by U.S. Mail.

## VI.
## CAUSES OF ACTION

### COUNTS ONE and TWO

### Violation of Title 18, United States Code, Sections 1962(c) (RICO Statute)

195.    Plaintiffs incorporate as though fully set forth herein, each allegation contained in paragraphs 1 through 194 above.

**A.    COUNT    ONE    --    THE    ASSOCIATION-IN-FACT    ENTERPRISE**
    (Against All Defendants for Violation of Title 18, United States Code, Section 1962 (c))

196.    As set forth herein below, EHP, Akash Bhagat, Elizabeth Fair, and Ruben Veloz are an association-in-fact Enterprise, as that term is defined in Title 18, United States Code, Section 1961(4). The Enterprise has functioned as a continuing unit since 2018. The Enterprise has an identifiable structure, with each person fulfilling a specific role to carry out and facilitate its purpose. The Enterprise engages in, and its activities affect, interstate commerce. (See paragraphs 212 through 215 below).

197.    The Enterprise exists separate and apart from the pattern of racketeering activity alleged herein. Throughout the period at issue (August 2018 through November 2022), the Enterprise continued to evaluate and treat and administer the treatment and billing of patients other than automobile accident patients. These include patients treating under private health insurance, and patients presenting for pain or conditions unassociated with any traumatic automobile accident event.

198.    The Enterprise has an identifiable structure, with each person fulfilling a specific role to carry out and facilitate its purpose.  For example:

a.    Defendants Akash Bhagat, Elizabeth Fair, Ruben Veloz, Jason Masvero, Leia England, Bhagat Investments and Southern Emergency Physicians have established, financed, owned, operated, and/or participated in the management of EHP's Memorial Heights FEMC facility in Harris County. For example, Bhagat, Fair, Veloz, Bhagat Investments and Southern Emergency Physicians have been partners in EHP during all or part of the period at issue. Bhagat and Fair are the principles of Bhagat Investments and Southern Emergency Physicians respectively. Bhagat and Veloz have been medical directors and supervised physician employees.[18] Fair has overseen billings. Masvero has been facility manager and director of nursing and supervised nurse employees. England has been office manager.

b.    Defendants Akash Bhagat, Leia England, and Jason Masvero have established, financed, owned, operated, and/or participated in the management of MVA Facility and MVA Physician.

c.    Defendants Akash Bhagat, Elizabeth Fair, Ruben Veloz, Pedram Behzadi, Tarek Defrawi, Andrea Marconi, Sara Reader, and EHP (through its employees such as nurses and radiology technicians) performed unnecessary emergency services such as examinations and ordering and performance of diagnostic testing such as CTs and x-rays.

---

[18] Dr. Bhagat remains listed as medical director. Also, in a 2023 deposition Dr. Behzadi identified his supervisor at Memorial Heights as Dr. Veloz, whom Dr. Behzadi stated was the medical director.

d.      Defendants Akash Bhagat and Leia England marketed the services of Memorial Heights to personal injury attorneys, for the attorneys to send clients to Memorial Heights to be seen for supposed emergency conditions and injuries under letters of protection.

e.      Defendants Akash Bhagat, Leia England, and Jason Masvero acted as liaisons with the attorneys to facilitate the operation of the Enterprise. This includes, on information and belief, keeping of statistics of referrals by England and communication by Masvero to law offices concerning treatment of their clients.

f.      Defendants MVA Facility and MVA Physician operated as an unlicensed FEMC facility to facilitate the unnecessary treatment and diagnostic testing of automobile accident claimants.

g.      Defendants MVA Facility and MVA Physician issued bills for unnecessary emergency room services and diagnostic testing. Defendant Leia England has acted as billing manager for these entities.

h.      Defendants EHP, MVA Facility, and MVA Physician generated and provided emergency room records and bills to the law offices of attorneys referring the patients to Memorial Heights, for inclusion in demand packages to be sent to Plaintiffs.

i.      According to Dr. Bhagat in his 2022 deposition, the post-August 2018 charges of MVA Facility and MVA Physician were determined by himself, Dr. Fair, and facility manager Masvero.

199.    The Enterprise engages in, and its activities affect, interstate commerce. (See paragraphs 212 through 215 below).

200.    The Defendants have been employed by and/or associated with the Enterprise, have participated in the management and operation of the Enterprise, and deliberately caused a fraud to be perpetrated upon Plaintiffs and other automobile insurers.

201.    As a direct and proximate result of the Defendants' conduct as set forth herein, Plaintiffs were injured by their payment of sums for fraudulently inflated bodily injury claims, arising from the pattern of racketeering activity. This injury is set forth more fully in paragraphs 209 through 211 and 245 through 250 below. The predicate acts are set forth fully in paragraph 211 herein below and the attached and incorporated Appendix A.

**B.    COUNT TWO -- THE EMERGENCY CENTER ENTERPRISE**

(Against Defendants Akash Bhagat, D.O, Memorial Heights Emergency Center MVA Facility Administration, LLC, Memorial Heights Emergency Center MVA Professional Administration, LLC, Elizabeth Fair, M.D., Bhagat Investments, Inc., Southern Emergency Physicians Ltd LLP, Ruben Veloz, M.D., Pedram Behzadi, M.D., Tarek Defrawi, M.D., Andrea Marconi, D.O., Sara Reader, M.D., Jason Masvero, R.N., and Leia England for Violation of Title 18, United States Code, Section 1962 (c))

202.    Pleading in the alternative, and in addition to the association-in-fact Enterprise alleged herein, Emergency Healthcare Partners, L.P. ("EHP") is an "enterprise" as that term is defined in 18 U.S.C. 1961(4). It is hereinafter referred to as "the Emergency Center Enterprise." Defendants Akash Bhagat, Memorial Heights Emergency Center MVA Facility Administration, LLC, Memorial Heights Emergency Center MVA Professional Administration, LLC, Elizabeth Fair, Bhagat Investments, Southern Emergency Physicians, Ruben Veloz, Pedram Behzadi, Tarek Defrawi, Andrea Marconi, Sara Reader, Jason Masvero, and Leia England are all "persons" within the meaning of 18 U.S.C. §1961(3). They are hereinafter referred to as the Emergency Center Enterprise Persons.

203.    The Emergency Center Enterprise Persons are all employed by or associated with the Emergency Center Enterprise, and conducted its affairs through a pattern of racketeering activity. For example:

    a.  Defendants Akash Bhagat, Elizabeth Fair, Ruben Veloz, Bhagat Investments, Southern Emergency Physicians, Jason Masvero, and Leia England have established, financed, owned, operated, and/or participated in the management of EHP and its Memorial Heights FEMC facility in Harris County. For example, Bhagat, Fair, Veloz, Bhagat Investments and Southern Emergency Physicians have been partners in EHP during all or part of the period at issue. Bhagat and Fair are the principles of Bhagat Investments and Southern Emergency Physicians respectively. Bhagat and Veloz have been medical directors and supervised physician employees. Fair has overseen billings. Masvero has been facility manager and director of nursing and supervised nurse employees. England has been office manager.

    b.  Defendants Akash Bhagat, Leia England, and Jason Masvero have established, financed, owned, operated, and/or participated in the management of the MVA Entities.

    c.  Defendants Akash Bhagat, Elizabeth Fair, Ruben Veloz, Pedram Behzadi, Tarek Defrawi, Andrea Marconi, and Sara Reader performed unnecessary emergency services such as examinations and ordering of diagnostic testing such as CTs and x-rays.

    d.  Defendants Akash Bhagat and Leia England marketed the services of Memorial Heights  to personal injury attorneys, for the attorneys to send clients to Memorial Heights to be seen for supposed emergent conditions and injuries under letters of protection.

e.   Defendants Akash Bhagat, Leia England, and Jason Masvero acted as liaisons with the attorneys to facilitate the operation of the Enterprise. This includes, on information and belief, keeping of statistics of referrals by England and communication by Masvero to law offices concerning treatment of their clients.

f.   Defendants MVA Facility and MVA Physician operated to facilitate the unnecessary treatment and diagnostic testing of automobile accident claimants.

g.   Defendants MVA Facility and MVA Physician issued bills for unnecessary emergency room services and diagnostic testing. Defendant Leia England acted as billing manager for these entities.

h.   Defendants MVA Facility, and MVA Physician provided emergency room records and bills to the law offices of attorneys referring the patients to Memorial Heights, for inclusion in demand packages to be sent to Plaintiffs.

204.   The Emergency Center Enterprise Persons operated the Enterprise for the purpose to inflate automobile accident claims through a 'build up' of the claim by unnecessary emergency services. This was accomplished through repeated violations of Title 18, United States Code, section 1341. As a direct and proximate result of the Defendants' conduct as set forth herein, Plaintiffs were injured by paying sums in payment of fraudulently inflated bodily injury claims, arising from the pattern of racketeering activity.  This injury is set forth more fully in paragraphs 209 through 211 and 245 through 250 below.

205.   The Emergency Center Enterprise had an existence separate and apart from the pattern of racketeering activity; specifically, the normal operation of a FEMC facility treating a variety of other patients, including patients treating under private health insurance, and patients presenting for pain or conditions unassociated with any traumatic event.

206.   The activities of the Emergency Center Enterprise affect interstate commerce. (See paragraphs 212 through 215 below). The predicate acts are set forth fully in paragraph 211 herein below, and the attached and incorporated Appendix A.

## C.   THE PURPOSE OF THE SCHEME

207.   The purpose of the scheme was to illicitly and illegally enrich the Defendants at the expense of Plaintiffs and their policyholders.

208.   As set forth set forth at length in paragraphs 56 through 194 above, and incorporated herein, the scheme is to create and pursue fraudulently inflated bodily injury claims.

## D.   THE PATTERN OF RACKETEERING ACTIVITIES

209.   Defendants have knowingly conducted and/or participated, directly and indirectly, in the conduct of the affairs of the above described Enterprises through a "pattern of racketeering activity" as defined by Title 18, United States Code, Section 1961(5).

210.   Such racketeering activity consists of repeated violations of the federal mail fraud statute, Title 18, United States Code, section 1341, based upon the fraudulent, inflated claims made regarding the supposed necessary treatment and diagnostic testing at Memorial Heights.

211.   These predicate acts were part of a scheme, and were not isolated events.  The predicate acts at issue are set forth in the attached Appendix A, and include acts of mail fraud in which demand packages including Defendants' records and bills were forwarded by claimants' attorneys to Plaintiffs, and settlement checks were forwarded by Plaintiffs to the attorneys. As set forth herein above, in those records and bills Defendants made fraudulent findings regarding the necessity of emergency medical services and diagnostic testing, regarding the extent of services, and fraudulently inflated the service costs. Defendants provided these documents to claimants' attorneys knowing they would be presented in demands to Plaintiffs. In reliance on the settlement demand package documents, Allstate forwarded by U.S. mail on or about the stated dates settlement checks

to the attorneys' offices or, in some cases, to Memorial Heights, in the amounts stated, including amounts attributable to the improper and fraudulent Memorial Heights facility fee and physician fee billing.  The Defendants caused the mailings described in this paragraph and shown in Appendix A.

## E.   EFFECT ON INTERSTATE COMMERCE

212.   The effect of each Enterprise on Interstate Commerce is substantial. Each Enterprise necessarily utilized the United States Postal Service in its fraud scheme.

213.   Further, Plaintiffs Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are national companies, with corporate home headquarters outside of Texas, and doing business throughout the United States. The settlement funds from which Plaintiff's money was received by each Enterprise were drawn from accounts of national banks, doing business in the various states of the United States.

214.   Additionally, each Enterprise utilizes the vRad remote radiology service for radiologist evaluation of CTs and x-rays. vRad is a Minnesota company with its corporate office located in Minnesota, and at times the remote radiologists themselves are located outside the state of Texas.

215.   Additionally, each Enterprise must necessarily purchase goods and services within interstate commerce (equipment, supplies, etc.) to conduct business operations, and to carry out the scheme.

## F.   INJURY TO PLAINTIFFS

216.   As a direct and proximate result of the Defendants' conduct, Plaintiffs were injured by paying sums in payment of fraudulent bodily injury claims, arising from the pattern of racketeering activity. This injury is set forth more fully in paragraphs 209 through 211 above, and paragraphs 245 through 250 below, and in the attached and incorporated Appendix A.

217.   By reason of their injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to title 18, United States Code, section 1964(c).

## VII.

### COUNT THREE -- CONSPIRACY TO VIOLATE SECTION 1962(c)

(Against All Defendants Regarding the Association-in-Fact Enterprise; Against
Defendants Akash Bhagat, D.O, Memorial Heights Emergency Center MVA Facility
Administration, LLC, Memorial Heights Emergency Center MVA Professional
Administration, LLC, Elizabeth Fair, M.D., Bhagat Investments, Inc., Southern
Emergency Physicians Ltd LLP, Ruben Veloz, M.D., Pedram Behzadi, M.D., Tarek
Defrawi, M.D., Andrea Marconi, D.O., Sara Reader, M.D., Jason Masvero, R.N., and
Leia England Regarding the Emergency Center Enterprise, for Violation of
Title 18, United States Code, Section 1962(d))

218.    Defendants willfully combined, conspired, and agreed with one another and with others to
violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or to participate,
directly or indirectly, in the affairs of the Enterprise, the activities of which were conducted through
a pattern of racketeering activities, in violation of 18 U.S.C. section 1962(d).

219.    As set forth above, in paragraphs 56 through 194 and 211, two or more persons agreed to
commit a substantive RICO offense. As also set forth herein, the Defendants knew of the essential
nature of the Enterprise, and agreed to the overall objective of the RICO offense. The object of this
conspiracy was to defraud Plaintiffs. As a direct and proximate result of the Defendants' conduct as
set forth herein, Plaintiffs were injured by paying sums regarding fraudulently inflated bodily injury
claims, arising from the pattern of racketeering activity.  This injury is set forth more fully in
paragraphs 209 through 211 above, and paragraphs 245 through 250 below, and in the attached and
incorporated Appendix A..

## VIII.
## COUNT FOUR

(Against All Defendants for Common Law Fraud)

220.    Plaintiffs incorporate, as though fully set forth herein, each allegation contained in
paragraphs 1 through 219 above.

221.     Defendants, personally or through agents (law office workers, etc.) acting at their direction, have made or caused to be made false and fraudulent material misrepresentations of fact to Plaintiffs; specifically, false and misleading statements and representations concerning the reasonableness and necessity of emergency room treatment. The scheme has been set forth herein at paragraphs 56 through 194.

222.     The misrepresentations were conveyed to Plaintiffs through attorney settlement demand letters issued by the law offices, and medical records, reports, and billings generated by EHP, and the MVA Entities and provided to the law offices to be included with the demand letters in settlement demand packages. The misrepresentations made to Plaintiffs in these documents include:

   a. The patient's presenting conditions were such that high complexity medical examinations were required;

   b. Orders for diagnostic testing such as x-rays and CTs were reasonable and necessary;

   c. High-level emergency room services were performed as represented in the operative records and bills; and

   d. Facility and physician charges were reasonable.

223.     Defendants also deliberately concealed information that would have revealed the actual nature of the patients' presentment to Memorial Heights, such as the patient was referred to Memorial Heights by an attorney, rather than coming to Memorial Heights on their own due to reasonable belief they needed emergency room evaluation and treatment. Additionally, according to Dr. Marconi's 2024 deposition testimony, the documents generated during the evaluation of the patients are destroyed, and the full nature of these medical records and the information they contained is unknown to Plaintiffs.

224.     At the time the statements and representations were made, as detailed in paragraphs 56 through 194 and 209 through 211 above, Defendants were aware of the falsity of the misrepresentations.

225.     Defendants made the misrepresentations with the intent to deceive Plaintiffs, and with the intent that Plaintiffs would act on the misrepresentations by paying sums of money in settlement of claims to the associated law offices, which would provide a portion of those funds to Defendants. The way the Defendants disbursed the money among themselves is solely in their knowledge.

226.     Plaintiffs relied on the misrepresentations, and thereby suffered injury by paying sums of money in settlement of the claims.  This injury is set forth more fully in paragraphs 209 through 211 above and paragraphs 245 through 250 below, and in the attached and incorporated Appendix A. Plaintiffs are also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

## IX.
## COUNT FIVE

### (Against All Defendants for Common Law Conspiracy)

227.     Plaintiffs incorporate, as though fully set forth herein, each allegation contained in paragraphs 1 through 222 above.

228.     Beginning about August 2018 and continuing through the present, Defendants have willfully combined, conspired, and agreed with each other and others to defraud Plaintiffs. Defendants, in combination with themselves and others, knowingly made false and misleading statements in regard to the existence, nature, and severity of the injuries to automobile collision patients, and the need for emergency evaluation and treatment, including high-level ER services and diagnostics including CTs and x-rays.

229.     The object of the conspiracy was to defraud Plaintiffs. There was a meeting of the minds and agreement on this course of action by each Defendant, and each Defendant played a specific role in the overall scheme to defraud Plaintiffs and other insurers. The Defendants, separately or in

concert with other Defendants and/or other parties, committed overt, unlawful acts in furtherance of this course of action. The roles of the conspirators and overt acts are set forth herein above.

230.    The false and fraudulent misrepresentations and omissions alleged above were made by Defendants and others with the purpose and intent to deceive Plaintiffs and to induce Plaintiffs to pay Defendants sums of money, through the associated law offices, to which Defendants were not legally entitled.

231.    As a direct and proximate result of Defendants' conduct, Plaintiffs have paid sums regarding the fraudulent treatment and billing arising from automobile collisions in which the claimant went to IST. This injury is set forth more fully in paragraphs 209 through 211 above and paragraphs 245 through 250 below, and in the attached and incorporated Appendix A.

232.    Plaintiffs are also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

## X.
## COUNT SIX

### (Against All Defendants for Unjust Enrichment)

233.    Plaintiffs incorporate, as though fully set forth herein, each allegation contained in paragraphs 1 through 232 above.

234.     As described above, Defendants have made false and fraudulent representations of fact to Plaintiffs regarding the existence, nature, and severity of supposed injuries allegedly attributable to automobile collisions and the need for emergency room treatment, and willfully combined, conspired, and agreed with each other and others to defraud Plaintiffs.

235.    Additionally, as set forth herein above, the MVA Entity Defendants operated as an unlicensed Freestanding Emergency Medical Care facility, and should not have billed for the services.

236.     Defendants, all of whom are healthcare providers or healthcare entities, or purport to be, also took undue advantage of Plaintiffs.

237.     Defendants have unjustly obtained a benefit from Plaintiffs, namely the payment for healthcare expenses that were unreasonable and unnecessary, and designed to enrich Defendants to Plaintiffs' detriment.

238.     As a direct and proximate result of Defendants' conduct, Plaintiffs have paid sums, and Defendants have been benefited from those payments, relating to the treatment and billing practices arising from automobile collisions at issue, in regard to the claimants' referral to Memorial Heights.

239.     The sums by which Defendants were unjustly enriched regarding the patients at issue are solely within Defendants' knowledge.

## X.
## COUNT SEVEN

(Against All Defendants for Money Had and Received)

240.     Plaintiffs incorporate, as though fully set forth herein, each allegation contained in paragraphs 1 through 239 above.

241.     Plaintiffs conferred a benefit upon Defendants by paying sums to settle the claims at issue. The records and bills provided by Defendants concerning emergency room services at Memorial Heights were at the very least a substantial factor in inducing Plaintiffs to settle these claims.

242.      The money Defendants obtained in connection with the payment of the claims at issue in equity and good conscience belongs to and should be returned to Plaintiffs.

243.      The sums by which Defendants were unjustly enriched regarding the patients at issue are solely within Defendants' knowledge.  However, based upon the substantial amounts of the MVA Entities' charges in the claims at issue, and the continued relationship between Defendants and attorneys to refer law office clients for supposed necessary emergency room services, the sums

received by Defendants are likely substantial. As set forth herein above, these services were not medically necessary, and do not meet the definition of emergency care under Texas law. Additionally, as set forth herein above, the MVA Entity Defendants operated as an unlicensed Freestanding Emergency Medical Care facility, and should not have billed for the services. In equity and good conscience, Defendants should be required to pay restitution to Plaintiffs equal to the total amounts Defendants received as a result of the Plaintiffs settling the claims at issue.

244.   Based upon Defendants' material misrepresentations and other affirmative acts to conceal their conduct from Plaintiffs, Plaintiffs injuries were inherently undiscoverable.

## XI.
## DAMAGES

245.   Plaintiffs incorporate, as though fully set forth herein, each allegation contained in paragraphs 1 through 244 above.

246.   Plaintiffs have been damaged by Defendants' practices outlined in this Complaint.

247.   As a result of these fraudulent claims, Plaintiffs were damaged in that they paid sums in regard to these inflated bodily injury claims. Plaintiffs seek recovery of the amount by which the claims were inflated; specifically, recovery of the amounts paid attributable to the Defendants' charges. The cases known to date are set forth in the attached and incorporated Appendix A..

248.   As set forth in Appendix A, the total amount of damages for these cases is $4,699,228.82. Regarding Counts 1, 2 and 3 (RICO violations), Plaintiffs are entitled to trebling of these damages pursuant to 18 U.S.C. §1964(c), of $14,097,686.46, and entitled to attorneys' fees and costs in an amount to be determined by the Court. Regarding Counts 4 and 5 (common law fraud and conspiracy), Plaintiffs are also entitled to exemplary damages to be determined at trial.

249.   Regarding Count 6 (Unjust Enrichment), Plaintiffs are entitled to the amount by which Defendants' were unjustly enriched.

250.     Regarding Count 7, Plaintiffs are entitled to restitution for the amounts which Defendants

obtained, which in equity and good conscience belong to Plaintiffs.

## XII.

## JURY DEMAND

251.     Trial by jury is requested on all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs **Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate County Mutual Insurance Company,** and **Allstate Fire & Casualty Insurance Company** respectfully request that upon final trial of this cause, the Court enter a judgment against Defendants, each of them jointly and severally:

(1)     Upon the First and Second Claims for Relief, all damages resulting from Defendants' violation of Title 18, United States Code, Section 1962(c), including prejudgment interest, the sum trebled pursuant to Title 18, United States Code, Section 1964(c);

(2)     Upon the Third Claim for Relief, all damages resulting from Defendants' violation of Title 18, United States Code, Section 1962(d) by conspiracy to violate Title 18, United States Code, Section 1962(c), including prejudgment interest, the sum trebled pursuant to Title 18, United States Code, Section 1964 (c);

(3)     Upon the Fourth Claim for Relief, all damages resulting from Defendants' fraudulent conduct;

(4)     Upon the Fifth Claim for Relief, all damages resulting from Defendants' conspiracy;

(5)     Upon the Sixth Claim for Relief, all sums to which Defendants were unjustly enriched to Plaintiffs' detriment;

(6)     Upon the Seventh Claim for Relief all sums to which, in equity and good conscience, Defendants should be required to pay restitution to Plaintiffs as a result of the Plaintiffs settling the claims at issue.

(7)      For the costs of suit including reasonable attorneys' fees in accordance with Title 18, United States Code, Section 1964(c);

(8)      Prejudgment interest at the maximum rate allowed by law;

(9)      Post-judgment interest at the maximum rate allowed by law;

(10)    Exemplary damages in such amount as the finder of fact may award at its discretion; and

(11)    All such other and further relief, legal and equitable, special or general, to which Plaintiffs may be justly entitled.

Respectfully submitted,

KNOX RICKSEN, LLP

*/s/ Bret Weatherford*

Bret Weatherford
Attorney in Charge
Texas State Bar No. 20998800
Federal I.D. No. 1322129
bww@knoxricksen.com
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

ATTORNEYS FOR PLAINTIFFS

Of Counsel:

Maisie Sokolove
California State Bar No. 239665
Federal I.D. No. 3863411
mcs@knoxricksen.com
Taylor T. Steele
Texas State Bar No. 24081164
Federal I.D. No. 3871848
tts@knoxricksen.com
Katherine Frank
Texas State Bar No. 24105630
Federal I.D. No. 3217765
kf@knoxricksen.com
Knox Ricksen, LLP
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765