# Exhibit 1

Page 1

CAUSE NO. 2020-84057

| | | |
|---|---|---|
| CELIA GONZALEZ | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| ALLSTATE FIRE AND CASUALTY | ) | |
| INSURANCE COMPANY | ) | |
| Defendant. | ) | 157TH JUDICIAL DISTRICT |

VOLUME 1 OF 1
ORAL AND VIDEOTAPED DEPOSITION OF
AKASH BHAGAT, M.D.
MAY 11, 2022

ORAL AND VIDEOTAPED DEPOSITION OF AKASH BHAGAT, M.D., produced at the instance of Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 11th day of May, 2022, from 10:05 o'clock a.m. to 1:08 o'clock p.m., before Monica Victor, a certified shorthand reporter, in and for the State of Texas, reported by computerized stenotype machine, at Law Offices of Marcos & Associates, P.C., 10700 North Freeway, 8th Floor, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



```
                                                  Page 2
 1                    INDEX
 2                                      PAGE
 3    Appearances .......................   3
 4
      AKASH BHAGAT, M.D.
 5
 6       Examination by Mr. Weatherford ..............   4
 7       Examination by Mr. Moriarty ................   124
 8       Further Examination by Mr. Weatherford ......   126
 9
      Correction Page ..................   129
10
      Reporter's Certificates ..........   131
11
12             EXHIBITS
      EXHIBIT      DESCRIPTION                  PAGE
13
      EXHIBIT 1    Affidavit Medical Records      7
14
      EXHIBIT 2    Color Xerox Photograph         14
15
      EXHIBIT 3    Color Xerox Photograph         15
16
      EXHIBIT 4    Color Xerox Photograph         16
17
      EXHIBIT 5    Memorial Heights Emergency     22
18                 Center Statement
19    EXHIBIT 6         Google Maps               37
20    EXHIBIT 7         Google Maps               38
21    EXHIBIT 8    Cypress Smart Choice Chiropractic  72
                   Chart Notes
22
      EXHIBIT 9    Memorial Heights Emergency Center  88
23                 Chargemaster
24
25            * * * * * * * * * *
```

```
                                                  Page 3
 1                 A P P E A R A N C E S
 2
 3    COUNSEL FOR PLAINTIFF:
 4    Mr. Wade Moriarty
      LAW OFFICE OF MARCOS & ASSOCIATES, P.C.
 5    10700 North Freeway, 8th Floor
      Houston, Texas 77037
 6    Telephone: 713.999.4444
      E-mail: wmoriarty@marcoslaw.com
 7
 8    COUNSEL FOR DEFENDANT:
 9    Mr. Michael D. Robbins
      DOYLE, RESTREPO, HARVIN & ROBBINS, L.L.P.
10    440 Louisiana Street, Suite 2300
      Houston, Texas 77002
11    Telephone: 713.228.5100
      Facsimile: 713.228.6138
12    E-mail: mrobbins@drhrlaw.com
13    Mr. Bret W. Weatherford
      LAW OFFICES OF KASSABIAN, DOYLE & WEATHERFORD, P.C.
14    524 E. Lamar Boulevard, Suite 280
      Arlington, Texas 76011
15    Telephone: 817.461.8855
      Facsimile: 817.274.9863
16    E-mail: bweatherford@kdwlawtx.com
17
      ALSO PRESENT:
18
      Mr. Isaac Bahena
19
20
21
22
23
24
25
```

```
                                                  Page 4
 1              THE VIDEOGRAPHER:  Good morning.  Today is
 2    Wednesday, May the 11th, 2022.  We are on the record,
 3    and the time is 10:05.
 4              (Witness sworn.)
 5              MR. WEATHERFORD:  Do we need announcements?
 6              THE REPORTER:  No.
 7              AKASH BHAGAT, D.O.,
 8    having been first duly sworn, testified as follows:
 9                      EXAMINATION
10    BY MR. WEATHERFORD:
11       Q.  Good morning, Dr. Bhagat.
12       A.  Good morning.
13       Q.  Could you state your full name?
14       A.  Akash Bhagat.
15       Q.  Okay.  And what is your profession?
16       A.  I'm an emergency physician.
17       Q.  How long have you been a medical doctor?
18    Let -- let me rephrase that actually.  When were you
19    first licensed as a medical doctor?
20       A.  Probably 2005, 2004 maybe.
21       Q.  Okay.  In Texas?
22       A.  Yes.
23       Q.  Have you ever been licensed in any state other
24    than Texas?
25       A.  No.
```

```
                                                  Page 5
 1       Q.  And what area of medicine do you practice?
 2       A.  Emergency medicine.
 3       Q.  Have you practiced emergency medicine since you
 4    graduated from medical school?
 5       A.  I have.
 6       Q.  Any other medical -- or areas of practice?
 7       A.  No.
 8       Q.  I actually found your -- your LinkedIn page,
 9    Doctor, but you're also -- you actually are also, as you
10    stated, an entrepreneur in hospitality and diversified
11    healthcare management industry.
12       A.  Yeah.  I should update this.
13       Q.  Is that sort of still correct or --
14       A.  It's sort of still correct, yeah.
15       Q.  Okay.  So in addition to actually being a
16    medical doctor, you also have some ventures in -- in,
17    like, business clubs, that type of thing?
18       A.  No longer.  That closed down, but I am an
19    entrepreneur.
20       Q.  Have you ever been deposed in a lawsuit before?
21       A.  I have.
22       Q.  On how many occasions?
23       A.  I believe just twice.
24       Q.  So this would be about the third?
25       A.  Probably third or fourth, yeah.
```



Page 34

1  working for either of the Memorial Heights MVA
2  Professional or Memorial Heights MVA Facility?
3      A. No.
4      Q. In the -- in the records that are before you,
5  the Memorial Heights records, is there any type of
6  questionnaire or form an incoming patient or family
7  member would complete that you did not see in those
8  records?
9      A. An incoming form. Can you --
10     Q. Right. I mean --
11     A. -- tell me what you mean by that?
12     Q. Well, let me sort of break it down.
13     A. Uh-huh.
14     Q. A patient comes to Memorial Heights.
15     A. Yes, sir.
16     Q. What type of paperwork would they be given when
17  they come to Memorial Heights?
18     A. Just some initial intake paperwork.
19     Q. Okay. Did you see those -- that paperwork in
20  this file?
21     A. This is the -- the medical record.
22     Q. Right.
23     A. So their initial intake with demographics,
24  whatever is on that intake paperwork is not -- is not in
25  here.

Page 35

1      Q. Okay. So there's a separate record that would
2  contain other records concerning Ms. Gonzalez?
3      A. If that's -- that's all input into our computer
4  system, and that's not part of the -- the medical
5  record. It's --
6      Q. Okay. Would these records be things like, you
7  know, where the -- for a patient or a family member of
8  the patient would write in what areas of the body there
9  was a complaint?
10     A. No.
11     Q. Level of pain?
12     A. No.
13     Q. Would it be strictly demographic information?
14     A. Yes, sir.
15     Q. Addresses, telephone numbers, that type of
16  thing?
17     A. Correct.
18     Q. Looking at the Memorial Heights records, do
19  they reflect when the accident occurred? And I think if
20  you reference page 13 or 16, 13 would be your own
21  physician's report.
22     A. Right.
23     Q. And in your report, did you reflect when the
24  accident occurred?
25     A. I wrote the injury occurred September 6th.

Page 36

1      Q. Okay. And the date that she actually came in
2  was September the 11th?
3      A. Yes.
4      Q. So this was five days after the accident that
5  she came to the freestanding emergency room?
6      A. Correct.
7      Q. Do you know if she sought treatment anywhere in
8  that five-day period before coming to Memorial Heights?
9      A. I did not notate that she did.
10     Q. Is that something you normally would notate?
11     A. If she told me or if she brought some sort of
12  documentation from another facility, then I would
13  include that, yes.
14     Q. I mean, is that unusual that a person would
15  wait five days to go to an ER after an accident?
16     A. No, it's not.
17     Q. Is this a situation where you think maybe she
18  just lived nearby and finally decided to come to your
19  facility?
20     A. I don't --
21         MR. MORIARTY: Objection --
22     A. I don't --
23         MR. MORIARTY: -- form.
24     A. I don't know.
25     Q. (BY MR. WEATHERFORD) Do the records that you

Page 37

1  have reflect how Ms. Gonzalez happened to come to
2  Memorial Heights?
3      A. No, I don't.
4      Q. Do they reflect where Ms. Gonzalez resides?
5      A. Resides?
6      Q. Right. I believe the billing record.
7      A. No, I don't know where she lives.
8      Q. What does the -- the Memorial Heights billing
9  record state her address was?
10     A. 7355 Stone Pine Lane.
11     Q. Are you familiar with where that is?
12     A. No, sir, I'm not.
13     Q. Memorial Heights itself, it's located fairly
14  close to Downtown?
15     A. It's a few miles outside, yes, sir.
16     Q. Maybe a couple of miles to the west of
17  Downtown?
18     A. Yes.
19         MR. WEATHERFORD: Can we go ahead and mark
20  this?
21         THE WITNESS: As what?
22         MR. WEATHERWORD: Oh, mark it as Exhibit 6.
23  Thank you.
24         (Exhibit 6 marked.)
25     Q. (BY MR. WEATHERFORD) And this is just

10 (Pages 34 to 37)



Page 38

1   something I pulled off of Google maps.  And can you see
2   that represents where that -- where the patient's
3   address is?
4       A.  Yes, sir.
5       Q.  Okay.  And, I mean, she's fairly well to the
6   west of Loop 8.  Would you agree?
7           MR. MORIARTY:  Objection, form.
8       A.  I agree she's to the west of Loop 8, yes.
9       Q.  (BY MR. WEATHERFORD) Okay.  I mean, she's not
10  very close to Memorial Heights, is she?
11          MR. MORIARTY:  Objection, form.
12      A.  Close is relative, sir.  I'm not sure how to
13  define that.
14          MR. WEATHERFORD:  Okay.  Can you mark this
15  as Exhibit 7?  Thanks.
16          (Exhibit 7 marked.)
17      Q.  (BY MR. WEATHERFORD) And I'm handing you
18  what's marked as Exhibit 7, and that's just another
19  Google location from Memorial Heights.
20      A.  Yes, sir.
21      Q.  Is -- does that correctly depict where Memorial
22  Heights Emergency Center is?
23      A.  It looks fairly close, yes.
24      Q.  I mean, compared to where Memorial Heights is
25  and where she lives is, that's a fair distance, isn't

Page 39

1   it?
2           MR. MORIARTY:  Objection, form.
3       A.  However you define fair, yes, sir.
4       Q.  (BY MR. WEATHERFORD) Well, per Mapquest, she
5   live 18.4 four miles away from Memorial Heights Medical
6   Center.  Would you consider that a -- a substantial
7   distance?
8           MR. MORIARTY:  Objection, form.
9       A.  Please be a little bit more detailed --
10      Q.  (BY MR. WEATHERFORD) Okay.  Sure.
11      A.  -- than substantial distance.
12      Q.  If -- if she lived 18.4 miles away from
13  Memorial Heights --
14      A.  Yes, sir.
15      Q.  -- Emergency Center, would you find that
16  unusual that a plaintiff would travel that far to get to
17  your freestanding ER?
18          MR. MORIARTY:  Objection, form.
19      A.  We've had patients come from further.
20      Q.  (BY MR. WEATHERFORD) Okay.  The photos that we
21  looked at earlier of Memorial Heights, is -- is Memorial
22  Heights Emergency Center visible from any freeway?
23      A.  The facility is not.
24      Q.  Okay.  You pretty much have to be driving on
25  Washington Avenue to see the facility?

Page 40

1       A.  To the see the facility, yes.
2           MR. MORIARTY:  Objection, form.
3           Hey, guys, can we take a quick break?
4           MR. WEATHERFORD:  Sure.
5           MR. MORIARTY:  My pen just ran out.
6           THE VIDEOGRAPHER:  Off the record at 10:50.
7           (Recess 10:50 a.m. to 10:59 a.m.)
8           THE VIDEOGRAPHER:  And we are back on the
9   record, and the time is 10:59.
10      Q.  (BY MR. WEATHERFORD) Sure.  Dr. Bhagat, could
11  you look at the -- the medical record in this case?  If
12  you would, turn to page 16.  And do you recognize what
13  this document to be?
14      A.  I do.
15      Q.  And what is that?
16      A.  It's the nursing record.
17      Q.  Okay.  And it appears to me the nurse really
18  keeps track of everything that happens with the patient
19  treatment.  Is that correct?
20      A.  Right.
21      Q.  Okay.  The triage says, "Arrived by private
22  vehicle."  Is that true?
23      A.  That's what it says, yes.
24      Q.  Okay.  I mean, do patients ever arrive by
25  ambulance to Memorial Heights?

Page 41

1       A.  No, we don't take inbound ambulance.
2       Q.  And looking at the dates, it appears that --
3   that several things -- or the times -- pardon me.
4   Looking at the times, it appears that several things
5   happened at 7:40, 19:40.  Do you -- do you agree with
6   that?  Right.  I mean, like the -- the time of --
7   underneath "Chief Complaint," what's the time that's
8   written?
9       A.  7:40.
10      Q.  Okay.  Would 7:40 have been the time that the
11  nurse was taking this information?
12      A.  That's when the nurse documented the
13  information.
14      Q.  Okay.  And at the same time, the Glasgow Coma
15  Score was also at 7:40?
16      A.  It says 20:35, sir.
17      Q.  Oh, okay.  So that was done quite later?
18      A.  It was either done or documented later, yes,
19  sir.
20      Q.  And let me ask you a -- a question on that
21  because I wasn't sure of this myself.  Look at where the
22  blood pressure and the heart rate was taken.  Do you see
23  that?
24      A.  I do.
25      Q.  Okay.  And there is a timestamp for 19:40,

11 (Pages 38 to 41)



Page 86

```
 1        MR. MORIARTY:  Objection, form.
 2     Q.  (BY MR. WEATHERFORD)  So did you start doing
 3  internal billings under the MVA entities, you know,
 4  right when you formed them?
 5     A.  No.  I imagine it was a little bit later.
 6     Q.  Okay.  But by this point, a little more than a
 7  month later, they were already billing?
 8     A.  Correct.
 9     Q.  Now, the -- the first charge under the
10  Facility -- I'm looking at the MVA Facility
11  Administration, LLC bill.  99285, that's a -- a CPT
12  code.
13     A.  Right.
14     Q.  Do you have an understanding of CPT codes?
15     A.  A high level, yes.
16     Q.  Okay.  Are -- they're standardized throughout
17  the United States.  Is that correct?
18     A.  Right.
19     Q.  Actually, CMS, the Medi- -- Medicare Center
20  requires it for a lot of billings.  Is that correct?
21     A.  I'm not sure of that case law, but it's -- it
22  sounds reasonable.
23     Q.  But they're -- they're very commonly used by
24  most healthcare providers today?
25     A.  Yes.
```

Page 87

```
 1     Q.  And this allows one medical provider to see
 2  what was coded and to know what -- pretty much exactly
 3  what was done --
 4     A.  Correct.
 5     Q.  -- by a prior provider?
 6     A.  Correct.
 7     Q.  Okay.  99285, is a 5 level the highest level of
 8  service?
 9     A.  No.  I believe there's a critical care modifier
10  as well that can be --
11     Q.  Okay.
12     A.  -- added.
13     Q.  And 99285 is basically the -- the basic
14  emergency room service?
15     A.  The -- a complex patient, yes.
16     Q.  Yeah, but it's -- but it's the -- the general
17  billing that the patient has come in the door and had to
18  be evaluated?
19     A.  I suppose so.
20     Q.  Okay.  And the charge is $10,500 for that one
21  service?
22     A.  Correct.
23     Q.  Okay.  And that's what Memorial Heights is
24  still seeking today?
25     A.  Correct.
```

Page 88

```
 1     Q.  Does Memorial Heights, on its Web site, have a
 2  Chargemaster posted?
 3     A.  It -- it does.
 4     Q.  Okay.  And I believe it's -- it's about 262
 5  pages long if you try to print it.
 6     A.  Probably so, sir.
 7     Q.  It -- it's lengthy, isn't it?
 8     A.  There's a lot of CT codes, yes.
 9     Q.  It -- it -- and I think it has probably about
10  every conceivable CT -- CPT code that could be billed.
11  Correct?
12     A.  It sounds like at 262 pages, it should be
13  pretty comprehensive.
14     Q.  I'm not -- I'm not going to give you the whole
15  thing, but I would like to mark this as Exhibit 9.
16        MR. WEATHERFORD:  Here you go.
17        (Exhibit 9 marked.)
18     Q.  (BY MR. WEATHERFORD)  And does this -- this
19  face page, does that look how -- how it would appear on
20  the -- the wording appears on the -- the Web site?
21     A.  This looks like our -- like it would be, yes.
22     Q.  Okay.  When did you start posting this
23  Chargemaster on the Web site?
24     A.  I don't recall exactly.  It was a few years
25  ago.
```

Page 89

```
 1     Q.  Okay.
 2     A.  It was prior to the pandemic, so probably 2019
 3  or 2018.
 4     Q.  Okay.  And -- and was there a Chargemaster, you
 5  think, on in 2018 when --
 6     A.  I wouldn't -- I wouldn't know exactly when --
 7     Q.  Okay.
 8     A.  -- we uploaded it.
 9     Q.  Is this the only -- does Memorial Heights only
10  have one Chargemaster?
11     A.  Currently, yes.
12     Q.  Regardless of patients?
13     A.  Yes.
14     Q.  Okay.  And you said, currently, yes.  Was there
15  a time before that there was different charge masters
16  for different types of patients?
17     A.  For -- for self-pay patients, I know that we
18  have a different fee schedule.  Like for upfront pay,
19  we -- we provide discounts.
20     Q.  Okay.  But the -- the -- the base charge would
21  still be the same.  It would just be discounted for
22  prompt pay?
23     A.  Correct.
24     Q.  Okay.  So if you looked at Chargemaster, there
25  would be the same price?
```

23 (Pages 86 to 89)



Page 90

1  A. When was this Chargemaster done?
2  Q. I printed it --
3  A. It doesn't say.
4  Q. I'll represent to you, I printed it off within
5  last couple of days.
6  A. Okay.
7  Q. It's the current one.
8  A. Okay.
9  Q. Was there ever a time when there was a separate
10 Chargemaster for the -- the letter of protection
11 patients treating under the MVA Facility entity?
12 A. I -- I -- I don't recall if there was a
13 different Chargemaster --
14 Q. Okay.
15 A. -- completely.
16 Q. There could -- there could have been?
17 A. We try to stick to one Chargemaster, but
18 billing is fluid. It changes. So I -- I can't tell you
19 exactly during that time period what was -- what the
20 charges were.
21 Q. Okay. Will you look at that $10,500 charge?
22 If you look at the -- the current Chargemaster -- and
23 I'll find the page. The next-to-last page at the
24 bottom, do you see the -- the charge on the current
25 Chargemaster for the 99285 --

Page 91

1  A. I do.
2  Q. -- service? What is the current charge for a
3  99285 service by Memorial Heights?
4  A. 3,500.
5  Q. Okay. And in September of 2018, the bill for
6  Ms. Gonzalez was 10,500.
7  A. Correct.
8  Q. That's -- so the -- the charge in 2018 was
9  exactly three times what the charge today would be?
10 A. Correct.
11 Q. When did that charge change?
12 A. I don't know exact date.
13 Q. Okay. Do you think that $10,500 is a
14 reasonable charge in view of the fact that you would
15 charge only a third of that today for a patient?
16 A. During that time, it was reasonable.
17 Q. But today it wouldn't be reasonable?
18 A. Today we have different prices.
19 Q. Okay. You dropped by a third. Do you know --
20 do you know when the price dropped by a third?
21 A. I don't know exactly, sir.
22 Q. At the time this bill was generated in -- for
23 the services -- actually it has a date at the top,
24 September 25, 2018?
25 A. Yes, sir.

Page 92

1  Q. Would that have been the date that this bill
2  was generated?
3  A. That's the date on the bill, yes, sir.
4  Q. Okay. On September the 20 -- in September of
5  2018, if I had been a non-accident patient coming in for
6  abdominal pain and I had been provided a 99285
7  service --
8  A. Yes, sir.
9  Q. -- would I have been billed $10,500 or would I
10 have been billed a lower amount?
11 A. I would have to look at bills from that time
12 for an abdominal pain patient, to be honest with you.
13 Q. Okay. There wasn't a separate charge list for
14 non-accident patients at the time?
15 A. I would have to refer back to, you know, our
16 documentation from back then. I just don't know.
17 Q. Is that documentation maintained?
18 A. What -- when the charge -- Chargemaster was
19 changed?
20 Q. Right.
21 A. There may be a way that we can find that
22 information out by scouring through old bills.
23 Q. Okay. But it wouldn't have been a separate
24 Chargemaster?
25 A. I -- I believe we have one Chargemaster. I

Page 93

1  would have to -- I don't do the billing. So I am not a
2  hundred percent sure.
3  Q. Okay. Would Ms. England know?
4  A. She -- she may.
5  Q. I mean, who is Ms. -- Ms. -- and her name's
6  Leia?
7       THE WITNESS: Do you mind if I run to the
8  restroom right quick? I've been drinking too much
9  coffee.
10      MR. WEATHERFORD: Sure. Sure.
11      THE WITNESS: Thank you.
12      THE VIDEOGRAPHER: Off the record and the
13 time is 12:07.
14      (Recess 12:07 p.m. to 12:16 p.m.)
15      THE VIDEOGRAPHER: We are back on the
16 record and the time is 12:16.
17 Q. (BY MR. WEATHERFORD) Now, Doctor, the second
18 charge that I want to look at is a cervical CT without
19 contrast and that was billed as CPT code -- CPT code
20 72125?
21 A. Yes, sir.
22 Q. And that was billed at $9,656.85?
23 A. Correct.
24 Q. Do you know what that -- the current charge
25 would be at Memorial Heights for that?



|  | Page 94 |  | Page 95 |
|---|---|---|---|
| 1 | A. No, I don't. | 1 | Q. The lumbar CT for Ms. Gonzalez under CPT code |
| 2 | Q. If -- if you look at the third page of that | 2 | 72131, lumbar CV -- CT of the lumbar spine without |
| 3 | exhibit, do you see the current charge for CPT code | 3 | contrast, $11,494.80. Do you see that? |
| 4 | 72125, CT cervical spine without contrast? | 4 | A. I do. |
| 5 | A. I do. | 5 | Q. Okay. Per the current Chargemaster, what would |
| 6 | Q. And that -- that's the same service that was | 6 | the charge for 72131 be? |
| 7 | billed Ms. Gonzalez. Correct? | 7 | A. $6,820.25. |
| 8 | A. Yes. | 8 | Q. That's only about 59 percent of the charge |
| 9 | Q. And what's the current charge on that? | 9 | that's charged for Ms. Gonzalez? |
| 10 | A. $5,568.78. | 10 | A. Sounds right. |
| 11 | Q. Okay. So that's more than $4,000 less than | 11 | Q. Well, if Ms. Gonzalez had come in today instead |
| 12 | what the MVA Facility bill is for Ms. Gonzalez? | 12 | of in 2018, the current charge would be $4,674 less. |
| 13 | A. From 2018, correct. | 13 | Correct? |
| 14 | Q. You know, the price has dropped close to half? | 14 | A. Yes. |
| 15 | A. If that's the amount, yes, sir. | 15 | Q. But is it your testimony if there was a |
| 16 | Q. If a -- if a motor vehicle accident patient | 16 | Chargemaster back in September of 2018 the higher charge |
| 17 | came in today -- | 17 | would have been the only charge on that Chargemaster? |
| 18 | A. Yes, sir. | 18 | A. I would have to refer to the Chargemaster from |
| 19 | Q. -- and treated at Memorial Heights and you did | 19 | 2018. |
| 20 | a cervical T -- CT without contrast -- | 20 | Q. Is that something you think you could try to |
| 21 | A. Yes, sir. | 21 | find? |
| 22 | Q. -- they'd be charged the $5,568 amount? | 22 | A. I can try. I belive it's electronic. So we |
| 23 | A. Yes. | 23 | just -- we -- we change it. It's not like -- we don't |
| 24 | Q. And not the $9,656 amount? | 24 | print out 260 pages to keep in our file. |
| 25 | A. Correct. | 25 | Q. So you think once a -- a new charge for a |

|  | Page 96 |  | Page 97 |
|---|---|---|---|
| 1 | Chargemaster is determined, basically the old | 1 | A. $1,917.90. |
| 2 | Chargemaster is erased since you have new information? | 2 | Q. That's one-third exactly of the $5,753.70 |
| 3 | A. Correct. | 3 | charge that was billed to Ms. Gonzalez. Is that |
| 4 | Q. Would there be any source other than billings | 4 | correct? |
| 5 | from that time period? | 5 | A. If you did the math, then I'll agree with you. |
| 6 | A. Not that I can think of currently, sir. | 6 | Q. About a third if -- if you don't do the math. |
| 7 | Q. The upper extremity CT without dye, that would | 7 | A. Okay. |
| 8 | be the -- the wrist CT. Correct? | 8 | Q. Well, it's basically 3800 compared to 5700. |
| 9 | A. Yes, sir. | 9 | Correct? |
| 10 | Q. Okay. And Memorial Heights is charge -- the | 10 | A. Would you like me to do the math? |
| 11 | MVA Facility Administration entity is charging | 11 | Q. No. No. |
| 12 | $5,753.70? | 12 | A. Okay. |
| 13 | A. That's correct. | 13 | Q. And, again, if a patient -- if an automobile |
| 14 | Q. Okay. I'm trying to find this. Where -- if | 14 | accident patient came in today treating under a letter |
| 15 | you look at the next page that -- from the page we were | 15 | of protection -- |
| 16 | looking at for the other CTs on the current | 16 | A. Uh-huh. |
| 17 | Chargemaster -- | 17 | Q. -- and received a upper extremity CT like this, |
| 18 | A. Okay. | 18 | would the charge be $3,835.80? |
| 19 | Q. -- do you see the -- the 73 -- the CPT 73200 -- | 19 | A. Today would be -- |
| 20 | A. I do. | 20 | Q. Oh, wait a minute. Pardon me. Would be |
| 21 | Q. -- service? And that's CT upper extremity | 21 | one-thousand nine -- let me rephrase the whole question |
| 22 | without material. But that's the service that was | 22 | then. If an -- if an automobile accident patient |
| 23 | provided to Ms. Gonzalez? | 23 | treating under an LOP came in today and had the -- the |
| 24 | A. It sounds like it, yes. | 24 | CT of the wrist, they would be billed $1,917.90? |
| 25 | Q. Okay. What's the current charge? | 25 | A. That's correct. |



Page 98

1    Q.  They would not be billed the $5,753.70 that
2  you're billing Celia Gonzalez?
3    A.  Correct.
4    Q.  Since we're on the page with the wrist, if you
5  look at the -- what would be the charge under the
6  current Chargemaster in 2022 for the CPT 73110, wrist
7  x-ray, minimum three views?
8    A.  Which page is that on?
9    Q.  The same page as the -- the one we were on with
10 the CT.
11   A.  $945.53.
12   Q.  Okay.  And on the MVA Facility Administration
13 bill for Ms. Gonzalez, that is $1,443.06?
14   A.  Yes, sir.
15   Q.  And, again, that's exactly one-third of the
16 charge for Ms. Gonzalez.
17   A.  No.
18   Q.  Oh, wait a minute.  Pardon me.  Let me withdraw
19 that question then.
20        So instead of $945, Ms. Gonzalez was billed
21 $1,443?
22   A.  And six cents.
23   Q.  And six cents.
24   A.  Yes, sir.
25   Q.  I mean, would it surprise you if the other

Page 99

1  charges were similar in this case?
2        MR. MORIARTY:  Objection, form.
3    A.  I'm not surprised by anything, sir.
4    Q.  (BY MR. WEATHERFORD)  Okay.  The short arm
5  splint, the actual service -- I mean, there's -- the
6  actual cost for the splint itself was over a a thousand
7  dollars.  Correct?
8    A.  Yeah, for the custom fabricated --
9    Q.  Okay.
10   A.  -- short arm fiberglass splint.
11   Q.  And the -- oh.  Pardon me.  I -- I interfered
12 with your answer.  But that was over a thousand dollars?
13   A.  Yes, sir.  $1,056.15.
14   Q.  But in addition to that, there was also a --
15 there's actually a charge for padding for the
16 compression bandage.  Is that part of the splint?
17   A.  Yes.
18   Q.  That's an additional $67?
19   A.  Yes, sir.
20   Q.  The Ace wrap, that's an additional 45.93?
21   A.  Yes, sir.
22   Q.  Okay.  The current Chargemaster, if you look
23 at -- I think it's the last page.  And this is actually
24 a supply code, 86449?
25   A.  Yes, sir.

Page 100

1    Q.  What would be the -- the cost for the Ace wrap
2  today?
3    A.  $15.31.
4    Q.  Okay.  And that is exactly one-third of the
5  $45.93 that's being charged to Ms. Gonzalez?
6    A.  It's exactly one-third, yes, sir.
7    Q.  Exactly one-third.  A lot of these have -- have
8  gone down to a third of what they were at the time you
9  charged Ms. Gonzalez.  Isn't that correct?
10        MR. MORIARTY:  Objection, form.
11   A.  It doesn't -- it doesn't seem like a lot of
12 them.  Some of them are.
13   Q.  (BY MR. WEATHERFORD)  Well, the -- the splint
14 that I was looking at, that --
15   A.  Uh-huh.
16   Q.  -- was billed at CPT code -- or the short arm
17 splint service -- and this is $688.  So this was for the
18 application by the tech of the splint?
19   A.  Yes.
20   Q.  Okay.  And that was billed under Code 29125.
21 If you -- if you look at the bottom of the -- the very
22 bottom of the first page of charges in this exhibit --
23   A.  Yes, sir.
24   Q.  -- is that that same service, 29125?
25   A.  Yes, it is.

Page 101

1    Q.  What was the charge currently for that?
2    A.  $229.60.
3    Q.  Okay.  And that's about -- that's exactly a
4  third of the -- the charge for Ms. Gonzalez, isn't it?
5    A.  Would you like me to do the math?
6    Q.  Well, it's a difference between $688.80 and
7  $229.60.
8    A.  It's a third.
9    Q.  Okay.  For Ms. Gonzalez's charges --
10   A.  Yes, sir.
11   Q.  -- current charges, who actually determined the
12 charge amounts that were used in the Chargemaster as of
13 that time?
14   A.  They were based on a variety of local
15 healthcare providers that provide the same service.
16   Q.  So you're saying you -- you look at other
17 healthcare providers to see what they charge?
18   A.  Yes.
19   Q.  And, like, for the basic 99285, other
20 freestanding emergency rooms were charging $10,500?
21   A.  I would have to look, but they're based on --
22 they are based on what other facilities providing the
23 same service are charging.
24   Q.  Do you recall what other facilities you looked
25 at?



```
                                                Page 114
 1        A. -- we looked at bills without patient names on
 2   them and we saw charges and made decisions based on
 3   those.
 4        Q. Okay.  So you -- you looked at bills from other
 5   facilities that patients had?
 6        A. Correct.
 7        Q. Okay.  Where do you obtain these bills from?
 8        A. From -- some patients sent them to me, some
 9   were from family members of our staff, various sources.
10        Q. How often do you update charges?
11        A. Whenever our costs seem to -- whenever there's
12   changes in -- in our -- within our industry.
13        Q. For -- for your own charge, you had a 99284
14   code?
15        A. Yes, sir.
16        Q. And that's actually not the 5 code that the
17   facility had.  Is -- are they supposed to correspond to
18   one another or can one be lower than the other or --
19        A. One can be lower.
20        Q. Okay.  And the emergency room visit Level 4 for
21   yourself is billed as $2,400.
22        A. That's what it says.
23        Q. Okay.  Isn't it true that before the formation
24   of the MVA entities Memorial Heights was billing Level 4
25   ER charges by the physicians at under $1,000?
```

```
                                                Page 115
 1        A. I would have to look at a bill from prior to
 2   the MVA entities.
 3        Q. Is it possible that earlier in 2018, before
 4   August of 2018, that Memorial Heights was charging Level
 5   4 services by the physician as -- as low as $752.40?
 6        A. I would have to check the bill to make sure,
 7   sir.
 8        Q. And you also charged the arm splint application
 9   for $978?
10        A. Correct.
11        Q. But you didn't apply the splint.  You
12   supervised the tech that was applying the splint?
13        A. Correct.
14        Q. So there is a charge both by the tech applying
15   the splint and a charge for you watching the tech apply
16   the splint?
17        A. Supervising and assisting, yes.
18        Q. For -- for $978?
19        A. Yes.  And making sure the splint was applied
20   properly, checking neurovascular status afterwards.
21        Q. Well, the --
22        A. There is additional things that go on too above
23   and beyond just applying a splint.
24        Q. I mean, the -- the wrist splint as a whole cost
25   well over $2,000 when you consider the over $1,000
```

```
                                                Page 116
 1   charge and the charge for the tech, the charge for you,
 2   the charge for the Ace bandage and materials?
 3        A. Correct.
 4        Q. And when she went to Smart Choice Chiropractic
 5   the next day, they -- it -- it doesn't appear that she
 6   even had it on.
 7             MR. MORIARTY:  Objection, form.
 8        A. That's what it appears like.
 9        Q. (BY MR. WEATHERFORD) Do you think she took it
10   off?
11        A. I can't make an opinion based on speculation.
12             MR. MORIARTY:  Objection, form.  Yeah.
13        Q. (BY MR. WEATHERFORD) Does Memorial Heights
14   market services to attorneys?
15        A. No.
16        Q. I know you said you do get referrals from
17   attorneys?
18        A. We -- we market our services in general and
19   people use our services for different reasons.
20        Q. And -- and how do you market in general?
21        A. Search and geo-optimization, Google,
22   billboards, word of mouth --
23        Q. Would you have had --
24        A. -- provide good service.
25        Q. Would you have had billboards up at -- in 2018?
```

```
                                                Page 117
 1        A. Yes.
 2        Q. Okay.  At what parts of town?
 3        A. I would have to check our roster to tell you
 4   exactly where they are, but we have numerous.
 5        Q. Would you have a -- a roster from 2018, at the
 6   time she treated?
 7        A. Clear Channel might.
 8        Q. The -- the Emergency Healthcare Partners, LP
 9   entity, which that's the entity that actually does
10   business as Memorial Heights.  Correct?
11        A. That's the legal entity which owns the
12   facility.
13        Q. Okay.  It -- it's the only entity that's
14   actually licensed by the State of Texas as a
15   freestanding ER.  Is that correct?
16        A. That's correct.
17        Q. Okay.  What are these -- these other entities,
18   MVA Physician Administration, LLC, are they a -- a
19   totally separate entity?
20        A. They're the billing entities.
21        Q. They're -- they're strictly billing entities?
22        A. Correct.
23        Q. Do they have different tax identification
24   numbers from the actual Emergency Healthcare Partners,
25   LP entity?
```



```
                                                    Page 118
 1      A.  I believe so, yeah.
 2      Q.  So a bill going out for an accident patient
 3  would be under a different tax identification number
 4  than a billing for the -- for an abdominal pain or I
 5  slipped on the dog in my front yard type of --
 6      A.  The -- the bill comes from the MVA entities and
 7  then I assume -- yeah -- there's a different tax ID
 8  number that -- it's a different billing company
 9  essentially that does the billing for the car accident
10  type patients.
11      Q.  Okay.  Earlier you talked about you had given a
12  deposition in a -- in a case against a partner?
13      A.  Uh-huh.
14      Q.  Was that a -- a lawsuit against Dr. Phelan?
15      A.  Yeah, there was a -- yes, it was.
16      Q.  And -- and that's a lawsuit that -- that your
17  entity, Emergency Healthcare Partners initiated against
18  Dr. Phelan?
19      A.  That's correct.
20      Q.  And Dr. Phelan actually filed a countersuit in
21  that action, didn't he?
22      A.  Correct.  But if this going to go much longer,
23  I would like to break for lunch.
24      Q.  It's -- it's not going to go much longer.
25      A.  Okay.
```

```
                                                    Page 119
 1      Q.  I think it's going to be done now in ten
 2  minutes.
 3      A.  In ten minutes?
 4      Q.  Ten or 15 minutes.
 5      A.  Okay.
 6      Q.  That -- that lawsuit against -- that lawsuit
 7  was in 2019.  Correct?
 8      A.  Correct.
 9      Q.  And it's -- it's resolved in some manner.  It's
10  no longer a live lawsuit?
11      A.  Correct.
12      Q.  Okay.  Do you recognize the -- the filings in
13  the case.
14      A.  Yes.
15      Q.  And you've read these before?
16      A.  Yes.
17      Q.  And you were probably deposed on these issues
18  in that case?
19      A.  Correct.
20      Q.  Okay.  If you look at the very bottom of page 7
21  on this, there is a heading, "Dr. Bhagat secretly forms
22  the MVA entities to run a personal injury accident
23  clinic out of the partnership's facility and using
24  partnership funds and resources."  I mean, would you
25  agree with that allegation?
```

```
                                                    Page 120
 1      A.  No.
 2      Q.  Did the other partners, the junior partners,
 3  who had, like, this Dr. Phelan and Dr. Fair that you
 4  talked about, did they know you were forming these --
 5  the MVA entities?
 6      A.  Dr. Fair did, yes.
 7      Q.  And Dr. Phelan didn't?
 8      A.  And if we're going to speak about this, then I
 9  would need my attorney for -- who's representing me
10  during this time to be present.
11      Q.  Okay.  But that suit is concluded now.  I
12  mean --
13      A.  Yes.
14      Q.  And -- and Dr. Phelan can't come back on you in
15  this suit because it's already concluded.  Correct?
16      A.  This -- this has been dismissed, yes.
17      Q.  Okay.  Just a question then on this.  There's a
18  Footnote No. 3 and the counterclaim states that -- that
19  Dr. Bhagat, yourself, entered into letters of protection
20  with at least 17 different personal injury attorneys.
21  And if you look at Footnote 3, that includes Javier
22  Marcos & Associates.  Did you form the MVA entity --
23  entities after coming to agreements with certain
24  personal injury attorneys to refer patients?
25      A.  I did not.
```

```
                                                    Page 121
 1      Q.  Did -- did you form them as part of a separate
 2  entity to assist personal injury attorneys in presenting
 3  personal injury claims based on automobile accidents?
 4      A.  No.
 5      Q.  Or to increase the charges for personal injury
 6  patients --
 7      A.  No.
 8      Q.  -- to support those claims?
 9      A.  No.  And above and beyond that, I'm -- I'm
10  going to need to involve my attorney if you want to
11  discuss any of those issues in there.
12      Q.  Okay.  Okay.  Let's just take a quick break.  I
13  think I'm -- I'm not going to come back to this.
14      A.  Okay.
15      Q.  And -- well, let me get this straight.  If --
16  if -- if I ask you any further questions about the --
17  the lawsuit involving Dr. Phelan --
18      A.  Right.
19      Q.  -- are you going to answer those questions?
20      A.  No, I won't.
21          MR. WEATHERFORD:  Let's just take a short
22  break.  We may be done.
23          THE VIDEOGRAPHER:  Off the -- excuse me --
24  off the record.  The time is 12:54.
25          (Recess 12:54 p.m. to 1:00 p.m.)
```

