## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ALLSTATE INDEMNITY COMPANY, | § | |
| *ET AL.* | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 4:24-CV-02573 |
| | § | |
| | § | |
| | § | |
| AKASH BHAGAT, D.O., *ET AL.*, | § | |
| Defendants. | § | |

---

## PLAINTIFFS' RESPONSE OPPOSING
## DEFENDANTS' MOTION TO DISMISS

---

### Table of Contents

I.     Summary ........................................................................................................... 5

II.    Nature and stage of the proceedings ............................................................ 6

III.   Issues presented .............................................................................................. 6

IV.   Allstate alleges a scheme to convert an emergency room into a personal-injury-referral enterprise. .......................................................................................................... 7

    A. Memorial Heights begins operating as a freestanding emergency room. ........................... 7

    B. Memorial Heights obtains a license to render emergency care only. ................................. 8

    C. Memorial Heights operates as a normal FEMC facility until mid-2018. ........................... 9

    D. In 2018, Dr. Bhagat forms the MVA Entities to treat and bill for non-emergency care rendered to personal-injury patients sent to Memorial Heights by plaintiffs' attorneys. . 10

    E. The MVA Entities operate as an unlicensed FEMC, treating large volumes of non-emergency patients referred by their attorneys, and unlawfully implements different pricing for those patients. ........................................................................................................... 11

    F. In its appendix to the complaint, Allstate details Defendants' alleged fraudulent acts related to 635 patients (a) to whom Defendants rendered unnecessary treatment and (b) who made personal-injury claims to Allstate for that treatment. ...................................... 12

V.    Standard of review ........................................................................................ 14

VI.   The Court should deny the motion to dismiss. ............................................ 15

    A. Allstate alleges sufficient detailed facts to state civil RICO claims by demonstrating a fraudulent scheme, Defendants' participation, and mail fraud as predicate acts. ............. 15

1.  Allstate pleads mail fraud predicates in "painstaking" detail. ................................. 16

2.  Allstate sufficiently alleges how Defendants caused the use of the mail. ............... 20

3.  Proximate cause under RICO does not require reliance. ........................................... 22

4.  The "non-owner" physicians were key participants in the enterprise...................... 23

5.  Allstate's damages are certain and are based on the specific amounts it overpaid the Defendants for their fraudulent treatment.................................................................. 24

6.  Allstate alleges a RICO conspiracy. ....................................................................... 26

B.  Defendants cannot escape liability because their patients make personal-injury claims or because Dr. Bhagat testified in a personal-injury case. ..................................................... 27

1.  Defendants' treatment of personal-injury patients does not immunize them from liability for the fraudulent conduct alleged under the judicial-proceedings privilege and the witness-immunity doctrine. .......................................................................... 27

2.  Allstate's allegations do not foreclose justifiable reliance or proximate cause....... 28

3.  The 2022 state court deposition testimony of Dr. Bhagat does not negate causation and reliance. ............................................................................................................. 30

C.  Allstate has alleged facts to support its state law claims, and this Court should exercise jurisdiction over them. .................................................................................................... 31

1.  Allstate alleges facts to establish common-law fraud.............................................. 31

2.  Allstate alleges facts to establish common law civil conspiracy. ............................ 33

3.  Allstate alleges facts to establish money had and received and unjust enrichment... 33

VII.  CONCLUSION.................................................................................................................... 35

## Table of Authorities

**Cases**

*Aetna Life Ins. v. Humble Surgical Hosp., LLC*,
  2016 U.S. Dist. LEXIS 180545 (S.D. Tex. 2016) ................................................................ 34
*Aetna Life Ins. v. Won Yi*,
  2019 U.S. Dist. LEXIS 93425 (S.D. Tex. 2019) .................................................................. 34
*Alameda Cnty. Employees' Ret. Assn. v. BP p.l.c. (In re BP p.l.c) P.L.C.*,
  2013 U.S. Dist. LEXIS 171459 (S.D. Tex. 2013) ............................................................... 22
*Allstate Ins. Co. v. Benhamou*, 190 F. Supp.3d 631 (S.D. Tex. 2016) ................................... *passim*
*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ................................................. *passim*
*Allstate Ins. Co. v. Rehab Alliance of Texas, Inc.*, 2015 Tex. App. LEXIS 3973 (Tex. App. –
  Houston [14th Dist.] 2014, pet. denied) ............................................................ 25, 26, 32
*Allstate Ins. v. Seigel*, 312 F. Supp. 2d 260 (D. Conn. 2004) ................................................ 25
*Allstate Ins. Co. v. Donovan*, 2012 U.S. Dist. LEXIS 92401 (S.D. Tex. July 3, 2012) ..................... 19
*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .......................................................... 24
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 7
*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836 (5th Cir. 2004) ............................................ 34
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 14
*Bird v. W.C.W.,* 868 S.W.2d 767 (Tex. 1994) ...................................................................... 28
*Bridge v. Phoenix Bond & Indem. Co.*, 533 U.S. 639 (2008) .......................................... 22, 29
*Cadle Co. v. Schultz*, 779 F. Supp. 392 (N.D. Tex. 1991) ...................................................... 15
*Chon Tri v. J.T.T.*, 162 S.W.3d 552 (Tex. 2005) ................................................................... 33
*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)................................ 14, 30
*Cuvillier v. Sullivan*, 503 F.3d 397 (5th Cir. 2007) ................................................................. 7
*Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97 (Tex. App. 2015) .......................................... 29
*Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766 (4th Cir. 2018) ................................... 27
*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278 (5th Cir. 1993)..................................... 14
*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) .................................. 15
*Formosa Plastics Corp. USA v Presidio Engineers and Contractors, Inc.*,
  960 S.W.2d 41, 50 (Tex. 1998).......................................................................................... 26
*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000)............................................... 34
*Giffin v. Summerlin*, 78 F.3d 1227 (7th Cir. 1995)................................................................. 27
*H.E.B., LLC v. Ardinger*, 369 S.W.3d 496, 507 (Tex. App. – Fort Worth 2012, no pet.)........... 34
*Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39 (Tex. 1992) ................................. 354
*Hernandez v. Hayes*, 931 S.W.2d 648 (Tex. App.—San Antonio 1996, writ denied) ................ 28
*In re Westcap Enterprises*, 230 F.3d 717 (5th Cir. 2000)......................................................... 19
*James v. Brown*, 637 S.W.2d 914 (Tex. 1982) ...................................................................... 28
*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ................................................... 14
*McIntyre v. Wilson*, 50 S.W.3d 674 (Tex. App.—Dallas 2001, pet. denied) ............................. 28
*Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*,
  2012 U.S. Dist. LEXIS 102789 (S.D. Tex. 2012) ............................................................... 35
*Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924 (S.D. Tex. 1985) ...................................... 14
*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
  898 F.3d 461 (5th Cir. 2018) ............................................................................................. 29
*NcNamara v. Bre-X Minerals, Ltd.*, 197 F. Supp. 2d 622 (E.D. Tex. 2001) .............................. 15

*Newby v. Enron Corp.* (*In re Enron Corp. Sec.*),
    2002 U.S. Dist. LEXIS 27594 (S.D. Tex. 2002) ................................................................ 14
*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*,
    9 F.4th 247 (5th Cir. 2021) ............................................................................................. 30
*Pittman v. Cuyahoga City Dept. of Children & Family Servs.*,
    640 F.3d 716 (6th Cir. 2011) ........................................................................................... 27
*Reves v. Ernst & Young*, 507 U.S. 170 (1993).................................................................... 23
*Scanlon v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) ................................................ 30
*Shell Oil v. Writt,* 464 S.W.3d 650 (Tex. 2015).................................................................. 28
*State Farm Mut. Auto Ins. Co. v. Misra,*
    658 F. Supp.3d 362 (W.D. Tex. 2016)...................................................................... *passim*
*State Farm Mut. Auto Ins. Co. v. Punjwani,*
    2019 U.S. Dist. LEXIS 223054 (S.D. Tex. 2019) ..................................................... *passim*
*State Farm Mut. Auto. Ins. Co. v. Complete Pain Sols., LLC,*
    2024 U.S. Dist. LEXIS 127107 (S.D. Tex. 2024) ............................................................ 23
*State Farm Mut. Auto. Ins. v. Kugler*,
    2011 U.S. Dist. LEXIS 107005 (S.D. Fla. 2011)...................................................... 20, 25
*State Farm Mut. Auto. Ins. v. Lincow*,
    715 F. Supp. 2d 617, 624-25 (E.D. Pa. 2010, *aff'd*, 444 F. App'x 617 (3d Cir. 2011) ........... 25
*Sykes v. James*, 13 F.3d 515, 516-17 (2d Cir. 1993).......................................................... 27
*Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365 (8th Cir. 1996)................................ 27
*Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996)............................................................... 32
*Transp. Ins. v. Faircloth*, 898 S.W.2d 269 (Tex.1995)....................................................... 19
*U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*,
    284 F. Supp. 2d 487 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) ..................... 15
*U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204 (E.D. Tex. 1998)...................................... 15
*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ........................................................................................... 15
*United Healthcare Servs., Inc. v. Rossel*,
    2024 U.S. Dist. LEXIS 177289 (N.D. Tex. 2024).................................................................. 33
*United States v. Bernegger*, 661 F.3d 232 (5th Cir. 2011) ........................................................ 21
*United States v. Reyes*, 239 F.3d 722 (5th Cir. 2001)............................................................. 20
*Vanderbilt Mortg. and Fin., Inc. v. Flores*,
    2010 U.S. Dist. LEXIS 44335 (S.D. Tex. 2010) ................................................................ 15

**Statutes**

18 U.S.C. § 1962...................................................................................................................... 7

**Rules**

F.R.C.P. 9(b). ................................................................................................................ 6, 8
F.R.C.P. 12(b)(6) .......................................................................................................... 6, 7, 8
Tex. Civ. Prac. & Rem. Code §18.002(b-1) ............................................................... 24, 29

4

TO THE HONORABLE UNITED STATES DISTRICT JUDGE KENNETH M. HOYT:

## I.    Summary

This case involves Defendants' use of a freestanding emergency care (FEMC) facility to defraud insurers like Allstate. Memorial Heights Emergency Center (MHEC) operated in Houston as a legitimate FEMC facility for almost a decade, treating those in need of immediate medical attention.

But in mid-2018, the facility began treating large numbers of personal-injury patients referred by their attorneys. These patients typically traveled long distances to MHEC and arrived at the "emergency" facility days after their accident. As detailed at length in Allstate's complaint, Defendants rendered unnecessary care to these non-emergency patients, charged inflated rates, and engaged in deceptive billing practices. Defendants caused their bills and medical reports to be included in settlement demands packages that their patients' attorneys sent to Allstate.

To survive a motion to dismiss, a RICO complaint must plead sufficiently detailed facts to state a claim under Rules 12(b)(6) and 9(b). Allstate has done so by clearly alleging a civil RICO claim, including a fraudulent scheme, Defendants' participation, and mail fraud as a predicate act. Allstate has likewise supported its state law claims, including common law fraud and unjust enrichment, with detailed factual allegations.

Allstate's 75-page complaint meets these standards, including "painstaking" detail (in Defendants' words) about the unnecessary treatment and false bills Defendants generated corresponding to the 635 patients identified in the appendix to Allstate's complaint. The appendix lists, by patient, the dates and means by which the demand package was sent, the date Allstate mailed the settlement payment, and the portion of the settlement amount paid for Defendants' bills. Defendants have sufficient detail to defend themselves, and similar allegations have withstood challenges in this Court and other Texas federal district courts.

Defendants' other arguments fail too. They want to escape liability because their bills were presented to Allstate in the context of personal-injury claims. But the law does not immunize fraud in this context, either under the witness-immunity doctrine or the judicial proceedings privilege.

And—even if it were proper to consider at the motion to dismiss stage—the deposition testimony of MHEC's primary owner, Dr. Bhagat, does not mean that Allstate could not have been defrauded after he testified. As his own evidence shows, Dr. Bhagat *denied* having engaged in the fraudulent conduct.

Finally, Allstate has also demonstrated that its damages are not speculative. They are based on the specific amounts it overpaid because of Defendants' acts. Those figures are listed in the complaint's appendix.

In sum, Allstate's complaint not only puts Defendants on notice of the specific fraud alleged against them but is also sufficient to state claims under the federal RICO statute and state law. The Court should deny Defendants' motion to dismiss in its entirety.

## II.    Nature and stage of the proceedings

Allstate's complaint asserts causes of action under sections 1962(c) and 1962(d) of the RICO statute, common-law fraud, conspiracy, money had and received, and unjust enrichment based on Defendants' scheme to extract money from Allstate by submitting fraudulent medical bills and records. Dkt. 1. Defendants moved to dismiss on September 20, 2024. Dkt. 14.

## III.    Issues presented

At issue is whether Allstate's complaint (Dkt. 1) states a claim in light of Rules 12(b)(6) and 9(b), including whether it: (1) pleads fraud with particularity, (2) alleges reliance, (3) pleads that the "non-owner" physician Defendants helped operate or manage a RICO enterprise, (4) alleges speculative injuries, and (5) pleads claims for common law fraud, civil conspiracy, money had and received, and unjust enrichment.

Also at issue is whether Defendants are immune under the judicial-proceedings privilege and witness-immunity doctrine, and whether reliance and causation are foreclosed by the adversarial context in which the alleged fraudulent statements were received and by the 2022 deposition testimony of Dr. Akash Bhagat.

As to Rule 12(b)(6), a complaint must contain facts that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Well-pleaded factual allegations as accepted as true. *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007). A claim has facial plausibility when the plaintiff pleads facts that allow the court to infer liability. *Iqbal*, 556 U.S. at 678. Under Rule 9(b) a claimant needs to allege "with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." F.R.C.P. 9(b).

### IV.    Allstate alleges a scheme to convert an emergency room into a personal-injury-referral enterprise.

In this case, the Defendant healthcare providers used an emergency room facility to carry out a scheme to defraud insurers like Allstate. They performed unnecessary treatment and diagnostic testing on non-emergency patients. They inflated the costs of those treatments in their bills. Their bills were sent to insurers like Allstate so they would make money from the unnecessary treatment. And their bills and records misrepresented the nature and extent of their patients' injuries. Defendants knew their misrepresentations would be relied upon by their patients, patients' attorneys, and insurers to obtain higher payouts of personal-injury claims. That was the object of their fraud.

#### A.    Memorial Heights begins operating as a freestanding emergency room.

Defendants own and operate Memorial Heights Emergency Center (MHEC), a freestanding emergency room facility. Dkt. 1 at ¶ 1. MHEC opened in 2009 "in a small strip center west of downtown Houston and operated as a normal freestanding emergency room through mid-2018." *Id*. at ¶ 2.

7

**B.    Memorial Heights obtains a license to render emergency care only.**

MHEC became a licensed Freestanding Emergency Medical Care (FEMC) facility in 2012. *Id*. at ¶ 30. Its "license authorizes *only emergency care services* and those procedures that are related to providing emergency care." 25 Tex. Admin. Code § 131.219(c)(4) (emphasis added).

Under Texas law, an FEMC facility is "a facility, structurally separate and distinct from a hospital, that receives an individual and provides emergency care." Dkt. 1 at ¶ 31 (citing Tex. Health & Safety Code § 254.001(2); 25 Tex. Admin. Code § 131.2). FEMC facilities are emergency facilities and not 'urgent care' offices. *Id*. Because FEMC facilities are freestanding emergency rooms, they use the same Current Procedural Terminology (CPT) billing codes as hospital emergency rooms, and a separate physician's fee can also be charged. *Id*.

Texas law defines "emergency care." It is health care rendered in a hospital ER or an FEMC to treat medical conditions of "*recent onset and severity*, including severe pain, psychiatric disturbances, or symptoms of substance abuse." *Id*. at ¶ 34.

Emergency conditions are those that would lead a prudent average person to believe that "*failure to get immediate medical care could result in*: (1) placing the person's health in serious jeopardy; (2) serious impairment to bodily functions; (3) serious dysfunction of a bodily organ or part; (4) serious disfigurement; or (5) in the case of a pregnant woman, serious jeopardy to the health of the woman or fetus." *Id*. at ¶ 34 (citing Tex. Health & Safety Code § 254.001(5); Tex. Bus. & Comm. Code § 17.464; 25 Tex. Admin. Code § 13.2(12)).

Because they are emergency facilities, Texas law requires FEMC facilities to be continually open, maintain equipment for x-rays, computed tomography (CT) scans, and sonograms, and have an agreement with a nearby hospital to transfer patients whose needs are beyond the facility's capabilities. *Id*. at ¶ 33.

8

Dr. Bhagat is MHEC's primary owner and its medical chief of staff. *Id.* at ¶¶ 35, 44, 76-77. On March 16, 2009, Drs. Bhagat, Fair, Veloz, and others formed Emergency Healthcare Partners, L.P. (EHP). *Id.* at ¶ 36. EHP operates as "Memorial Heights Emergency Center" or MHEC. *Id.* at ¶ 40.

> **C.   Memorial Heights operates as a normal FEMC facility until mid-2018.**

Through mid-2018, MHEC operated as a normal FEMC facility, treating about eight patients per day, including a few personal-injury or car-wreck patients. *Id.* at ¶¶ 45-47.

MHEC staffs one physician, one nurse, and one radiology technician on duty at any given time. *Id.* at ¶ 92. Defendant Jason Masvero, R.N. began working at MHEC around July 2013 and assumed the role of MHEC's facility administrator the next year. *Id.* at ¶ 48. Masvero sometimes works as duty nurse and at other times as the facility administrator. *Ibid.*  Defendant Leia England began working at MHEC has been MHEC's office manager since 2014. *Id.* at ¶ 49.

EHP's physician partners, including Drs. Bhagat, Fair, and Veloz, as well as MHEC's employee physicians, Defendant Drs. Behzadi, Defrawi, Marconi, and Reader, all were treating patients at MHEC by late 2016. *Id.* at ¶¶ 51, 86. Around that time, MHEC began sending its x-rays and CTs to be interpreted by teleradiologists working for vRad, a Minnesota company. *Id.* at ¶ 52. Those radiologists interpreted the images remotely and sent reports of their findings to MHEC. *Id.*

During this time (before mid-2018), MHEC billed its patients directly, using an outside billing companies. *Id.* at ¶ 53. The bills for facility services instructed patients to pay MHEC, and the bills for the physician's professional fee were to be paid to "Emergency Medicine Physicians" (EMPT). *Id.* ¶ 54. Also during this time, MHEC's charges for personal-injury patients did not differ from the charges incurred by any other MHEC patient. *Id.* at ¶ 55.

**D.     In 2018, Dr. Bhagat forms the MVA Entities to treat and bill for non-emergency care rendered to personal-injury patients sent to Memorial Heights by plaintiffs' attorneys.**

MHEC's structure changed in August 2018. At that time, Dr. Bhagat formed two entities—the MVA Entities[1]—and he served as the sole manager of both. *Id*. at ¶¶ 56-57. The MVA Entities used the same address as MHEC (*id*. at ¶¶ 40, 57) but they obtained their own tax ID numbers and opened separate bank accounts (*id*. at ¶ 61).

Coincidentally, around August 2018, several personal-injury attorneys agreed with Dr. Bhagat to refer their car wreck clients to MHEC. *Id*. at ¶ 59. MHEC treated these patients under letters of protection (LOPs), which means the attorneys agreed to pay MHEC from the patients' settlement or lawsuit recovery. *Ibid*.

The MVA Entities took over billing for personal-injury patients. *Id*. at ¶ 62. For all personal-injury patients referred by their attorneys, *the MVA Entities* (as opposed to the outside billing company) generated bills. *Id*. The MVA Entities' bills included MHEC's logo, and instructed that payments should be directed to the MVA Entities themselves (no longer Memorial Heights). *Id*. at ¶¶ 63-64. These entities do not bill for non-LOP patients (like those paying with health insurance). *Id*. at ¶ 94. Nor do they evidently bill for personal-injury patients who were *not* referred to MHEC by counsel. *Id*. at ¶ 62.

MHEC's office manager, Leia England, became the billing supervisor for the MVA Entities. *Id*. at ¶ 65. England and Masvero liaised with the attorneys who referred their clients to MHEC. *Id*. at ¶ 66. England also marketed MHEC to personal-injury firms and maintained statistics on the number of patients the firms referred to MHEC monthly. *Ibid*.

---

[1] Memorial Heights Emergency Center MVA Facility Administration, LLC (MVA Facility) and Memorial Heights Emergency Center MVA Professional Administration, LLC (MVA Physician) (collectively, the MVA Entities)

    **E.**    **The MVA Entities operate as an unlicensed FEMC, treating large volumes of non-emergency patients referred by their attorneys, and unlawfully implements different pricing for those patients.**

When the MVA Entities were formed, MHEC's billing and payment procedure were not the only things to change—so did MHEC's operations and patient population. *Id*. at ¶ 67.

MHEC began treating *far* more personal-injury patients; the daily patient count doubled. *Id*.[2] MHEC's physicians started ordering and performing far more CTs on these patients than they had before—adult patients began receiving one to three CTs on average. *Id*.

As the treatment level increased, so did the charges. The MVA Entities began billing the highest-level billing code available for ER visits and the second-highest level available for physician's professional fees. *Id*.; *see also id*. at ¶ 67(c) n.10-11. MHEC's records do not support the use of these high-fee billing codes. *Id*. at ¶ 166-169 (requiring "immediate significant threat to life or physiologic function.'").[3] The documented triage-to-discharge times for patients for which CPT 99285 was billed were often less than an hour, and at times less than 30 minutes. *Id*. at ¶¶ 173-174.

Even though it was illegal, MHEC adopted a dual pricing list (or chargemaster). *Id*. at ¶ 67(d). That price list reflected that a new, higher rate for LOP patients would be billed by the MVA Entities. *Id*. at ¶ 67(d), n.12 (citing Tex. Ins. Code § 552.003). Dr. Bhagat did not deny using such a separate chargemaster at deposition, but claimed he did not know if he had a

---

[2] In state-court depositions, Defendant Drs. Reader and Behzadi claimed they could not state the average number of patients seen daily as it "varies." Dkt. 1 at ¶¶ 72-73. However, Dr. Reader admitted that on her last 24-hour shift, around 22 patients presented. *Id*. at ¶ 73. In a 2024 deposition, Defendant Dr. Marconi admitted that over 25 patients can be seen on shifts, and the "productivity bonuses" to physicians were based on if more that 25 or 30 patients presented in a shift. *Id*. at ¶¶ 74, 89.

[3] In the period at issue, according to AMA guidelines, use of the CPT 99285 coding required (1) a comprehensive history, (2) a comprehensive examination, and (3) medical decision making of high complexity. Dkt. 1 at ¶ 166. According to the definition, "[u]sually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function." Use of the 99284 required (1) a detailed history, (2) a detailed examination, and (3) medical decision making of moderate complexity. *Id*. at ¶¶ 67c, n. 10, 166.

separate chargemaster. *Id*. at ¶ 69. MHEC's physicians began receiving "productivity bonuses" or "incentive pay," which Dr. Marconi testified were paid if the number of patients presenting during a 24-hour shift exceeded 25 or 30. *Id*. at ¶ 89.

In May 2019, EHP sued former EHP/MHEC owner Dr. Phelan, who counterclaimed alleging that Dr. Bhagat formed the MVA Entities without his knowledge "to run a personal injury accident clinic" out of MHEC. *Id*. at ¶ 75. Dr. Phelan alleged that Dr. Bhagat entered LOP agreements with at least 19 attorneys or firms who referred clients to MHEC for non-emergency injuries, MHEC's daily patient count doubled, and that Defendants billed LOP patients at higher rates than other MHEC patients (who were still billed by an outside company rather than the MVA Entities). *Id*.

And in late 2022, an EHP partner/owner, Dr. Fair, filed a sworn pleading seeking to depose Dr. Bhagat. *Id*. ¶ 84. The pleading asserted that Dr. Bhagat formed the MVA Entities, attorneys thereafter referred clients to MHEC after issuing LOPs to the MVA Entities, and the MVA Entities use MHEC's facility, personnel, and equipment to treat these personal-injury patients. *Id*. at ¶¶ 84-85. Dr. Fair did not disclaim knowledge or approval of that arrangement. *Id*. at ¶ 85. Instead, she sought "to investigate whether the MVA Entities were fully reimbursing EHP for use of EHP's facility, personnel, and equipment." *Id*.

### F. In its appendix to the complaint, Allstate details Defendants' alleged fraudulent acts related to 635 patients (a) to whom Defendants rendered unnecessary treatment and (b) who made personal-injury claims to Allstate for that treatment.

In Appendix A to its complaint, Allstate identifies 635 personal-injury patients. It lists their initials, dates of injury and treatment, their attorneys' names, and the dates those attorneys sent settlement demands to Allstate and by what means including if by mail. *Id*. at pp. 78-95. It also lists the settlement amounts Allstate paid to those MHEC patients and the dates it mailed the settlement checks. *Ibid*. The appendix identifies the amounts attributable to MHEC's charges of the total settlements Allstate paid. *Ibid*.

As to all of its patients, MHEC's license only allowed it to provide emergency care (*id*. ¶ 34). Aside from a radiology license, its only license is a FEMC license. *Id*. at ¶ 112. But the 635 patients at issue often did not seek treatment at MHEC until days after their accidents. *Id*. at ¶¶ 104-105. Police reports issued concerning the accidents almost always stated that they were not injured. *Id*. ¶ 98. These patients lived far away, often over twenty miles in cities such as Spring, Tomball, and Sugar Land, and would pass other FEMC facilities and ERs on their way to MHEC. *Id*. at ¶¶ 99-103.

Before August 2018, all MHEC patients completed detailed intake paperwork. *Id*. at ¶ 119. That did not occur for the LOP patients referred by attorneys. *Id*. at ¶¶ 120-121. Only minimal medical records were provided in the LOP cases. *Id*. at ¶ 125. These records include brief nurse's and doctor's reports, an "Order Sheet" reflecting the lab and/or diagnostic studies ordered, and a one-page release signed by a nurse that lists diagnoses and prescribed medications. *Ibid*. The only other documents generally produced are the radiology reports from the independent vRad company. *Id*. at ¶ 125.

The nurse reports always list the personal-injury patients' chief complaint as "motor vehicle collision." *Id*. at ¶ 131. The "physical assessment" portions are brief, and much of the remainder of the reports are 'canned' self-harm assessments reported to be negative. *Id*. at ¶¶ 136, 137. The physicians' reports usually note neck pain (or lack thereof) and almost always prescribed the same medications. *Id*. at ¶¶ 143, 148. Nothing indicates these prescriptions were called in to any pharmacy. *Id*. The "Physical Exam" portions of the physician's reports are brief. *Id*. at ¶ 146.

Some of the patient treatment documents are even shredded without being scanned or otherwise preserved, as Dr. Marconi admitted in a 2024 deposition. *Id*. at ¶¶ 127-128.

Although patients purportedly came to MHEC for emergency care, the services provided to these patients were generally limited to evaluations and CTs. *Id*. at ¶ 160. Few if any LOP patients receive collars or slings for injuries. *Id*. Virtually none received any wound care. *Id*. at

¶ 161. And although many expensive CTs were ordered, there was no documented medical necessity for those tests (likely because none existed). *Id*. at ¶ 154. Indeed, sometimes CTs and x-rays were ordered *before* a physician evaluated the patient. *Id*. at ¶ 157. And sometimes the CTs or x-rays were actually performed *before* the physician saw the patient or even before the documented triage time. *Id*. at ¶ 158.

## V.    Standard of review

Motions to dismiss are "viewed with disfavor and rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Courts should not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ibid*.  If the factual allegations are plausible, the court must assume they are true and cannot decide disputed fact issues. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation omitted). Leave to amend the complaint should be liberally granted. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284-85 (5th Cir. 1993).

A plaintiff satisfies Rule 9 if he pleads the circumstances constituting fraud to allow the defendant to file an adequate answer. *Newby v. Enron Corp.* (*In re Enron Corp. Sec.*), 2002 U.S. Dist. LEXIS 27594, at *33 (S.D. Tex. 2002). The focus is whether, given facts of the case and the parties' circumstances, the pleading satisfies the purposes of Rule 9(b). *Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924, 927 (S.D. Tex. 1985). Rule 9(b) has four purposes: (1) to ensure a defendant has sufficient information to formulate a defense by having notice of the conduct complained of; (2) to protect defendants against frivolous suits; (3) to eliminate fraud actions in which all the facts are learned after discovery; and (4) to protect defendants from

undeserved harm to their goodwill and reputation. *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 494 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004).

When the facts are within the defendant's knowledge, less detail is required in the complaint. *Allstate Ins. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016); *Cadle Co. v. Schultz*, 779 F. Supp. 392, 396 (N.D. Tex. 1991). Fraud can also be pled on information and belief when the facts of the fraud are within the perpetrator's knowledge. *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). And where alleged fraud is complex and occurs over time, the requirements of Rule 9(b) are lessened. *U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (citations omitted). Courts should be sensitive to the fact that application of Rule 9(b) before discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." *NcNamara v. Bre-X Minerals, Ltd.*, 197 F. Supp. 2d 622 (E.D. Tex. 2001) (citations omitted). If a fraud pleading is insufficient, the plaintiff should be allowed to amend. *Vanderbilt Mortg. and Fin., Inc. v. Flores*, 2010 U.S. Dist. LEXIS 44335, *26 (S.D. Tex. 2010); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006).

**VI.    The Court should deny the motion to dismiss.**

Allstate has alleged detailed facts amounting to actionable fraud. Defendants fail to meaningfully refute the complaint's description of their coordinated scheme to inflate medical bills. And their reliance on privilege and evidentiary matters is misplaced and does not shield them from liability. Their motion lacks merit and should be denied.

> **A.  Allstate alleges sufficient detailed facts to state civil RICO claims by demonstrating a fraudulent scheme, Defendants' participation, and mail fraud as predicate acts.**

Allstate's 75-page complaint includes sufficient detail under RICO. Defendants formed and operated the MVA Entities to render and unlawfully bill for non-emergency care for referred patients. Similar allegations have withstood motions to dismiss in Fifth Circuit courts.

15

Defendants *do not* assert Allstate failed to plead a RICO enterprise. Also, aside from the four 'non-owner' physician defendants, Defendants do not assert Allstate failed to plead facts showing any other defendants conducted or participated in the alleged enterprises.

The motion to dismiss ignores the pertinent RICO case opinions in similar cases from Texas federal courts that are controlling here. The motion cites *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) and *Allstate Ins. Co. v. Benhamou*, 190 F. Supp.3d 631 (S.D. Tex. 2016) just once, with no elaboration on either opinion. The motion never references *State Farm Mut. Auto Ins. Co. v. Punjwani*, 2019 U.S. Dist. LEXIS 223054 (S.D. Tex. 2019) or *State Farm Mut. Auto Ins. Co. v. Misra,* 658 F. Supp.3d 362 (W.D. Tex. 2016). The complaints in *Benhamou*, *Punjwani*, and *Misra* mirror the complaint here, including the manner in which the predicate acts of mail fraud are alleged and presented, and the district courts denied Rule12(b) and Rule 9(b) motions to dismiss in those three cases.

### 1. Allstate pleads mail fraud predicates in "painstaking" detail.

Contrary to Defendants' argument, Allstate has adequately pled its mail fraud predicate to support its RICO claim. And its allegations mirror the sufficient allegations in controlling cases.

As Defendants acknowledge, paragraphs 1-180 provide "painstaking" detail of their operations. The paragraphs of the complaint that Defendants assert are the only allegations of fraud [*Id*. at ¶¶ 185, 189, 190, 192] are in the complaint's "Claim Presentation" section and the particular paragraphs cited are basically only a summary of those prior allegations. These include MHEC operated as a normal FEMC until the MVA Entities were formed, after which auto accident patients were referred by attorneys for "emergency care," which does not meet Texas law's definition of emergency care. *Id*. at ¶¶ 112-116. MHEC is only licensed to provide emergency care—care that a prudent layperson believes is needed immediately with the risk of serious jeopardy to health and impairment to bodily functions. Dkt. 1, ¶ 34.

Records provided to Allstate did not disclose attorney referrals. *Id*. at ¶¶ 112-116. After the MVA Entities' formation, unnecessary CT scans were ordered, and the highest-level CPT code 99285 was improperly used, even for brief patient visits. *Id*. at ¶¶ 67c, 173. Attorney-referred patients were also not given intake documents, unlike other patients, to conceal their referrals. *Id*. at ¶¶ 119-122. Handwritten patient evaluations were shredded. *Id*. at ¶¶ 127-128. All defendants, including the non-owner physicians, worked at MHEC for at least two years before the scheme started and were aware of these changes. *Id*. at ¶¶ 36, 48-51.

These allegations suffice under the law of this Circuit.[4] The complaint here is like the one in *Benhamou*, a RICO and fraud action against a pain management clinic, an anesthesia entity, and their operators. *Benhamou,* 190 F. Supp. 3d at 640. There, Allstate alleged the types of misrepresentations in medical records and bills, listed the patients by initials, and stated the dates of the demand packages and Allstate mailing of settlement checks, the amount of the checks, and the amount attributed to the defendants' bills. *Id*. at 661. The court denied dismissal under Rule 12(b)(6) and Rule 9(b). *Id*. at 641.

The *Benhamou* court found the complaint sufficiently pled predicate acts because it "list[ed] the following acts of alleged mail fraud: the mailing of 29 demand packages, which included the records and billings BCPC Defendants supplied, and the mailing of 51 settlement payments by Allstate." *Id*. at 661. As here, each mailing was "linked to a specific patient identified by initials." *Ibid*. And, as in this case, Allstate alleged that that the patients were covered by LOPs and received unnecessary medical services, the types of documents defendants supplied for the demand packages, total settlement amounts, the amounts attributable to the fraudulent billing, and the dates of mailing of the settlement checks. *Ibid*.

---

[4] The paragraphs of the complaint that Defendants assert are the only allegations of fraud (¶¶ 185, 189, 190, 192) are in the complaint's "Claim Presentation" section are only a summary of the prior allegations.

17

The *Benhamou* court found "that these allegations are sufficient to meet the *McClelland* standard that the success of defendants' scheme depended 'in some way' on each mailing: no medical provider who makes a claim for payments pursuant to a settlement agreement 'could reasonably expect an insurer to make a payment without supporting documentation being sent in the mail.'" *Benhamou,* 190 F. Supp. 3d at 661 (cleaned up). The same is true here.

In another RICO case involving a pain-management scheme, plaintiff State Farm described operations of the alleged enterprise, including types of misrepresentations made in reports and unnecessary recommendations for surgical injections. *State Farm Mut. Auto Ins. Co. v. Punjwani*, 2019 U.S. Dist. LEXIS 223054, at *7-8 (S.D. Tex. 2019), Dkt. 1 at ¶¶ 23-69.

State Farm attached an appendix listing the same kinds of information as here—patient initials, charges, date of the demand package, settlement amount, and date of the settlement check mailing. *Id*. at Dkts. 1-5. State Farm satisfied Rule 9(b) because it alleged the Defendants "conducted illegitimate evaluations and made predetermined recommendations for medically unnecessary ESIs." *Punjwani,* 2019 U.S. Dist. LEXIS 223054, at *8.

The complaint "describe[d] this scheme at length" including "detailed appendices that identify and illustrate the alleged fraudulent scheme, including initial exam reports, MRI reports, operative reports, and demand packages containing settlement information for the claims at issue." *Id*. These allegations "provide[d] ample notice" to the defendants under Rule 9(b). *Ibid*. (citing *Benhamou*, 190 F. Supp. 3d at 659-60 (detailed allegations of unnecessary treatment and inflated services leading to higher insurance claims "make the predicate acts alleged by Plaintiff plausible.")). Allstate's allegations are no different and equally put the Defendants on notice of the facts of their fraud.

Allstate's complaint is also like State Farm's RICO complaint in *State Farm Mut. Auto Ins. Co. v. Misra*, 658 F. Supp.3d 362 (W.D. Tex. 2016), with an exhibit spreadsheet containing such information. *See* Case 5:22-cv-00806, Dkts. 1, 1-6. The *Misra* court denied the motion to dismiss because, in addition to attaching the claims data like Allstate does here, State Farm

alleged the defendants had "prepared fraudulent bills and supporting medical documents to send to personal injury attorneys," that those attorneys "included the purportedly fraudulent bills and records in settlement demand packages to" State Farm to create leverage to "settle the claims based on the allegedly inflated value created by the purportedly fraudulent bills/records." *Misra*, 658 F. Supp.3d at 376. The settlement checks were then mailed, and these allegations "plausibly allege[d] a predicate act of mail fraud." *Ibid.*[5]

Just as they bury their heads in the sand about the concrete facts alleged against them, Defendants raise none of these controlling authorities in their motion. Yet the inescapable conclusion is that courts have repeatedly upheld these types of RICO allegations under Rules 9 and 12(b).

Further, Allstate has pleaded actionable factual misrepresentations, not "statements of opinion" or of "monetary value" as Defendants contend. Defendants cite *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000) and *Transp. Ins. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995), but these cases hold that whether a statement is actionable factual statement or a mere opinion "depends on the circumstances in which [that] statement is made" including "the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Westcap*, 230 F.3d at 726-27 (quoting *Faircloth*, 898 S.W.2d at 276). Here, Defendants performed unnecessary medical services that they documented in their bills and reports (Dkt. 1 at ¶ 1); they did not

---

[5] Yet another parallel example is the amended complaint in *Allstate v. Donovan*, a case discussed in *Benhamou* and which described the pain-management enterprise and attached an appendix identifying the patients at issue by initials, treatment dates, settlement amounts, and mailing dates. *Benhamou*, 190 F.Supp. 3d at 661, n. 14 (citing *Allstate Ins. v. Donovan*, Case 4:12-cv-00432, 2012 U.S. Dist. LEXIS 92401). Those allegations stated a RICO claim. *Benhamou*, 190 F.Supp. 3d at 661, n. 14 ("It is also worth noting that after the *Donovan* plaintiffs amended their complaint to include allegations similar to those at issue in this case (i.e., patient initials, dates of the predicate acts of mail fraud, etc.), the court denied the defendants' subsequent motions to dismiss.").

simply make statements about monetary value. Such allegations are not opinions and satisfied Rule 9(b) in *Benhamou*, *Punjwani*, and *Misra* as described above.

Finally, Allstate alleges actionable material misrepresentations. "A reasonable medical provider making a claim for payment under a settlement agreement could not expect an insurer to make a payment without supporting documentation being sent in the mail." *Benhamou*, 190 F. Supp. 3d at 661. Here, Defendants provided their records to their patients' law offices, knowing the documents would be included in settlement demand packages forwarded to Allstate, and understood the records inflated the value of the patient's personal-injury claim. Dkt. 1 at ¶ 18. Defendants knew these misrepresentations mattered to Allstate; that is why they made them.

### 2. Allstate sufficiently alleges how Defendants caused the use of the mail.

The Court should deny the motion because Allstate has alleged the Defendants orchestrated the fraudulent billing scheme, which necessarily involved the use of mail for demand letters and settlement checks. The mail was an integral part of the scheme. Those allegations suffice under the law.

To violate the mail fraud statute, a defendant need not have used the mail himself or even intended that the mail be used. *Benhamou*, 190 F.Supp.3d at 660. A defendant uses the mail when they perform an act knowing that use of the mail will follow in the ordinary course of business, or where use of the mail can reasonably be foreseen. *United States v. Reyes*, 239 F.3d 722, 736 (5th Cir. 2001).

Under civil RICO, an insurer successfully alleges mail fraud where defendants use patients' attorneys as a conduit to pass fraudulent bills and medical documentation to the insurer. *State Farm Mut. Auto. Ins. v. Kugler*, 2011 U.S. Dist. LEXIS 107005, at *2, *11 (S.D. Fla. 2011). In *Kugler*, defendants knew that their bills for unnecessary medical procedures would be mailed to State Farm. *Id*. at *38. That fact sufficed for RICO liability. *Ibid*.

A defendant is also liable for mail fraud when they cause a victim to use the mail, such as when the victim mails a check to them. *See United States v. Bernegger*, 661 F.3d 232, 240-241 (5th Cir. 2011); *Benhamou*, 190 F. Supp. 3d at 660-61. The *Benhamou* complaint, similar to the one here, listed the mailing of 29 demand packages, which included records and bills defendants supplied, and the mailing of 51 settlement payments as the acts of mail fraud. *Benhamou*, 190 F. Supp. 3d at 660. The *Benhamou* court noted the success of defendants' scheme depended in some way on each mailing: no medical provider who makes a claim for payment could reasonably expect an insurer to make a payment without supporting documentation being sent in the mail. *Id*. at 660-61.

Defendants in *Punjwani* and *Misra* made similar arguments. Dr. Punjwani argued State Farm's pleadings did not state predicate acts of mail fraud because it made no factual allegations Punjwani used the mail. *Punjwani*, 2019 U.S. Dist. LEXIS 223054, at *9. The Court disagreed:

> However, to state a claim for mail fraud, 'the defendant need not personally effect the mailing. It is sufficient that the defendant . . . "act with knowledge that the use of the mails will follow in the ordinary course of business."' [citations omitted]. State Farm's allegations that it used the mail to pay for the alleged fraudulent claims for unnecessary treatment, as anticipated by Punjwani, adequately allege fraudulent use of the mail.

*Ibid*. The *Misra* Court likewise concluded:

> Plaintiffs assert that Defendants prepared fraudulent bills and supporting medical documents to send to personal injury attorneys, who in turn, included the purportedly fraudulent bills and records in settlement demand packages to Plaintiffs (as the insurers of the allegedly at fault driver in the underlying automobile accident). Personal injury attorneys would then use the bills/records to request settlements at or near policy limits. Plaintiffs would settle the claims based on the allegedly inflated value created by the purportedly fraudulent bills/records, and then used mail to send the settlement checks as payment for the claims. The allegations in the complaint along with the attached exhibits support these assertions and are sufficient to plausibly allege a predicate act of mail fraud.

*Misra*, 658 F.Supp.3d at 376 (citations omitted).

21

Here, Defendants forwarded their patients' medical records and bills to their patients' lawyers, who enclosed these documents in demand packages to Allstate. Dkt. 1 at ¶ 182. They knew the documents they provided would be forwarded to Allstate and that they falsely inflated the value of the claims. *Id*. at ¶¶ 185-186. At times, the law offices sent the demand packages by U.S. Mail, as identified in the appendix. Allstate issued checks to settle the claims listed in the complaint, which it forwarded to the law offices by U.S. Mail. *Id*. ¶ 194. The relevant details of these mailings are included in the attached appendix. Allstate has thus pled mail fraud.

### 3. Proximate cause under RICO does not require reliance.

Next, although Defendants assert Allstate fails to allege reliance, the RICO counts predicated on mail fraud do not require reliance. *Bridge v. Phoenix Bond & Indem. Co.,* 533 U.S. 639, 653-654 (2008)*; Plambeck*, 802 F.3d at 676; *Misra*, 658 F.Supp.3d at 375.

But even if reliance were necessary, it would be shown here. As this Court noted in a non-RICO case cited by Defendants, "reliance allegations are often inherently conclusory, one either relies or one does not rely." *Alameda Cnty. Employees' Ret. Assn. v. BP p.l.c. (In re BP p.l.c) P.L.C.*, 2013 U.S. Dist. LEXIS 171459, at *113 (S.D. Tex. 2013). In *Alameda*, the complaint listed the plaintiffs' purchases of ordinary BP shares in alleged reliance on misrepresentations, and those purchase listings "convey[ed] the necessary amount of detail to satisfy Rule 9(b)." *Ibid*. Here, Allstate has listed, by claimant, the amounts paid for each fraudulent claim that Defendants caused to be submitted, and that the payments were made in reliance on those bills and reports. The complaint meets the standard outlined in *Alameda*.

Finally, Defendants are wrong that "it is just as likely" Allstate relied on misrepresentations by the attorneys who forwarded the demand packages. The complaint painstakingly details Defendants' misrepresentations, which were forwarded to Allstate in demand packages. Those misrepresentations were made in Defendants' records and bills. Dkt. 1 at ¶ 1. Any evidentiary analysis of whether Allstate relied on other documents is premature.

### 4. The "non-owner" physicians were key participants in the enterprise.

The Court should also deny the motion because Allstate alleges that the four "non-owner physicians" participated in managing the RICO enterprises. Their unnecessary treatment of personal-injury patients was critical to the scheme. As the sole physicians during shifts, they controlled treatment, diagnoses, and recordkeeping, which fueled the fraudulent enterprise. *See State Farm Mut. Auto. Ins. Co. v. Complete Pain Sols., LLC*, 2024 U.S. Dist. LEXIS 127107, at *23-24 (S.D. Tex. 2024) ("By virtue of their positions [as physicians], each doctor was in charge of their record keeping/documentation (even if it was delegated to someone else) and each made their own diagnoses and their own treatment plan and recommendations."). The doctors therefore "participated in managing the enterprise with their supervisory roles in their respective parts of the scheme." *Allstate Ins. Co. v. Plambeck*, 802 F.3d at 674-75 (citations omitted).

Indeed, RICO defendants need only have "some part in directing the enterprise's affairs," and no "formal position in the enterprise" is required. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). An enterprise can be operated even by "lower rung participants in the enterprise who are under the direction of upper management." *Plambeck*, 802 F.3d 665 at 675.

In similar cases, where defendant doctors provide unnecessary services, make treatment decisions, and are responsible for their patient records, courts found that they directed the enterprise's affairs because it could not function without their involvement, and they made the fraudulent medical decisions at issue. *Complete Pain*, No. 4:20-cv-2606, 2024 U.S. Dist. LEXIS 127107, at *23-24 (S.D. Tex. July 18, 2024). In *Complete Pain*, the court rejected the same arguments by employed pain-management physicians who claimed they were just service providers. *Ibid.*

Here, each physician managed their patient diagnoses and treatment at MHEC and handled documentation for their patients. Dkt. 1 at ¶ 92. After the MVA Entities formed, patient count more than doubled (*id.* at ¶ 67(a)), and the physicians received "productivity bonuses" directly tied to patient volume, incentivizing their participation in the scheme (*id.* at ¶ 89)*.* In

state-court depositions, Drs. Reader, Behzadi and Marconi admitted that patients advised them they were sent to MHEC by attorneys. *Id.* at ¶¶ 88, 99(b)-(c), 110(b)-(d).

Also, these doctors' handwritten patient notes were shredded, suggesting a deliberate attempt to conceal evidence of their fraudulent practices. *Id.* at ¶¶ 127-128. Their examinations were brief and insufficient to warrant the high-level emergency charges billed. For example, Claimant CR was documented as seeing Dr. Defrawi at 6:47 p.m. and was discharged at 6:53 p.m. *Id.* at ¶ 173(b). That six-minute visit led to an order for cervical and thoracic CT scans, despite the lack of an emergency condition, and resulted in the highest-level CPT 99285 billing, meant for severe, life-threatening conditions. Dkt. 1 at ¶¶ 102(b), 173(b).[6]

Their continued participation after the MVA Entities formed, along with their awareness of the operational changes, demonstrates their commitment to the enterprises' scheme. They knowingly benefited financially from their roles and were integral to the enterprise's success. Unlike mere "service providers," these physicians were key actors, directing and managing the enterprise's fraudulent activities. The doctors therefore "participated in managing the enterprise with their supervisory roles in their respective parts of the scheme," *Plambeck*, 802 F.3d at 674-75, making them liable under RICO.

### 5. Allstate's damages are certain and are based on the specific amounts it overpaid the Defendants for their fraudulent treatment.

The Court should further deny the motion because Allstate's claimed damages—specific amounts paid in response to Defendants' false claims—are not speculative. The complaint details itemized overpayments tied directly to the fraudulent billing scheme.

Under RICO, the fraudulent conduct and the injury must be linked. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006). And in the context of insurers' RICO suits against health care providers, courts have consistently found such linkage where, as here, overpayments result from fraudulent medical bills when those damages are specifically itemized and supported

---

[6] CR's total time at MHEC was 19 minutes, from 6:34 p.m. to 6:53 p.m. *Id.* at ¶ 173(b).

by factual allegations. *See, e.g., Benhamou*, 190 F. Supp.3d at 645 (Allstate's alleged damages were not "indirect" or "too remote" where it alleged harm based on overpayment resulting from Defendants' fraudulent bills and Allstate was "the object of" the fraud, "not an indirect or incidental party to" it).

In *Allstate Ins. Co. v. Seigel,* 312 F. Supp. 2d 260, 263 (D. Conn. 2004), the complaint alleged defendants treated accident patients referred by attorneys or chiropractors, charged for unnecessary (or unperformed) diagnostic tests, and issued fraudulent medical reports. The court concluded:

> Allstate was directly injured by Seigel's fraudulent conduct, since Allstate paid settlements and judgments that were based, at least in part, on phony medical bills, tests that were never performed and/or medical reports that purportedly documented injuries that had never been sustained by the tort victims.

*Id*. at 267.[7]

Here, Allstate has itemized the amounts overpaid due to Defendants' fraudulent claims, showing concrete injury. Dkt. 1-2 (rightmost column). These allegations are nearly identical to the alleged damages in *Benhamou*. *See* 190 F. Supp.3d at 645. Defendants, as the *Benhamou* defendants, rely on *Allstate Ins. Co. v. Rehab Alliance of Texas, Inc.*, 2015 Tex. App. LEXIS 3973 (Tex. App. – Houston [14th Dist.] 2014, pet denied). However, the *Benhamou* court found *Rehab Alliance* did not apply, as it dealt with summary judgment evidence and not the sufficiency of pleadings. *Id*. at 645-46. The court further elaborated that the defendants "make

---

[7]    *See also Kugler*, 2011 U.S. Dist. LEXIS 107005, at *5-6 (insurer could recover "to the extent its settlement decision making was influenced and distorted by false billings generated by the defendants" where insurer alleged defendants' bills for unnecessary treatment artificially inflated the value of the claims); *State Farm Mut. Auto. Ins. v. Lincow*, 715 F. Supp. 2d 617, 624-25 (E.D. Pa. 2010, *aff'd*, 444 F. App'x 617 (3d Cir. 2011) (jury awarded $4 million in damages to State Farm based on payments to defendants resulting from fraudulent claims for unnecessary or non-existent treatment where evidence "sufficiently identified payments made to the Defendants as well as other payments as result of the fraudulent records.")

much of the outcome in *Rehab Alliance*" and that it had thoroughly reviewed defendants' supplemental briefing and plaintiffs' response and remained unpersuaded its holding applied. *Id.* at 646, n. 4. "A court's analysis of the sufficiency of pleadings does not depend on the sufficiency of the evidence." *Id.* (citations omitted). The "*Rehab Alliance* case was also distinguishable on the facts, and unlike [*Benhamou*], the theory of injury in *Rehab Alliance* was "not tied to any specific claim or claims that form[ed] the basis of the suit." *Id.*[8]

Defendants may argue that Allstate's damages are speculative because settlements include factors beyond medical bills. However, this argument fails, as Allstate seeks only the specific portions of settlements tied to Defendants' fraudulent billing, not total settlement amounts. Dkt. 1 at ¶ 247. Courts have upheld similar claims, where itemized fraudulent bills supported the damages, as in *Plambeck*, where Allstate demonstrated that settlement payments were tied to fraudulent services. *Plambeck*, 802 F.3d at 677.

Allstate's damages are directly tied to Defendants' fraudulent billing and not speculative, as supported by precedent. The Court should deny Defendants' motion to dismiss on this ground.

### 6. Allstate alleges a RICO conspiracy.

The Court should deny the motion as to the RICO conspiracy claim (under section 1962(d)) because Allstate has pleaded a valid substantive claim under section 1962(c). Defendants do not independently challenge the conspiracy claim.

---

[8] Defendants' reliance on *Formosa Plastics Corp. USA v Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 50 (Tex. 1998) is equally misplaced because that case rejected alleged damages based on a hypothetical bid (although it did confirm out-of-pocket and benefit-of-the-bargain damages). But here, Allstate does not seek damages based on hypothetical settlements or total amount of settlements. Rather, for each claimant at issue, Allstate seeks the portions of the settlement attributed to MHEC through the MVA Entity billings. Dkt. 1 at ¶¶ 246-250, Dkt. 1-2. Those amounts are specifically listed for each of the 635 claims claim in the appendix.

**B.** **Defendants cannot escape liability because their patients make personal-injury claims or because Dr. Bhagat testified in a personal-injury case.**

Having failed to rebut that Allstate pleaded valid RICO or state law claims, Defendants resort to arguing that their alleged fraudulent medical treatment and misrepresentations are immune from liability as a matter of law, and that a 2022 deposition where Dr. Bhagat disclaimed knowledge or denied of various aspects of the alleged scheme somehow defeat Allstate's claims. Those arguments do not merit dismissal of the complaint.

**1.** **Defendants' treatment of personal-injury patients does not immunize them from liability for the fraudulent conduct alleged under the judicial-proceedings privilege and the witness-immunity doctrine.**

The Court should deny Defendants' motion because their fraudulent medical treatment and billing for personal-injury claimants is not protected by the judicial-proceedings privilege or witness-immunity doctrine. No legal authority supports this claim, and adopting it would allow health care providers to falsify bills simply because their patient is suing someone else for the cost of that care.

Defendants cite unrelated cases involving experts or government officials sued for testimony or actions in investigations. These authorities do not apply to the context of unlawful medical billing, and they do not compel the extreme result of dismissing the complaint. For example, in *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 769-70 (4th Cir. 2018), immunity protected a doctor's testimony in black lung hearings. Similarly, *Pittman v. Cuyahoga City Dept. of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011), protected a family worker in custody proceedings, and *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1373 (8th Cir. 1996), applied immunity to social workers in child abuse cases. *See also Sykes v. James*, 13 F.3d 515, 516-17, 521 (2d Cir. 1993) (in section 1983 matter, parole officer immune for alleged perjurious affidavit in habeas case); *Giffin v. Summerlin*, 78 F.3d 1227, 1228 (7th Cir. 1995) (doctor's immune for opinion about standard of care provided in deposition testimony).

Defendants also misinterpret Texas law. In *McIntyre v. Wilson*, 50 S.W.3d 674, 678 (Tex. App.—Dallas 2001, pet. denied), the court granted immunity for attorney testimony in a malpractice case, which has no relevance here. Defendants argue Texas law recognizes that immunity extends to "contemplated judicial proceedings," citing *Hernandez v. Hayes*, 931 S.W.2d 648, 650 (Tex. App.—San Antonio 1996, writ denied), but that case involved testimony by teachers as part of a school board grievance hearing, which the court held was a quasi-judicial proceeding.[9]

Defendants fail to cite any case granting immunity for submitting fraudulent medical records to an insurance company. Unsurprisingly, courts have repeatedly found defendants can be liable for submitting false medical bills in the context of settlement demands. *E.g.*, *Plambeck*, 802 F.3d 665, 677 (5th Cir. 2015), *Benhamou*, 190 F. Supp. 3d 631, 645-46 (S.D. Tex. 2016).

### 2. Allstate's allegations do not foreclose justifiable reliance or proximate cause.

The Court should also deny the motion because Allstate has adequately alleged that Defendants proximately harmed it, and that Allstate relied on their false bills and records. Defendants' fraud manipulated the settlement process, making Allstate's reliance reasonable,

---

[9] Concerning the other Texas cases Defendants cite, *James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982), concerned physicians' reports to a probate judge in mental health proceedings. *Bird v. W.C.W.,* 868 S.W.2d 767 (Tex. 1994) involved a psychologist who communicated her conclusion to the family court by affidavit. *Id.* at 768. *Shell Oil v. Writt,* 464 S.W.3d 650, 658 (Tex. 2015) dealt with alleged defamatory statements in a Shell report to the Department of Justice, which the court found Shell was compelled to provide as part of a criminal investigation.

And while it is beyond the scope of Defendants' motion to dismiss, most claims at issue were not filed into suit, and the law does not support immunity for medical providers whose alleged fraudulent statements took the form of medical records and bills presented in demand packages. And any affidavits attaching records and bills that may have been filed in litigated cases would have been business record and section 18.001 affidavits, and not affidavits of investigations, findings and conclusions, or recommendations, under state authority or direction such as a child welfare worker or parole officer, as in the cases cited by Defendants. Tex. Evid. R. 902(10)(B) provides a one-page form affidavit for authentication of business records. Tex. Civ. Prac. & Rem. Code §18.002(b-1) provides the one-page form affidavit regarding billing records.

inevitable, and indeed the whole point of the scheme. At the very least, Defendants' arguments do not foreclose these facts as a matter of law.

As to common-law fraud,[10] justifiable reliance is usually a question of fact. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018). And reliance need not be reasonable. *Benhamou*, 190 F. Supp 3d at 664 (citations omitted). In *Benhamou*, as here, Allstate identified the speaker, time, place, and content of fraudulent misrepresentations in health care bills, and alleged its reliance on those misrepresentations. *Id.* And Allstate had alleged "the elements of common-law fraud," including that the "billings and records submitted to Allstate" were materially false, that Defendants knew it and intended Allstate to send settlement checks in response, and injury to Allstate by the amount of overpayments. *Benhamou*, 190 F. Supp 3d at 664. The court found these satisfied the pleading requirements for common law fraud. *Ibid*. The complaint here pleads similar allegations regarding common law fraud and thus should be allowed to proceed. Dkt. 1 at ¶¶ 1, 8-9, 60, 62-63, 67, 70-74, 86-90, 98-107, 113-116, 119-122, 127-128, 130, 150, 152-155, 166-169, 171-174, 184, 189-190, 192, 194, 207-208, 211, 221-226, 230, 235.

And contrary to Defendants' position, the transactions were not "arm's length" as a matter of law.[11] If that were true, Defendants would not have shredded patient records (*id.* at

---

[10] As to the RICO claims, Allstate has already shown that reliance is not necessary. *See* Section VI.A.3 above. Reliance is not the "only causal mechanism" to show "proximate cause under RICO." *Plambeck*, 802 F.3d at 676. Mail fraud is a "predicate act of racketeering under RICO, even if no one relied on any misrepresentation," and "one can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation." *Misra*, 658 F. Supp. 3d at 375 (citing *Bridge*, 533 U.S. at 648, 649). As in *Plambeck*, "[r]egardless of how proximate cause is sliced, Allstate" has shown it because "[t]here is no plausible argument that the insurers were unforeseeable victims or otherwise wronged by the caprice of chance," as the "object of the enterprise was to collect from…insurance companies." 802 F.3d at 676.

[11] Defendants rely on *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 100 (Tex. App. 2015) for the proposition that reliance on representations in an adversarial context is not generally justified, but that holding is limited to promissory estoppel claims. Here, Allstate alleges Defendants' bills and reports affirmatively misled it and were calculated to do that, not that it relied on any

¶ 128, 191) and would have revealed the truth—that their patients did not come to MHEC for emergency care, but because their personal-injury attorney directed them there. Dkt. 1 at ¶¶ 116, 121-122, 189-190.

### 3. The 2022 state court deposition testimony of Dr. Bhagat does not negate causation and reliance.

The Court should also deny the motion because no deposition testimony negates causation and reliance.[12] This includes Dr. Bhagat's May 2022 deposition,[13] where he denied or disclaimed knowledge of several key facts alleged here.

First, at this stage, the district court must not go outside the pleadings and must accept all well-pleaded facts as true. *Scanlon v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The "one limited exception" concerns documents referenced in the complaint that are central to the plaintiff's claim. *Id.* (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496,498-99 (5th Cir. 2000) (evaluating agreement and assessment regarding merger); *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 252 n. 2 (5th Cir. 2021) (audit report)). Defendants cite no authority for the Court to venture outside the pleadings to evaluate deposition testimony or questions, especially where several other depositions are referenced throughout the complaint.

Even if considered, Dr. Bhagat's testimony is not conclusive. On key matters, he claimed ignorance or denied them entirely. For example, Dr. Bhagat testified the MVA Entities are strictly billing entities, but seven months later his partner, Dr. Fair, expressly contradicted that in a sworn pleading. Dkt. 1 at ¶¶ 84, 85, 111,193 (Dr. Fair stated that the MVA Entities reimbursed

---

promise of performance. Defendants cite no authority for the proposition that fraud can never occur in the context of settlement negotiations between represented parties. And whether Allstate should have relied on any misrepresentation or omission due to its resources at best is a question of fact not appropriate at this stage.

[12] As discussed above, reasonable reliance is not an element of any claim, so Dr. Bhagat's testimony is not a reason to grant the motion.

[13] Defendants incorrectly argue that references to their testimony in Allstate's complaint violate unspecified protective orders.

MHEC owner EHP for use of the MHEC facility, personnel, and equipment and that the LOPs were directed to the MVA Entities). And Allstate alleged that the MVA entities operated as an unlicensed FEMC facility, which was suggested in Dr. Fair's Rule 202 petition. *Id*. at ¶ 193.

And far from admitting key facts, Bhagat *denied* whether he reached LOP referral deals with at least 17 personal-injury attorneys and formed the MVA Entities after those deals. Dkt. 14-1, 120:17-25. Bhagat swore he did not know if there were multiple chargemasters. *Id*. at 90:9-13, 92:13-16.[14] He denied services were marketed to attorneys. *Id*. at 116:13-15. He denied he formed the MVA Entities to run a personal-injury clinic out of the partnership's facility (*id*. at 119:20-120:1), or to assist personal-injury attorneys in presenting claims or to increase charges for those patients (*id*. at 121:1-7). If anything, his denials or claimed lack of knowledge can be explained by a motivation for Allstate to keep relying on MHEC's false statements.

For the above reasons, Defendants' position reflects a question of fact that cannot be resolved at the pleadings stage. Bhagat's testimony does not preclude any claim as a matter of law.

### C.    Allstate has alleged facts to support its state law claims, and this Court should exercise jurisdiction over them.

Finally, Allstate has adequately pled state-law claims over which this Court should exercise jurisdiction.

### 1.    Allstate alleges facts to establish common-law fraud.

The Court should deny the motion because Allstate's complaint provides sufficient factual detail to support its common-law fraud claim. The elements of fraud are: (1) a material representation; (2) its falsity; (3) the speaker's knowledge of the falsity or reckless disregard for the truth; (4) intent that the other party rely on it; (5) reliance; and (6) injury. *Benhamou*, 190 F.

---

[14] While the motion cites "extensive questioning" about the differences between the charges on the patient's bill and the chargemaster, that questioning concerned the then-listed 2022 chargemaster on the MHEC website, and not a second chargemaster for non-accident patients in effect when the plaintiff treated in September 2018. Dkt. 14-1 at 88:1-21. Bhagat testified he did not recall if there was ever a separate chargemaster for LOP patients. *Id*. at 90:9-13.

Supp. 3d at 644 (citing *Tilton v. Marshall*, 925 S.W.2d 672, 684 (Tex. 1996)). Allstate's complaint addresses these elements.

Specifically, Defendants made false statements to Allstate, including about the reasonableness and necessity of emergency treatment. Dkt. 1 at ¶ 221. They made misrepresentations about the need for emergency services in their bills, including that (a) the patients' conditions required high-level emergency services (CPT 99285 and 99284), (b) such services were provided, (c) diagnostic testing was necessary and reasonable, and (d) emergency facility and emergency physician charges were reasonable. Dkt. 1 at ¶¶ 189, 221-222.

And MHEC's records concealed that personal-injury attorneys referred patients, falsely implying that the patients acted as "prudent laypersons" who believed they needed "immediate medical care at an emergency facility." *Id*. at ¶¶ 190, 223. Defendants, as licensed providers, knew their services did not meet emergency care standards. *Id*. at ¶¶ 7-8, 67, 86, 166, 168-169. Confirming an intent to conceal its fraud and deceive insurers, MHEC shredded its treatment records. *Id*. at ¶¶ 128, 191-192. Defendants meant to deceive Allstate into settling claims, and Allstate suffered financial harm. *Id*. at ¶¶ 225-226.

Allstate's complaint meets Rule 12(b)(6) standards, alleging material misrepresentations about the necessity of medical services. Dkt. 1 at ¶¶ 189-190. Allstate relied on these misrepresentations by settling claims. *Id*. ¶¶ 9, 194, 201, 211, 226, 231, 238. As noted, Allstate's allegations are like those in *Benhamou*—where the court declined to dismiss[15] the fraud claim. 190 F. Supp. 3d at 664. The *Benhamou* court concluded, in regard to the common-law fraud cause of action:

---

[15] *Rehab Alliance* is irrelevant at this stage, as it involved summary judgment, not a Rule 12(b)(6) motion. *Benhamou*, 190 F. Supp. 3d at 645-46. And unlike this case and *Benhamou*, the theory of injury in *Rehab Alliance* was "not tied to any specific claim or claims that form[ed] the basis of the suit." *Ibid.*

> Moreover, the complaint sufficiently alleges the elements of common-law fraud: that the representations (the billings and records submitted to Allstate) were material and false, BCPC Defendants were aware of the documents' falsity but intended that Allstate would act on the misrepresentations by sending settlement checks covering the fraudulent billings, and that Allstate was injured (overpayment). The Court finds that the complaint satisfies the pleading requirements for common-law fraud with regard to BCPC Defendants.

*Benhamou*, 190 F. Supp 3d at 664. The Complaint here pleads similar allegations in regard to common law fraud. Dkt. 1 at ¶¶ 1, 8-9, 60, 62-63, 67, 70-74, 86-90, 98-107, 113-116, 119-122, 127-128, 130, 150, 152-155, 166-169, 171-174, 184, 189-190, 192, 194, 207-208, 211, 221-226, 230, 235. The result should therefore be no different here.

### 2. Allstate alleges facts to establish common law civil conspiracy.

Allstate has also stated a civil conspiracy claim. Allstate alleges that Defendants worked together to defraud it by exaggerating the emergency nature of patients' conditions and inflating treatment costs. Because Allstate asserts a valid common-law fraud claim, the conspiracy claim is proper, as civil conspiracy is a derivative tort. *United Healthcare Servs., Inc. v. Rossel*, 2024 U.S. Dist. LEXIS 177289, at *64 (N.D. Tex. 2024).

Although MHEC was a legitimate facility before the MVA Entities were formed, Defendants kept working there after its transition, treating non-emergency patients and charging for unnecessary tests. Dkt. 1 at ¶ 86. A conspiracy involves: (1) two or more people; (2) a common goal; (3) an agreement; (4) unlawful acts; and (5) damages proximately caused. *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). Defendants agreed to provide unnecessary treatment to inflate claims their patients' attorneys sent to insurers. Dkt. 1 at ¶¶ 8, 59, 67, 86, 90, 116, 121, 182-185. The alleged mail fraud satisfies the fourth element, and Appendix A details the damages.

### 3. Allstate alleges facts to establish money had and received and unjust enrichment.

Allstate has adequately alleged that the money it paid to settle personal-injury claims involving false medical records and bills rightfully belongs to it under both money-had-and-received and unjust-enrichment theories.

33

A money had and received claim allows recovery of funds paid based on fraudulent bills.[16] This claim is flexible and not bound by strict technical rules. *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (internal citations omitted). To assert a money-had-and received claim, it is enough to allege that the defendant holds money which in equity and good conscience belongs to the plaintiff. *H.E.B., LLC v. Ardinger*, 369 S.W.3d 496, 507 (Tex. App. – Fort Worth 2012, no pet.). Providers who receive money indirectly through false claims can be liable even if the funds were paid to the claimants' attorneys. *Punjwani*, 2019 U.S. Dist. LEXIS 223054, at *15; *Misra*, 658 F. Supp. 3d at 377. Unjust enrichment applies when there is a taking of undue advantage. *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Defendants submitted fraudulent bills and medical records leading Allstate to settle claims or pay more than it would have. These fraudulent submissions caused Defendants to receive money that, in equity, belongs to Allstate. Dkt. 1 at ¶¶ 237-239. These allegations state valid claims. *See Punjwani*, 2019 U.S. Dist. LEXIS 223054, at *13 (State Farm stated claim where it conferred benefit on defendants by paying claims to their patients' attorneys).

Finally, the Court should reject the argument that a release bars recovery, as no authority supports that position, Allstate seeks only the money tied to Defendants' fraud, and no release is before the Court. And Allstate has stated an unjust-enrichment claim despite any settlement agreements and LOPs. Defendants' reliance on *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) to argue otherwise is misguided. The written contracts there concerned the sale of natural gas, and the contracts were between the plaintiffs and defendant. *See id. Fortune* is nothing like this case.

---

[16] *E.g., Aetna Life Ins. v. Won Yi*, 2019 U.S. Dist. LEXIS 93425, at *6 (S.D. Tex. 2019); *Aetna Life Ins. v. Humble Surgical Hosp., LLC*, 2016 U.S. Dist. LEXIS 180545, at *2 (S.D. Tex. 2016); *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*, 2012 U.S. Dist. LEXIS 102789, at *3-4 (S.D. Tex. 2012).

Finally, Defendants misunderstand the allegations by arguing that Allstate has no private cause of action to complain of their operation of an unlicensed FEMC. Allstate brings no claim under the FEMC statute, but the fact that the MVA Entities operated as a separate, unlicensed FEMC is a factor in the equitable analysis of whether Defendants were unjustly enriched or hold money that in good conscience belong to Allstate.

## VII.    CONCLUSION

The Court should deny the motion for the reasons above. If it is inclined to grant any portion of the motion, the Court should allow leave to amend.

Respectfully submitted,

KNOX RICKSEN, LLP

*/s/ Bret Weatherford*
Bret Weatherford
Attorney in Charge
Texas State Bar No. 20998800
Federal I.D. No. 1322129
bww@knoxricksen.com
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

ATTORNEYS FOR PLAINTIFFS

Of Counsel:

Maisie Sokolove
California State Bar No. 239665
Federal I.D. No. 3863411
mcs@knoxricksen.com
Taylor T. Steele
Texas State Bar No. 24081164
Federal I.D. No. 3871848
tts@knoxricksen.com

Katherine Frank
Texas State Bar No. 24105630
Federal I.D. No. 3217765
kf@knoxricksen.com
Knox Ricksen, LLP
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

## CERTIFICATE OF SERVICE

I certify that on October 21, 2024 a true and correct copy of Plaintiffs' Response to Defendants' Motion to Dismiss was served on all counsel of record electronically through the electronic filing manager.

/s/ *Bret Weatherford*
Bret Weatherford