UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLSTATE INDEMNITY COMPANY, | § | |
| *ET AL.* | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 4:24-CV-02573 |
| | § | |
| | § | |
| | § | |
| AKASH BHAGAT, D.O., *ET AL.*, | § | |
| Defendants. | § | |

**APPENDIX TO PLAINTIFFS' RESPONSE OPPOSING
DEFENDANTS' MOTION TO DISMISS**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE KENNETH HOYT:

Come now Plaintiffs and file this Appendix to their *Plaintiffs' Response Opposing Defendants' Motion to Dismiss*.

TAB A    *Aetna Life Ins. v. Humble Surgical Hosp., LLC*, 2016 U.S. Dist. LEXIS 180545 (S.D. Tex. 2016)

TAB B    *Aetna Life Ins. v. Won Yi*, 2019 U.S. Dist. LEXIS 93425 (S.D. Tex. 2019)

TAB C    *Alameda Cnty. Employees' Ret. Assn. v. BP p.l.c. (In re BP p.l.c) P.L.C.*, 2013 U.S. Dist. LEXIS 171459 (S.D. Tex. 2013)

TAB D    *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*, 2012 U.S. Dist. LEXIS 102789 (S.D. Tex. 2012).

TAB E    *Newby v. Enron Corp.* (*In re Enron Corp. Sec.*), 2002 U.S. Dist. LEXIS 27594 (S.D. Tex. 2002)

TAB F    *State Farm Mut. Auto. Ins. Co. v. Complete Pain Sols., LLC*, 2024 U.S. Dist. LEXIS 127107 (S.D. Tex. 2024)

TAB G    *State Farm Mut. Auto. Ins. v. Kugler*, 2011 U.S. Dist. LEXIS 107005 (S.D. Fla. 2011)

TAB H    *State Farm Mut. Auto Ins. Co. v Punjwani*, 2019 U.S. Dist. LEXIS 223054 (S.D. Tex. 2019)

TAB I    *United Healthcare Servs., Inc. v. Rossel*, 2024 U.S. Dist. LEXIS 177289 (N.D. Tex. 2024)

TAB J    *Vanderbilt Mortg. and Fin., Inc. v. Flores*, 2010 U.S. Dist. LEXIS 44335, (S.D. Tex. 2010)

Respectfully submitted,

KNOX RICKSEN, LLP

*/s/ Bret Weatherford*
Bret Weatherford
Attorney in Charge
Texas State Bar No. 20998800
Federal I.D. No. 1322129
bww@knoxricksen.com
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

ATTORNEYS FOR PLAINTIFFS

Of Counsel:

Maisie Sokolove
California State Bar No. 239665
Federal I.D. No. 3863411
mcs@knoxricksen.com
Taylor T. Steele
Texas State Bar No. 24081164
Federal I.D. No. 3871848
tts@knoxricksen.com
Katherine Frank
Texas State Bar No. 24105630
Federal I.D. No. 3217765
kf@knoxricksen.com
Knox Ricksen, LLP
3710 Rawlins St., Suite 1450
Dallas, Texas 75219
Tel.: (469) 887-1760
Fax: (469) 887-1765

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 21, 2024 a true and correct copy of the Appendix to Plaintiffs' Response to Defendants' Motion to Dismiss was served on all counsel of record electronically through the electronic filing manager.


<u>/s/ *Bret Weatherford*</u>
Bret Weatherford

## *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*

United States District Court for the Southern District of Texas

December 31, 2016, Decided; December 31, 2016, Entered

Civil Action H-12-1206

**Reporter**

2016 U.S. Dist. LEXIS 180545 *; 62 Employee Benefits Cas. (BNA) 2618; 2016 WL 7496743

Aetna Life Insurance Company, Plaintiff, versus Humble Surgical Hospital, LLC, Defendant.

**Subsequent History:** Judgment entered by *Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC, 2017 U.S. Dist. LEXIS 28261 (S.D. Tex., Feb. 3, 2017)*

Appeal dismissed by *Aetna Life Ins. Co. v. Humble Surgical Hosp., L.L.C., 2017 U.S. App. LEXIS 16969 (5th Cir. Tex., Apr. 5, 2017)*

**Prior History:** *Aetna Life Ins. Co. v. Humble Surgical Hosp., L.L.C., 518 Fed. Appx. 300, 2013 U.S. App. LEXIS 7394 (5th Cir. Tex., Apr. 12, 2013)*

**Counsel:** [*1] For Aetna Life Insurance Company, Plaintiff: John Bruce Shely, LEAD ATTORNEY, Kelsey Jenae Hope, Kendall M Gray, Brian C Pidcock, Andrews Kurth Kenyon LLP, Houston, TX; Laura M Trenaman, Andrews Kurth LLP, Houston, TX.

For Humble Surgical Hospital, LLC, Defendant: Robert H Bateman, LEAD ATTORNEY, Adam Brett Chambers, Bateman Pugh, PLLC, Houston, TX.

For Humble Surgical Hospital, LLC, Counter Claimant: Adam Brett Chambers, Bateman Pugh, PLLC, Houston, TX.

For Aetna Life Insurance Company, Counter Defendant: John Bruce Shely, LEAD ATTORNEY, Kelsey Jenae Hope, Kendall M Gray, Brian C Pidcock, Andrews Kurth Kenyon LLP, Houston, TX; Laura M Trenaman, Andrews Kurth LLP, Houston, TX.

**Judges:** Lynn N. Hughes, United States District Judge.

**Opinion by:** Lynn N. Hughes

# Opinion

Opinion on Debt and Truculence

*I. Introduction.*

A hospital waived patient fees and paid kickbacks to referring physicians. In three years it billed more than $86. 2 million to an insurer. Because the hospital's dishonest bills and illegal payments tricked the insurer into overpaying claims, the insurer can elect to take one of three remedies.

*2. Background.*

Humble Surgical Hospital, LLC, is a five-bed hospital in Humble, Texas. Since it opened in August 2010, [*2] it has collected over $41.4 million from Aetna Life Insurance Company for services to Aetna members.

A. *Plans.*

Aetna insures patients through an array of plans that vary broadly in cost and coverage. All of the plans have three things in common: (a) the insurer pays a portion of the patient's bill; (b) the insurer pays a smaller portion when the patient uses a hospital with which the insurer does not have a fee schedule; and (c) the insurer does not pay when a hospital waives the patient's share.

In-network healthcare providers contract with Aetna to serve patients at agreed prices; out-of-network providers do not. A patient who seeks care from an out-of-network hospital pays more out of his pocket than if he had used an in-network hospital. Aetna does not have a relationship with Humble; it is outside of Aetna's network of hospitals. Humble charges a lot more than a hospital in Aetna's network would.

B. *Scheme.*

Humble is a five-bed, out-of-network hospital that set its prices comparable to major Houston hospitals. In fact, it used Memorial Hermann in the Medical Center with 3,803 beds as its standard. Because no economically rational patient would choose it over an in-network provider, [*3] Humble paid referral fees to doctors, waived patient costs, and submitted inflated bills to

2016 U.S. Dist. LEXIS 180545, *3

Aetna.

Humble was joined by 103 doctors through a written proposal — printed in four colors — that offered them thirty percent of facility fees it collected from Aetna in exchange for referrals. Each doctor paid Humble only $3,500 in yearly "administrative and investment fees" — not a contribution of capital — to be entitled to the kickbacks.

To hide the referral-fee arrangement, the doctors created their own limited liability companies — shell entities. Humble agreed with the shells that they would pretend to assume Humble's billing responsibilities. Then they would do nothing, giving Humble and its affiliate, K&S Consulting, LLC, (a) control of billing and payments, and (b) five percent of the fees collected from Aetna. K&S Consulting would charge Aetna — identifying only Humble as the provider — and Aetna would pay the allowed amounts on each bill into Humble's bank account. Humble would kick back to the shells thirty percent of the facility fee paid by Aetna. In sum, Humble got seventy percent and the doctors got thirty percent.[1]

Humble also promised patients (a) that their out-of-pocket expenses [*4] would be equal to or less than in-network, and (b) possibly a refund if their insurer paid in full. Without disclosing the illegal conditions under which it agreed to treat patients, Humble submitted claims. Aetna processed and paid them based on Humble's certification that each one was "true, accurate, and complete.[2]

Aetna sues Humble for (a) money had and received, fraud, and negligent misrepresentation, and (b) relief under the *Employee Retirement Income Security Act*. The court now addresses the claim for money had and received.[3]

3. Money *Had and Received*.

A case for money had and received looks solely to whether the defendant holds money that belongs to the plaintiff. Aetna must show that Humble has been paid money that — in equity — belongs to Aetna.[4]

---

[1] See the Appendix.

[2] UB-04 Uniform Bill.

[3] 1J. Pomeroy, Equity Jurisprudence §§ 108, 174 (5th ed. 1941).

[4] 3J. Pomeroy, Equity Jurisprudence §§ 869, 910 1-1 ed.

A. *Assignments.*

As an out-of-network provider, Humble is only entitled to a patient's benefits through an assignment.[5] Despite having obtained assignments for its services only, Humble testified that the shells actually performed the services for which Aetna paid. No assignments exist from the patients to the shells, and Humble has no assignments from the shells to bill and collect for their services. The shells are not licensed; had they [*5] assigned any claims to Humble, the assignments would have been void for their multifaceted illegality.[6]

Without an assignment, Humble has no right to be paid under Aetna's contracts with the patients. Aetna will recover $41,411,650.98 from Humble for overpayments from August 2010 through October 2013 — an amount that Humble concedes.

B. *In-network.*

Texas does not allow hospitals to bill patients one way and the plan another[7] Humble is an out-of-network hospital, but it did not oblige patients to pay out-of-network amounts. Instead, it told patients that its services' costs would be equal to or less than at an in-network facility.

From August 2, 2010, to May 11, 2012, Humble submitted $68,626,126.71 of out-of-network claims, and Aetna paid $27,813,059.61. If Humble had billed Aetna the same way it told the patients it would — at in-network rates — Aetna would have paid $7,564,799.96.

Aetna will take $20,248,259.65 — the difference between what it paid Humble as an out-of-network provider from August 2, 2010, to May 11, 2012, and what it would have paid Humble as an in-network provider.

C. *Kickbacks.*

Humble tries to characterize its agreements with the unlicensed shells as leases for use of its [*6] hospital.

---

1941); *Staats v. Miller, 150 Tex. 581, 243 S.W.2d 686, 687 (Tex. 1951)*; *City Bank of Hous. v. First Nat. Bank of Hous., 45 Tex. 203, 217-18 (1876).*

[5] *Harris Methodist Fort Worth v. Sales Support Servs., 426 F.3d 330, 333-34 (5th Cir. 2005).*

[6] *Morrison v. City of Fort Worth, 138 Tex. 10, 155 S.W.2d 908, 909 (Tex. 1941).*

[7] *Tex. Ins. Code § 1204.055*; *Tex. Occ. Code § 101.201.*

2016 U.S. Dist. LEXIS 180545, *6

Unlicensed entities cannot lease hospitals.[8] An entity that does nothing except cash checks does not need hospital space — it is a conduit. Humble's agreements with the shells are referral-fee arrangements, not leases.

Texas prohibits hospitals from paying doctors to refer patients.[9] Because Humble kicked back to the doctors thirty percent of its collections, Aetna is entitled to $12,423,495.29 — thirty percent of the $41,411,650.98 it paid Humble.

4. *Preemption.*

Aetna seeks to recoup money that it improperly paid because of Humble's fraud. Humble says that Aetna's claims attempt to enforce the plans with state law, improperly circumventing ERISA's enforcement provisions.

Claims that seek to enforce the plans — like a plaintiff suing an insurer for denial of benefits — are covered by the Act. Aetna's claims do not seek to enforce the plans. Aetna wants to recoup the money Humble tricked it into paying for no benefit at all to the patients; the plans are merely the context of Humble's fraud.[10]

The Act does not give comprehensive regulations and procedures for all eventualities that might be tangentially related to a benefit plan. It is silent about overpayment by an insurer to a provider. [*7] Recourse to the common-law right to recover an insurer's overpayments does not interfere with the national scheme.[11] Aetna's claims are not preempted.

5. *Defenses.*

Humble has no defense.

A. *Voluntary Payment.*

Humble says that Aetna cannot recover because it knowingly paid what Humble charged it when it could have contested those payments. Humble misunderstands Aetna's claim. Aetna does not claim

merely that Humble overcharged. It says that Humble overcharged it and (a) did not charge patients as the plans required, (b) did not provide the services for which it was billing, (c) had no assignments from the shells, and (d) paid kickbacks to referring doctors.

Because Aetna had no knowledge of these facts and never led Humble to believe that its bills would not be challenged if they turned out to be false, the voluntary payment rule cannot apply.[12]

B. *Accord and Satisfaction.*

Humble has not shown that Aetna disputed the bills, and intentionally agreed to relinquish any claims it might have had against Humble for its overcharges.[13]

Aetna never released its right to seek a refund from Humble on any claim. In fact, Humble expressly agreed that all payments by Aetna are subject to the patients' policy and [*8] Aetna was not guaranteeing any payment.[14]

C. *Unclean Hands.*

Aetna's hands are clean. Humble is filthy up to the elbows from lies and corrupt bargains.

D. *Express Contract.*

Humble says that because it is an assignee of the patients' benefit plans, Aetna's right to a refund is barred by the express contract rule. The plans do not cover overpayments to a provider much less claims tainted by illegal inducements that lured patients and doctors.[15]

As explained, Humble has no assignments from patients. Even if it did, overpayments under a contract can be recovered under a theory of restitution or unjust enrichment.[16] Aetna's claims are not eliminated.

6. *Sanctions.*

---

[8] *25 Tex. Admin. Code § 133.21(c)(1).*

[9] *Tex. Occ. Code § 102.001 (a).*

[10] *Trs. of AFTRA Health Fund v. Biondi, 303 F.3d 765, 779 (7th. Cir. 2002).*

[11] *Geller v. Cty. Line Auto Sales, Inc., 86 F.3d 18, 19-23 (2nd Cir. 1996).*

[12] *Miga v. Jensen, 299 S.W.3d 98, 103 (Tex. 2009).*

[13] *Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 863 (Tex. 2000).*

[14] Dkt. No. 209-12, Exhibit 6.

[15] 1 S. Williston, A Treatise on the Law of Contracts § 1:6 (4th ed. 1990); *Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683-84 (Tex. 2000).*

[16] *Sw. Electric Power Co. v. Burlington N. R.R. Co., 966 S.W.2d 467, 469-70 (Tex. 1998).*

2016 U.S. Dist. LEXIS 180545, *8

Assuming Aetna's motion for judgment was not meritorious, Humble's answer and counterclaims would be struck. From the beginning Humble has been recalcitrant and obstreperous. Through six sets of lawyers, countless orders, hearings, and conferences, Humble's behavior has ranged from openly defiant to evasive — always feigning compliance. The court has admonished Humble time and time again. These points are illustrative:

A. Humble refused to comply with the court's orders to produce. A year later, when threatened with contempt, Humble finally [*9] produced some of its records, despite claiming that it had complied all along.

B. In an effort to deliberately obstruct discovery, Humble removed from its papers "some of the references to use and co-management agreements in the summary as it would be prepared for Hughes.[17]

C. Only after Aetna collaterally discovered in related litigation Humble's use agreements did Humble admit it had them.

D. Though it finally capitulated and produced what was ordered, Humble restricted access to its papers by using the court's order on confidentiality improperly — Humble designated all of its papers for attorneys only without determining whether the restriction was proper. It then blamed Aetna and sought sanctions against it for violating the confidentiality order.

E. Unhappy with the court's denying it relief, Humble surreptitiously sought to re-litigate the issue by suing in Connecticut[18] and unjustifiably seeking to intervene in a proposed class action in New Jersey.[19]

This case has had a tortured existence, and the bulk of the activity has been trying to force Humble to tell the truth. Humble has conducted guerrilla warfare against this court, Aetna, the patients, and common decency.

Humble has been repeatedly [*10] warned about its conduct. It has been given the opportunity to reform and has not done so. Its answer and counterclaims are struck as a consequence of its malfeasance.

---

[17] Dkt. No. 260-1, Exhibit A.

[18] Humble Surgical Hosp., LLC v. Aetna Life Ins. Co., No. 13-1903 (D. Conn. filed Dec. 17, 2013).

[19] TRI 3 Enters., LLC v. Aetna, Inc., No. 11-3921 (D. N.J. filed May 16, 2011).

7. *Conclusion.*

Hospitals that obtain patients through illegal remuneration to them or their doctors may not be paid under the plans. At its election, Aetna will take from Humble:

A. $41,411,650.98 — the amount Aetna paid Humble from August 2010 through October 2013;

B. $20,248,259.65 — the difference between what Aetna paid Humble as an out-of-network provider from August 2, 2010, to May II, 2012, and what it would have paid Humble as an in-network provider; or

C. $12,423,295.29 — the thirty percent kickbacks paid by Humble with Aetna's money.

Signed on December 31, 2016, at Houston, Texas.

/s/ Lynn N. Hughes

Lynn N. Hughes

United States District Judge

## Appendix

## Fund Flows

## Aetna v. Humble Surgical Hospital



**End of Document**

## *Aetna Life Ins. Co. v. Won Yi*

United States District Court for the Southern District of Texas

June 3, 2019, Decided; June 3, 2019, Filed; June 4, 2019, Entered

Civil Action H-14-900

**Reporter**
2019 U.S. Dist. LEXIS 93425 *; 2019 WL 2355543

Aetna Life Insurance Company, Plaintiff, versus Won Yi, et al., Defendants.

**Counsel:** [*1] For Aetna Life Insurance Company, Plaintiff, Counter Defendant: John Bruce Shely, LEAD ATTORNEY, Andrews Kurth Kenyon LLP, Houston, TX; Courtney B Glaser, Mary Katherine Strahan, Hunton Andrews Kurth LLP, Houston, TX; Laura M Trenaman, Andrews Kurth LLP, Houston, TX.

For Won Yi, MD, Defendant, ThirdParty Plaintiff: Martin E Rose, LEAD ATTORNEY, Bryan P Rose, Frost Brown Todd LLC, Dallas, TX; Christopher M McDowell, McDowell Law PLLC, Coppell, TX; F Leighton Durham, III, Durham, Pittard & Spalding, LLP, Dallas, TX.

For Paradigm Ambulatory Medical Services, PA, Paradigm Anesthesia Services, PA, Paragon Ambulatory Health Resources, LLC, Defendants: Martin E Rose, LEAD ATTORNEY, Bryan P Rose, Frost Brown Todd LLC, Dallas, TX; F Leighton Durham, III, Durham, Pittard & Spalding, LLP, Dallas, TX.

For Complete Anesthesia Services, PA, Defendant: Martin E Rose, LEAD ATTORNEY, Bryan P Rose, Frost Brown Todd LLC, Dallas, TX; Michael Ross Cunningham, LEAD ATTORNEY, Cunningham Swaim, LLP, Dallas, TX; F Leighton Durham, III, Durham, Pittard & Spalding, LLP, Dallas, TX.

For Physicians Auditing & Billing Services, Inc., Defendant: Danielle Harsany Maya, LEAD ATTORNEY, Cotney Law, Houston, TX; Martin E [*2] Rose, LEAD ATTORNEY, Bryan P Rose, Frost Brown Todd LLC, Dallas, TX; Dolores Christene Wood, Sheehy Ware et al, Houston, TX; Kimberly Roshell Snagg, Law Offices of Kimberly R. Snagg, Houston, TX.

For Aetna Health, Inc., Third Party Defendant: John Bruce Shely, LEAD ATTORNEY, Andrews Kurth Kenyon LLP, Houston, TX; Mary Katherine Strahan, Hunton Andrews Kurth LLP, Houston, TX.

For Paradigm Ambulatory Medical Services, PA, ThirdParty Plaintiff: Martin E Rose, LEAD ATTORNEY, Frost Brown Todd LLC, Dallas, TX; Michael Ross Cunningham, LEAD ATTORNEY, Cunningham Swaim, LLP, Dallas, TX.

For Physicians Auditing & Billing Services, Inc., ThirdParty Plaintiff, Counter Claimant: Danielle Harsany Maya, LEAD ATTORNEY, Cotney Law, Houston, TX; Martin E Rose, LEAD ATTORNEY, Frost Brown Todd LLC, Dallas, TX; Dolores Christene Wood, Sheehy Ware et al, Houston, TX; Kimberly Roshell Snagg, Law Offices of Kimberly R. Snagg, Houston, TX.

For Paragon Ambulatory Health Resources, LLC, Paradigm Anesthesia Services, PA, Paradigm Ambulatory Medical Services, PA, ThirdParty Plaintiffs, Counter Claimants: Martin E Rose, LEAD ATTORNEY, Frost Brown Todd LLC, Dallas, TX.

For Won Yi, MD, Counter Claimant, ThirdParty Plaintiff: [*3] Martin E Rose, LEAD ATTORNEY, Bryan P Rose, Frost Brown Todd LLC, Dallas, TX; Christopher M McDowell, McDowell Law PLLC, Coppell, TX.

**Judges:** Lynn N. Hughes, United States District Judge.

**Opinion by:** Lynn N. Hughes

# Opinion

Amended Opinion on Judgment

1. *Facts.*

In 1998, Paragon Ambulatory Health Resources, LLC, and its related businesses engaged Physicians Auditing & Billing Services, Inc., for its billing and collections. The Paragon companies supplied mobile anesthesia during minor, in-office gynecological procedures. In 2010, Paragon began to issue franchises.

Won Yi is a board-certified anesthesiologist. In 2010, he acquired a Paragon franchise. He also owns these Paradigm entities:

🪟 *Go to table1*

2019 U.S. Dist. LEXIS 93425, *3

Aetna Life Insurance Company issues group insurance policies, including those that fund employer-sponsored health-benefit plans. It also serves as a third-party administrator for self-funded health plans. In either case, the insured receives specified benefits for covered health expenses — as defined by the plan. Aetna processes and pays claims.

2. *Plans.*

Aetna's plans distinguish [*4] between medical providers who have a fee agreement with it and those who do not. Those providers who are covered by an agreement are called in-network; the others are obviously out-of-network. Medical billing levels have considerable variability by geography — urban or suburban, nature of the service, and administrative burden. With many services, Aetna agrees to pay bills submitted by those that commit to a fee schedule. Both categories of services must comply with the non-price conditions of the plans. Some of these are that the providers must collect co-pays and deductibles, and charge reasonable fees for necessary services.

By joining Aetna's network, Aetna can reliably and quickly evaluate and pay claims. This reduces both sides' administrative costs, and it accelerates their cash flows. Further, a patient who gets care from an out-of-network provider is likely to pay more than if he were using a network one. The non-network charge commonly exceeds Aetna's estimate of the reasonable market value for the care supplied.

Aetna and Yi have not agreed to a fee schedule. None of Yi's affiliates has agreed. They are all out-of-network providers.

3. *Scheme.*

Yi uses a billing model that was [*5] developed by two people: (a) Paragon Ambulatory Health Resources's owner, Neal Fisher, and (b) Physicians Auditing's owner, Vicki White.

Yi established the Paradigms to submit medical bills under a range of tax identification numbers and names. For each patient seen, Yi would present two claims to Aetna: (a) a professional fee to administer the anesthesia and (b) a facility fee. Paradigm would bill Aetna $10,000 to $15,000 per procedure, while billing the patients $600. Paragon would collect a royalty and other fees based mostly on a percentage of Yi's collections; Physicians Auditing took eight percent of Yi's collections.

The law requires that medical services only charge proper, reasonable, and medically necessary fees.[1] They are barred from knowingly (a) presenting a false claim for payment under an insurance policy and (b) charging two different prices for the same service — with the higher price based on the existence of insurance coverage.[2]

The defendants submitted wholly dishonest claims. Aetna paid them based on the reasonable belief that each of the bills reflected that the service had complied with (a) the clinic's obligations that condition its right to payment and (b) having [*6] disclosed a true, accurate, and complete bill for the service actually done.

Aetna sues Physicians Auditing, Paragon, Yi, and the Paradigms for (a) money had and received and (b) relief under the *Employee Retirement Income Security Act*.

4. *Money Had and Received.*

A claim for money had and received depends of Aetna's having paid money to the defendants by mistake.

Assume that, based on Paradigm's bill, Aetna pays $1,000 for 60 widgets. When it later discovers that it received only 30 widgets, it may recover $500 that Paradigm got for the undelivered widgets. That money belongs to Aetna. Aetna has shown that the defendants have been paid money in pretend reliance on the billing company that — in simple equity — belongs to Aetna.[3]

A. *Professional Fees.*

Paradigm's formula for anesthesia charges is: (base units + time units) x (unit rate). In other words, a starting fee is increased for time. This may sometimes be a reasonable proxy for complexity. That total is increased by its unit rate.

Aetna's standard time allowance is based on fifteen-minute intervals. The time starts when the anesthesiologist is ready to induce the patient and ends when the anesthesiologist is no longer directly,

---

[1] *Tex. Health & Safety Code Ann. § 311.0025(a).*

[2] *Tex. Occ. Code Ann. § 105.002*; *Tex. Ins. Code Ann. § 552.003 (a) (1)-(2).*

[3] 3 J. Pomeroy, Equity Jurisprudence §§ 869, 910 (5th ed. 1941); *Staats v. Miller, 150 Tex. 581, 243 S.W.2d 686, 687 (Tex. 1951)*; *City Bank of Hous. v. First Nat. Bank of Hous., 45 Tex. 203, 217-18 (1876).*

2019 U.S. Dist. LEXIS 93425, *6

physically [*7] tending to the patient — after the patient is safely placed under post-operative supervision.

Compared to Aetna's standards, the defendants used base units inexplicably higher than Aetna's. They billed 10-minute units that were conventionally 15-minutes. They increased the customary unit price by one-third.

Yi routinely reported false anesthesia time — he typically reported sixty or more minutes for a twenty to thirty minute procedure. Yi conceded that his entities reported time when an anesthesiologist was not directly tending to the patient.

While the Paradigms billed Aetna $5,000 to $8,000 for these, they charged the patients a flat fee of $600. They earned $600 per patient from Aetna — and cheated Aetna out of the balance.

Aetna overpaid professional charges on 750 treatments. It will recover $1,740,672.42, the amount paid in excess of $600 per claim.

B. *Facility Fee.*

Under Aetna's plans, an anesthesiologist may receive a professional fee for his work; he may also submit reimbursement claims for anesthesia supplies and drugs. Separate claims for equipment, the room, and other facility charges are not covered for procedures in the office.

Yi adopted Paragon's practices and filed claims [*8] for mobile anesthesia equipment. He represented to Aetna that Paradigm — a wholly unlicensed operation — was the provider and used billing codes to indicate a professional had served the patients. Yi says Paradigm administered professional services for "unusual" anesthesia. For each procedure, Aetna was charged an additional $6,500 that the patient was not charged. Once Aetna discovered that Paradigm charged facility fees, it denied its claims.

None of the entities billing for facility fees is properly licensed. Aetna's plans and policies do not cover Paradigm's bills for facility fees. Aetna will recover $347,972.02 for what it paid on facility fee claims.

C. *Liabiliy.*

Joint and several liability applies when each party is independently liable for part of the injury to which its own conduct contributed. That is, where people cause an injury that cannot be apportioned with reasonable certainty among specific wrongdoers, they are each

liable for it all, jointly and severally.[4]

Paragon and Physicians Auditing developed the template to cheat insurance companies. The entire business model was centered on creating multiple limited liability companies to submit medical claims to insurance companies, [*9] masking the volume of claims generated by Yi. Yi and the Paradigm entities adopted the template and paid Physicians Auditing a royalty from revenue generated. All of the defendants were directly compensated under this scheme, and they are jointly and severally liable for Aetna's damages of $1,740,672.42.

5. *Voluntary Payment.*

The defendants assert that Aetna's voluntary payment defeats its claims; however, they did not plead voluntary payment. Assuming they had, Aetna would still recover its money. Nothing suggests that Aetna knowingly paid the facility or other charges with the intent to waive its rights to recover for errors and cheating. Aetna reviewed and relied on the incomplete, mis-labeled, and fictional facility claims. Yes, Aetna might have discovered the thieves earlier; however, that is like a burglar saying that it is not liable for stealing from a house because the owners could have locked the door. Being slow to catch a pen-and-paper bandit is not waiver, consent, gift, or entitlement.

6. *ERISA.*

The defendants have counter-sued saying that Aetna has violated the regulatory scheme. It did not. A medical service provider may contest the denial of charges in an appeal administratively. [*10] They would need to prove that their separate charges for mobile anesthesia equipment and technical services are covered and payable under the terms of the plans.[5]

Aetna has established that these separate charges are not authentic. The plans do not cover charges for transporting and installing mobile anesthesia or other office-level equipment. The plans also do not pay claims submitted by unlicensed providers. The plans do not cover bills that are twelve times higher than they should be.

_____

[4] *Amstadt v. U.S. Brass Corp., 919 S.W.2d 644, 654 (Tex. 1996)*; **Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1095 (5th Cir. 1973)**.

[5] *Perdue v. Burger King Corp., 7 F.3d 1251, 1254 (5th Cir. 1993)*.

2019 U.S. Dist. LEXIS 93425, *10

Without facts, the defendants insist the plans are not representative. They billed Aetna's plan, not a statistically standard plan. They have offered no other plans with language that shows their equipment charges are covered. They also say the plans do not clearly exclude equipment. The issue is whether their services are covered under Aetna's plans, and they are not. Simply put, Aetna's denial of the claims is fully consonant with its plans and ERISA.

7. *Conclusion.*

Dishonest bills, fake standards, and irregular medicine caused Aetna to pay money to these defendants. Aetna will recover the overpayments of $1,740,672.42 and facility fees of $347,972.02 jointly and severally from:

Won Yi;

Paradigm Services, [*11] LLC;
Complete Anesthesia Services, PA;
Paradigm Anesthesia Services, PA;
Paradigm Ambulatory Associates, LLC;
Paradigm Ambulatory Medical Services, PA;
Physicians Auditing & Billing Services, Inc.; and
Paragon Ambulatory Health Resources, LLC.

Aetna will also recover its attorney's fees in a separate hearing. Won Yi; Paradigm Services, LLC; Complete Anesthesia Services, PA; Paradigm Anesthesia Services, PA; Paradigm Ambulatory Associates, LLC; Paradigm Ambulatory Medical Services, PA; Physicians Auditing & Billing Services, Inc.; and Paragon Ambulatory Health Resources, LLC, will take nothing from Aetna.

Signed on June 3, 2019, at Houston, Texas.

/s/ Lynn N. Hughes

Lynn N. Hughes

United          States          District          Judge

2019 U.S. Dist. LEXIS 93425, *11

**Table1 (***Return to related document text***)**

| | |
|---|---|
| Paradigm Ambulatory Medical Services, PA | Paradigm Services, LLC |
| Paradigm Anesthesia Services, PA | Complete Anesthesia Services, PA |
| Paradigm Ambulatory Associates, LLC | |

**Table1 (***Return to related document text***)**

**End of Document**

# *Alameda Cnty. Employees' Retirement Assn. v. BP p.l.c. (In re BP p.l.c.)*

United States District Court for the Southern District of Texas, Houston Division

December 2, 2013, Decided; December 5, 2013, Filed

MDL No. 10-md-2185; Civ. Act. No. 4:12-cv-1256 (cons.)

**Reporter**

2013 U.S. Dist. LEXIS 171459 *; 2013 WL 6383968

IN RE: BP p.l.c., SECURITIES LITIGATION; ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, et al., Plaintiffs, v. BP p.l.c., et al., Defendants.

**Prior History:** *In re BP P.L.C. Secs. Litig., 2013 U.S. Dist. LEXIS 171453 (S.D. Tex., Dec. 2, 2013)*

**Counsel:** [*1] For Alameda County Employees' Retirement Association, Plaintiff: Emma Gilmore, Marc I Gross, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY; Jason S Cowart, Jeremy A Lieberman, Matthew L Tuccillo, Pomerantz Grossman et al, New York, NY; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX.

For State-Boston Retirement System, Employees' Retirement System of the City of Providence, Consol Plaintiffs: Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom & Gross, New York, NY; Jason S Cowart, Jeremy A Lieberman, Matthew L Tuccillo, Pomerantz Grossman et al, New York, NY; Sammy Ford, IV, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, TX.

For BP PLC, Defendant: Thomas W Taylor, Andrews and Kurth, Houston, TX.

For BP America Inc., BP Exploration & Production, Inc., Anthony B Hayward, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX.

For Douglas Suttles, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Jaren Janghorbani, Roberto Finzi, Theodore V Wells, Jr., Paul Weiss et al, New York, NY; Patrick J Somers, Paul Weiss Rifkind Wharton Garrison, New York, NY.

Andrew G Inglis, Defendant, Pro se.

Robert [*2] Malone, Defendant, Pro se.

For David Rainey, Defendant: Brian M Heberlig, Patrick Francis Linehan, Reid H Weingarten, Steptoe and Johnson LLP, Washington, DC.

H Lamar McKay, Defendant, Pro se.

Robert W Dudley, Defendant, Pro se.

**Judges:** HON. KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KEITH P. ELLISON

# Opinion

**AMENDED MEMORANDUM AND ORDER**

Pending before the Court is Defendants' Consolidated Motion to Dismiss Plaintiffs' Complaints. (Doc. No. 46.)[1] Having reviewed the motion, Plaintiffs' response (Doc. No. 55), Defendants' reply (Doc. No. 63), and all papers in support thereof, the Court finds that Defendants' motion (Doc. No. 46) must be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

This case is part of a "first tranche" of securities fraud actions filed against various BP companies and executives that are advanced mostly under state law. Plaintiffs seek to hold Defendants responsible for financial harm caused by BP's falling stock prices after the Deepwater Horizon explosion on April 20, 2010 and the resulting 87-day oil spill in deepwater Gulf of Mexico. Plaintiffs contend that Defendants materially misrepresented the worth of BP's [*3] stock prior to and immediately following the disaster. They believe Defendants should compensate them for their financial losses following the alleged correction of BP's stock price.

The Court has written at length regarding the events of April 20, 2010. A putative class action grounded in U.S.

---

[1] Unless otherwise indicated, all docket references are to 12-cv-1256.

federal securities law (the "Class Action") is also pending before the Court, and three separate motions to dismiss have been resolved by written order in that action. A more extensive description of the factual allegations regarding BP's checkered safety record and the tragic events leading up to the Deepwater Horizon explosion may be found in two of the Court's prior orders. *See* In re BP p.l.c. Securities Litig. ("BP I"), 843 F. Supp. 2d 712, 724-25, 741-42 (S.D. Tex. 2012); In re BP p.l.c. Securities Litig. ("BP II"), 852 F. Supp. 2d 767, 775-78 (S.D. Tex. 2012).

This action both overlaps substantially with, and deviates from, the Class Action. Most importantly, Plaintiffs in this case seek compensation for losses caused by drops in the price of BP's Ordinary Shares—listed and sold only on the London Stock Exchange ("LSE")—as well as for drops in the price of BP's American Depositary Shares [*4] ("ADSs")—listed and sold on the New York Stock Exchange ("NYSE"). In the Class Action, the Court held that U.S. federal securities laws do not provide relief for losses experienced on foreign exchanges. *BP I, 843 F. Supp. 2d at 796.* Consequently, to recover the full range of their losses from both types of financial instruments, Plaintiffs in this case bring both federal and state law claims.

Plaintiffs' First Amended Consolidated Complaint (the "Complaint") is very similar to the Second Consolidated Amended Class Action Complaint (the "Class Action Complaint") in the Class Action. It alleges that a series of public statements—in press releases, regulatory filings, and news reports—were misleading. One important distinction between the Complaint and the Class Action Complaint is that the Complaint includes more specific allegations of Plaintiffs' diligence in researching BP, assessing whether to invest, and then making investments. Specifically, the Complaint contains allegations about particular investment advisors used by the various plaintiffs; what those investment advisors reviewed; and how at least one of them—[TEXT REDACTED BY THE COURT] representing Alameda County—met with BP [*5] officials face-to-face to discuss concerns about [TEXT REDACTED BY THE COURT].[2] Statements from seven face-to-face meetings with [TEXT REDACTED

_____

[2] BP also allegedly met with investment advisors for Providence and State-Boston in the United States, but Plaintiffs concede that this information is not included in the Complaint. (Doc. No. 55 (the "Cons. Opp."), at 25 n.14.) The Court cannot consider matters outside the Complaint at this time.

BY THE COURT] are included in the Complaint as alleged misrepresentations.

The Complaint also expounds upon Defendants' alleged campaign, post-disaster, to promote and perpetuate the notion that the amount of oil spilling into the Gulf each day was approximately 5,000 barrels, and not 70,000 barrels as reported by other observers of the tragedy. To this end, the Complaint incorporates an additional twelve alleged public misstatements from April and May 2010 which are not found in the Class Action Complaint. Plaintiffs have also included copious detail regarding data and estimates generated within BP that contradicted the post-spill public statements, as well as developments in the criminal and civil enforcement case against BP and its executives and employees [*6] in which some liability for misleading the U.S. government and the public has been admitted.

## A. The Parties

The plaintiffs are: Alameda County Employees' Retirement Association ("Alameda County"); Employees' Retirement System of the City of Providence ("Providence"); and State-Boston Retirement System ("State-Boston" and, collectively with Alameda County and Providence, "Plaintiffs"). Plaintiffs are all U.S. public pension funds. Alameda County and State-Boston purchased both Ordinary Shares on the LSE and ADSs on the NYSE. Providence purchased only Ordinary Shares on the LSE. Alameda County and State-Boston's BP holdings date from November 29, 2006; Providence's BP holdings date from October 2, 2009. (Doc. No. 36 (the "Compl."), at ¶¶ 22-24.)

The defendants are: BP p.l.c., BP America, Inc., and BP Exploration & Production, Inc. and seven of BP's present and former officers and directors. BP p.l.c. ("BP" or the "Company") is a U.K. corporation with its principal executive offices located in London, England. (Compl. ¶ 25.) BP America, Inc. ("BP America") and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal [*7] places of business in Houston, Texas. (*Id.* ¶¶ 26-27.)

The seven individual defendants were directors and officers of one or more of the corporate defendants prior to and during the Deepwater Horizon spill. They are Anthony B. Hayward, executive director from 2003 to November 2010 and Chief Executive Officer ("CEO") at BP from May 2007 to October 2010; Douglas Suttles, Chief Operating Officer for BP E&P from January 2009

2013 U.S. Dist. LEXIS 171459, *7

to at least January 2011; Andrew G. Inglis, executive director and Chief Executive of Exploration and Production at BP from 2007 to October 2010; Robert Malone, Chairman and President of BP America from July 2006 to February 2009; David Rainey, BP America's Vice President of Exploration for the Gulf of Mexico; H. Lamar McKay, the Chairman and President of BP America since January 2009; and Robert Dudley, executive director of BP since April 2009 and its Group Chief Executive since October 2010 (collectively, the "Individual Defendants"). (Compl. ¶¶ 29-35.)

## B. Alleged Public Misrepresentations

As noted above, the alleged public misrepresentations included in the Complaint are largely the same as the misrepresentations at issue in the Class Action. The statements began in [*8] January 2007 and continued through May 2010, after the Deepwater Horizon explosion. The alleged public misrepresentations can be divided into three broad categories: (1) statements regarding BP's safety reform efforts following a fatal explosion at the Company's Texas City refinery in 2005; (2) statements regarding BP's ability to respond to an oil spill in deepwater; and (3) statements regarding the amount of oil spilling from the Macondo well after the Deepwater Horizon collapsed.

## 1. BP's safety reform efforts

On March 23, 2005, an explosion at BP's Texas City refinery killed 15 people and injured approximately 170 others. (Compl. ¶ 57.) The catastrophe—one in a long string of safety missteps, as catalogued in the Complaint—prompted BP, on recommendation from the U.S. Chemical Safety Board ("CSB"), to commission an independent panel of experts to review its safety culture and procedures and recommend improvements. (*Id.* ¶¶ 61-62.) This panel—led by former U.S. Secretary of State James Baker, III and known as the "Baker Panel"—issued a report in January 2007 (the "Baker Report") criticizing BP for emphasizing personal safety (i.e., occupational safety such as slip and falls) over process [*9] safety. (*Id.* ¶ 72.) The Baker Report set out ten recommendations and urged BP to implement them expeditiously:[3]

---

[3] Although the Baker Report recommendations were directed at BP's U.S. refineries, BP announced that it would "implement the mandates across all lines of its business." (Compl. ¶¶ 75, 88.)

RECOMMENDATION # 1 — PROCESS SAFETY LEADERSHIP — The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION # 2 — INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM — BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION # 3 — PROCESS SAFETY KNOWLEDGE AND EXPERTISE — BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, [*10] possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION # 4 — PROCESS SAFETY CULTURE — BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION # 5 — CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY — BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION # 6 — SUPPORT FOR LINE MANAGEMENT — BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION # 7 — LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY — BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries

by BP's refining line management, executive management (including the Group Chief Executive), and the Board of Directors.

RECOMMENDATION # 8 — PROCESS SAFETY AUDITING — BP should establish and [*11] implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION # 9 — BOARD MONITORING — BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION # 10 — INDUSTRY LEADER — BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

(*Id.* ¶ 74.)

Plaintiffs allege that Defendants [*12] embraced the Baker Panel's recommendation to "articulat[e] a clear message on the importance of process safety," but failed to match that message with policies and actions. (Compl. ¶ 76.) Despite this, BP's purported progress on the Baker Report roadmap was a common refrain in public statements after January 2007. The following statements fall into this category of alleged misrepresentation:

• A press release issued January 16, 2007, announcing the release of the Baker Report, stated: "BP **already has taken** a number of actions which align with the recommendations of the [Baker Panel] and will, after a more thorough review, develop plans . . . for applying lessons learned elsewhere." (*Id.* ¶ 331.)

• In a press release issued October 25, 2007, announcing the resolution of law enforcement investigations into Texas City and an oil spill in Prudhoe Bay, Alaska, Malone stated: "In the months and years since these violations occurred,

**we have made real progress in the areas of process safety performance and risk management.**" (*Id.* ¶ 341.)

• At the Houston Forum on November 8, 2007, Hayward stated: "**We continue to implement the roadmap provided to ourselves and the industry by the excellent work** [*13] **of the Baker Panel.** BP remains absolutely committed to taking these lessons and becoming a world leader in process safety." (*Id.* ¶ 343.)

• In the 2007 Annual Review, dated February 22, 2008, Hayward stated: "When I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. **I set out three priorities: safety, people and performance.**" (*Id.* ¶ 345.)

• At the 2008 Strategy Presentation conducted via teleconference on February 27, 2008, and again at the 2008 Annual General Meeting held April 17, 2008, Hayward stated: "**[O]ur intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel**[.]" (*Id.* ¶¶ 347, 349.)

• At the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum on December 17, 2008, Hayward stated: "BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was a tragic and unacceptable loss of life. . . . **We opened ourselves up to scrutiny . . . [a]nd we have continuously reported progress against a response plan and against an independent external report.**" (*Id.* ¶ 352.)

• BP's 2009 Annual Report [*14] filed March 5, 2010 and signed by Hayward, stated: "**Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments** . . . . Throughout this time the group chief executive has made safety the number one priority." (*Id.* ¶ 379.)

• During a March 23, 2010 speech at the Peterson Institute for International Economics, Hayward stated: "**That tragic accident [i.e., Texas City] has changed in a profound and fundamental way our approach to safety and operations integrity — providing a safe working environment is a paramount responsibility, and our first and**

2013 U.S. Dist. LEXIS 171459, *14

*foremost priority.*" (*Id.* ¶ 383.)

According to Plaintiffs, the above statements were false and misleading because BP had not, in fact, instituted the safety reforms advocated by the Baker Panel. (*E.g.,* Compl. ¶ 332.) They claim that BP's abject failure to make any progress on the above recommendations was made tragically clear when a series of process safety failures led to the April 20, 2010 blowout on the Deepwater Horizon. According to Plaintiffs, the events leading up to April 20, 2010 demonstrate that BP— despite public attestations of reform [*15] and progress—continued to suffer from a misguided focus on occupational safety over process safety; lacked adequate and consistent process safety procedures; and had engaged in short-sighted, cost-driven decisionmaking which compromised its ability to maintain safe operations and resulted in an unreasonable risk of catastrophic failures. (*Id.* ¶¶ 11-12, 117-18, 246, 259-60, 262, 264.) Importantly, these same issues were raised in the Baker Report and in other investigations conducted regarding the Texas City and Prudhoe Bay disasters.[4] (*Id.* ¶¶ 64, 72.)

In addition to the above statements regarding BP's "progress" on the Baker Report roadmap, Plaintiffs allege that Defendants also misrepresented the scope and implementation of BP's Operating Management System ("OMS")—the cornerstone of BP's safety reform efforts. OMS was a response to the second recommendation [*16] of the Baker Panel: "BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks[.]" (Compl. ¶ 77.) Defendants touted OMS in a variety of public settings, repeatedly updating on its roll-out and reach:

• BP's 2006 Sustainability Report, dated May 9, 2007, stated: "The OMS is a *comprehensive system that covers all aspects of our operations . . . . The new OMS will apply to all operations* by the end of 2010 . . . . *Each site will have its own local OMS*, based on a consistent group-wide framework[.]" (*Id.* ¶ 333.)

---

[4] In early 2006, between 210,000 and 260,000 gallons of oil leaked from BP's pipelines in Prudhoe Bay, Alaska. It was determined that the leak had been ongoing for weeks before BP discovered it. (Compl. ¶ 65.) BP subsequently pled guilty to a criminal charge in connection with the Prudhoe Bay incident and paid $22 million in fines. (*Id.* ¶ 68.)

• On a July 24, 2007 conference call with analysts and investors, Hayward stated: "We are also in the early days of establishing a new way of operating in BP — *with the progressive rollout of a common group-wide Operating Management System.*" (*Id.* ¶ 337.)

• At the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007, Inglis stated: "One aspect of our focus on safe and reliable operations . . . is our new standardized [OMS]. *This will provide a blueprint for safety and all aspects of operations throughout BP.*" (*Id.* ¶ 339.)

• [*17] A press release issued October 25, 2007 stated: "BP America is in the midst of a comprehensive effort to improve its safety culture and *to strengthen and standardize process safety and risk management programs* at all BP-operated facilities." (*Id.* ¶ 341.)

• At the 2008 Strategy Presentation conducted via teleconference on February 27, 2008, and again at the 2008 Annual General Meeting held April 17, 2008, Hayward stated: "*[O]ur intense focus on process safety continues. We . . . have begun to implement a new Operating Management System across all of BP's operations.*" (*Id.* ¶¶ 347, 349.)

• In the 2008 Annual Review dated February 24, 2009, Hayward stated: "*The BP [OMS] turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.*" (*Id.* ¶ 355.)

• BP's 2008 Annual Report, filed March 4, 2009 and signed by Hayward, stated: "We continue to implement our new *[OMS], a framework for operations across BP that is integral to improving safety and operating performance in every site.* When fully implemented, OMS will be the single framework within which we will operate[.]" (*Id.* ¶ 358.) Elsewhere, the Report stated: "All operated [*18] businesses plan to transition to OMS by the end of 2010." (*Id.*)

• In the 2008 Sustainability Review released April 16, 2009, Hayward stated: "You can see a similar balanced approach in our new *[OMS], which is to be implemented at each BP site.*" (*Id.* ¶ 370.)

• BP's 2009 Annual Review, dated February 26,

2013 U.S. Dist. LEXIS 171459, *18

2010, stated: "A key enabler for [safe, reliable and compliant operations] is the BP operating management system *(OMS), which provides a common framework for all BP operations . . . . OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework*." (*Id.* ¶ 377.)

• BP's 2009 Annual Report, filed March 5, 2010 and signed by Hayward, stated: "A key enabler for [safe, reliable and compliant operations] is the BP *[OMS], which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency*." (*Id.* ¶ 379.) Elsewhere, it stated: "*BP's [OMS], which provides a single operating framework for all BP operations*, is a key part of continuing to drive a rigorous approach to safe operations." (*Id.*) It also stated: "Following the [*19] tragic incident at the Texas City refinery in 2005, the SEEAC committee has observed a number of key developments, including . . . *development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites* . . ." (*Id.*)

• At the Howard Weil Energy Conference on March 22, 2010, Inglis stated: "*Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance*." (*Id.* ¶ 381.)

• BP's 2009 Sustainability Review dated April 15, 2010, stated: "*BP's [OMS] provides a single framework for all BP operations to follow,* covering all areas from process safety, to personal health, to environmental performance. Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken. Its principles and processes are designed to simplify the organization, improve productivity, *enable consistent execution* and focus BP on performance." (*Id.* ¶ 387.)

• BP's 2009 Sustainability [*20] Report, dated April

15, 2010, stated: "*BP continues to implement its [OMS], a cornerstone of achieving safe, reliable and responsible operations at every BP operation.*" (*Id.* ¶ 390.)

The above statements are alleged to be misleading because they repeatedly emphasized the all-encompassing, consistent nature of OMS, without disclosing that it was not designed to and would not apply to project sites owned by contractors. (Compl. ¶¶ 93-97.) This was a significant carve-out to OMS—six out of seven offshore drilling units in the Gulf of Mexico in early 2010 were owned by contractors, including, notably, the Transocean-owned Deepwater Horizon. (*Id.* ¶ 93.)

Multiple statements regarding the pace of the OMS roll-out in the Gulf of Mexico are also alleged to have been misleading. These include the following:

• In the 2008 Annual Review, dated February 24, 2009, BP stated: "During the year we began migrating to *the new BP OMS, which has an increased focus on process safety and continuous improvement.* The majority of our operations in North America Gas, the *Gulf of Mexico*, Colombia and the Endicott field in Alaska *all completed the migration to the OMS in 2008*." (Compl. ¶ 354.)

• The 2008 Annual Report, [*21] filed March 4, 2009 and signed by Hayward, stated: "*Eight sites completed the transition to OMS in 2008 . . . [including] the Gulf of Mexico*[.]" (*Id.* ¶ 358.)

• In the 2009 Sustainability Review, dated April 15, 2010, Hayward stated: "*Having been initially introduced at eight sites in 2008,* the OMS rollout extended to 70 sites by the end of 2009 . . . *This means implementation is 80% complete.*" (*Id.* ¶ 385.)

Plaintiffs claim that the statements were misleading because they touted full implementation of OMS in the Gulf of Mexico before full implementation had actually been achieved. (*Id.* ¶¶ 100-07.)

Finally, Plaintiffs allege that at least two misrepresentations were made regarding BP's receptiveness to safety concerns raised by its employees and its treatment of safety whistleblowers. Like the representations regarding OMS, the statements about employee feedback and non-retaliation were relevant to one of the recommendations of the Baker

2013 U.S. Dist. LEXIS 171459, *21

Report: Recommendation # 4, which encouraged BP to "involve the relevant stakeholders to develop a positive, trusting, and open process safety culture[.]" (Compl. ¶ 74.) The alleged misstatements in this category include:

• On May 16, 2007, in testimony [*22] before a House subcommittee, Malone stated: "I continue to meet with employees to reinforce my expectations of them: *that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.*" (*Id.* ¶ 335.) Malone further stated: "*BP does not tolerate retaliation against workers who raise safety concerns.*" (*Id.*)

• On December 17, 2008, during a speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum, Hayward stated that BP's "high profile safety lapses" provided "a huge opportunity to learn and improve the way we operate. *We opened ourselves up to scrutiny — and we listened more to our front-line operations people — who, of course, really know what is going on on the ground.*" (*Id.* ¶ 352.)

Plaintiffs claim that these statements were false because safety concerns raised by BP employees were, at best, ignored. At worst, safety whistleblowers were marginalized, retaliated against, and even terminated. (*Id.* ¶¶ 187-201.)

## 2. BP's oil spill prevention and response capabilities

Defendants are also alleged [*23] to have misrepresented BP's ability to prevent and to respond to an oil spill in deepwater, both to the U.S. government and to investors. Most of the alleged misstatements in this category are found in the Regional Oil Spill Response Plan ("OSRP")—last updated in June 2009 and covering the entire Gulf of Mexico region—and the Initial Exploration Plan ("IEP") for the Macondo well, submitted March 10, 2009. (Compl. ¶¶ 227, 229.) Both documents were filed with the U.S. Department of the Interior's Minerals Management Service ("MMS") and made publicly available. (*Id.* ¶¶ 360, 372.) The alleged misstatements found in the documents include:

• The IEP stated: "*BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge,*" which BP estimated at 162,000 barrels of oil per day. (*Id.* ¶¶ 360, 363.)

• The IEP also stated: "*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for [*24] containment and recovery and removal of the oil spill.*" (*Id.* ¶ 360.) It also stated: "An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.* Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*" (*Id.* ¶ 361.)

• The OSRP estimated the "*TOTAL WORST CASE DISCHARGE*" scenarios in the Gulf of Mexico at between 28,033 barrels and 250,000 barrels of oil per day. (*Id.* ¶ 372.)

• The OSRP also stated that BP and its subcontractors could recover approximately *491,721 barrels of oil per day* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf. (*Id*) It stated that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*" (*Id.*)

In addition to the alleged misrepresentations in the OSRP and IEP, Plaintiffs include 2 other public statements which addressed [*25] BP's spill prevention technologies and promoted BP's ability to deal with any adverse consequences from their deepwater activities:

• On November 19, 2009, Rainey testified before a Senate Committee and gave "[e]xamples of the technologies which have helped to reduce accidental releases," including "*[b]lowout preventer technology which includes redundant systems and controls*" and "*BP's fiber optic network in the U.S. Gulf of Mexico which allows us to monitor well pressures in real time, both*

at the facility and in our offices in Houston." (*Id.* ¶ 375.) He also testified: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. ***All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents***." (*Id.*)

• BP's 2009 Sustainability Report, dated April 15, 2010, stated: "***[W]e seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate*** [*26] ***contingency planning and emergency response***." (*Id.* ¶ 389.)

Rainey's testimony regarding "technologies which have helped to reduce accidental releases" is alleged to be false because the blow-out preventers used in the Gulf of Mexico—including on the Deepwater Horizon—did not have safety redundancies such as a second blind shear ram or an acoustical control switch. (Compl. ¶ 376(d)-(e).) Additionally, although Rainey testified that BP could "monitor well pressures in real time," both offshore and in BP's Houston office, in reality no one in BP's Houston office monitored well pressures from the Macondo well—either prior to or on the night that the well blew. (*Id.* ¶ 376(e).)

The falsity of the statements regarding BP's oil spill response capabilities was revealed in April, May, June, and July 2010, when BP proved utterly incapable of counteracting or stopping the oil spill, despite the fact that it was nearly three times *less* serious than the worst case scenario contemplated in the IEP, and four times less serious than that contemplated in the OSRP. Indeed, several Defendants have since admitted that—in contrast to the self-assured statements in the OSRP and IEP—BP did not have the necessary [*27] tools and technologies to counteract an oil spill in deepwater. This includes Suttles, who stated that BP did not have a response plan with "proven equipment and technology" to contain a spill; Hayward, who admitted that BP "did not have the tools you'd want in your tool kit" to stop the leak, and that, after the spill, BP had been "making it up day to day;" Malone, who conceded that BP did not have "individual technologies" for dealing with an oil spill prior to the Deepwater Horizon explosion; and Inglis, who testified that BP had not invested a single dollar in

developing methods to contain an oil spill. (Compl. ¶¶ 289, 369(f)-(g), 369(i).)

### 3. BP's oil spill estimates

Finally, Defendants are alleged to have drastically understated the quantity of oil spilling into the Gulf following the Deepwater Horizon explosion and collapse. According to Plaintiffs, the accuracy of the publicized estimates was important for at least two different reasons. It defined the amount of money BP would owe the U.S. government in fines. (Compl. ¶¶ 211, 436-37.) It also affected how much BP would need to spend in offshore and onshore spill response, as well as the extent of its exposure to liability for [*28] private claims and lawsuits. (*Id.* ¶ 437.) Because investors were keenly aware of these metrics, continually evaluating the wisdom of any potential or existing investment in BP, it was particularly important for Defendants to be forthcoming and guileless in their public estimates of the spill rate. (*Id.* ¶ 213.) In the month following the explosion, these estimates were starkly consistent. As indicated below, they ranged from an early number of 1,000 barrels per day to a much-repeated "best guess" of 5,000 barrels per day:

• On April 28, during a Unified Command press briefing, Suttles stated that BP's best estimate was that ***1,000 barrels of oil per day*** were flowing from the well. (*Id.* ¶ 399.)

• On April 29, Suttles conducted an interview on The Early Show and provided the following estimate: "I think that somewhere ***between one and five thousand barrels a day is probably the best estimate*** we have today." (*Id.* ¶ 401(a).)

• Also on April 29, Suttles conducted an interview on Good Morning America and stated: "I think ***between one and 5,000 barrels a day is a reasonable estimate.*** (*Id.* ¶ 401(b).)

• Also on April 29, Suttles conducted an interview with The Today Show and stated: "I actually don't [*29] think there's a difference between NOAA's view and our view. I would say ***the range is 1,000 to 5,000 barrels a day.***" (*Id.* ¶ 401(c).)

• A Form 6-K filed with the SEC on April 29 stated: "Efforts continue to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day.***" (*Id.* ¶ 404.)

• Another Form 6-K filed with the SEC on April 30 stated: "Efforts to stem the flow of oil from the well, **currently estimated at up to 5,000 barrels a day**, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the flow out preventer (BOP) on the sea bed." (*Id.* ¶ 405.)

• Also on April 30, the estimate of **5,000 barrels per day** was posted on BP's corporate website. (*Id.* ¶ 406.)

• A Form 6-K filed with the SEC on May 4, 2010 stated: "[C]urrent estimates by the U.S. National Oceanic and Atmospheric Administration (NOAA) suggest **some 5,000 barrels (210,000 U.S. gallons) of oil per day** are escaping from the well." (*Id.* ¶ 414.)

• On May 5, Hayward conducted an interview with the Houston Chronicle and stated: "**A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day.**" (*Id.* ¶ 416.)

• On May 14, Suttles conducted an interview with Good Morning [*30] America and stated: "[O]urselves and the people from NOAA and others believe that **something around 5,000, that's actually barrels a day, is the best estimate**." (*Id.* ¶ 420.)

• Also on May 14, Suttles conducted an interview with The Today Show. In response to the question of whether BP had "underplayed" the size of the leak and if the leak could be "more than 5,000 barrels a day," Suttles stated: "I don't think it is wildly different than that number . . . **it could be a bit above or below**." (*Id.* ¶ 421.)

• Also on May 14, BP reasserted the 5,000-barrels-per-day figure on cnn.com and rejected an external estimate of 70,000 barrels per day. Dudley stated that the 70,000-barrels-per-day figure was "**not accurate at all**" and that it "**isn't anywhere I think within the realm of possibility.**" (*Id.* ¶ 422.)

• On May 17, during a Unified Command press briefing, in response to a question of how certain BP was about the 5,000-barrels-per-day figure, Suttles stated: "**[T]hat's our best estimate today.** Clearly people are constantly asking that question." (*Id.* ¶ 425.)

• On May 19, McKay testified before a House committee.[5] In response to the question of whether "5,000 barrels per day" was the "most accurate" [*31] figure for the magnitude of the spill, McKay stated: "**That is our best estimate.**" (*Id.* ¶ 418.) Further, in response to the question of whether an external estimate of 70,000 barrels per day could be accurate, McKay stated: "It is theoretically possible. **I don't think anyone believes it is quite that high that has been working on this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.**" (*Id.*)

• On May 21, Suttles conducted another interview with Good Morning America. In response to a question of whether BP "deliberately underestimate[d] the size of the spill," Suttles stated: "I should actually point out that the 5,000 barrels a day . . . That was not just BP's estimate. That was the estimate of the Unified Command, including NOAA and the Coast Guard. **And that's the best estimate we have.**" (*Id.* ¶ 427.)

• On May 22, Suttles conducted an interview with NPR's "Weekend Edition," in which he stated: "**[T]hose are the techniques we use to give an estimate, and 5,000 barrels a day was the best [*32] estimate we could do.**" Suttles also refuted the external estimate of 70,000 barrels per day: "**I've heard those estimates and seen them and I don't believe it's possible that it's anywhere near that number** . . . since I can't meter it, I can't actually say it couldn't be. But **all of our techniques say that that's highly unlikely.**" Suttles also stated that the top kill technique—one of BP's failed attempts to stop the spill—would not complicate the situation because "**we don't think the rate's anywhere near that high [of 70,000 barrels per day].**" (Compl. ¶ 430.)

Time has proven the above estimates grossly inadequate. It is currently estimated that between 53,000 and 62,000 barrels of oil gushed from the Macondo well each day that the blowout was not contained. (Compl. ¶ 211.) In the 87 days that it took BP

---

[5] Although the Complaint indicates that the House testimony was given on May 10, 2010, Defendants clarify that it was given on May 19, 2010. (Doc. No. 48 ("Cons. MTD"), at 34 n.24.) The Court accepts Defendants' representation.

to close the well, more than 4.9 million barrels of oil escaped into the Gulf of Mexico. (*Id.* ¶¶ 211, 324.) But even more importantly than the test of hindsight, [*33] Plaintiffs allege that the publicized estimates from April and May 2010 were contradicted by BP's own internal figures, shared only within a "circle of trust." (*Id.* ¶¶ 203-04, 214-15, 219, 409(a), 409(d), 433(a), 433(d)-(i).) They were also contradicted by numerous external estimates of which BP was aware. (*Id.* ¶¶ 207, 409(b)-(c), 433(b)-(c).) These figures did not yield a single identifiable consensus; they generally ranged from *at least* 5,000 to over 100,000 barrels per day. (*Id.* ¶¶ 203-04, 207, 214-15, 219, 409(a)-(d), 433(a)-(i).) But—with one exception—each belied the 5,000-barrel per day "best guess" repeated at least fifteen times in the thirty-two days following the disaster.[6]

## C. Alleged Private Misrepresentations

In addition to the above public misrepresentations, Alameda County claims that it received and relied upon a number of private misrepresentations directed specifically to its investment manager, [*34] [TEXT REDACTED BY THE COURT] These statements were made during seven face-to-face meetings in which representatives from BP spoke with representatives from [TEXT REDACTED BY THE COURT]

The first meeting occurred on November 29, 2006, before the release of the Baker Report. (Compl. ¶ 439(a).) BP's Investor Relations Director, Fergus MacLeod, represented BP. (*Id.*) [TEXT REDACTED BY THE COURT] entered the meeting with concerns about [TEXT REDACTED BY THE COURT].[7] (*Id.*) BP countered these concerns by discussing the multiple independent investigations into its safety practices—including the Baker Panel—and its "on-going" safety reform efforts. (*Id.*) BP informed [TEXT REDACTED BY THE COURT] that the "recent adverse events" were due

to residual competing cultures from legacy companies that BP had acquired. (*Id.*) It emphasized that "BP was determined to learn lessons from Texas City;" that safety spending would be increased; and that steps had already been taken to "rectify [BP's] shortcomings." (*Id.*)

[TEXT REDACTED BY THE COURT] met with BP again on February 7, 2007. (Compl. ¶ 439(b).) Hayward, Dudley, MacLeod, then-CEO Lord Edmund John Philip Browne, and BP executive John Manzoni represented BP. (*Id.*) Once again, the conversation focused on BP's safety issues. BP updated [TEXT REDACTED BY THE COURT] on the multiple independent investigations into Texas City and Prudhoe Bay. (*Id.*) BP stated that its strategy remained improvement of "safety and performance." (*Id.*) It indicated that "local checks and balances in compliance" had been instituted within the U.S. and that "BP assessed risk on an asset by asset basis and took action to reduce risk, so that risk in its business [was] lower . . . in an attempt to create a consistent operations system or a 'BP way.'" (*Id.*)

The third meeting occurred on September 17, 2007. (Compl. ¶ 439(c).) MacLeod represented BP. (*Id.*) BP again updated [TEXT REDACTED BY THE COURT] on developments regarding the Thunder Horse platform; [*36] the Prudhoe Bay pipeline spill; and the Texas City explosion. (*Id.*) BP claimed that it had "learned lessons" from Texas City that it would apply to other refineries. (*Id.*) It also spoke about the causes of the Thunder Horse incident, and steps that had been taken to prevent its recurrence. (*Id.*) Finally, BP claimed that, in the Continental United States, "BP had made a 5-year commitment to tight gas drilling and better crews." (*Id.*)

BP and [TEXT REDACTED BY THE COURT] met again on March 8, 2008. (Compl. ¶ 439(d).) BP's CFO, Byron Grote; BP's GVP — Russia, James Dupree; and a BP Investor Relations executive, Peter Hall, represented BP. (*Id.*) [TEXT REDACTED BY THE COURT] (*Id.*) [TEXT REDACTED BY THE COURT] (*Id.*) BP stated—as it did on November 29, 2006—that it would increase funding for safety and that "its cost cutting would not impact [its] ability to conduct safe operations." (*Id.*) Specifically with regard to BP's reorganization efforts, BP assured [TEXT REDACTED BY THE COURT] that "personnel reductions" would not "repeat the mistakes of the past." (*Id.*) It claimed that reductions would be made to "overhead personnel," with operational personnel being increased rather than reduced. [*37] (*Id.*) [TEXT REDACTED BY THE COURT] and BP also discussed the Thunder Horse and Atlantis project delays. BP provided some insight into their causes and

---

[6] The one exception is a BP-prepared estimate, provided to "BP's senior management" on or around April 26, stating that the possible range for the spill was 1,063 barrels per day to 14,266 barrels per day, with a "best" estimate of 5,758 barrels per day. (Compl. ¶¶ 204, 412.)

[7] In July 2005, BP experienced problems with the Thunder Horse PDQ, a newly-deployed production and drilling rig in the Gulf of Mexico which almost capsized due to the incorrect installation of [*35] a key internal valve. When the rig was dry-docked for repairs, it was discovered that the underwater pipelines beneath the rig were riddled with cracks. It took three years to complete the Thunder Horse repairs. (Compl. ¶ 56.)

discussed measures that had been taken in response—such as "putting contingencies in project planning that were more realistic" and "set[ting] up a project academy at MIT" for project engineers to attend. (*Id.*)

BP's reorganization and cost cutting efforts were also a topic of conversation at the fifth and sixth meetings. (Compl. ¶¶ 439(e)-(f).) Grote; a BP Investor Relations Manager, Craig Marshall; and the COO of Fuels Value Chains, Tufan Erginbilgic, represented BP at the meeting on March 17, 2009. (*Id.* ¶ 439(e).) At that meeting, BP discussed current and projected cost cutting levels. (*Id.*) Grote; Marshall; and BP's CFO of E&P, Ellis Armstrong represented BP at the meeting on March 3, 2010. (*Id.* ¶ 439(f).) At that meeting, [TEXT REDACTED BY THE COURT] (*Id.*) BP responded by promoting the efficiencies gained from its restructuring and cost cutting efforts. (*Id.*)

The last meeting occurred on March 18, 2010. (Compl. ¶ 439(g).) BP's Chairman, Carl-Henric Svanberg, and three members of BP's Board of Directors—De-Anne Julius, William Castell, [*38] and Ian Prosser—represented BP. (*Id.*) BP stated that safety continued to be a high priority, and that "BP's standardized processes were being rolled out successfully throughout the company." (*Id.*)

Alameda alleges that the above misrepresentations tracked the statements disseminated to the public, reinforcing the false message that BP was improving its process safety procedures as a result of the Texas City explosion and the Baker Report recommendations. (*E.g.*, Compl. ¶¶ 176, 180.) Alameda also claims that BP's representations regarding its restructuring and cost cutting efforts were misleading because they were not accompanied by a disclosure that those efforts "had impacted and would impact [its] ability to deliver on prior safety representations." (*Id.* ¶¶ 439(e)-(f).)

## II. PLAINTIFFS' CLAIMS

As noted above, only Alameda County and State-Boston purchased ADSs on the NYSE. Consequently, only Alameda County and State-Boston assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and *Rule 10b-5* of the Securities and Exchange Commission ("SEC") against the corporate Defendants and the "Individual Fraud Defendants."[8],[9]    (Compl. ¶¶ 522-27.) They also

[*39] assert violations of section 20(a) of the Exchange Act against the corporate Defendants and the Individual Fraud Defendants. (*Id.* ¶¶ 528-34.)

All Plaintiffs assert common law fraud and common law aiding and abetting fraud claims against the corporate Defendants and the Individual Fraud Defendants. (Compl. ¶¶ 535-46.) Additionally, all Plaintiffs assert common law negligent misrepresentation claims against all Defendants. (*Id.* ¶¶ 547-56.)

Finally, Plaintiffs bring several state statutory claims. All Plaintiffs bring statutory fraud claims against all Defendants based on the Texas Business & Commerce Code. (Compl. ¶¶ 557-61.) Alameda County also pursues statutory fraud claims against the corporate Defendants and the Individual Fraud Defendants under the California Corporations Code and the California Civil Code. (*Id.* ¶¶ 562-74.) Finally, State-Boston charges all Defendants with deceptive and [*40] unfair trade practices under Massachusetts law. (*Id.* ¶¶ 575-86.)

## III. DEFENDANTS' MOTION

Defendants' Motion to Dismiss raises several possible grounds for dismissing part of Plaintiffs' case.[10] The substance of their arguments will be ordered, not as presented in their briefs, but in the sequence in which they are addressed herein.

- Defendants argue that several alleged misrepresentations are non-actionable under the Exchange Act for one or more of the following reasons: (1) the statements are too general to be actionable as fraud; (2) the statements are non-actionable opinions or statements of future intention; (3) the statements are not adequately pled as false; or (4) the statements are not adequately alleged to have been made with

---

[8] The Court will refer to Alameda County's and State-Boston's

claims arising under section 10(b) and *Rule 10b-5* as "section 10(b)" claims.

[9] The "Individual Fraud Defendants" are defined as Hayward, Suttles, Inglis, Rainey, McKay, and Dudley. (Compl. ¶ 523.) Malone is not an Individual Fraud Defendant.

[10] As noted in the previous section, Alameda County and State-Boston bring claims under the Exchange Act based on their purchases of ADSs on the NYSE. In the Class Action, the Court previously considered—and [*42] found viable—Exchange Act claims based on several alleged public misrepresentations in the Complaint. Those statements are not challenged in the Motion to Dismiss currently before the Court.

scienter. (Doc. No. 48 ("Cons. MTD"), at 56-64.)

• Defendants argue that English law applies to Plaintiffs' common law and state statutory claims. (*Id.* at 9-18.) They identify three available claims under English law: common law deceit; common law negligent misstatement; and statutory securities fraud under the Financial Services and Markets Act 2000 ("FSMA"). They raise the following arguments for dismissal of these three "state law" claims:

> • Plaintiffs [*41] fail to state a claim for deceit because they have not adequately alleged reliance or intent to induce reliance.
> • Plaintiffs fail to state a claim for negligent misrepresentation because they have not adequately alleged reliance or a duty to speak carefully.
> • Plaintiffs fail to state a claim for statutory securities fraud because they have not adequately alleged reliance, because the law does not permit recovery for "holder" claims, and because statutory securities fraud cannot be asserted against the Individual Defendants.

(*Id.* at 18-42.) Alternatively, if the Court decides that Plaintiffs' English law claims survive the above challenges, Defendants argue that they should be dismissed under the doctrine of forum non conveniens. (*Id.* at 43-47.)

• Alternatively, if the Court decides that the law of any U.S. jurisdiction applies to Plaintiffs' common law and state statutory claims, Defendants argue that such claims are barred by the dormant *commerce clause*.[11] (*Id.* at 47-56.)

## IV. LEGAL STANDARD FOR RULE 12(b)(6)

In considering a *Rule 12(b)(6)* motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of Plaintiffs. *Nathenson v. Zonagen Inc., 267 F.3d 400, 406 (5th Cir. 2001)*. The Court does not accept as true, however, "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 550 (5th Cir. 2007)* (citation omitted) (internal

quotation marks omitted).

Because a *Rule 12(b)(6)* motion attacks the legal sufficiency of the claims, the Court must confine its analysis to the contents of the pleadings, including attachments thereto, with only two exceptions. First, the Fifth Circuit allows the Court to consider certain documents attached to the motion to dismiss. *See, e.g., Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000)*. [*43] Such documents must be referenced in the complaint and central to Plaintiffs' claims. *Id.* (citation omitted); *Scanlan v. Texas A&M Univ., 343 F.3d 533, 536 (5th Cir. 2003)*. Second, because this is a securities case, the Court may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with those agencies. *Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir. 1996)*. However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

Regardless of the substantive law that governs Plaintiffs' claims, the Court will apply federal procedural law in this case. *Brown v. Miller, 519 F.3d 231, 238 (5th Cir. 2008)* ("[F]ederal courts use federal procedure even when applying state law[.]"). Accordingly, the Court must decide if Plaintiffs have stated a claim pursuant to the pleading rules contained in *Rule 8* and *Rule 9* of the Federal Rules.

## A. *Rule 8(a)* Notice Pleading

The default standard for pleading in federal court is contained in *Rule 8(a)*:

> A pleading that states a claim for relief [*44] must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . .

*Fed. R. Civ. Pro. 8(a)(2)*. This standard is commonly referred to as "notice pleading." Under notice pleading requirements, a complaint will survive a motion to dismiss as long as it contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As noted above, the Court is

---

[11] The Court does not reach the merits of Defendants' argument regarding the dormant *commerce clause* due to its resolution of choice of law.

required to accept only well-pleaded *factual* allegations as true; it does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers', 497 F.3d at 550* (citation omitted) (internal quotation marks omitted).

## B. Heightened Pleading under *Rule 9(b)*

Plaintiffs' allegations of fraud must also meet the stricter standards of *Rule 9(b)*, which provides that, "[i]n [*45] alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. "At a minimum, *Rule 9(b)* requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003)* (citation omitted) (internal quotation marks omitted). The Fifth Circuit has explained that "*Rule 9(b)* requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *Id.* (quoting *Williams v. WMX Techs., Inc., 112 F.3d 175, 179 (5th Cir. 1997)*). Insufficiently particular fraud allegations are properly challenged by a *Rule 12(b)(6)* motion for dismissal for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 185 n.8 (5th Cir. 2009)*; *Carter v. Nationwide Prop. and Cas. Ins. Co., 2011 U.S. Dist. LEXIS 60480, 2011 WL 2193385, at *1 (S.D. Tex. June 6, 2011)*.

*Rule 9(b)*'s particularity requirement is "supplemental" to the *Iqbal* requirement that a pleading include facts that, taken as true, "state a claim to relief that is plausible on its [*46] face." *Grubbs, 565 F.3d at 185*. Thus, *Rule 9(b)* "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id. at 186* (internal quotation marks omitted).

## C. Additional Pleading Requirements Imposed by PSLRA

Alameda County's and State-Boston's Exchange Act claims are further subject to the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). For each act or omission alleged to be false or misleading, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A)* (emphasis added).

This provision alters how the Court views allegations relevant to scienter at the pleading stage. While the Court in a *12(b)(6)* motion is typically required to draw all reasonable inferences from the alleged facts in the Plaintiffs' favor, the PSLRA obligates the Court to consider *all* possible inferences from the facts—both those supporting and those undercutting scienter—in order to evaluate whether a "strong" inference of scienter exists. *See* [*47] *Tellabs, Inc. v. Makor Issue & Rights, Ltd. ("Tellabs I"), 551 U.S. 308, 323-24, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*.

# V. ALAMEDA COUNTY'S AND STATE-BOSTON'S FEDERAL CLAIMS

## A. Legal Standards

### 1. Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b)*. SEC *Rule 10b-5*, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *17 C.F.R. § 240.10b-5(b)*. The Supreme [*48] Court has inferred from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs I, 551 U.S. at 318*. To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. _Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 238-39 (5th Cir. 2009)_.

### a. Material Misrepresentations and Omissions

Because Alameda County and State-Boston assert securities fraud claims, they must satisfy the heightened pleading requirements of _Rule 9(b)_. _See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994)_. As noted above, _Rule 9(b)_ obligates a plaintiff to: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; [*49] (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, _i.e._, why the statement is fraudulent. _ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002)_. These allegations constitute the "who, what, when, where, and how" of the alleged fraud. _Id._

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is material as a matter of law. _Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1318-22, 179 L. Ed. 2d 398 (2011)_. Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. _Id. at 1321_ (citation omitted) (internal quotation marks omitted). The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in [*50] making an investment decision. _Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)_. For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. _Id. at 231-32_; _see also Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1445 (5th Cir. 1993)_ (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the 'total mix' of information available about the

proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. _Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir. 1994)_.

### b. Scienter

Section 10(b) and _Rule 10b-5_ do not protect investors against negligence or corporate mismanagement. _Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 539 (5th Cir. 2008)_. To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter. _Tellabs I, 551 U.S. at 319_.

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, [*51] or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" _Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 207 (5th Cir. 2009)_ (quoting _R2 Invs. LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005)_); _see also Plotkin v. IP Axess Inc., 407 F.3d 690, 697 (5th Cir. 2005)_ ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" _Rosenzweig v. Azurix Corp., 332 F.3d 854, 866 (5th Cir. 2003)_ (quoting _Nathenson, 267 F.3d at 408_).

The Fifth Circuit has rejected the group pleading approach [*52] to scienter. _Shaw Grp., 537 F.3d at 533-34_. As a result, the court may not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." _Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004)_. A connection is properly pleaded if Plaintiffs allege that a particular individual signed the document in which a statement appears, or if Plaintiffs adequately allege the individual's involvement in creating the document. _Fin._

*Acquisition Partners LP v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006)*. The Court can then evaluate the adequacy of Plaintiffs' scienter allegations by looking to the "state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Shaw Grp., 537 F.3d at 533* [*53] (quoting *Southland, 365 F.3d at 366*).

Because of the above pleading rules, scienter usually cannot be established in the absence of a connection between the statement and a particular individual. The Court has recognized, however, a work-around for unattributed corporate statements crafted by the Seventh Circuit in *Makor Issue & Rights, Ltd. v. Tellabs, Inc. ("Tellabs II"), 513 F.3d 702 (7th Cir. 2008)*. The Seventh Circuit hypothesized that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *513 F.3d at 710*. By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero. *Id.* Subsequent courts to have considered application of this potential roundabout—including this one—have underscored that it is narrow indeed. See, e.g., *In re BP P.L.C. Securities Litig. ("BP III"), 922 F. Supp. 2d 600, 636 (S.D. Tex. 2013)* (falsity must be so "egregious" that "intent to deceive or recklessness may be presumed from the face of the statement itself"); *In re Dell Sec. Litig., 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008)* [*54] (falsity must be "so dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to **know** that the announcement was false") (citation omitted) (internal quotation marks omitted).

## 2. Section 20(a) claims

Under section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)*. Section 20(a) is a secondary liability

provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a). *ABC Arbitrage, 291 F.3d at 348 n. 57* (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws"). Accordingly, if a plaintiff fails to state a claim [*55] for a primary securities fraud violation under section 10(b) or *Rule 10b-5*, the plaintiff necessarily fails to state a claim for control person liability under section 20(a). *See, e.g., Blackwell, 440 F.3d at 288*.

## B. Effect of Rulings in the Class Action

The Court recently ruled on a motion to dismiss the Second Amended Complaint in the Class Action. Pursuant to this ruling, Plaintiffs have elected not to pursue claims based on two alleged misstatements—one made by Hayward during a July 24, 2007 investor call, and another made by Inglis during a September 25, 2007 industry conference. (Doc. No. 55 ("Cons. Opp."), at 8 n.1.) The Court therefore grants Defendants' Motion to Dismiss as to these alleged misstatements.

In addition to these two statements, Plaintiffs also assert claims based on several alleged public misstatements which have been found by the Court to be insufficiently pled—in total or in part—in the Class Action. As Plaintiffs do not indicate that they are abandoning these alleged misstatements, they will be addressed here, with reference to the Court's prior rulings.

## C. Analysis

Defendants seek dismissal of Alameda County's Exchange Act claims predicated on statements made [*56] in the seven face-to-face meetings between BP and [TEXT REDACTED BY THE COURT] (Cons. MTD at 36-40.) They incorporate by reference arguments for dismissal of Alameda County's and State-Boston's claims predicated on thirteen public statements included in the Second Amended Complaint, as set forth in a motion to partially dismiss that pleading in the Class Action. (*Id.* at 5, 56.) Finally, they seek dismissal of Alameda County's and State-Boston's claims predicated on six public statements not included in the Second Amended Complaint in the Class Action. (*Id.* at 5, 56-64.) Defendants claim that these statements are not actionable for one or more of the following reasons: (1) the statements are too general to be actionable as fraud; (2) the statements are non-actionable opinions or

statements of future intention; (3) the statements are not adequately pled as false; or (4) the statements are not adequately alleged to have been made with scienter.

## 1. Alleged Misrepresentations from the [TEXT REDACTED BY THE COURT] Meetings

### a. Falsity

Defendants claim that none of the alleged statements from the face-to-face meetings between BP and [TEXT REDACTED BY THE COURT] (investment advisor to Alameda [*57] County) can serve as the basis of a 10(b) claim. Defendants' first complaint is that Alameda County's allegations do not satisfy *Rule 9(b)*, because they do not allege: (1) what exact statements were made; (2) by whom; (3) why the statements were false or misleading; and (4) what facts support the assertion that the speakers spoke with scienter. (Cons. MTD at 37.) Defendants further suggest that, even if Alameda County amended to comply with the requirements of *Rule 9(b)*, the statements from the face-to-face meetings would be non-actionable because they are (1) factual information about the company not alleged to be misleading and (2) general positive statements that do not convey any actionable representation of fact. (*Id.* at 37-39.)

The Court finds that Alameda County has adequately identified the content of statements allegedly made at the various [TEXT REDACTED BY THE COURT] meetings. It has trouble, however, identifying which specific statements are alleged to be false. The Complaint is of little assistance in this regard. Unlike the public statements, the specific language complained of in the [TEXT REDACTED BY THE COURT] meetings is not separately identified by use of italics [*58] or bolding.

Fortunately, Alameda County's opposition brief sheds some light on the basis of its claims. First, Alameda County maintains that certain statements identified are similar to public statements regarding the Baker Report which have been held actionable in the Class Action. (Cons. Opp. at 28-29.) It also argues that the BP representatives in attendance misled [TEXT REDACTED BY THE COURT] by omitting key information regarding their safety reform efforts and continued risk exposure. (*Id.* at 25-29.) These alleged omissions include: (1) that BP had not adequately implemented the recommendations of the Baker Panel;

(2) that BP had not and would not implement OMS on rigs and operational sites not fully owned by BP; (3) that BP was not prepared to respond adequately to a drilling accident in deepwater; and (4) that BP's cost cutting efforts had jeopardized its ability to deliver on its promises of safety reform. (*Id.* at 28, 30.)

It is undeniable that Alameda County's allegations depict a series of encounters between [TEXT REDACTED BY THE COURT] and BP in which safety issues occupied center stage. Repeatedly, [TEXT REDACTED BY THE COURT] focused the conversation on [TEXT REDACTED BY [*59] THE COURT]. But the Court may not presume the falsity of BP's statements to [TEXT REDACTED BY THE COURT] solely on the basis that safety featured prominently in each conversation and that BP subsequently suffered another catastrophic process safety failure on the Deepwater Horizon. Rather, to be actionable, Defendants' alleged misrepresentations regarding safety must be capable of being adjudged either true or false when made.

The line between optimism and misdirection can be quite fine, as the Court has previously emphasized. In the Class Action, the Court found actionable certain public statements regarding BP's progress on recommendations made in the Baker Report. See *BP I, 843 F. Supp. 2d at 757-59*. The Court reached the opposite conclusion, however, when it came to certain public statements that touted BP's "progress" on process safety reform generally, or that declared a corporate commitment to safety. *Id. at 754-57, 766-67*. The Court noted that the Baker Report provided a "clear roadmap" by which the truthfulness of BP's statements about its safety reform efforts could be gauged, while generalized, aspirational statements about the importance of safety and BP's "progress" on [*60] safety performance could not reliably be measured as true or false. *Id. at 756-59, 767*. This same razor-edge—dividing material representations from immaterial corporate puffing—will govern whether Alameda County has stated a viable 10(b) claim on the basis of BP's private statements to [TEXT REDACTED BY THE COURT].

Several alleged misrepresentations from the [TEXT REDACTED BY THE COURT] meetings involve tangible, factual statements regarding incidents at Prudhoe Bay, Thunder Horse, and Atlantis and steps taken in response thereto. These include the following statements:

- Statements during the September 17, 2007 meeting that "BP has to make sure nothing goes

wrong" with Alaska pipelines which were being replaced and that "mistakes had been made in design [on Thunder Horse] . . . but . . . project management was brought back in-house." (Compl. ¶ 439(c).)

• Statements during the March 3, 2008 meeting that "Thunder Horse and Atlantis project delays had involved unproven technology;" that "BP was too confident and did not recognize the full risks [in those projects]"; that "key lessons were learnt from the Thunder Horse experience [which] are unique to BP and can be used in future projects;" [*61] that, as a result, "BP was putting contingencies in project planning that were more realistic;" and that "BP had set up a project academy at MIT . . . which all project engineers would attend[.]" (Id. ¶ 439(d).)

Although most of the above statements are of the type that can be assessed as true or false, Plaintiffs have made no allegations suggesting that they were untrue. Nor are the topics at issue so deeply intertwined with the Baker Report; OMS; BP's oil spill response capabilities; or BP's cost-cutting efforts that—even if true on their face—they were rendered misleading by the "omissions" suggested by Plaintiffs. See *Stitching Pensioenfonds ABP v. Merck & Co., Inc., Civil Action No. 05-5060, 2012 U.S. Dist. LEXIS 113813, 2012 WL 3235783, at \*4-5 (D.N.J. Aug. 1, 2012)* (recognizing that alleged fraudulent omissions must be "related to the subject matter of the [affirmative] statement"). Because Alameda County has not adequately alleged that the above statements were false when made, they cannot form the basis of a viable 10(b) claim.

Just as the Prudhoe Bay, Thunder Horse, and Atlantis incidents were commonly discussed during the face-to-face meetings, [TEXT REDACTED BY THE COURT] and BP also spoke often and at [*62] length about Texas City. The following statements, germane to Texas City, are alleged by Plaintiffs to have been misleading:
• Statements during the November 29, 2006 meeting that "internally, BP had already made efforts to rectify its shortcomings;" that BP "was already beefing up refinery turnaround procedures;" that "things at BP will change as a result of what happened;" that "BP was determined to learn lessons from Texas City;" and that the Texas City disaster occurred, in part, because of a "persistence of different cultures of the companies BP had acquired . . . [as] each major facility still had its own way of doing things[.]" (Compl. ¶ 439(a).)

• Statements during the February 7, 2007 meeting that "risk in [BP's] business is now lower" because "BP assessed risk on an asset by asset basis and took action to reduce risk . . . in an attempt to create a consistent operations system or a 'BP way.'" (Id. ¶ 439(b).)

• A statement during the September 17, 2007 meeting that "BP had learned lessons from the Texas City Refinery that could apply to its other refineries[.]" (Id. ¶ 439(c).)

Alameda County argues that these statements resemble the public statements regarding BP's progress on [*63] the Baker Panel recommendations which have already been found actionable. (Cons. Opp. at 28-29.) It also argues that BP's statements were misleading because they did not disclose that "BP had not adequately implemented the recommendations of the Baker Panel or OMS" and that "BP did not implement and had no intention of implementing OMS at rigs or other operational sites that were not fully-owned by BP[.]" (Id. at 30.)

The statements made during the November 29, 2006 meeting certainly foreshadow Defendants' later public representations regarding progress made on the Baker Panel recommendations. Nonetheless, Alameda County has not adequately alleged that the November 29, 2006 statements were false. The Baker Report was not released until January 2007. Plaintiffs have not alleged that either BP or [TEXT REDACTED BY THE COURT] had any advance notice of its contents or recommendations. Therefore, in November 2006, the BP representatives meeting with [TEXT REDACTED BY THE COURT] could not possibly have rooted their alleged "ongoing" efforts to "rectify their shortcomings" in the Baker Report. Nor can the Baker Report provide a yardstick to judge the truth or falsity of BP's statements.

Although [*64] this chronological inconsistency is resolved with the September 17, 2007 meeting, the Court cannot discern how the single Texas City-related statement from this meeting is alleged to be false. The statement indicated that BP had cross-applied lessons learned from Texas City to its other refineries. Nothing in the Complaint impugns the accuracy of this statement, or indicates how an alleged falsehood regarding BP's refineries relates to the fall-out from a later disaster in BP's offshore drilling operations.

The Court agrees, however, that Alameda County has adequately alleged the falsity of the Texas City-related statement from the February 7, 2007 meeting. Less than

2013 U.S. Dist. LEXIS 171459, *64

three months after BP had informed [TEXT REDACTED BY THE COURT] that the Texas City incident was partially due to competing safety cultures at different legacy operating sites, BP indicated that risk in its business had been "lower[ed]" due to the "creat[ion of] a consistent operations system"—a "'BP way.'" (Compl. ¶ 439(b).) This statement evoked the Baker Panel recommendation to "establish and implement an integrated and comprehensive process safety management system"—which was purportedly addressed by BP's OMS. (*Id.* [*65] ¶¶ 74, 77.) Alameda County has adequately alleged that BP's statement to [TEXT REDACTED BY THE COURT] was a misleading half-truth, by failing to indicate that the "lower[ed]" risk profile stemming from BP's "consistent operations system" referred only to sites fully-owned and operated by BP—despite BP's professed intention to apply the Baker Panel recommendations across all lines of business worldwide.

Similarly, the Court finds that Alameda County has adequately alleged the falsity of the following statement from the March 18, 2010 meeting:
• "BP's standardized processes were being rolled out successfully throughout the company." (Compl. ¶ 439(g).)

Although not expressly linked to either Texas City or the Baker Panel, it can reasonably be inferred—both in the context of BP and [TEXT REDACTED BY THE COURT]'s prior interactions and in the context of BP's simultaneous public statements—that the "standardized processes" referred to BP's OMS. For the reasons articulated above, as well as in the Court's prior orders, this statement is adequately alleged as misleading due to the failure to disclose that the substance of the OMS architecture did not apply to, and was not intended to be implemented [*66] on, contractor-owned sites.

During these sessions with [TEXT REDACTED BY THE COURT], multiple representations were made regarding BP's efforts to streamline its organization and to cut costs, and how these efforts would not detract from BP's focus on safety. These include the following:
• Statements during the November 29, 2006 meeting that BP would increase spending on safety issues and that it would be "difficult to focus on costs at the same time as safety and integrity were taking priority." (Compl. ¶ 439(a).)

• Statements during the March 3, 2008 meeting that "personnel reductions as part of BP's reorganization would not repeat the mistakes of the past;" that "reductions were overhead personnel;" that "operational [employees] were being increased rather than reduced;" and that its cost cutting would not impact [its] ability to conduct safe operations[.]" (*Id.* ¶ 439(d).)

• Statements during the March 17, 2009 meeting regarding "current and projected cost cutting levels," which were allegedly misleading because they did not disclose "that the cuts had impacted and would impact BP's ability to deliver on its prior safety representations." (*Id.* ¶ 439(e).)

• A statement during the March [*67] 3, 2010 meeting—made in the context of [TEXT REDACTED BY THE COURT] "concerns regarding [TEXT REDACTED BY THE COURT]—that BP had "improved efficiency," which was allegedly misleading because it did not "disclos[e] that the restructuring and cost reduction had impacted and would impact BP's ability to deliver on its prior safety representations." (*Id.* ¶ 439(f).)

In a prior order in the Class Action, the Court dismissed 10(b) claims based on public statements that BP would prioritize safety over its efforts to cut costs. The Court reasoned that plaintiffs in the Class Action (the "Class Action Plaintiffs") had failed to demonstrate—beyond conclusory allegations—how BP's reorganization affected its safety budget, safety personnel, and safety capabilities. *See BP I, 843 F. Supp. 2d at 767-68.* The Court found that the Class Action Plaintiffs had failed to connect BP's reorganization to specific safety failures, and therefore had not adequately alleged that the public statements were false. *See id.* The same analysis and conclusion pertain to the [TEXT REDACTED BY THE COURT] statements above.

Finally, in its opposition brief, Alameda County highlights a number of alleged misrepresentations [*68] that address more broadly BP's safety reform efforts. These include:
• A statement during the November 29, 2006 meeting that "things at BP will change" as a result of Texas City, "with a focus on safety, integrity, and performance in all of BP's divisions[.]" (Compl. ¶ 439(a).)
• Statements during the February 7, 2007 meeting that "BP's strategy . . . [was to] focus . . . on safety and performance" and that "BP had implemented local checks and balances in compliance[.]" (Compl. ¶ 439(b).)

• A statement during the September 17, 2007

meeting that "BP had made a 5-year commitment to tight gas drilling and better crews [in the lower 48 U.S. states]." (*Id.* ¶ 439(c).)

• A statement during the March 18, 2010 meeting that "there was a clear and increasing focus on safety at BP[.]" (*Id.* ¶ 439(g).)

Alameda County has not indicated how any of these statements was misleading. Indeed, all of the statements are of the generalized, aspirational character that the Court has previously found non-actionable as a matter of law. *See BP I, 843 F. Supp. 2d at 756-57, 766-67.* Such statements will not support a 10(b) claim.

## b. Scienter

Defendants argue that scienter has not been adequately pled for any of the statements [*69] made directly to [TEXT REDACTED BY THE COURT] They note that most of the statements are unattributed to any specific individual, and that the few attributed statements were made by individuals other than the Individual Defendants, for whom no scienter allegations have been made. (Cons. MTD at 39-40.)

As explained above, only two of the alleged misrepresentations made to [TEXT REDACTED BY THE COURT] have been adequately alleged as false. These are:

• The statement during the February 7, 2007 meeting that BP's risk had been "lower[ed]" through an "attempt to create a consistent operations system, or a 'BP way.'" (Compl. ¶ 439(b).) Several individuals represented BP at the meeting, including Hayward and Dudley. However, no individual is identified as having made the alleged misstatement. It is therefore an unattributed corporate statement.

• The statement during the March 18, 2010 meeting that BP's standardized processes were being rolled out successfully throughout the company. (*Id.* ¶ 439(g).) Several individuals represented BP at the meeting, but none is specified as having made the alleged misstatement. It is therefore an unattributed corporate statement.

Alameda County notes that the [*70] Court found the Class Action Plaintiffs had adequately alleged that Hayward, Suttles, BP plc, BP America, and BP E&P possessed scienter for public misrepresentations. (Cons. Opp. at 30.) Because the scienter allegations in

the Complaint are substantially identical to the scienter allegations in the Class Action, Alameda County argues, the Court may find scienter for the [TEXT REDACTED BY THE COURT] misstatements as well. (*Id.* at 30-31.)

Alameda County's argument leapfrogs many required steps in the Court's analysis. The Court's prior scienter findings are only germane to the extent that: (1) the individuals involved are the same; (2) the alleged misrepresentations are related; and (3) the timing of the statement is consistent with the allegations supporting scienter. None of the [TEXT REDACTED BY THE COURT] statements is alleged to have been made by Suttles. Nor are any of the [TEXT REDACTED BY THE COURT] statements related in subject matter to Suttles's alleged misrepresentations regarding the magnitude of the oil spill—an unsurprising fact given that the [TEXT REDACTED BY THE COURT] meetings all occurred prior to the Deepwater Horizon disaster. Put simply, the scienter allegations [*71] relevant to Suttles have no bearing on any [TEXT REDACTED BY THE COURT] statement.

As for Hayward, he too is not identified as having made any of the alleged misrepresentations to [TEXT REDACTED BY THE COURT]. But he is alleged to have been *present* at the February 7, 2007 meeting. Plaintiffs argue that Hayward had a duty to correct any misrepresentations made by others at the meeting. (Cons. Opp. at 31.) The alleged misrepresentation from that meeting involved BP's "consistent operations system"—which the Court interpreted, above, as a reference to OMS. The Court found that the Class Action Plaintiffs had adequately alleged Hayward's scienter for similar OMS-related statements. The Court reasoned that, as alleged, Hayward understood the limitations to the OMS design with regards to contractor-owned sites, or that he was reckless in not doing so. *See BP III, 922 F. Supp. 2d at 625-28.* Therefore, if Alameda County is correct that Hayward can be liable for securities fraud on the basis of failing to correct misrepresentations made by others, the Court's prior scienter findings as to Hayward would be germane.

Alameda County's theory finds some support in Fifth Circuit law. In *Barrie v. Intervoice-Brite,* [*72] *Inc.*, the Fifth Circuit recognized that a viable securities fraud claim could be grounded in a defendant's alleged failure to correct misrepresentations made by another in his presence. *397 F.3d 249, 263 (5th Cir. 2005).* A subsequent case clarified that *Barrie* was only consistent with the Fifth Circuit's general prohibition on "group pleading" if the plaintiff specifies who made the

2013 U.S. Dist. LEXIS 171459, *72

alleged misstatement, and who remained silent despite knowing that the statement was false. *See Blackwell, 440 F.3d at 288.* The Complaint does not contain this level of detail. Because Plaintiffs have not specified Hayward's role in the February 7, 2007 misrepresentation, his alleged scienter is not germane.

Alameda County also argues, in the alternative, that the OMS-related misrepresentations from the [TEXT REDACTED BY THE COURT] meetings rise to the level of egregious falsity contemplated in *Tellabs II*, obviating any need to attribute the statements to specific individuals with scienter. (Cons. Opp. at 31.) The argument is foreclosed by a prior finding in the Class Action. As the Court noted in that case, Defendants persuasively argued that the alleged misrepresentations regarding the scope of OMS are [*73] actually faithful to the OMS design. *See BP III, 922 F. Supp. 2d at 630.* As a result, it is impossible to say that any individual responsible for the statements at issue must have known their misleading nature.

Because the statements from the February 7, 2007 and March 18, 2010 meetings with [TEXT REDACTED BY THE COURT] were not extraordinarily false on their face, Alameda County needed to attribute or link them to individuals with the requisite scienter. This, Alameda County has failed to do. The statements do not support viable 10(b) claims.

## 2. Alleged Public Misrepresentations Regarding OMS

Defendants have incorporated arguments for dismissal lodged against several public OMS-related statements also at issue in the Class Action Complaint. Since the filing of the Motion to Dismiss at issue in this case, the Court has ruled on Defendants' arguments in the Class Action. The Court finds that its rulings are applicable in the context of the Complaint at issue here. Specifically, Alameda County and State-Boston have adequately alleged both falsity and scienter for the following public OMS-related statements:

• Hayward's statement in the 2008 Annual Review that OMS "turns the principle of [*74] safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." (Compl. ¶ 355.)

• The statements in the 2008 Annual Report, signed by Hayward, that OMS is a "framework for operations across BP that is integral to improving

safety and operating performance in every site" and that the Gulf of Mexico "completed the transition to OMS in 2008." (*Id.* ¶ 358.)

• Hayward's statement in the 2008 Sustainability Review that OMS is "to be implemented at each BP site." (*Id.* ¶ 370.)

• Statements in the 2009 Annual Review, reviewed by the Board of Directors, including Hayward, that OMS "provides a common framework for all BP operations" and "enables each site to focus on the most important risks in its own operations[.]" (*Id.* ¶ 377.)

• Statements in the 2009 Annual Report, signed by Hayward, that OMS "provides a common framework for all BP operations;" is a "single operating framework for all BP operations;" and is "being progressively adopted by all operating sites[.]" (*Id.* ¶ 379.)

• Hayward's statement in the 2009 Sustainability Review which reinforced that OMS had been implemented in the Gulf of Mexico in 2008. (*Id.* ¶ 385.)

The remaining public OMS-related [*75] statements, however, are deficient and cannot support a 10(b) claim. For five of the statements, Alameda County and State-Boston have adequately pled falsity, but not scienter. These are:

• Statements in the 2006 Sustainability Report that OMS "covers all aspects of our operations" and "will apply to all operations by the end of 2010[.]" (Compl. ¶ 333.)

• The statement in the 2008 Annual Review that the Gulf of Mexico "completed the migration to the OMS in 2008." (*Id.* ¶ 354.)

• Inglis's statement at a 2010 industry conference that OMS "provides a single, consistent framework for our operations[.]" (Compl. ¶ 381.)

• The statement from the 2009 Sustainability Review that OMS "provides a single framework for all BP operations to follow[.]" (*Id.* ¶ 387.)

• The statement from the 2009 Sustainability Report that OMS is "a cornerstone of achieving safe, reliable and responsible operations at every BP operation." (*Id.* ¶ 390.)

Finally, two OMS-related statements made by Hayward are too general and ephemeral to support Plaintiffs'

2013 U.S. Dist. LEXIS 171459, *75

theory of falsity. These are:

• Hayward's statement—delivered both at the 2008 Strategy Presentation and the 2008 Annual General Meeting—that BP has "begun to implement a [*76] new Operating Management System across all of BP's operations." (Compl. ¶¶ 347, 349.)

### 3. January 16, 2007 Press Release

A press release issued January 16, 2007 stated that "BP already has taken a number of actions which align with the recommendations of the [Baker Panel]." (Compl. ¶ 331.) This statement closely resembles other alleged misrepresentations of progress on the Baker Panel recommendations, which the Court found adequately alleged as false. *See BP I, 843 F. Supp. 2d at 757-59.* But the Court also found that the statements were not so egregiously false as to circumvent the requirement that they be linked to specific individuals with knowledge of their misleading nature. (Doc. No. 327 at 2, Civ. Act. No. 10-md-2185, *In re: BP p.l.c. Securities Litigation.*) Nothing in Plaintiffs' Complaint compels a different conclusion. Because Plaintiffs have not adequately alleged corporate scienter for the January 16, 2007 press release, it is not actionable under Section 10(b).

### 4. May 16, 2007 House Testimony

On May 16, 2007, Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. (Compl. ¶ 335.) During his testimony, [*77] he stated, "[t]oday, I want to assure you that we get it. We have learned lessons of the past." (*Id.*) He also stated: "BP America is committed to safety." (*Id.*) The Court previously found that these statements were too general to be actionable as securities fraud. *See BP I, 843 F. Supp. 2d at 757.* The Court maintains this position.

Malone also testified that he met with employees "to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right an responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue." (Compl. ¶ 335.) He concluded that: "BP does not tolerate retaliation against workers who raise safety concerns." (*Id.*) The Court

previously found that this testimony was adequately alleged as false, in light of persistent, continued retaliation against BP's employees both before and after Malone's statement. *See BP I, 843 F. Supp. 2d at 764-66.* However, the Class Action Plaintiffs had not adequately alleged Malone's knowledge of the retaliation. Although Malone was supposedly informed of retaliation in 2008, his knowledge *after* [*78] his May 2007 testimony is irrelevant to the issue of whether he knowingly misspoke in May 2007. *See id. at 785.* Plaintiffs have provided no new allegations regarding Malone's scienter, and his *post hoc* awareness of retaliation does not present a plausible theory for liability under *Rule 8(a).* Because Plaintiffs have not adequately alleged Malone's scienter for the May 16, 2007 testimony, it is not actionable under Section 10(b).

### 5. October 25, 2007 Press Release

A press release issued October 25, 2007 quoted Malone as stating: "In the months and years since [Texas City and Prudhoe Bay] occurred, we have made real progress in the areas of process safety performance and risk management." (Compl. ¶ 341.) In the Class Action, the Court found that this statement was adequately alleged as false, because it grounded promises of "real progress" in the specific recommendations of the Baker Panel. *See BP I, 843 F. Supp. 2d at 757-59.* The Court ultimately found the statement not actionable, however, because the Class Action Plaintiffs had not adequately alleged that Malone knew BP had failed to implement the process safety measures recommended by the Panel. *See id. at 784-85.* The fact that Malone [*79] served on BP's executive management team and was involved in the day-to-day running of BP was not sufficient for purposes of establishing scienter. *Id. at 785.* Plaintiffs have provided no new allegations regarding Malone's scienter for the October 25, 2007 statement. Consequently, it remains non-actionable.

The press release also stated: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities." (Compl. ¶ 341.) Although OMS is not explicitly mentioned, the reference to "standardiz[ing] process safety and risk management programs" likely invokes the OMS project. Additionally, the representation that programs would be standardized "at all BP-operated facilities" is substantially similar to other OMS-related statements that have been held

actionable in the Class Action. *See BP III, 922 F. Supp. 2d at 618-24*. The Court therefore finds that this statement is adequately alleged as false. The statement is not attributed to any specific individual, however. Defendants have demonstrated that such statements can be fairly interpreted as consistent with the OMS [*80] framework. *See id. at 630*. Because the OMS-related statement in the October 25, 2007 press release does not rise to the level of patent, obvious falsity which would support a finding of corporate scienter, it is not actionable in the absence of individualized scienter allegations.

### 6. November 19, 2009 Senate Testimony

On November 19, 2009, Rainey gave testimony before the U.S. Senate Committee on Energy and Natural Resources. Rainey stated that "[r]eleases from oil and gas operations are rare," due in part to "the application of technology" such as "[b]lowout preventer technology which includes redundant systems and control" and "BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston." (Compl. ¶¶ 374-75.) Plaintiffs allege that this portion of Rainey's testimony was false, because: (1) redundancies on the Deepwater Horizon's blowout preventer had been deliberately removed by Transocean, at BP's behest, and (2) no one in Houston monitored the well pressures for the Macondo well, either prior to or during the evening of April 20, 2010, when the well blew. (*Id.* ¶ 376(d)-(e).) The Court [*81] finds these details sufficient to allege the falsity of Rainey's testimony regarding BP's spill prevention technology.

Plaintiffs have not adequately alleged that Rainey was aware of these contradictory facts, however—either specifically with regards to the Deepwater Horizon and the Macondo well, or more generally with regards to BP's typical operations in the Gulf of Mexico. Indeed, the only relevant scienter allegations for Rainey involve his position as BP America's Vice President of Exploration for the Gulf of Mexico and his alleged participation in a 2009 "gap assessment" which "identified significant risks to BP in the Gulf of Mexico." (Compl. ¶ 33.) Plaintiffs do not specify what "significant risks" were identified through the 2009 gap assessment, nor whether the gap assessment took place before or after Rainey's November 2009 testimony. Without more information, Rainey's scienter may not be presumed solely on the basis that he occupied a position of importance in the BP hierarchy. *See In re Franklin Bank*

*Corp. Securities Litig., 782 F. Supp. 2d 364, 376 (S.D. Tex. 2011)*.

A similar fate befalls the portion of Rainey's testimony directed to BP's oil spill response capabilities. [*82] Rainey stated: "All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to [accidental discharge] incidents." (Compl. ¶ 375.) The Class Action Plaintiffs, utilizing similar allegations, adequately alleged the falsity of this statement, but not Rainey's scienter. *See BP I, 843 F. Supp. 2d at 763-64, 781*. Plaintiffs have no new allegations relevant to Rainey's knowledge of BP's oil spill response capabilities.[12] The statement cannot support a 10(b) claim.

### 7. 2009 Sustainability Report

BP's 2009 Sustainability Report, issued on April 15, 2010, claimed that BP's "operating facilities have the capacity and resources to respond to spill incidents[.]" (Compl. ¶ 389.) In [*83] the Class Action, the Court held that this statement was adequately alleged as false, but that it did not rise to the level of falsity required to establish corporate scienter in the absence of attribution to a specific individual. *See BP III, 922 F. Supp. 2d at 638-39*. Plaintiffs have no new allegations relevant to scienter for this statement. It remains non-actionable.

### 8. May 14, 2010 Article and May 19, 2010 House Testimony

On May 14, 2010, an article appeared on cnn.com which quoted Dudley refuting the estimate of a Purdue University professor that the Macondo well was leaking upwards of 70,000 barrels of oil per day. Dudley stated that the estimate was "not accurate at all" and "[not] anywhere I think within the realm of possibility." (Compl. ¶ 422.)

Five days later, on May 19, McKay appeared before the

---

[12] Plaintiffs have included copious new allegations regarding Rainey's knowledge of the magnitude of the oil spill and his alleged role in defrauding the U.S. government by reverse-engineering "estimates" of the oil spill to match the Company's publicized 5,000-barrel-per-day figure. (Compl. ¶¶ 218-19, 221.) Such allegations are irrelevant to the issue of Rainey's knowledge, pre-spill, that BP lacked adequate spill response capabilities.

U.S. House of Representatives Committee on Transportation and Infrastructure. He claimed that the 5,000 barrels-per-day number was BP's "best estimate" of the spill. (Compl. ¶ 418.) He also downplayed the possibility that the professor's much higher estimate might be accurate:

> It is theoretically possible. I don't think anyone believes it is quite that high that has been working on [*84] this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.

(*Id.*)

Defendants do not dispute that the two statements above are adequately alleged as false. Instead, they claim that Plaintiffs have not adequately alleged scienter for Dudley or McKay, respectively. (Cons. MTD. at 62-64.) They also suggest that McKay's testimony—replete with qualifying words such as "I don't think" and "I don't know"—is a non-actionable statement of opinion and cannot support a claim for securities fraud under the doctrine of "bespeaks caution." (*Id.* at 63-64.)

The Court disagrees. Plaintiffs' allegations present a compelling case that Dudley's and McKay's post-spill misrepresentations were issued with knowledge of multiple conflicting internal estimates, or that they were made recklessly without adequate understanding of the work being performed by BP's own resources.[13] The allegations are even more substantial than those found to support Suttles's scienter in the Class Action; in contrast to the two internal [*85] sources cited in the Class Action Complaint, Plaintiffs have identified at least six conflicting internal sources which pre-date Dudley's and McKay's statements. (Compl. ¶¶ 219, 409(a), 409(d), 433(a), 433(d)-(e).)

The Court also finds the "bespeaks caution" doctrine inapplicable. "Bespeaks caution" limits liability for

---

[13] Defendants claim that Plaintiffs' scienter allegations are insufficient because Dudley and McKay are not specifically alleged to have received any of the conflicting internal or external estimates. (Cons. MTD at 62-64.) But given the importance of the oil spill to the Company, and the fact that Dudley and McKay voluntarily spoke to the public and to Congress as authorities on the disaster, it was at least reckless for them not to have fully apprised themselves of all internal estimates of the spill.

predictive statements which are coupled with sufficient cautionary language. *Rubinstein, 20 F.3d at 167*. Although McKay's testimony contained qualifications, it was not a prediction of future events; it was a statement of existing facts. Through his statements, McKay represented that BP had studied the oil spill; that BP had determined 5,000 barrels per day was the most [*86] accurate estimate; and that BP did not believe the oil spill could be as high as 70,000 barrels per day. Moreover, even if "bespeaks caution" was applicable, the Court does not find that McKay's use of qualifying language, in the circumstances, rendered his testimony immaterial as a matter of law. *See id. at 167-68* (noting that, under the "bespeaks caution" doctrine, "cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law" because "materiality is not judged in the abstract, but in light of the surrounding circumstances'") (quoting *Krim, 989 F.2d at 1448*).

Defendants may be attempting to argue that McKay testified as to his opinion and that Plaintiffs were not entitled to rely upon his opinion in deciding whether to invest in or divest BP stock. But this argument does not accurately state the law. A section 10(b) claim may be premised on a statement of opinion. *See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991)*; *see also In re Enron Corp. Securities, 465 F. Supp. 2d 687, 723-24 (S.D. Tex. 2006)* ("Although *Virginia Bankshares* dealt with a claim under *§ 14(a) of the Securities Exchange Act*, [*87] other courts have applied its rationale to claims under § 10(b) for false or misleading statements.") (citing *Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 670 (5th Cir. 2004)*). In such circumstances, the stated "opinion" is fraudulent if it was not genuinely held; if the speaker did not have a reasonable basis for his opinion; or if the speaker was aware, but did not disclose, adverse company-specific information which undermines the opinion. *See U.S. v. Causey, 2005 U.S. Dist. LEXIS 48841, 2005 WL 2647976, at *8 (S.D. Tex. Oct. 17, 2005)* (relying upon *In re Wells Fargo Securities Litig., 12 F.3d 922, 930 (9th Cir. 1993))*. Plaintiffs' allegations support the inference that McKay either did not have a reasonable basis for his opinion, or that he was aware of contradicting internal estimates created by BP which undermined his opinion. McKay's House testimony is actionable.

## VI. PLAINTIFFS' STATE LAW CLAIMS

## A. Choice of Law

Plaintiffs assert statutory claims under Texas, California, and Massachusetts law. (Compl. ¶¶ 557-86.) They also assert common law claims, for which four different states' laws are proffered as providing the substantive law. (*Id.* at ¶¶ 535-56.) Defendants, on the other hand, believe the case [*88] should be decided under English law. (Cons. MTD. at 2-3.) Therefore, Defendants urge the Court to conduct a choice of law analysis prior to deciding the viability of Plaintiffs' claims. (*Id.* at 10-11.)

Plaintiffs suggest that the Court need not conduct the analysis, at least at this point, because BP has not demonstrated a conflict in the substantive laws that might be applied to their claims. (Cons. Opp. at 10-11.) They note that the common law across the proposed jurisdictions is largely identical. (*Id.*)

The Court agrees that BP has not demonstrated as strong a conflict in the proposed substantive laws as would ordinarily precipitate a conflict-of-laws analysis, at least with regards to Plaintiffs' common law claims. Specifically, many of the arguments raised by BP under English common law would appear to be identical under the common law of Texas, California, Massachusetts, and Rhode Island. But even in the absence of an irreducible conflict, failure to fix upon one jurisdiction's laws—out of the ten jurisdictions that have been posited by the Plaintiffs in this and other related individual actions—is less than ideal. For the sake of these cases and all other "tag along" lawsuits [*89] that may come after, the Court will take this opportunity to address choice of law.

### 1. Legal standard

Because this case originated in this district, the Court looks to Texas's choice-of-law rules. *In re Enron Corp. Securities, Deriv., & "ERISA" Litig., 511 F. Supp. 2d 742, 790 (S.D. Tex. 2005)*. Texas has adopted the Restatement (Second) of Conflict of Laws's "most significant relationship" test. *Hughes Wood Products, Inc. v. Wagner, 18 S.W.3d 202, 205 (Tex. 2000)*.

The starting point for the most significant relationship test is the Restatement's provision regarding fraud and related claims, *Section 148*. The factors to consider under *Section 148* are:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the

representations,
(c) the place where the defendant made the representations,
(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced [*90] to enter by the false representations of the defendant.

*Restatement (Second) Conflict of Laws § 148(2)*.

Generally, an analysis of the *Section 148* factors will yield the jurisdiction with the most significant relationship to fraud-related claims. The result must be tested, however, against the general policy principles embodied in *Section 6 of the Restatement:*

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Restatement (Second) Conflict of Laws § 6(2)*. If *Section 6* points to a different jurisdiction than that returned under *Section 148*, the *Section 6* jurisdiction will control. Id. *§ 148 cmt. b*.

### 2. Analysis

Choice-of-law is not a mechanical analysis, in which the various factors can be equally weighted and scored to arrive at a determinative conclusion. Nevertheless, the [*91] Court will address in turn each relevant *Section 148* factor.[14] The Court will then examine whether the

---

[14] The final two *§ 148* factors—concerning the "tangible thing" which is the subject of the parties' transaction and the place where the plaintiff is to render performance under a contract—

policy considerations under *Section 6* mandate a different conclusion.

### a. Section 148

The first *Section 148* factor is the place or places where Plaintiffs acted in reliance upon Defendants' alleged misrepresentations. Defendants claim that Plaintiffs acted in reliance in England, where they purchased BP's Ordinary Shares on the LSE. (Cons. MTD at 15-16.) Plaintiffs respond that reliance occurred not only in England, but also in the various locations in which they or their investment advisors made decisions respecting BP's Ordinary Shares. (Cons. Opp. at 16-17.) Even accepting Plaintiffs' argument, it is not alleged that any Plaintiff or investment advisor made any decision regarding BP's Ordinary Shares in Texas. Further, it appears that such decisions were made in a multiplicity of jurisdictions, including, at a minimum, California, [*92] Massachusetts, Rhode Island, and England. (Compl. ¶¶ 479, 487, 495.) Therefore, this factor points to England over any particular U.S. jurisdiction.

The second *Section 148* factor is the place where Plaintiffs received the representations. Defendants de-emphasize this factor to the extent that Plaintiffs received the public representations in their states of residence, or in the states of residence of their investment advisors. (Cons. MTD at 15, 16-17.) They argue that the factor should be ascribed weight only for those representations specifically directed to Plaintiffs or their advisors. (*Id.* at 12, 14-15.) Defendants note that the only private representations directed to Plaintiffs or their advisors were delivered in England. (*Id.* at 14-15.)

The Court agrees that the globally-disseminated public statements, which were "received" in any jurisdiction where an investor in BP Ordinary Shares resided, should not be the focus of its analysis. *See Restatement (Second) Conflict of Laws § 145 cmt. e* (acknowledging that, in certain circumstances, "the place of injury will not play an important role in the selection of the state of the applicable law," including when "the place of injury can [*93] be said to be fortuitous or when . . . it bears little relation to the [alleged tortious act]"). However, Plaintiffs dispute that they received Defendants' private representations solely in England. They allege that representations were also delivered to their advisors in Atlanta and Boston. (Cons. Opp. at 16.) This may be

true, but statements made at BP's meetings with [TEXT REDACTED BY THE COURT] are the only private representations detailed at any length in the Complaint. And *no* private representation is alleged to have been directed specifically to Plaintiffs or their advisors in Texas. Therefore, the second *Section 148* factor also points to England over any particular U.S. jurisdiction.

The third *Section 148* factor is the place where Defendants made the representations. Both parties emphasize the importance of this factor, and the Court agrees that it should be weighted very heavily in the overall analysis. *See Restatement (Second) of Conflict of Laws § 148 cmt. h* (noting "[t]his contact is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons and to tangible things"). Defendants contend that most of the alleged misrepresentations [*94] were issued in or from England. (Cons. MTD at 13-14.) Plaintiffs disagree. They note that, out of approximately 49 potentially viable misstatements, 30 were made in the U.S., "including Texas." (Cons. Opp. at 13-14.) To be clear, only five of the alleged misstatements were made in Texas.[15] (*Id.* at App. A.) Texas does not even claim the most number of statements of any U.S. jurisdiction; that distinction belongs to either the District of Columbia, with thirteen statements, or to Louisiana, with twelve statements. (*Id.*) By contrast, nineteen alleged misstatements were made in England.[16] (*Id.*) The third *Section 148* factor also points to England over any particular U.S. jurisdiction.

The fourth *Section 148* factor is the residence and nationality of the various parties. Defendants argue that this factor is "neutral," because the parties reside in many different places. (Cons. MTD at 16-17.) It is true that the three Plaintiffs hail from three different states: California, Rhode Island, and Massachusetts. While this means that the residence and nationality of the Plaintiffs

---

are inapplicable to the present dispute and will not be considered.

---

[15] The parties do not always agree on how to categorize and count the various statements. For example, Defendants dispute that statements made in BP's SEC filings should be considered statements made in the District of Columbia, and they contend that certain statements should not be counted separately. (Doc. No. 63 ("Cons. Reply"), at 12 n.9-10.) Because the Court does not find that these distinctions appreciably change the outcome, it will adopt Plaintiffs' position on how to count and geographically attribute [*95] the various statements.

[16] Two statements are of unknown geographic origin. (Cons. Opp. at App. A.)

2013 U.S. Dist. LEXIS 171459, *95

may yield an inconclusive result, it does not follow that the residence and nationality of the Defendants necessarily does so. Particularly in a context such as this, where the vast majority of the alleged misrepresentations were not specifically targeted to Plaintiffs in their home states, it is appropriate to weight the residence and nationality of the Defendants more heavily. *See* Greenberg Traurig of New York, P.C. v. Moody, 161 S.W.3d 56, 72 (Tex. App.—Houston 2005, no pet.) (noting an "important distinction [that] greatly impacts the conflict-of-laws analysis" between fraud-based claims "aimed at defendants . . . with whom [plaintiffs] had no contact and no direct dealings" and fraud-based claims [*96] "aimed at [defendants] . . . with whom [plaintiffs] had personal contact and direct dealings").

Plaintiffs emphasize the fact that many Defendants have strong ties to Texas. (Cons. Opp. at 14.) Two of the corporate defendants—BP America and BP E&P—are headquartered in Texas. (Compl. ¶¶ 26-27.) At least one Individual Defendant—McKay—is "based" in Texas.[17] (*Id.* ¶ 34.) Four others—Suttles, Inglis, Malone, and Rainey—served as officers of BP America or BP E&P, Texas companies.[18] (*Id.* ¶¶ 30-33.) While these ties to Texas are certainly compelling, it cannot be disputed that Defendants also have strong ties to England. BP plc is headquartered and incorporated in England. (*Id.* ¶ 25.) Five Individual Defendants—Hayward, Inglis, Malone, McKay, and Dudley—served as directors or officers of BP, an English company. (*Id.* ¶¶ 29, 31-32, 34-35.) In these circumstances, it is impossible to state that Defendants are more closely allied with either England or Texas. Therefore, the fourth Section 148 factor points both to England and Texas as equally viable alternatives.

Plaintiffs identify another connection between their claims and Texas which is not easily captured under any of the foregoing factors: that many of the alleged

---

[17] Plaintiffs suggest that four other Individual Defendants also reside in Texas. (Cons. Opp. at 3, 14.)

[18] Plaintiffs allege that Inglis [*97] was the CEO of BP E&P. (Compl. ¶ 31.) The Court notes some ongoing confusion in this and related cases regarding whether Inglis was the CEO of BP E&P—the Texas operating subsidiary—or the Chief Executive of BP plc's Exploration & Production business unit. (Doc. No. 527 at 27-28, Civ. Act. No. 10-md-2185, *In re: BP plc Securities Litigation*.) For present purposes, the Court accepts Plaintiffs' representation that Inglis was the CEO of the Texas operating subsidiary.

misrepresentations directly concerned BP's operations in the U.S., including deepwater Gulf of Mexico. These operations were conducted by BP's Texas-based subsidiaries. (Cons. Opp. at 15-16.) The Court agrees that this is a valid and important consideration. However, the residence of the U.S. operating companies seems less relevant than the fact that the Macondo well itself was located on the Outer Continental Shelf adjacent to Louisiana. Therefore, to the extent that this connection should be considered as an additional "factor," it points to Louisiana rather than [*98] Texas.

In summary, none of the Restatement factors militate in favor of Texas over England. However, three factors favor England over any U.S. jurisdiction; one is evenly divided between England and Texas; and a final consideration points to Louisiana. Section 148 indicates that England, not Texas, has the most significant relationship to Plaintiffs' claims.

**b.** Section 6

Plaintiffs do not expressly address Section 6 of the Restatement, although they claim that Texas's more robust protections against investor fraud indicates a "superior interest in this case." (Cons. Opp. at 12.) This appears to be an invitation for the Court to find that Texas—regardless of the result under Section 148—possesses a more significant relationship to the case for policy reasons.

Plaintiffs have noted a number of ways in which Texas law provides for greater potential recovery than English law. These include: (1) Texas law permits Plaintiffs to assert common law claims *in addition* to their statutory fraud claims, rather than supplanting some claims with statutory fraud; (2) Texas law recognizes a common law aiding and abetting fraud claim; (3) Texas allows Plaintiffs to assert statutory fraud claims against [*99] officers and directors; (4) Texas law does not have a scienter requirement for statutory fraud; (5) Texas law makes punitive damages available for statutory fraud; and (6) Texas, unlike England, does not have a "loser pays" regime. (Cons. Opp. at 11-12 & n.3.)

The Court agrees that Texas has a public policy interest that must be taken into account, particularly under Section 6 of the Restatement. But it disagrees that England lacks such an interest simply because its strictures are less accommodating of Plaintiffs' recovery. England, too, regulates and prohibits fraudulent

practices associated with the purchase of securities. It simply defines those practices more narrowly than Texas—presumably because it, on public policy grounds, has struck a different balance between the interests of the opposing sides. *See* Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)* (No. 08-1191), 2010 WL 723009 ("U.K. Amicus Curiae Br."), at *1 (Feb. 25, 2010) ("The United Kingdom has made numerous important policy choices regarding securities regulation and litigation practices and procedures. Many of those choices reflect a [*100] balancing of interests and policies that differs from the balances that have been struck in the United States."). For example, the decision to require scienter for statutory fraud is as much a policy choice as the converse.

Plaintiffs have not provided—and the Court cannot discern—any strong public policy grounds for displacing England as the jurisdiction with the most significant relationship to Plaintiffs' claims. Plaintiffs' most compelling argument is that the U.S. *in general* has as strong or a stronger connection to the controversy than England, and that, within the U.S., either Texas or Louisiana has the most relevance to the case. But the choice here is between England and a specific state within the U.S., not the U.S. as a whole. *See Restatement (Second) of Conflict of Laws § 3 cmt. a.* At this preliminary stage, the Court can draw no conclusion other than that English law pertains to Plaintiffs' claims.

## B. Mapping Plaintiffs' State Claims onto English Law

### 1. Unavailable Claims

Defendants claim that a decision to apply English law to Plaintiffs' state-law claims carries immediate consequences. According to Defendants, English law does not recognize claims for aiding and abetting [*101] common-law fraud, statutory fraud, or statutory unfair and deceptive trade practices, and these claims should be dismissed. (Cons. MTD at 18 n.12.) Plaintiffs do not dispute this characterization of English law. The Court therefore grants Defendants' motion as to these unavailable claims.

Defendants also assert that English law makes some of the alleged misstatements actionable only under statute—specifically, FSMA—while the rest are actionable only under the common law. (Cons. MTD at

10.) According to Defendants' English law expert, this exclusivity rule applies to statements made in Annual Reports. (Doc. No. 48-14 ("Moore Decl."), at ¶ 29.) Plaintiffs' English law expert disagrees with this interpretation of FSMA. (Doc. No. 57 ("Lowe Decl."), at ¶¶ 19-42.) Because the dispute concerns only two statements at issue in the Complaint, both of which have been held actionable under *Rule 10(b)* and will be subject to discovery under either interpretation of the FSMA, the Court declines to decide the controversy at the motion to dismiss stage.[19]

### 2. Available Claims

Defendants acknowledge [*102] three English law claims which map onto Plaintiffs' theories of liability under state law. These include FSMA claims; claims for common law fraud (known as "deceit" in English parlance); and claims for common law negligent misrepresentation (known as "negligent misstatement"). (Cons. MTD at 3, 18.)

The elements of a FSMA claim are: (1) purchase of Defendant's securities; (2) in actual and justifiable reliance on (i) any untrue or misleading statement in a publication to which the law applies or (ii) omission of any matter required to be included in such a publication; (3) scienter regarding the misstatement or omission by a person with responsibility for it; and (4) loss as a result. (Moore Decl. at ¶ 19.) The elements of common law deceit are: (1) Defendant makes a false representation; (2) knowing it to be untrue, or being reckless as to whether it is true; (3) and intends that Plaintiff should act in reliance on it; and (4) Plaintiff does rely on it and suffers loss. (*Id.* at ¶ 40.) The elements of common law negligent misstatement are: (1) Defendant owed Plaintiff a duty to speak carefully; (2) which Defendant breached by failing to exercise due care before speaking; (3) Plaintiff [*103] relied on Defendant's careless misstatement; and (4) Plaintiff suffered a loss. (*Id.* at ¶ 78.)

## C. Effect of Rulings on Alameda County's and State-Boston's Federal Claims

Defendants contend that their arguments for dismissal of Alameda County's and State-Boston's 10(b) claims are equally applicable to Plaintiffs' English law claims.

---

[19] The relevant alleged misrepresentations are found in the 2008 and 2009 Annual Reports. (Compl. ¶¶ 357-58, 379.)

(Cons. MTD at 33 n.23.) With only two exceptions, noted below, the Court agrees that statements which will not support a 10(b) claim also will not support Plaintiffs' English law claims. This includes statements that are too general to be actionable as fraud, and statements that have not been adequately alleged as false. It also includes statements that are non-actionable expressions of future intention, opinion, or belief. In each of these scenarios, the law governing Alameda County's and State-Boston's 10(b) claims is substantively identical to the law governing Plaintiffs' English law claims.[20]

The only significant deviations between _Rule 10(b)_, on the one hand, and Plaintiffs' English law claims, on the other, appear in the element of scienter. Clearly, negligent misstatement does not contain a requirement that the relevant Defendant knew his statement was false or misleading. Therefore, if a claim has been dismissed for failure to adequately allege scienter, it may nonetheless be actionable as negligent misstatement, so long as the elements of that claim have otherwise been met.

Additionally, while English common law deceit has a scienter requirement largely identical to Alameda County's and State-Boston's section 10b claims, Plaintiffs' English law claims are not subject to the PSLRA. This affects one alleged misrepresentation in Plaintiffs' Complaint: Inglis's statement at a 2010 industry conference that OMS "provides a single, consistent framework for our operations[.]" (Compl. ¶ 381.) In the Class Action, the Court dismissed 10(b) claims against Inglis based on this statement because the allegations failed to give rise to a _strong_ inference of scienter, as required by the PSLRA. See _BP III, 922 F. Supp. 2d at 624, 628-29_. Such a finding [*105] cannot be reflexively applied to Plaintiffs' deceit claims because the PSLRA does not govern those claims. The Court must re-evaluate the allegations to determine whether they support a _plausible_ inference of scienter, as required by _Rule 8(a)_ and _Iqbal._

The Court finds that they do. Plaintiffs have alleged that Inglis was a member of GORC, a committee convened specifically to oversee and shepherd the OMS implementation project. (Compl. ¶¶ 31, 77.) This

committee allegedly reviewed and approved the guidelines governing the structure of OMS. (_Id._ ¶ 95.) GORC also allegedly discussed how the implementation of OMS would be limited to project sites owned and operated by BP. (_Id._) Inglis was the CEO of the Exploration and Production business segment and, according to Plaintiffs, the author of a July 2009 email in which he noted that "conformance with Control of Work (CoW) practices"—a facet of OMS—"on many of [BP's] contractor operated drilling rigs, falls short of BP expectations." (_Id._ ¶¶ 31, 169-70.) These allegations fairly suggest that Inglis knew that the components of OMS would be implemented only on assets owned or controlled by BP. The Court previously found that the allegations [*106] did not give rise to a _strong_ inference that Inglis spoke with intent to mislead regarding the scope of OMS. See _BP III, 922 F. Supp. 2d at 628-29_. However, they do present a _plausible_ case that Inglis was not entirely forthcoming during his 2010 presentation at the Howard Weil Energy Conference. The statement is actionable under common law deceit.

### D. Actual Reliance

Defendants' first argument for dismissal is that Plaintiffs have not adequately pled their reliance on any of the alleged misstatements. (Cons. MTD at 19-20, 23-26.) As noted above, "actual reliance" is an element for all three of plaintiffs' claims: FSMA fraud, common law deceit, and common law negligent misstatement. Unlike U.S. federal securities law, English law does not presume reliance based on the theory of "fraud on the market."[21] See U.K. Amicus Curiae Br., 2010 WL 723009, at *17; Moore Decl. ¶¶ 35, 71; Lowe Decl. ¶ 89.

Defendants claim that "actual reliance" must be pled with particularity under the heightened pleading standards of _Rule 9(b)_. (Cons. MTD at 19.) They argue that Plaintiffs' allegations of reliance on Defendants' public statements are conclusory, failing to specify

---

[20] Specifically, all of Plaintiffs' English claims require a false representation of fact, and they permit recovery for reliance on statements of future intention, opinion, and belief only when the intention was not genuinely held or the opinion or belief was not genuinely [*104] entertained. (Moore Decl. ¶¶ 43-48.)

[21] In addition to arguing that they have adequately pled "actual reliance," Plaintiffs suggest that they can rely on allegations of "indirect reliance." They describe their "indirect reliance" as follows: that the market price of BP's Ordinary Shares was positively affected by Defendants' alleged misrepresentations; [*107] that Plaintiffs assumed the market price was not so affected; and that they relied upon the market price in deciding whether to invest. (Cons. Opp. at 40-41.) The Court finds Plaintiffs' "indirect reliance" theory to be nothing more than a relabeling of "fraud on the market," which is not recognized in English law.

2013 U.S. Dist. LEXIS 171459, *107

which alleged misstatements were relied upon and when. (*Id.* at 23-24.) Defendants also note that, while Alameda County worked with [TEXT REDACTED BY THE COURT]—who met face-to-face with BP officials, it has failed to identify any actionable misrepresentations from these meetings.[22] Therefore, to the extent Alameda County alleges that it relied upon statements made in the face-to-face meetings, these allegations would not create the required nexus between Defendants' allegedly misleading public statements and Alameda County's decisions to buy, sell, or hold BP securities. (*Id.* at 24-26.) Finally, Defendants suggest [*108] that Plaintiffs' allegations of reliance are undercut by allegations regarding the extensive research and modeling performed by their investment advisors in deciding whether to invest in BP. (*Id.* at 26.)

In their response, Plaintiffs dispute the implication that an alleged misrepresentation need be the sole inducer of their action in reliance. They claim that if a misrepresentation had "a material influence" and was a "substantial factor in bringing about [their] action," then they have sufficiently alleged reliance. (Cons. Opp. at 37.) Plaintiffs also dispute that they must plead reliance with particularity under *Rule 9(b)*. (*Id.* at 37-38.) They cite cases in which courts have acknowledged the "inherently conclusory" nature of reliance allegations and declined to dismiss fraud claims on the pleadings. (*Id.* at 38.)

The Court agrees with Plaintiffs that, under English law, Defendants' misrepresentations need not have been the "sole inducement" of Plaintiffs' action in reliance. *Barton v. County Nat West Ltd.* [1999] 1999 WL 477744, at ¶ 55 [*109] ("[T]he misrepresentation does not have to be the sole inducement."). The issue of whether the stricter pleading requirements of *Rule 9(b)* apply to allegations of reliance presents a harder question. *Rule 9(b)* states that a plaintiff "alleging fraud" must "state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. The typical articulation of the rule's effect is that it requires a plaintiff to allege specifically the "time, place, and contents of the [alleged] false representations, as well as the identity of the person making the misrepresentations and what [that person] obtained thereby." *Williams, 112 F.3d at 177* (citation omitted). Specifically, in securities cases, a plaintiff must "specify the statements contended to be fraudulent,

identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id. at 177-78*. This is often described as the "who, what, when, where, and how" of the alleged fraudulent scheme. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc., 336 F.3d 375, 384 (5th Cir. 2003)*.

In addition to the above restatements of *Rule 9(b)*, the policy rationales for the rule have been well-explored [*110] in Fifth Circuit case law. As numerous courts have recounted, *Rule 9(b)* protects defendants from "unfounded allegations of wrongdoing which might injury their reputations." *Hernandez v. Ciba-Geigy Corp. USA, 200 F.R.D. 285, 290 (S.D. Tex. 2001)*. It discourages the filing of baseless complaints "'as a pretext for discovery of unknown wrongs.'" *Frith v. Guardian Life Ins. Co. of Am., 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998)* (quoting *Mitchell Energy Corp. v. Martin, 616 F. Supp. 924, 927 (S.D. Tex. 1985))*. And it fully informs defendants of their alleged roles in the fraudulent scheme so that they may prepare their defense. *See U.S. ex rel. Graves v. ITT Educ. Servs., Inc., 284 F. Supp. 2d 487, 494 (S.D. Tex. 2003)*.

The Court notes that none of the above restatements of—or justifications for—*Rule 9(b)* appears to implicate the element of reliance. The restatements all focus exclusively on the plaintiff's obligation to include specifics regarding the fraudulent scheme and the defendant's role in it—not whether the scheme actually harmed the plaintiff. Similarly, the policy justifications for *Rule 9(b)* are related to the divulgence of the defendant's alleged bad acts—not whether those acts [*111] are responsible for plaintiff's alleged harm. Applying these general principles to the text of *Rule 9(b)*, it would appear that reliance is not a "circumstance[] constituting fraud" that must be alleged with "particularity."

Most courts, however, have concluded differently. The Fifth Circuit, this district, and other district courts within this circuit have either held or strongly suggested that *Rule 9(b)*'s particularity requirement extends to allegations of actual reliance. *See Sanchez v. Liggett & Myers, Inc., 187 F.3d 486, 491 (5th Cir. 1999); In re Enron Corp. Securities, Deriv. & ERISA Litig., 540 F. Supp. 2d 800, 830 (S.D. Tex. 2007); Hernandez, 200 F.R.D. at 291; Sullivan v. Leor Energy LLC, Civ. Act. No. H-05-3913, 2006 U.S. Dist. LEXIS 73609, 2006 WL 2792909, at *7 (S.D. Tex. Sept. 28, 2006); Steiner v. Southmark Corp., 734 F. Supp. 269, 275 (N.D. Tex. 1990); Club Escapade 2000, Inc. v. Ticketmaster,*

---

[22] The issue of whether any statement identified from the face-to-face meetings with [TEXT REDACTED BY THE COURT] can support a claim of fraud is addressed separately, in Section V.C.1.

*L.L.C., No. EP-11-CV-166, 2011 U.S. Dist. LEXIS 136956, 2011 WL 5976918, at *4 (W.D. Tex. Nov. 29, 2011).* A number of federal courts outside this circuit are in accord. *See Evans v. Pearson Enterprises, Inc., 434 F.3d 839, 852-53 (6th Cir. 2006); In re Washington Mut., Inc. Securities, Deriv. & ERISA Litig., No. 2:08-md-1919, 2010 U.S. Dist. LEXIS 73628, 2010 WL 2545415, at *5 (W.D. Wash. June 21, 2010);* [*112] *Gray v. Bayer Corp., Civil Action No. 08-4716, 2009 U.S. Dist. LEXIS 48181, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009); Amzak Corp. v. Reliant Energy, Inc., No. 03 C 0877, 2004 U.S. Dist. LEXIS 16514, 2004 WL 1882482, at *6 (N.D. Ill. Aug. 19, 2004); Baxter v. A.R. Baron & Co., Inc., No. 94 Civ 3913, 1995 U.S. Dist. LEXIS 14882, 1995 WL 600720, at *4 (S.D.N.Y. Oct. 12, 1995).*[23]

Although the Court would not independently arrive at this conclusion, it will apply the prevailing view that the [*113] particularity requirement of *Rule 9(b)* extends to allegations of reliance. In other words, to surmount the hurdle of *Rule 9(b)*, Plaintiffs must "describe . . . the circumstances of [their] reliance" with particularity. *Sullivan, 2006 U.S. Dist. LEXIS 73609, 2006 WL 2792909, at *7.* In reviewing the adequacy of Plaintiffs' allegations under *Rule 9(b)*, the Court remains cognizant of two important limiting principles. First, "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case." *Guidry v. Bank of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992).* Second, reliance allegations are often inherently conclusory: one either relies, or one does not rely. *See In re Compaq Securities Litig., 848 F. Supp. 1307, 1312 (S.D. Tex. 1993); Steiner, 734 F. Supp. at 275.*

Plaintiffs' reliance allegations are found principally in Section XIII of the Complaint. The following is a brief summary of the reliance allegations:

---

[23] As Plaintiffs note, some courts have reached the opposite conclusion: that reliance allegations are not subject to heightened pleading under *Rule 9(b). See Timberlake v. Synthes Spine Co., L.P., Civil Action No. V-08-4, 2009 U.S. Dist. LEXIS 29074, 2009 WL 926990, at *6 (S.D. Tex. Mar. 31, 2009); In re Taxable Mun. Bonds Litig., Civ. A. MDL No. 863, 1992 U.S. Dist. LEXIS 9960, 1992 WL 165974, at *1 n.11 (E.D. La. July 1, 1992); Anthony v. Yahoo! Inc., 421 F. Supp. 2d, 1257, 1264 (N.D. Cal. 2006); Indiana Bell Telephone Co. v. Ward, No. IP 02-170-C H/K, 2002 U.S. Dist. LEXIS 26013, 2002 WL 32067296, at *3 (S.D. Ind. Dec. 6, 2002).* This appears to be the minority view, however. Importantly, the Court is not aware of any case in which the Fifth Circuit has reviewed reliance allegations connected to a claim of fraud under the notice pleading requirements of *Rule 8(a).*

• Providence alleges that it employed [TEXT REDACTED BY THE COURT] to manage its investment decisions during the relevant time period. (Compl. ¶ 479.) [TEXT REDACTED BY THE COURT] took an "analytical, research-based approach" to investing Providence's assets, which included "read[ing] and rely[ing] [*114] upon publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments. (*Id.* ¶ 480.) [TEXT REDACTED BY THE COURT] "conducted a comprehensive valuation analysis of BP as a potential investment in or about early 2009." (*Id.*) It reviewed, in addition to other materials, BP's SEC filings. (*Id.* ¶ 482.) It also met directly with BP's Head of Investor Relations on or about May 14, 2007. (*Id.* ¶ 481.) Pursuant to this due diligence by [TEXT REDACTED BY THE COURT] Providence purchased BP Ordinary Shares in October 2009. (*Id.* ¶ 486.)

• State-Boston alleges that it employed [TEXT REDACTED BY THE COURT] and [TEXT REDACTED BY THE COURT] to manage its investment decisions during the relevant time period. (*Id.* ¶ 487.) State-Boston makes specific allegations regarding [TEXT REDACTED BY THE COURT] s actions in advising State-Boston's purchases; these are presented as an "example" of how State-Boston's investment decisions were made. (*Id.* ¶ 488.) According to these allegations, [TEXT REDACTED BY THE COURT] took an "analytical, research-based approach" to investing State-Boston's assets, which included "read[ing] and rely[ing] upon [*115] publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments. (*Id.* ¶ 488.) Throughout the relevant time period, [TEXT REDACTED BY THE COURT] "directly met with BP management to discuss BP on an approximately annual basis." (*Id.* ¶ 489.) It reviewed, in addition to other materials, BP's SEC filings, analyst reports, and analyst calls. (*Id.*) Following the Deepwater Horizon disaster, [TEXT REDACTED BY THE COURT] monitored BP's statements regarding the incident, "specifically those regarding the oil flow rate." (*Id.* ¶ 490.) Pursuant to this due diligence, State-Boston made over 60 purchases of BP Ordinary Shares and/or ADSs, beginning in January 2007 and ending in May 2010. (*Id.* ¶ 493.)

• Alameda County alleges that it used many

2013 U.S. Dist. LEXIS 171459, *115

different investment advisors, including [TEXT REDACTED BY THE COURT] (*Id.* ¶ 495.) [TEXT REDACTED BY THE COURT] 's actions in advising Alameda County's purchases are presented as an example of how Alameda County's investment decisions were made.[24] (*Id.* ¶ 496.) According to these allegations, [TEXT REDACTED BY THE COURT] employed an "analytical, research-based approach" to investing Alameda [*116] County's assets, which included "read[ing] and rely[ing] upon publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments." (*Id.*) [TEXT REDACTED BY THE COURT] met with BP management at least six different times during the relevant time period. (*Id.* § 497.) [TEXT REDACTED BY THE COURT] also monitored BP's SEC filings and, following the Deepwater Horizon disaster, BP's statements regarding the oil flow rate. (*Id.* ¶¶ 498, 500.) Pursuant to this due diligence, Alameda County made over 100 purchases of BP Ordinary Shares and/or ADSs, beginning in November 2007 and ending in May 2010. (*Id.* ¶ 508.)

The Court finds that, at a minimum, *Rule 9(b)* requires Plaintiffs to specify "with particularity" what actions it took *or forewent* in reliance upon Defendants' alleged [*117] misrepresentations. *See In re Enron, 540 F. Supp. 2d at 830; Evans, 434 F.3d at 853.* At this time, the only actions identified with any level of detail are Plaintiffs' various purchases of BP's Ordinary Shares within the relevant time period. (Compl. ¶¶ 486, 493, 508.) No other specific act of reliance appears in the Complaint or can be recoverable without more detailed pleading. Specifically, to the extent Plaintiffs claim that they relied upon Defendants' alleged misstatements by deciding not to divest themselves of BP's Ordinary Shares, such reliance is, at present, insufficiently pled under *Rule 9(b)* and cannot form the basis of any recovery. (*E.g.,* Compl. ¶¶ 494, 509 (alleging that State-Boston and Alameda County experienced "[l]osses related to . . . pre-Relevant Period purchases or acquisitions").)

The Court finds that Plaintiffs' listing of purchases of BP's Ordinary Shares, however, conveys the necessary amount of detail to satisfy *Rule 9(b).* As a matter of logic, each Plaintiff can only have relied on those alleged misstatements which occurred *prior* to its final listed purchase of BP's Ordinary Shares. The Court therefore dismisses, as to Providence, any claim premised on [*118] alleged misstatements made after October 2009: the final purchase date listed for that Plaintiff.[25] (Compl. ¶ 486.)

To the extent that Defendants fault Plaintiffs for not citing specific public statements that motivated each and every purchase of Ordinary Shares, the Court disagrees that *Rule 9(b)* mandates this level of specificity. Pursuant to *Rule 9(b),* Plaintiffs have catalogued in detail the statements they contend were materially misleading. Their allegations of falsity and scienter have been tested, both in this case and in the Class Action. The statements now generally fall within five defined categories: (1) that BP misrepresented its progress vis-à-vis the Baker Report recommendations; (2) that BP misrepresented the scope of its OMS program; (3) that BP misrepresented the pace of implementation of its OMS program; (4) that BP misrepresented its ability to respond to an oil spill in deepwater; and (5) that BP misrepresented the rate at which oil was spilling into the Gulf following the Deepwater Horizon disaster. [*119] Importantly, the first three of these categories touch upon the state of BP's efforts to reform its safety practices. Given the general coherence of Plaintiffs' allegations regarding Defendants' allegedly fraudulent "scheme," the Court does not believe that identifying which *specific* misrepresentations motivated each purchase would be a productive exercise for either side. *See Steiner, 734 F. Supp. at 273* (noting that *Rule 9(b)* does not require "needlessly repetitive pleading"). Of course, by this ruling, the Court does not relieve Plaintiffs of the obligation to prove actual reliance before they may recover any damages. But it concludes that any deficiency in the element of actual reliance is best tested on a full record, not on the pleadings. *See Celanese Corp. v. Coastal Water Auth., 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007); In re Enron Corp. Securities, Deriv., & ERISA Litig., No. MDL-1446, 2010 U.S. Dist. LEXIS 145220, 2010 WL 9077875, at *40 (S.D. Tex. Jan. 19, 2010).*

---

[24] The Complaint also contains allegations regarding the actions of another of Alameda County's investment advisors, [TEXT REDACTED BY THE COURT] (Compl. ¶¶ 503-07.) Like [TEXT REDACTED BY THE COURT], [TEXT REDACTED BY THE COURT] spoke with BP management during the relevant time period and monitored BP's SEC filings and public statements. (*Id.* ¶¶ 504-05.)

[25] Alameda County's and State-Boston's final purchases occurred in May 2010, the same month in which the final alleged misstatements were made. (Compl. ¶¶ 493, 508.)

Case 4:24-cv-02573    Document 27-1    Filed on 10/21/24 in TXSD    Page 45 of 136

Page 32 of 44
2013 U.S. Dist. LEXIS 171459, *119

**E. Negligent Misstatement**

As noted above, Defendants cannot be liable to Plaintiffs for negligent misstatement unless they owed Plaintiffs a duty to speak carefully. Defendants claim that Plaintiffs have not adequately alleged that Defendants [*120] owed such a duty (Cons. MTD at 40-42), which Plaintiffs deny (Cons. Opp. at 44-45).[26] Before delving into the parties' specific arguments, it is helpful to sketch the broad parameters of negligent misstatement.

English common law does not recognize a general, background obligation to exercise care when speaking. Such an obligation can be imposed by contract, or by virtue of a fiduciary relationship between the parties, but neither applies in the present case. In addition to these categorical situations, a duty to speak carefully can be "voluntarily [*121] assumed" in certain limited circumstances. Specifically, if a defendant provides information or renders advice to a plaintiff, knowing that the plaintiff may rely upon it for purposes of deciding whether to engage in a particular transaction, the defendant owes the plaintiff a duty to take care that the information or advice is not false or misleading. *See Caparo Industries PLC v. Dickman* [1990] 2 A.C. 605, at 620-21 (Bridge) (summarizing the general holding of *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465). In such situations, the duty to speak carefully is said to be borne of the parties' "special relationship" or "proximity," although these terms are useful only in the sense that they provide shorthand for the various factual scenarios that have been acknowledged to give rise to the duty.

The parties need not be in a direct relationship, or even aware of each other, to be in a "special relationship." For example, it is possible for a plaintiff to be an unknown member of a defined group who received the information or advice. *Caparo*, 2 A.C. 605, at 638

(Oliver). Similarly, the information or advice can be transmitted indirectly from the defendant to the plaintiff [*122] through an intermediary, so long as the defendant was aware or should have been aware that the transmittal would take place. *Id.*

Despite these allowances, English courts have taken great care to keep the "special relationship" strand of negligent misstatement narrow. The background rule—that people are not obligated to exercise care before speaking—is intended to remain predominant.[27] Accordingly, courts are wary to recognize a "special relationship" when it would create a new, significant, and sweeping exception to the background rule. *See Reeman and Anor v. Department of Transport* [1997] P.N.L.R. 618, at 625, 632-33, 636.

With this background in mind, the Court turns to the parties' contentions. Defendants cite English case law that a duty to speak carefully does not arise from a "special relationship" unless the defendant's statement was: (1) plaintiff-specific (or made to a group, identifiable at the time the statement was made, to which the plaintiff belongs); (2) purpose-specific; and (3) transaction-specific. (Cons. MTD at 41.) Defendants argue that the only statements in the Complaint directed at any Plaintiff were the statements made in face-to-face meetings with [TEXT REDACTED BY THE COURT] which they claim are non-actionable for reasons other than the non-existence of a duty to speak carefully.[28] (*Id.* at 41-42.) They also argue that none of Defendants' alleged misstatements was purpose-specific—i.e., made specifically to be used by Plaintiffs in making investment

---

[26] Defendants also claim that Plaintiffs' negligent misstatement claims against the Individual Defendants must be dismissed because these Individual Defendants were, at all times, speaking in their capacities as representatives of the various corporate Defendants. (Cons. MTD at 40-41.) Defendants have not adequately briefed this issue or provided the English authorities necessary for the Court's consideration. Therefore, the Court will not dismiss the negligent misstatement claims against the Individual Defendants based on their alleged lack of personal liability, although Defendants are free to re-urge the point at a subsequent stage of the case.

---

[27] English common law disfavors wider imposition of a duty to speak carefully because of the difficulty of cabining liability:

> Words are more volatile than deeds. They travel fast and far afield. They are used without being expended and take effect in combination with innumerable facts and other words. Yet they are dangerous and can cause vast financial damage. How far they are relied on unchecked . . . must in many cases be a matter of doubt and difficulty. If the mere hearing or reading of words were held to create proximity, there might be no limit to the persons [*123] to whom the speaker or writer could be liable.

*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465, at 534 (Pearce).

[28] The issue of whether any statement identified from the face-to-face meetings with [TEXT REDACTED BY THE COURT] [*124] can support a claim of fraud is addressed separately, in Section V.C.1.

decisions—or transaction-specific—i.e., directed to specific purchases in shares. (*Id.* at 42.)

Plaintiffs do not dispute Defendants' characterization of the law, but claim that they have adequately alleged that their relationship with Defendants was "sufficiently close" to give rise to negligent misrepresentation liability. (Cons. Opp. at 44.) They base their argument on: (1) Plaintiffs' investment advisors meeting personally with BP representatives, and (2) the fact that most of the Plaintiffs were pre-existing shareholders of BP at the time the misrepresentations were made. (*Id.*)

The Court finds that Alameda County has adequately pled that Defendants involved in the face-to-face meetings with [TEXT REDACTED BY THE COURT] voluntarily assumed a duty to speak carefully. During these meetings, the relevant Defendants provided information to [TEXT REDACTED BY THE COURT] They were aware of [TEXT REDACTED BY THE COURT]'s identity and role as investment advisor to major institutional investors. Although they may not have been aware of the identities of [TEXT REDACTED BY THE COURT]'s clients, such clients were members of a defined class in existence at the time of meetings. Finally, given [TEXT REDACTED BY THE COURT]'s [*125] role as investment advisor, the relevant Defendants were or should have been aware that the information provided would be used to determine whether to invest in or divest BP stock. In summary, these meetings meet every requirement for a "special relationship" under English common law.

Of course, the duty to speak carefully was assumed only with regard to the meetings themselves, and only with regard to [TEXT REDACTED BY THE COURT] and its clients. Plaintiffs' attempt to extend this duty to Defendants' public statements and to all shareholders is unavailing. English common law is clear that a defendant should not be held liable for negligently speaking unless he "was, or ought to have been aware that his advice or information would in fact be made available to and be relied on by a particular person or class of persons for the purposes of a particular transaction or type of transaction," such that he could or should have "directed his mind . . . to some particular and specific purpose[.]" *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553, at 566 (Richman).[29] During the

face-to-face meetings, the relevant Defendants were able to and should have directed their minds to [TEXT REDACTED [*126] BY THE COURT], its clients, and the investment decisions to be made by those entities. But beyond that circumstance, Plaintiffs' allegations do not support that any Defendant, in making or issuing any public statement, did or should have had [TEXT REDACTED BY THE COURT] or its clients in mind.

Plaintiffs' second argument—that Defendants had a "special relationship" with Plaintiffs as pre-existing shareholders of BP at the time of the allegedly negligent public statements—is also unconvincing. By focusing on the fact that Plaintiffs were pre-existing shareholders, Plaintiffs may be trying to avoid the implication made by Lord Bridge in *Caparo* that prospective shareholders cannot be meaningfully distinguished from other economic actors who deal with the corporation and are likely to make decisions [*127] based on the corporation's perceived financial viability. *See Caparo*, 2 A.C. 605, at 623. It is doubtful, however, that a meaningful distinction can be drawn between pre-existing and prospective shareholders—as Lord Oliver noted, also in *Caparo. Id.* at 650-51; *see also Morgan Crucible Co. PLC v. Hill Samuel & Co. Ltd.* [1991] Ch. 295, CA, at 321 (questioning without resolving whether target company which owed duty of care to identified take-over bidder would also owe duty to any unidentified "white knight" who relied upon the company's defense documents to interpose a higher bid). Moreover, the Court is aware of no English case imposing upon corporations a generalized common law duty to speak carefully, running either to the corporations' shareholders or to the investing public as a whole.[30] If

_____

*See Caparo Industries PLC v. Dickman et al.* [1990] 2 A.C. 605, at 624 (Bridge); *Al-Nakib Investments (Jersey) Ltd. v. Longcraft* [1990] 1 W.L.R. 1390, at 1396-97.

[30] Several cases have recognized that companies owe a duty to speak carefully when issuing prospectuses which invite the subscription of shares in a newly-formed corporation. *See generally Possfund Custodian Trustee Ltd. v. Diamond* [1996] 1 W.L.R. 1351; *Al-Nakib*, 1 W.L.R. 1390; [*128] *Peek v. Gurney* [1873] L.R. 6 H.L. 377. In *Al-Nakib*, the duty was limited to the act of reliance explicitly invited by the prospectus, and it did not extend to a similar act of reliance—specifically, purchasing additional shares on the open market. *See* 1 W.L.R. 1390, at 1397-99. *Possfund* parted ways with this analysis, finding that the plaintiffs in that case had adequately alleged that modern prospectuses are issued not only to invite initial subscription of shares, but also to encourage the purchase of shares on the open market. *See* 1 W.L.R. 1351, at 1365-67. Regardless of which case properly

_____

[29] Although the quoted language is taken from a minority opinion in a New Zealand case, its articulation of what should be the parameters of common law negligent misstatement has been endorsed by English courts over the majority's holding.

2013 U.S. Dist. LEXIS 171459, *128

this Court were to recognize such a duty, it would subvert two important limitations on negligent misstatement under English common law.

First, holding broadly that corporations are in a "special relationship" with shareholders would ignore the requirement that a negligent misstatement must be "plaintiff-specific." *See Caparo*, 2 A.C. 605, at 651 (Oliver) (noting that the duty to speak carefully "is not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained"). English courts have rejected the invitation to dispense with this requirement in the context of corporate communications. *See Morgan Crucible*, Ch. 295 at 316 (implying that duty to speak carefully did not and could not have attached before the takeover company made itself known by advancing its opening bid); *Caparo*, 2 A.C. 605, at 623 (Bridge) (stating that creation of "unlimited duty of care owed by auditors for the accuracy of their accounts to all who may foreseeably rely upon them" is a "legislative step" for Parliament, not the courts); *see also Galoo Ltd. v. Bright Graham Murray* [1994] 2 B.C.L.C. 492, at 513; *Al-Nakib Investments (Jersey) Ltd. v. Longcraft* [1990] 1 W.L.R. 1390, at 1398-99; *but see Possfund Custodian Trustee Ltd. v. Diamond* [1996] 1 W.L.R. 1351, at 1364-65 [*130] (suggesting that proximity can be shown between a defendant who makes misstatements in a general-circulation prospectus and "the members of the public" if "reliance by the members of the public for the purpose in question is intended"). The Court also notes that recognizing a "special relationship" between a corporation and its shareholders would affect a "significant extension of the scope of the law of negligence," which English courts have expressly cautioned against. *Reeman*, P.N.L.R. 618, at 636.

Second, it would ignore the requirement that a negligent misstatement must be "purpose-specific." English courts are extremely exacting when they impose this requirement. For example, in the case of *Caparo*, Lord Oliver rejected the proposition that periodic corporate

---

reflects the state of the common law on prospectuses, both *Al-Nakib* and *Possfund* fairly stand for the proposition that a company may owe a duty to speak truthfully with regards to specific documents or statements that invite and intend a specific type of reliance, but the invitation must be reasonably explicit and will be narrowly construed. None of the public statements at issue is adequately alleged to fall within this narrow window. Importantly, neither *Al-Nakib* nor *Possfund* supports imposing upon BP a generalized duty to speak carefully in all situations which inures to the benefit of its [*129] shareholders.

reporting—mandated by statute—is done for the "purpose" of informing investment decisions, although the reporting is no doubt also utilized for that reason. Instead, pursuant to the statutory scheme, the "purpose" for these communications is to inform shareholders of the activities of the company so that they can exercise their shareholder rights at the annual general meeting. *See* 2 A.C. 605, at 629-32. Similarly, in *Al-Nakib* [*131] *Investments (Jersey) Ltd. v. Longcraft*, the Chancery Court found that the purpose of a prospectus directed to existing shareholders was to invite the subscription of shares pursuant to the prospectus, and not to encourage the purchase of additional shares on the open market. *See* 1 W.L.R. 1390, at 1397; *accord Peek v. Gurney* [1873] L.R. 6 H.L. 377, at 411-13; *but see Possfund*, 1 W.L.R. 1351, at 1636, 1365-67 (acknowledging that modern-day prospectuses may also be issued for the intended purpose of encouraging the purchase of shares on the open market).

Even courts which have found statements issued for the very purpose to which the plaintiff put them are careful to construe that purpose narrowly. In one such case, the plaintiff's position was deemed only "arguable" even though the defendants—directors of a company which was the target of plaintiff's take-over bid—allegedly conscripted and issued defense documents: (1) with plaintiff in mind and (2) with the specific intent of causing plaintiff to increase the amount of its bid. *See Morgan Crucible*, Ch. 295 at 314. Similarly, in another case, the court found that the pursuing company in a take-over situation had stated a claim for negligent [*132] misstatement against the target company's auditor only because the auditor was specifically aware, at the time of its audit, that the target company's accounts were the basis for fixing the purchase price under the parties' acquisition agreement. *See Galoo*, 2 B.C.L.C. 492, at 514.

The authorities cited above all indicate that the "purpose-specific" prong is rigidly imposed. Importantly, it cannot be met by mere foreseeability that the statement could be used for another purpose. *See Morgan Crucible*, Ch. 295 at 317; *see also Caparo*, 2 A.C. 605, at 643 (Oliver) ("[I]t is almost always foreseeable that someone, somewhere and in some circumstances, may choose to alter his position upon the faith of the accuracy of a statement or report which comes to his attention . . . . To apply as a test of liability only the foreseeability of possible damage without some further control would be to create a liability wholly indefinite in area, duration and amount and would open up a limitless vista of uninsurable risk for the

professional man."). The Court distills from these cases that influencing the plaintiff's behavior must have been an express and motivating purpose of the defendant's statement. [*133] At present, Plaintiffs' allegations do not support the inference that any of Defendants' public statements was issued with the express and motivating purpose of influencing the investment decisions of BP's shareholders.

The requirements of negligent misstatement under English common law, strictly enforced, leave no room for the legal theory espoused by Plaintiffs. Although this outcome may appear harsh, the rationale for disallowing negligent misstatement claims based on general circulation statements is best articulated by Lord Bridge in *Caparo*:

The salient feature [of cases recognizing a duty to speak carefully] is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly and knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation. . . . ***The situation is entirely different where a statement is put into more or less general circulation and may foreseeably be relied on by strangers to the maker of the statement for*** [*134] ***any one of a variety of different purposes which the maker of the statement has no specific reason to anticipate.*** To hold the maker of the statement to be under a duty of care in respect of the accuracy of the statement to all and sundry for which they may choose to rely on it is not only to subject to him . . . to "liability in an indeterminate amount for an indeterminate time to an indeterminate class" . . . it is also to confer on the world at large a quite unwarranted entitlement to appropriate for their own purposes the benefit of the expert knowledge or professional expertise attributed to the maker of the statement.

2 A.C. 605, at 620-21 (citation omitted) (emphasis added).

Defendants' public statements were not specifically directed to the Plaintiffs or to an identifiable class to which Plaintiffs belonged. They were not specifically directed to the purpose of informing Plaintiffs' investment decisions. As a result, no special relationship arose pursuant to English common law, and Defendants were under no duty to exercise care when speaking. Plaintiffs' negligent misstatement claims based upon Defendants' public statements fail as a matter of law.

## F. Intent to Induce Reliance

Defendants [*135] also argue that, for purposes of their common law deceit claims, Plaintiffs have not adequately alleged that the makers of the alleged misrepresentations intended to induce Plaintiffs' reliance.[31] They acknowledge that *Rule 9(b)* permits intent to be alleged generally, but nonetheless raise three separate arguments for why plaintiffs' allegations of intent to induce reliance are insufficient. First, Defendants criticize Plaintiffs' allegations of intent to induce reliance as entirely "conclusory," citing the following allegation from paragraph 536 of the Complaint: "Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants" made the alleged misrepresentations "with the intent and/or foreseeability that Plaintiffs and investors would rely thereon." (Cons. MTD at 29.) Second, anticipating the argument that intent to induce reliance can be inferred from the circumstances in which the statements issued, Defendants note that several alleged misstatements "were not addressed to the investing public, let alone to plaintiffs in particular." (*Id.* at 29.) Finally, Defendants argue that Plaintiffs have failed to distinguish among the Defendants in their allegations of intent. (*Id.* at 31-32.)

The first and third of these arguments raise interrelated concerns about the form of Plaintiffs' pleading. Defendants complain that Plaintiffs have not adequately pled the element of intent because the allegation cited above is a conclusion of intent unsupported by factual allegations that relate to specific individuals. Although Defendants claim that the failure to distinguish among the Defendants is due to Plaintiffs' use of "group pleading"—disallowed in the Fifth Circuit under the case of *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*— the Court finds that this argument obscures rather than clarifies the issue to be decided. "Group pleading" is a judicial presumption that permits certain individuals to be linked to unattributed corporate communications

---

[31] Intent [*136] to induce reliance is not required for recovery under Section 90A of the FSMA. Although it is not technically an element of negligent misstatement, there is similarity between intent to induce reliance for deceit and the requirement of a "special relationship" giving rise to a duty to speak carefully under negligent misstatement, as explored more fully in the Court's analysis.

simply by virtue of their roles in the corporation. [*137] *See Shaw Grp., 537 F.3d at 531 n.1*. The Fifth Circuit disapproved the use of "group pleading" under the PSLRA on the rationale that it fails to identify a particular individual who: (1) was responsible for the alleged misstatement and (2) had the required knowledge that the alleged misstatement was false or misleading. As the Fifth Circuit explained, it is "appropriate to look to the state of mind of the *individual* corporate official or officials who [are involved in making a statement] rather than generally to the *collective knowledge* of all the corporation's officers and employees acquired in the course of their employment." *Southland, 365 F.3d at 366* (emphasis added). The Fifth Circuit drew support for its holding from other courts which had noted the mischief created by patching together the mental states of multiple corporate representatives to arrive at a "collective" fraudulent intent which no single individual possessed. *See, e.g., In re Apple Computer, Inc. Sec. Litig., 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)* ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false."); *Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1311 (S.D. Fla. 2000)* [*138] ("The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents.").

The Court does not dispute that "group pleading" is inadequate in this Circuit. However, it does not follow that generalized allegations of intent to induce reliance—based on objective features of the alleged misstatements themselves—necessarily invite the same sort of mischief as "group pleading" Defendants' participation in a statement and their knowledge of its falsity. Certainly, the Complaint must allege facts that support the existence of intent to induce reliance in the individual or individuals responsible for each alleged misstatement. However, unlike knowledge of falsity, the Court believes that such facts may be alleged on an undifferentiated basis. Depending on the circumstances alleged, it may be reasonable to infer that any individual involved in an alleged misstatement possessed a particular understanding of the audience and effect of the statement, without delineating that understanding by named individuals.

With this framework in mind, the Court turns to [*139] Plaintiffs' allegations relevant to intent to induce reliance. The allegations must be tested under the substantive requirements of English common law. Defendants contend that mere foreseeability of inducement could occur is not sufficient (Cons. MTD at 28-29)—a point that Plaintiffs do not appear to contest. Actual foresight that inducement could occur, however, appears to mandate a different conclusion. English courts have expressed the principle to be applied in a number of different ways. Some have found the intent element satisfied when inducement was a "natural consequence" of the allegedly fraudulent statement. *See Andrews v. Mockford* [1896] Q.B. 372, at 378 (intent shown when "natural consequence of the publication [of the false statement] in the newspaper was that the plaintiff should buy shares"); *Richardson v. Silvester* [1873] Q.B. 34, at 36 (intent adequately alleged when "natural consequence would be that a person who was desirous of becoming a tenant would, upon reading the [false] advertisement, incur expense in looking at the farm"); *but see Brown Jenkinson & Co. Ltd. v. Percy Dalton (London) Ltd.* [1957] 2 Q.B. 621, at 644 (Evershed, dissenting) ("[I]t is essential [*140] for the establishment of a conspiracy to defraud that the defrauding of some third party should not merely be the consequence or the possible or likely consequence of the agreement of the alleged conspirators; but should be its real purpose and aim."). Others have concluded that a defendant who "appreciated" or "must have known" that inducement would occur is deemed to have intended that result. *See Shinhan Bank Ltd. v. Sea Containers Ltd.*, 2000 WL 1274111, at 11 (intent shown when defrauding party "appreciated that (barring some unforeseen intervention) the bank would pay against the false clean receipts"); *see also Cullen v. Thomson* [1862] All E.R. Rep. 640, at 644 (intent adequately alleged when defendants made knowing false representations "under such circumstances as they must have supposed would probably induce a person in the situation of the [plaintiff] to act upon it and to buy shares in the partnership concern").

Following the general rule laid down by these cases, so long as Plaintiffs have alleged facts from which it is fair to infer that the responsible Defendant anticipated that the statement in question would reach the Plaintiffs and be relied upon by them in connection [*141] with investment decisions, Plaintiffs will have cleared the bar for stating a claim under *Rules 8(a)* and *9(b)*. As suggested by the parties, the Court finds it helpful to categorize and analyze the various alleged misstatements according to the contexts in which they

were made.[32]

## 1. Face-to-face meetings

Several alleged misstatements were made during face-to-face meetings between representatives of BP and the investment firm [TEXT REDACTED BY THE COURT] acting as advisor to Alameda County. (Compl. ¶ 439.) Plaintiffs have alleged that [TEXT REDACTED BY THE COURT] specifically voiced concerns about [TEXT REDACTED BY THE COURT] (*Id.* at ¶ 439(a).) The individuals representing BP in those meetings are alleged to have responded specifically to [TEXT REDACTED BY THE COURT]'s questions and concerns. (*Id.*) Under these circumstances, it is reasonable to infer that these individuals were aware of to whom they were speaking and the line of business in which those people were employed. They must have therefore anticipated [*142] that their statements could reach [TEXT REDACTED BY THE COURT]'s clients and that those clients' investment decisions could be shaped in part by the information provided. *See Gross v. Lewis Hillman Ltd.* [1969] 1 Ch. 445, at 461 (acknowledging that misrepresentations about a piece of commercial property made to an "expert dealer" should be actionable by a client of the dealer who buys on the dealer's recommendation); *Swift v. Winterbotham* [1873] Q.B. 244, at 253 (finding that misrepresentation about a commercial entity's creditworthiness made by one bank to another is actionable by the receiving bank's customer because it was "known and contemplated" that the misrepresentation would be "communicated" to the customer). Given these circumstances, Alameda County has adequately alleged intent to induce reliance in connection with the statements made during the face-to-face meetings with [TEXT REDACTED BY THE COURT] [33]

## 2. Communications [*143] directed to investors

Other alleged misstatements were made in connection with corporate reporting, meetings, and teleconferences

expressly aimed at shareholders and the investing public. Defendants' English law expert suggests that the anticipated audience for these statements may not be sufficient to establish intent to induce reliance, analogizing to the *Caparo* case in which Lord Oliver and Lord Jauncey determined that compliance with corporate reporting requirements is not done for the "purpose" of permitting the public to make informed investment decisions, but to equip shareholders with the necessary information to exercise their rights of ownership. (Moore Decl. ¶¶ 63-66.)

Although attractive on its face, the Court does not believe that the analogy to the law of negligent misstatement withstands scrutiny. The issue encountered in negligent misstatement—addressed in more depth in Section VI.E, above—is whether a defendant has willingly entered into a "special relationship" with the plaintiff such that the law may imply a duty to speak carefully. English common law is very reticent to find such a "special relationship." One limiting requirement is that the statement must have been [*144] made for the purpose to which it was used by the plaintiff. Awareness that the statement *could* be used for that purpose is clearly not sufficient. *Caparo*, 2 A.C. 605, at 660 (Jauncey) (noting that "auditors [are] aware that their reports will be seen and relied upon by the members [of a company]" but that this fact "does not answer the fundamental question of the purpose . . . for which the annual accounts of a company are prepared and distributed to its members"). In other words, informing or affecting the plaintiff's actions must have been a motivating impetus for the making of the statement before a special relationship can exist.

The Court does not find this facet of negligent misstatement to be interchangeable with intent to induce reliance under deceit.[34] As noted above, English

---

[32] For clarity, the Court will address the sufficiency of Plaintiffs' allegations of intent to induce reliance without regard to whether the other elements of deceit have been established.

[33] To the extent that Providence and State-Boston also assert deceit claims on the basis of these statements, they have not adequately alleged that the BP participants knew their statements would be disseminated beyond [TEXT REDACTED BY THE COURT] and its clients.

[34] One English case, *Possfund Custodian Trustee Ltd. v. Diamond*, suggests that intent to induce reliance is a required element of both deceit and negligent misstatement, and that the element is indeed interchangeable [*146] between the two claims. *See* 1 WLR 1351, at 1364 (stating that both deceit and negligent misrepresentation require "a material representation intended to influence . . . the mind of the representee"); *see also McInerny v. Lloyds Bank Ltd.* [1974] 1 Lloyds Rep. 246, at 253 ("[I]t seems to me that when one man makes a statement to another with the intention of inducing him to enter into a contract with him . . . on the faith of it, the maker must be regarded as accepting a responsibility for the statement [if negligently made]."). *Possfund* describes the requisite intent as a desire to "influence" the plaintiff's behavior and indicates

common law supports that a defendant is adequately alleged to have intended to induce reliance if he knew that inducement was likely to occur. Such a showing would not be sufficient to ground a "special relationship" for purposes of a negligent misstatement claim. Although the Court has not encountered a case or treatise that directly confronts the issue, this seemingly contradictory outcome can be reconciled [*145] by reference to the fact that a deceit claim involves a knowing or severely reckless misrepresentation. When a defendant knowingly states a falsehood, with awareness that the falsehood will reach the plaintiff and may affect his behavior, it is reasonable to infer that the defendant intended the result obtained. Indeed, some English cases have gone so far as to state that the situation gives rise to a "rebuttable presumption" of intent. *See Goose v. Wilson Sandford & Co.*, 2000 WL 191196, at 14-15 ("[I]f a fraudulent misrepresentation is found to have been made it will give rise to a rebuttable presumption of fact that the representor intended the representee to act in reliance on it.") (citations omitted). By contrast, a defendant to a negligent misstatement claim is only alleged to have spoken carelessly. Without more than awareness that the statement could affect the plaintiff's behavior, the defendant should not be deemed to have voluntarily assumed a duty towards him.[35]

---

that the intent must be "expressly communicated" to the plaintiff or capable of being "reasonably inferred" by the plaintiff from the circumstances. 1 WLR 1351, at 1364. The Court finds that *Possfund's* description of the intent element is appropriate for negligent misstatement—the claim actually at issue in that case—but under-inclusive for deceit.

[35] The Court also notes that the law on negligent misstatement disfavors the implication of a duty when the alleged misstatement was not directed at the specific plaintiff, or to an identifiable and discrete group [*147] to which the plaintiff belonged. By contrast, a fraudulent misstatement can be actionable even it was circulated generally with the intent that any member of the public act in reliance thereupon. *See Andrews v. Mockford* [1896] 1 Q.B. 372, at 385 (approving jury determination that defendants disseminated misrepresentations through a prospectus and a publicized telegram "in order to induce members of the public" to buy shares of a company); *Swift v. Winterbotham* [1873] L.R. 8 Q.B. 244, at 253 (a representation can be actionable "even if it is made to the public generally with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby); *Richardson v. Silvester* [1873] L.R. 9 Q.B. 34, at 36 (finding actionable a representation in a newspaper advertisement that was "made and published in order to be read by persons who would be likely to be tenants of farms"); *Barry v. Croskey* (1861) 2 J. & H. 945, at 956 (acknowledging that false representations can be directed to "every member of

As a result, the Court is persuaded that Defendants' intent to induce reliance has been adequately alleged for the statements directly addressed to BP's shareholders and the investing public. The individuals responsible for these statements were ostensibly aware of the documents in which the statements appeared, or the settings in which the statements were made. They must have therefore anticipated that their statements would reach investors and that investment decisions could be shaped in part by what they said. Therefore, Plaintiffs have adequately alleged intent to induce reliance in connection with the following statements:

• Statements made during conference calls held on July 24, 2007 and February 27, 2008, which were allegedly conducted "with analysts and investors." (Compl. ¶¶ 337, 347.)

• Statements made in BP's periodic corporate reporting, including Annual Reviews, Annual Reports, Sustainability [*149] Reviews, and Sustainability Reports. (*Id.* ¶¶ 333, 345, 354, 357-58, 370, 377, 379, 385, 387, 389-90.) The Annual Reports were filed with the SEC. (*Id.* ¶ 357, 379.) The Annual Reviews, Sustainability Reviews, and Sustainability Reports were "made available to the investing public on [BP's] official website." (*Id.* ¶¶ 333, 345, 354, 370, 377, 385.) Defendants argue that the Sustainability Reviews and Sustainability Reports were not directed to shareholders and the investing public because of language in those documents advising readers not to rely upon them for purposes of deciding whether to invest in BP. (Cons. MTD at 30.) Such a "disclaimer" may be sufficient to prevent a "special relationship" from arising under negligent misstatement, but it does not negate intent to induce reliance if such intent actually existed. Plaintiffs have alleged that BP intended the Sustainability Reports and Sustainability Reviews to reach shareholders and the investing public. They were reviewed by the SEEAC as "material to be placed before shareholders which addresses environmental, safety and ethical performance." (*Id.* ¶¶ 150-56.) It is reasonable in these circumstances, regardless of

---

the community who was likely to purchase shares in [a] company . . . with the intent that every such member . . . should purchase shares at high prices for the [*148] benefit of the company"); *but see Peek*, L.R. 6 H.L. 377, at 400 (suggesting that member of the public who purchased shares in reliance on statements made in a prospectus "inviting the public to apply for allotment of shares" cannot recover without "connect[ing] himself with [defendants]").

the presence of [*150] a disclaimer, to infer that the responsible Defendants made the statements with intent to induce Plaintiffs' reliance.

• Statements made at BP's 2008 Annual General Meeting with shareholders, which were made publicly accessible on BP's website and which were subsequently filed with the SEC on Form 6-K as an "Address to Shareholders at The Annual General Meeting of BP plc on April 17, 2008." (*Id.* ¶¶ 349-50.)

## 3. Press releases

One alleged misstatement was contained within a January 16, 2007 press release announcing the release of the Baker Report. The contents of the release were also filed with the SEC on Form 6-K. (Compl. ¶ 331.) Another alleged misstatement was contained within an October 25, 2007 press release, which was also filed with the SEC on Form 6-K. (*Id.* ¶ 341.) Because the alleged misstatements were publicly disseminated, and filed with the SEC, it is reasonable at this stage to infer that the individuals involved with the press releases contemplated that it would reach investors and could potentially affect investment decisions.

## 4. Industry conferences

Five alleged misstatements were delivered by Defendants Inglis and Hayward as part of prepared remarks at industry conferences. [*151] (Compl. ¶¶ 339, 343, 352, 381, 383.) Three of these speeches—Hayward's remarks at the 2008 HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum; Inglis's remarks at the 2010 Howard Weil Energy Conference; and Hayward's remarks at the Peterson Institute for International Economics in 2010—were subsequently posted on BP's publicly-accessible website. (*Id.* ¶¶ 352, 381, 383.) Additionally, the Howard Weil Energy Conference was billed as "one of the premier investor conferences in the energy industry." (*Id.* ¶ 382(b).) Although thin, these allegations support the inference that Defendants Inglis and Hayward delivered their remarks with knowledge that they would reach investors and could affect their investment decisions. Plaintiffs have not sufficiently alleged, however, that Inglis had such knowledge regarding remarks delivered at 2007 Sanford Bernstein 4th Annual Strategic Decisions Conference, or that Hayward had such knowledge regarding remarks delivered at the 2007 Houston

Forum. (*Id.* ¶¶ 339, 343.) As a result, Plaintiffs have not adequately alleged intent to induce reliance for these earlier alleged misstatements.

## 5. Congressional testimony

Plaintiffs also assert deceit [*152] claims based on Defendant Malone's testimony to a subcommittee of the U.S. House of Representatives on May 16, 2007 and Defendant Rainey's testimony to a committee of the U.S. Senate on November 19, 2009. (Compl. ¶¶ 335, 374-75.) Plaintiffs' allegations do not indicate any circumstances surrounding the testimony which would support an inference that Malone or Rainey understood or desired that his comments would extend beyond the U.S. Congress to the investment community. Plaintiffs have not adequately alleged intent to induce reliance for these alleged misstatements.

## 6. MMS filings

Several alleged misstatements were included in the IEP for the Macondo well and the Regional OSRP for the Gulf of Mexico. (Compl. ¶¶ 360-63, 372.) These were regulatory filings required by the U.S. Department of the Interior Minerals Management Services ("MMS") before BP could commence exploration activities on the Offshore Continental Shelf. (*Id.* ¶ 364.) Defendants argue that the documents were not addressed to or intended for the investing public. (Cons. MTD at 30.) The Court agrees. On their face, these documents are addressed to the regulatory agency with which they were filed. Although they complied [*153] with specific MMS regulations, there is no suggestion that these regulations were intended to protect investors or to facilitate informed investment decisions. As a result, Plaintiffs have not adequately alleged that the individuals responsible for the alleged misstatements in the IEP and OSRP knew that those statements would ever be read by or relied upon by investors. On the allegations currently set forth, Plaintiffs' deceit claims premised on those documents fail as a matter of law.

## 7. Post-spill statements

Finally, the alleged post-spill statements made by Defendants Suttles, Hayward, McKay, Dudley, and "BP"—all concerning the amount of oil gushing into the Gulf of Mexico—were made through a variety of media intended to reach as broad an audience as possible.

(Compl. ¶¶ 399, 401, 404-06, 414, 416, 418, 420-22, 425, 427-28, 430.) Specifically:

• Many post-spill statement were made on nationally-broadcast television shows or to nationally-distributed print journalists. (*Id.* ¶¶ 401, 416, 420-22, 427, 430.)

• Three were made during the course of Unified Command press conferences. (*Id.* ¶ 399, 425, 428.)

• Several were filed with the SEC on Form 6-Ks. (*Id.* ¶¶ 404, 405, 414.)

• One appeared [*154] on BP's publicly-accessible website. (*Id.* ¶ 406.)

• One was made to a committee of the U.S. House of Representatives during the course of a public hearing. (*Id.* ¶ 418.)

In the thirty-two days following the disaster, three BP representatives (Suttles, Hayward, and McKay) and five unattributed corporate sources repeated the 5,000-barrel-per-day estimate at least fifteen times in at least eight different public outlets.[36]

These allegations fairly support that Suttles, Hayward, McKay, Dudley, and any individual responsible for the unattributed corporate statements made by "BP" were involved in a coordinated and very public campaign to instill and perpetuate the belief that the loss of oil per day was approximately 5,000 barrels and not 70,000 barrels as estimated by other observers of the ongoing tragedy. Plaintiffs acknowledge that these post-spill statements could have been intended to deceive the U.S. government, to whom penalties would be owed based on the total volume of oil spilled. (Compl. ¶ 211.) But they also allege [*155] that BP's existing and prospective shareholders were another intended audience of the statements. (*Id.* ¶¶ 212-13.) Given the circumstances existing at the time; the alleged evidence within BP that the spill rate was much higher than publicized; and the fact that BP has admitted criminal and civil liability in connection with some of the above statements, the Court finds that Plaintiffs' allegations fairly support the inference that the Defendants responsible for the post-spill statements spoke with intent to affect the investment decisions of BP's existing and prospective shareholders.[37]

## VII. FORUM NON CONVENIENS

Defendants request—as an alternative to their arguments regarding the infirmities of Plaintiffs' state-law claims [*156] under English law—that the Court dismiss those claims under the doctrine of forum non conveniens. Under this doctrine, the Court may decline to exercise jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co., Ltd., 265 F.3d 258, 268 (5th Cir. 2001)*. "[T]he ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 527, 67 S. Ct. 828, 91 L. Ed. 1067 (1947)*.

### A. Legal Standard

Analysis of a motion to dismiss for forum non conveniens proceeds in two stages. First, the Court must decide whether an available and adequate alternative forum exists. To make this assessment, the Court generally considers the following factors: "(1) amenability of the defendant to service of process and (2) availability of an adequate remedy in the alternative forum." *Karim, 265 F.3d at 268*; *see also Gonzalez v. Chrysler Corp., 301 F.3d 377, 379-80 (5th Cir. 2002)*; *McLennan v. Am. Eurocopter Corp., 245 F.3d 403, 424 (5th Cir. 2001)*.

If the Court concludes that an available and adequate [*157] alternative forum exists, it then determines which forum is best suited to the litigation. *Karim, 265 F.3d at 268*. This prong of the analysis begins with a consideration of "relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum." *In re Air Crash Disaster near New Orleans, 821 F.2d 1147, 1165 (5th Cir. 1987)*. The private interest factors to be

---

[36] Although it is alleged that Dudley disputed higher estimates of the oil spill, it is not alleged that he reiterated the 5,000 barrels per day estimate. (Compl. ¶ 422.)

[37] According to the Complaint, certain post-spill statements undergirded criminal charges and civil claims brought by the U.S. government against BP. BP pled guilty to the criminal charge of felony obstruction of Congress, among other charges, and agreed to pay $4 billion—the highest criminal penalty in U.S. history. (Compl. ¶ 210.) BP also settled the SEC's civil securities fraud case, agreeing to a penalty of $525 million—the third largest in the SEC's history. (*Id.*)

considered by the Court relate primarily to the convenience of the litigants. They are:

(1) the relative ease of access to sources of proof;
(2) the availability of compulsory process to secure the attendance of witnesses;

(3) the cost of attendance for willing witnesses; and

(4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Syndicate 420 at Lloyd's London v. Early American Ins. Co., 796 F.2d 821, 831 (5th Cir. 1986)* (citing *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*).

If the private interest factors weigh in favor of dismissal, the motion to dismiss for forum non conveniens may be granted. *See Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G., 955 F.2d 368, 376 (5th Cir. 1992)* (finding [*158] "no need to consider the public interest factors" when the "balance of private interest factors favor[ed] dismissal"). Otherwise, the Court must consider in turn the relevant public interest factors. "If these factors weigh in the moving party's favor, the district court may dismiss the case." *Gonzalez, 301 F.3d at 380* (citing *Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 837 (5th Cir. 1993)*; *see also In re Air Crash, 821 F.2d at 1165* ("If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors.").

The public interest factors relevant to the analysis are:

(1) the administrative difficulties flowing from court congestion;
(2) the local interest in having localized controversies decided at home;

(3) the familiarity of the forum with the law that will govern the case; and

(4) the avoidance of unnecessary problems of conflict of laws or the application of foreign law.

*Syndicate 420, 796 F.2d at 831* (citing *Piper Aircraft, 454 U.S. at 241 n.6*). In cases where the private interest factors do not weigh heavily in favor of the alternative forum, a court may still dismiss an action in light of the relevant [*159] public interest considerations. *See Piper Aircraft, 454 U.S. at 256 n. 23* ("[I]f the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper."); *In re Air Crash, 821*

*F.2d at 1165-66* ("[E]ven when the private conveniences of the litigants are nearly in balance, a trial court has discretion to grant forum non conveniens dismissal upon finding that retention of jurisdiction would be unduly burdensome to the community, that there is little or no public interest in the dispute or that foreign law will predominate if jurisdiction is retained.") (quoting *Pain v. United Technologies Corp., 637 F.2d 775, 792, 205 U.S. App. D.C. 229 (D.C. Cir. 1980)*).

When undertaking the required balancing, "no one private or public interest factor should be given conclusive weight[.]" *In re Air Crash, 821 F.2d at 1163.* Ordinarily a favorable presumption is applied to the plaintiff's choice of forum. Thus, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)*; *see also Veba-Chemie A.G. v. M/V Getafix, 711 F.2d 1243, 1245 (5th Cir. 1983)* [*160] ("[A] forum non conveniens dismissal must be based on the finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate and available alternative forum.").

**B. Analysis**

Defendants claim that: (1) England is an available and adequate alternative forum for these claims, and (2) the private and public interest factors favor dismissal. (Cons. MTD at 43-47.) Regarding the private interest factors, Defendants claim that most of the alleged misstatements originated from England and that the non-party witnesses such as [TEXT REDACTED BY THE COURT] are predominantly in England. (*Id.* at 45-46.) Regarding the public interest factors, Defendants note that English courts are more familiar with English law. They also emphasize that the FSMA has not been widely interpreted, which will make it more difficult for the Court to construe and apply that law. (*Id.* at 46-47.)

Plaintiffs contend that England is not an available alternative forum because it cannot adjudicate their entire case—specifically, Alameda County and State-Boston cannot pursue their Exchange Act claims in England. They suggest that an alternative forum is not [*161] adequate if it cannot accommodate all of Plaintiffs' claims. (Cons. Opp. at 19.)

As to the private interest factors, Plaintiffs note that many similar claims are pending in this court, and convenience will be served by leaving them in a single

forum. (Cons. Opp. at 19-20.) They caution that dismissing for forum non conveniens creates the risk of inconsistent rulings between this Court and English courts. (*Id.* at 20.) As to the location of witnesses, Plaintiffs believe this factor favors the current forum because four of seven individual defendants are located here; two of three corporate defendants are located here; Defendants are already actively involved in this multi-district litigation, as well as another located in New Orleans, Louisiana; and [TEXT REDACTED BY THE COURT] has agreed to participate without need for compulsory process. (*Id.* at 20-21.) Finally, Plaintiffs note that documents have already been produced in this forum with no problems. (*Id.* at 21-22.)

As to the public interest factors, Plaintiffs argue that congestion on the Court and burden on the community will not be alleviated by dismissal, since Alameda County's and State-Boston's Exchange Act claims will have to [*162] remain here. (Cons. Opp. at 23.) Plaintiffs also criticize Defendants' reliance on FSMA as a reason for dismissal, because: (1) they dispute that a claims under FSMA is the sole claim that may be brought for the covered statements, and (2) even if the Defendants' interpretation of FSMA is correct, only two statements out of nearly fifty alleged misstatements would be affected. (*Id.* at 23-24.)

In their reply brief, Defendants dispute Plaintiffs' assertion that England is not an available forum. They state that courts have discretion to dismiss only part of a case under forum non conveniens. (Doc. No. 63 ("Cons. Reply"), at 29.) They also clarify that they have agreed Plaintiffs will have access to discovery produced in this multi-district litigation, regardless of the forum in which their English law claims are tried. Therefore, they dispute that forum non conveniens dismissal will be inefficient. They claim the only pertinent question for the Court is which forum should handle dispositive motions and trial. (*Id.* at 30.)

The Court does not find that Defendants have surmounted the high bar for disturbing Plaintiffs' choice of forum. Even assuming that Defendants are correct that England [*163] represents an available forum—despite the fact that Alameda County and State-Boston may not pursue their Exchange Act claims there—the private and public interest factors, viewed *in toto*, do not indicate that this Court is an inconvenient forum for Plaintiffs' English law claims.

First, the relevant private interest factors do not weigh in favor of dismissal. Defendants had these cases

aggregated in the instant multi-district litigation based on their similarities and the efficiencies to be gained from coordinated pretrial proceedings. It would be *in*efficient to send these claims to England, when nearly the same issues will be adjudicated here in the Class Action and in individual actions asserting Exchange Act claims. Defendants' offer to coordinate discovery, regardless of where the cases are tried, would not alleviate the inefficiency, although it does prompt the question of what legitimate benefit Defendants hope to gain from proceeding in the English courts.

Nor do the public interest factors return a different result. The one public interest factor favoring dismissal is the need to apply foreign law to some of Plaintiffs' claims. But this factor alone cannot be determinative. *See* [*164] *Piper Aircraft, 454 U.S. at 260 n.29* (noting that the need to apply foreign law, on its own, "is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate"); *see also In re Air Crash, 821 F.2d at 1163* (emphasizing that "no one private or public interest factor should be given conclusive weight" when deciding forum non conveniens). Moreover, the Court is certainly capable of applying English law, which shares so many strong similarities with U.S. law due to a common heritage.[38]

The other public interest factors weigh in favor of retaining Plaintiffs' English law claims in this forum. Because the Class Action and any individual actions asserting Exchange Act claims will be tried in this Court, dismissal of the English law claims will not appreciably relieve "congestion" [*165] on the Court's docket. Most importantly, the nature of the controversy is unquestionably local, and resolving it here will not unduly burden the local community. The oil spill which prompted these claims occurred only 50 miles off the coast of Louisiana, in the Gulf of Mexico. The majority of the misrepresentations alleged by Plaintiffs touch the adequacy of, and the attention paid to, the safety of BP's *U.S.* operations, conducted largely by its *U.S.* subsidiaries based in this very district. Because neither the private interest factors nor the public interest factors weigh heavily in favor of dismissal, the Court declines to upend Plaintiffs' choice of forum.

---

[38] The Court acknowledges that it will require the assistance of English law experts to interpret and apply the FSMA. It does not find, however, that this fact justifies dismissal when the FSMA applies to, at most, two alleged misrepresentations, and when the FSMA has already been rendered obsolete by the enactment of a successor law. (Lowe Decl. ¶¶ 7, 15.)

2013 U.S. Dist. LEXIS 171459, *165

## VIII. CONCLUSION

It is ordered that Defendants' Consolidated Motion to Dismiss (Doc. No. 46) is **PARTIALLY GRANTED**. For the reasons articulated in this memorandum and opinion, the Court grants the motion as to the following claims:

• All claims for common law aiding and abetting fraud.

• All claims for statutory fraud under Texas and California law.

• All claims for deceptive trade practices under Massachusetts law.

• As to Providence only, all claims based on public statements made after October 2009.

• All claims based on statements [*166] made in the November 29, 2006 meeting with [TEXT REDACTED BY THE COURT]. (Compl. ¶ 439(a).)

• All claims based on statements made in the January 16, 2007 press release (*Id.* ¶ 331.)

• All Exchange Act and deceit claims based on statements made in the February 7, 2007 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(b).)

• All claims based on statements made in the 2006 Sustainability Report, dated May 9, 2007. (*Id.* ¶ 333.)

• All claims based on statements made in the May 16, 2007 House testimony. (*Id.* ¶ 335.)

• All claims based on statements made in the July 24, 2007 investor call. (*Id.* ¶ 337.)

• All claims based on statements made in the September 17, 2007 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(c).)

• All claims based on statements made in the September 25, 2007 industry conference. (*Id.* ¶ 339.)

• All claims based on statements made in the October 25, 2007 press release. (*Id.* ¶ 341.)

• All deceit and negligent misstatement claims based on statements made in the November 8, 2007 industry conference. (*Id.* ¶ 343.)

• All negligent misstatement claims based on statements made in the 2007 Annual Review, dated February 22, 2008. (*Id.* ¶ 345.)

• All negligent misstatement claims based [*167] on statements made in the February 27, 2008 investor presentation. (*Id.* ¶ 347.)

• All claims based on statements made in the March 3, 2008 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(d).)

• All negligent misstatement claims based on statements made in the 2008 Annual General Meeting, held April 17, 2008. (*Id.* ¶ 349.)

• All negligent misstatement claims based on statements made in the December 17, 2008 industry conference. (*Id.* ¶ 352.)

• All claims based on unattributed statements made in the 2008 Annual Review, dated February 24, 2009. (*Id.* ¶ 354.)

• All negligent misstatement claims based on Hayward's statements in the 2008 Annual Review. (*Id.* ¶ 355.)

• All negligent misstatement claims based on statements made in the 2008 Annual Report, dated March 4, 2009. (*Id.* ¶¶ 357-58.)

• All deceit and negligent misstatement claims based on statements made in the March 10, 2009 Initial Exploration Plan. (*Id.* ¶¶ 360-63.)

• All claims based on statements made in the March 17, 2009 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(e).)

• All negligent misstatement claims based on statements made in the 2008 Sustainability Review, dated April 16, 2009. (*Id.* ¶ 370.)

• All deceit and negligent [*168] misstatement claims based on statements made in the June 30, 2009 Oil Spill Response Plan. (*Id.* ¶ 372.)

• All claims based on statements made in the November 19, 2009 Senate testimony. (*Id.* ¶¶ 374-75.)

• All negligent misstatement claims based on statements made in the 2009 Annual Review, dated February 26, 2010. (*Id.* ¶ 377.)

• All claims based on statements made in the March

2013 U.S. Dist. LEXIS 171459, *168

3, 2010 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(f).)

• All negligent misstatement claims based on statements made in the 2009 Annual Report, dated March 5, 2010. (*Id.* ¶ 379.)

• All Exchange Act and deceit claims based on statements made in the March 18, 2010 meeting with [TEXT REDACTED BY THE COURT]. (*Id.* ¶ 439(g).)

• All Exchange Act and negligent misstatement claims based on statements made in the March 22, 2010 industry conference. (*Id.* ¶ 381.)

• All negligent misstatement claims based on statements made in the March 23, 2010 industry conference. (*Id.* ¶ 383.)

• All negligent misstatement claims based on Hayward's statements in the 2009 Sustainability Review, dated April 15, 2010. (*Id.* ¶ 385.)

• All claims based on unattributed statements in the 2009 Sustainability Review. (*Id.* ¶ 387.)

• All claims based [*169] on statements made in the 2009 Sustainability Report, dated April 15, 2010. (*Id.* ¶¶ 389-90.)

• All negligent misstatement claims based on post-spill statements made between the dates of April 28, 2010 and May 22, 2010. (*Id.* ¶¶ 399, 401, 404-06, 414, 416, 418, 420-22, 425, 427-28, 430.)

In all other respects, the Motion is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 2nd day of December, 2013.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

**End of Document**

## *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*

United States District Court for the Southern District of Texas, Houston Division

July 24, 2012, Decided; July 24, 2012, Filed

CIVIL ACTION H-11-2086

**Reporter**

2012 U.S. Dist. LEXIS 102789 *; 2012 WL 3028107

MID-TOWN SURGICAL CENTER, LLP, Plaintiff, v. BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORP., Defendant.

**Prior History:** *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex., Inc., 2012 U.S. Dist. LEXIS 51073 (S.D. Tex., Apr. 11, 2012)*

**Counsel:** [*1] For Mid-Town Surgical Center, LLP, Plaintiff: James M Kimbell, LEAD ATTORNEY, Strasburger & Price LLP, Houston, TX; Charles Scott Nichols, Strasburger Price LLP, Houston, TX.

For Blue Cross Blue Shield of Texas, Inc., Defendant: William Joel Akins, Wilson Elser Moskowitz Edelman Dicken, Dallas, TX; E Stratton Horres, Jr, Marcie Jane Freeman, Wilson Elser et al, Dallas, TX.

For Blue Cross Blue Shield of Texas, Inc., Counter Claimant, Counter Defendant: Marcie Jane Freeman, Wilson Elser et al, Dallas, TX.

**Judges:** Gray H. Miller, United States District Judge.

**Opinion by:** Gray H. Miller

# Opinion

## ORDER

Pending before the court is plaintiff Mid-Town Surgical Center, LLP's ("Mid-Town") partial motion to dismiss defendant Blue Cross Blue Shield of Texas's ("BCBSTX") counterclaim. Dkt. 30. Upon consideration of the motion, response, and the applicable law, Mid-Town's partial motion to dismiss the counterclaim is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

Mid-Town is an ambulatory surgery center licensed by the Texas Department of State Health Services. Dkt. 30. Mid-Town is an "out-of-network" provider who provides its patients same-day surgery without the added expense of an overnight hospital stay. *Id.* Mid-Town alleges [*2] that it provided services to persons allegedly insured by health care plans administered by BCBSTX for which BCBSTX failed to reimburse Midtown, despite its representation that it would and contrary to the terms of the plans and applicable state law. Dkts. 28, 30.

Mid-Town filed suit against BCBSTX to recover approximately $12,000,000 in past-due, unpaid, and/or underpaid reimbursements and other damages pursuant to the terms of various health benefits plans directly insured and/or administered by BCBSTX. Dkts. 16, 30. BCBSTX disputes that it underpaid or failed to pay Mid-Town on any of its insurance claims. Dkt. 28. To the contrary BCBSTX counterclaims, alleging that it should be reimbursed for certain overpayments it made to Mid-Town. *Id.*

Mid-Town seeks reimbursement and BCBSTX seeks return of overpayments for claims made under three types of health benefits plans. Dkts. 28, 30. The plans at issue are employer self-funded plans ("ERISA Plans"), federal employee benefit plans ("FEHBA Plans"), and direct insurer plans ("Individual Purchaser Plans"). [1] Dkt. 28. Because the law treats these types of health benefits plans differently, the court analyzes these

---

[1] Neither [*3] Mid-Town nor BCBSTX has identified the specific claims alleged to have been overpaid or underpaid, quantified the dollar amount of the alleged overpayment or underpayment, indicated when the alleged overpayment or underpayment occurred, or designated the health benefits plan associated with each claim as an ERISA Plan, FEHBA Plan, or Individual Purchaser Plan. Both parties' pleadings suggest that the claims at issue are comprised of claims from each of the three types of health benefits plans. While these general allegations are sufficient for the purposes of pleading, the court notes that before trial each party needs to identify and separate its claims for reimbursement into these three categories.

claims separately.

## II. ANALYSIS

Mid-Town brings this partial motion to dismiss BCBSTX's counterclaims under four theories: (1) BCBSTX's state law counterclaims are preempted by ERISA; (2) BCBSTX's state law counterclaims are preempted by FEHBA; (3) BCBSTX failed to plead legally cognizable state law claims in compliance with *Rule 8(a)*; and (4) BCBSTX failed to plead its Texas Theft Liability Act claim in compliance with *Rule 9(b)*. Dkt. 30.

## A. ERISA Preemption

Employee benefits rights under the Employee Retirement [*4] Income Security Act of 1974 (ERISA) apply to any employee benefit plan if it is established or maintained by any employer engaged in commerce, any employee organization representing employees engaged in commerce, or both. *29 U.S.C. § 1003(a)*. Congress's purpose in enacting ERISA was to create a comprehensive statute for the regulation of employment benefit plans. *Aetna Health Inc. v. Davila, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L. Ed. 2d 312 (2004)*. Integrated enforcement is an essential mechanism for the accomplishment of this purpose. *Id.* "The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Aetna, 542 U.S. at 208-09* (quoting *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L. Ed. 2d 39 (1987))*. "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna, 542 U.S. at 209*. ERISA provides the exclusive remedy in accordance [*5] with congressional intent. *Id.* Therefore "if an individual, at some point in time, could have brought his claim under *ERISA § 502(a)(1)(B)*, and where there is no other independent legal duty that is implicated by a defendant's actions," ERISA preempts that individual's claim. *Id. at 210*.

BCBSTX brings counterclaims for reimbursement for claims which include claims allegedly made by participants in ERISA Plans. Dkt. 28. Mid-Town argues

that ERISA preempts BCBSTX's state law claims. Dkt. 30. BCBSTX counters that "[w]hile it is true that *some* of those plans are governed by ERISA or FEHBA, it is also true that *some* of those plans are not." Dkt. 31 at 2. In other words, BCBSTX contends that Mid-Town's arguments about ERISA preemption are inapplicable with respect to BCBSTX's counterclaims for reimbursement of overpayments made on Individual Purchaser Plans which are not governed by ERISA or FEHBA. *Id.*

The court agrees. BCBSTX's state law counterclaims are preempted by ERISA only for the alleged overpaid claims arising from Mid-Town patients who sought medical services under ERISA Plans. ERISA does not preempt claims arising from patients who held FEHBA Plans or Individual Purchaser Plans [*6] because these plans are not created by ERISA, receive no right to remedies under ERISA, and a state law cause of action does not duplicate, supplement, or supplant the remedies available under ERISA. Therefore ERISA preempts BCBSTX's state law counterclaims as to alleged overpayments on ERISA Plans, but ERISA does not preempt state law counterclaims as to alleged overpayments on FEHBA Plans and Individual Purchaser Plans.

## B. FEHBA Preemption

Under the Federal Employees Health Benefits Act (FEHBA), the United States Office of Personnel Management negotiates contracts with private insurance carriers to provide health benefits plans to federal employees. FEHBA establishes the types of health benefits plans offered (*5 U.S.C. § 8903*) and to whom they are available (*5 U.S.C. § 2105*). FEHBA preempts any state or local law that is inconsistent with respect to the nature, provision, or extent of coverage or benefits. *5 U.S.C. § 8902(m)(1)*. This provision ensures nationwide uniformity in the administration of FEHBA benefits. *Burkey v. Government Employees Hosp. Ass'n, 983 F.2d 656, 660 (5th Cir. 1993)*.

The analysis for FEHBA preemption is similar to that of ERISA preemption discussed above. Mid-Town points [*7] to FEHBA's "broad preemption provision" and goal of "nationwide uniformity of the administration of FEHBA benefits" to conclude that BCBSTX's state law counterclaims are preempted by FEHBA. Dkt. 30 at 13.

For the same reasons that ERISA preempted only ERISA Plan claims, BCBSTX's state law counterclaims

are preempted by FEHBA only as to the alleged overpaid claims arising from patients Mid-Town served who held FEHBA Plans. FEHBA preemption is applicable only to FEHBA Plans made in accordance with the FEHBA statute and inapplicable to plans established outside the scope of this statute, such as ERISA Plans and Individual Purchaser Plans. Neither ERISA nor FEHBA preempt BCBSTX's counterclaims on reimbursement of alleged overpayments on Individual Purchaser Plans. Therefore, the court now turns to the sufficiency of the pleadings of the state law counterclaims, as they apply to Individual Purchaser Plans.

## C. Pleading Legally Cognizable State Claims

"*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which [*8] it rests.'" *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id. at 554* (internal citations omitted). In order to survive a motion to dismiss, the complaint must contain sufficient factual material, accepted as true, to "state a claim to relief that is plausible on its face." *Id. at 547.*

Mid-Town alleges that BCBSTX has failed to plead legally cognizable state law claims for the following state law counterclaims: (1) breach of contract; (2) unjust enrichment/equitable restitution; (3) money had and received; and (4) the Texas Theft Liability Act. Dkt. 30. Mid-Town claims BCBSTX "failed to include 'detailed factual allegations' that when assumed to be true 'raise a right to relief above the speculative level.'" *Id.* This misstates the law, which holds that "a complaint 'does not need detailed [*9] factual allegations,' but must provide the plaintiff's grounds for entitlement to relief- including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Sullivan, 503 F.3d 397, 401 (5th Cir. 2007)* (quoting *Twombly, 550 U.S. at 555*) (emphasis added). BCBSTX argues that it has stated sufficient facts to survive *Rule 12(b)(6)* and that requiring BCBSTX to

"identify specific claims on which overpayments were made, quantify the amounts of such overpayments, or indicate when such overpayments occurred" would essentially be a request for BCBSTX to make an evidentiary showing at the pleading stage, which is not required in order to survive a motion to dismiss. Dkt. 31.

### (1) Breach of Contract

"The essential elements in a suit for breach of contract are: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Bank of Texas v. VR Elec., Inc., 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)*.

Mid-Town and BCBSTX do not dispute the existence of a valid contract because both parties [*10] seek damages based on alleged unpaid or overpaid claims based on the same or similar contracts. "BCBSTX performed those contracts by providing coverage to the insureds and tendering payment of benefits." Dkt. 28. BCBSTX alleges that Mid-Town breached the contract by failing to abide by the return of benefits provision in returning all overpayments to BCBSTX. *Id.* In failing to do so, BCBSTX has suffered damages. *Id.* This is an adequately pled "short and plain statement of the claim" showing BCBSTX may be entitled to relief and giving Mid-Town "fair notice of what the . . . claim is and the grounds upon which it rests," in accordance with the *Twombly* standard. *Twombly, 550 U.S. at 545*.

### (2) Unjust Enrichment and Equitable Restitution

"Unjust enrichment demands restitution when a party receiving property or benefits would be unjustly enriched if it were permitted to retain the property or benefits at the expense of another." *Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 43 (Tex. 1992)*. "The phrase 'unjust enrichment' is used in law to characterize the result [of] the failure to make restitution of benefits under such circumstances as to give rise to an implied or quasi-contract [*11] to repay." *Fun Times, 517 S.W.2d at 884*. "A right of recovery under unjust enrichment is essentially equitable and does not depend upon the existence of a wrong." *Id.*

In its claim for unjust enrichment and equitable restitution, BCBSTX alleges "[b]y billing BCBSTX in violation of its billing requirements, Mid-Town obtained a

2012 U.S. Dist. LEXIS 102789, *11

benefit conferred by BCBSTX . . . and Mid-Town's retention of those benefits would, under the circumstances, be unjust." Dkt. 28 at 5. This is sufficient under *Twombly* to adequately plead a claim for unjust enrichment and equitable restitution.

### (3) Money Had and Received

"A cause of action for money had and received is not based on wrongdoing but instead, 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" *Doss v. Homecomings Fin. Network, Inc., 210 S.W.3d 706, 711 (Tex. App.—Corpus Christi 2006)*. BCBSTX alleges that equity and good conscience call for all overpayments to be refunded because the overpayments rightfully belong to BCBSTX, not Mid-Town. Dkt. 28. This adequately pleads a claim for money had and received.

### (4) Texas Theft Liability Act

The elements of a Texas Theft Liability Act [*12] claim are the elements of the alleged violation of the Texas Penal Code under which the claim is brought. The Act defines "theft" as "unlawfully appropriating property or unlawfully obtaining services as described by *Section 31.03, 31.04, 31.05, 31.06, 31.07, 31.11, 31.12, 31.13,* or *31.14*, Penal Code." *Tex. Civ. Prac. & Rem. Code § 134.002(2)*. BCBSTX alleges that Mid-Town is guilty under *Section 31.03*. Under *Section 31.03* "Theft," "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." *Tex. Penal Code § 31.03(a)*. "Appropriation of property is unlawful if: (1) it is without the owner's effective consent; (2) the property is stolen and the actor appropriates the property knowing it was stolen by another; or (3) property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another." *Id. § 31.03(b)*.

BCBSTX alleges that by issuing or causing to be issued misleading and incorrect bills, Mid-Town deliberately misled BCBSTX into providing property, in the form of money, to Mid-Town without [*13] BCBSTX's effective consent and based on false pretenses. BCBSTX has adequately pleaded a claim under the Texas Theft Liability Act.

### D. Texas Theft Liability Act and *Rule 9(b)*

*Federal Rule of Civil Procedure 9(b)* requires a party that is alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake" in its pleading. *FED. R. CIV. P. 9(b)*. "*Rule 9(b)* is an exception to *Rule 8(a)*'s simplified pleading that calls for a 'short and plain statement of the claim.'" *U.S. ex rel. Grubbs v. Kannegant, 565 F.3d 180, 185 (5th Cir. 2009)*. "*Rule 9(b)* supplements but does not supplant *Rule 8(a)*'s notice pleading." *Id. at 186*. *Rule 9(b)* "requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Id.*

Mid-Town argues that BCBSTX's allegation that Mid-Town submitted misleading and incorrect bills under the Texas Theft Liability Act was insufficiently pled under *Rule 9(b)*. BCBSTX asserts that it does not have to satisfy *Rule 9(b)* to adequately plead this claim, or, in the alternative, BCBSTX asserts that its counterclaim is adequately [*14] pled under *Rule 9(b)*. Dkt. 31.

Mid-Town cites no authority indicating that a claim for theft pursuant to the Texas Theft Liability Act triggers *9(b)*'s heightened pleading standard. As discussed above, the Texas Theft Liability Act provides a civil cause of action for violations of the *Texas. Civ. Prac. & Rem. Code Ann. § 134.002(2)*. BCBSTX claims that Mid-Town is guilty under *Section 31.03 of the Texas Penal Code*, entitled "Theft." The court notes that Chapter 31, which criminalizes theft, is distinct from Chapter 32, which addresses fraud. In the absence of authority to the contrary, because the counterclaim was brought under the theft chapter of the Texas Penal Code, *9(b)*'s heightened pleading standard for fraud claims is not implicated. And, as discussed above, BCBSTX has pled this claim sufficiently to meet *Rule 8(a)*'s standards.

### III. CONCLUSION

Pending before the court is Mid-Town's partial motion to dismiss BCBSTX's counterclaim under four theories: (1) BCBSTX's state law counterclaims are preempted by ERISA; (2) BCBSTX's state law counterclaims are preempted by FEHBA; (3) BCBSTX failed to plead legally cognizable state law claims in compliance with *Rule 8(a)*; and (4) BCBSTX failed to plead its [*15] Texas Theft Liability Act claim under *Rule 9(b)*.

2012 U.S. Dist. LEXIS 102789, *15

Dkt. 30. As discussed in more detail above, the motion is GRANTED IN PART for state law claims regarding only insurance claims made by participants in ERISA Plans and FEHBA Plans. In all other respects, the motion is DENIED.

It is so ORDERED.

Signed at Houston, Texas on July 24, 2012.

/s/ Gray H. Miller

Gray H. Miller

United States District Judge

---

**End of Document**

## *Newby v. Enron Corp. (In re Enron Corp. Sec.)*

United States District Court for the Southern District of Texas, Houston Division

August 9, 2002, Decided

MDL-1446, CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES, CIVIL ACTION NO. G-02-0299

**Reporter**
2002 U.S. Dist. LEXIS 27594 *

In Re Enron Corporation Securities, Derivative & "ERISA" Litigation; MARK NEWBY, ET AL., Plaintiffs vs. ENRON CORPORATION, ET AL., Defendants; AMERICAN NATIONAL INSURANCE COMPANY, AMERICAN NATIONAL INVESTMENT ACCOUNTS, INC., SM&R INVESTMENTS, INC., AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, STANDARD LIFE AND ACCIDENT INSURANCE COMPANY, FARM FAMILY LIFE INSURANCE COMPANY, FARM FAMILY CASUALTY INSURANCE COMPANY, AND NATIONAL WESTERN LIFE INSURANCE COMPANY, Plaintiffs vs. J.P. MORGAN CHASE AND COMPANY, Defendant.

**Subsequent History:** Motion denied by, Claim dismissed by *In re Enron Corp. Secs, 2002 U.S. Dist. LEXIS 26261 (S.D. Tex., Aug. 15, 2002)*

**Prior History:** *Newby v. Enron Corp., 2002 U.S. Dist. LEXIS 28397 (S.D. Tex., May 1, 2002)*

**Disposition:** Plaintiffs' motion to remand denied. JPM's motion to dismiss denied.

**Counsel:** [*1] For American National Insurance Company, American National Investment Accounts Inc., SM&R Investments Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, National Western Life Insurance Company, Plaintiffs: Andrew J. Mytelka, John S. McEldowney, Greer Herz & Adams, Gavelston, TX.

For JP Morgan Chase & Co, Defendant: Richard Warren Mithoff, Jr., Mithoff and Jacks, Houston, TX.

**Judges:** MELINDA HARMON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MELINDA HARMON

# Opinion

*MEMORANDUM AND ORDER*

Pending before the Court in the above referenced action, alleging violations of the Texas Securities Act (a/k/a "the Texas Blue Sky Laws"), *Tex. Rev. Civ. Stat. Ann. art. 581-33*, and *Tex Bus. & Comm. Code Ann, § 27.01* ("Fraud in Real Estate and Stock Transactions"), as amended, and Texas common-law claims of fraud, conspiracy, and negligence, are two motions: (1) Plaintiffs American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, [*2] Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company's motion to remand (# 810 in H-01-3624) this case to the 56th Judicial District Court of Galveston County, Texas; and (2) JPMorgan Chase & Co.'s ("JPM's") motion to dismiss Plaintiffs' original petition (# 870)

In this suit Plaintiffs allege that from JPM's agreements with Enron, JPM knew or should have known that Enron's purported trading of oil and natural gas contracts through a company known as "Mahonia, Ltd." was actually a mechanism for transferring losses from one financial reporting period to another to allow Enron to mislead investors and shareholders purchasing Enron stock, bonds, preferred stock, commercial paper and other securities about the actual financial status of Enron.

This suit was initially removed from the 56th Judicial District Court of Galveston County, Texas to the United States District Court, Galveston Division, Southern District of Texas, by JPM and subsequently transferred to and consolidated into *Newby,* now pending before the undersigned judge in the Houston Division. In its Notice of [*3] Removal, JPM asserted that this Court has federal-question subject-matter jurisdiction and presented three alternative grounds for removal: (1) supplemental jurisdiction under *28 U.S.C. § 1367(a)* (". .

2002 U.S. Dist. LEXIS 27594, *3

. In any civil action of which alternative grounds for removal: (1) supplemental jurisdiction under *28 U.S.C. § 1367(a)* (". . . In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under *Article III of the United States Constitution*") on the grounds that Plaintiffs' claims are so related to those already pending before this Court in *Newby*, all based on a common nucleus of operative facts, that they constitute part of the same case or controversy; (2) preemption by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), *Pub. L. No. 105-353, 112 Stat. 3227*, codified as amended in part at *15 U.S.C. §§ 77p(b)* and *78bb(f)*; and (3) pursuant to *28 U.S.C. § 1334(b)* [*4] ("the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11") and *§ 1452(a)* ("A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under *§ 1334* of this title.") because the claims or causes of action are related to the Enron Corporation Chapter 11 bankruptcy.

Defendant bears the burden of demonstrating that the federal jurisdictional requirements for removal asserted here have been satisfied. *Manguno v. Prudential Property and Casualty Co., 276 F.3d 720, 723 (5th Cir. 2002)*. Moreover, a party opposing a motion to remand bears the burden of demonstrating federal subject matter jurisdiction. *Green v. Ameritrade, 279 F.3d 590, 596 (8th Cir. 2002)* (SLUSA issue). Defendant also bears the burden of demonstrating that the removal was procedurally proper. *Manguno, 276 F.3d at 723*. "Any ambiguities [in the state court petition] are construed against removal [*5] because the removal statute should be strictly construed in favor of remand." *Id., citing Acuna v. Brown & Root, Inc., 200 F.3d 335, 339 (5th Cir. 2000)*.

The first two bases for removal were previously raised and rejected by this Court in another member case, G-02-0084, *American National Ins. Co. et al. v. Arthur Andersen L.L.P. et al.*, brought by the same Plaintiffs as here. For the same reasons the Court rejects them here.

Regarding Defendant's first ground for removal, supplemental jurisdiction, Plaintiffs charge JPM with "turn[ing] the supplemental statute on its head by arguing that *28 U.S.C. §§ 1441* and *1367* allow removal

of state law claims even when no federal question is raised in Plaintiffs' petition," and with "do[ing] away with the well-pleaded complaint rule."

This Court agrees with Plaintiffs that JPM's supplemental jurisdiction argument has the proverbial "cart before the horse." There can be no supplemental jurisdiction without the existence initially of original federal subject matter jurisdiction over at least some of the claim in the *same* suit, at the point it is either filed in or removed to federal court. [*6] *Peacock v. Thomas, 516 U.S. 349, 354-55, 133 L. Ed. 2d 817, 116 S. Ct. 862 (1996)*; *Franceskin v. Credit Suisse, 214 F.3d 253, 258* & n.2 (2d Cir. 2000); *Ortlof v. Silver Bar Mines, Inc., 111 F.3d 85, 86-7 (9th Cir. 1997)*, as amended on denial of rehearing (June 10, 1997); *Phelps v. Nationwide Ins. Co.,37 Fed. Appx. 752, 2002 WL 1334757, *2 (6th Cir. 2002)*.

Plaintiffs contend that JPM's second ground for removal is frivolous because this suit does not qualify as a "covered class action" under SLUSA. The Court concurs here, also.

Under the well-pleaded complaint rule and SLUSA's definitions of its scope, no federal question jurisdiction was created by Plaintiff's original state-law petition, since, as discussed below, it is not a "covered class action" and no consolidation with any other state-court, Enron-related securities suits was requested nor ordered by the state court.

SLUSA states in part that "no covered class action based upon the statutory or common law of a State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . an untrue statement or omission of a material fact in [*7] connection with the purchase or sale of a covered security . . . ." Plaintiffs assert claims under Texas statutes and common law. Generally federal jurisdiction exists only if the federal question is facially evident in the plaintiff's well-pleaded complaint. *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 96 L. Ed. 2d 318, 107 S. Ct. 2425 (1987)*; *Terrebonne Homecare, Inc. v. SMA Health Plan, Inc., 271 F.3d 186, 188 (5th Cir. 2001)*. Moreover, a plaintiff is master of his complaint and may choose the law, on which he wishes to rely to avoid removal to federal court. *Carpenter v. Wichita Falls Indep. School Dist. 44 F.3d 362, 366 (5th Cir. 1995)*.

As a narrow exception to the well pleaded complaint rule, the artful pleading doctrine, applies where federal law completely preempts the field and prevents a

2002 U.S. Dist. LEXIS 27594, *7

plaintiff from precluding removal by failing to plead necessary federal questions. *Id.; Waste Control Specialists, LLC v. Envirocare of Texas, Inc., 199 F.3d 781, 783 (5th Cir. 2000)*, citing *Rivet v. Regions Bank of La., 522 U.S. 470, 139 L. Ed. 2d 912, 118 S. Ct. 921 (1998)* ("The artful pleading doctrine allows removal where federal [*8] law completely preempts a plaintiff's state-law claim. . . . Although federal preemption is ordinarily a defense, once the area of state law has been completely considered, any claim purportedly based on the preempted state law is considered from its inception, a federal claim and therefore arises under federal law."). Thus Defendant bears the burden of demonstrating that a federal right is an essential element of Plaintiffs' claims and that Congress intended SLUSA to preempt Plaintiffs' claims.

Federal law may preempt state law in any of three ways: (1) Congress may expressly define the extent to which it intends to preempt state law; (2) Congress may indicate an intent to occupy an entire field of regulation; or (3) Congress may preempt a state law that conflicts with federal law even when it has not expressly preempted the state law nor indicated an intent to occupy the field. *New Orleans Public Service, Inc. v. Council of City of New Orleans, 911 F.2d 993, 998 (5th Cir. 1990)* (citing *Michigan Canners and Freezers Assoc. v. Agricultural Marketing and Bargaining Board, 467 US 461, 469, 81 L. Ed. 2d 399, 104 S. Ct. 2518 (1984))*, cert. dismissed, *502 U.S. 954, 116 L. Ed. 2d 357, 112 S. Ct. 411 (1991)*. [*9]

Congress has enacted several federal statutes in the past few years to attempt to establish uniformity in the securities markets. The Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. §§ 77z-1, 78u*, which amended the *1933 Securities Act* and the *1934 Securities Exchange Act*, set out heightened pleading requirements [1] and for complaints under *Rule 10b-5*, mandated pleading of specific facts creating a strong inference of scienter for private class actions and other suits alleging securities fraud in an effort to minimize meritless lawsuits. *15 U.S.C. § 78a et seq.* H. Conf. Rep. No. 105-803 (1998). When, as a result, plaintiffs began filing in state rather than federal court, asserting claims under state statutory or common law to avoid the PSLRA's stringent procedural and pleading hoops, Congress passed SLUSA in 1998 to close the

loophole. 144 Cong. Rec. H10771 (daily ed. Oct. 13, 1998, 1998 WL 712049). SLUSA in essence made federal court the exclusive venue for securities fraud class actions meeting its definitions and ensured they would be governed exclusively by federal law. *15 U.S.C. § 77p(b)-(c).* [*10] Congress' purpose in enacting the statute was to "'prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State court, rather than Federal court.'" *Korsinsky v. Salomon Smith Barney, Inc., 2002 U.S. Dist. LEXIS 259, No. 01 6085(SWK), 2002 WL 27775, *3 (S.D.N.Y. 2002)* quoting H.R. Conf. Rep. No. 105-803 (1998). Moreover, the Court observes that the same report indicates that in SLUSA Congress did not evidence an intent to occupy the entire field of securities regulation, but expressly delineated the scope of preemption:

In order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits.

H.R. Conf. Rep. 105-803, *2.

[*11] With respect to removal, the plain language of SLUSA, *15 U.S.C. § 77p(c)*, reveals Congress' intent to preempt a specific category of state-law class actions, which it defines as follows: "Any covered class action brought in any State Court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending . . . ." Title *15 U.S.C. § 78bb(f)(5)(B)* defines a "covered class action" as

(i) any single lawsuit in which--

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominated over any question affecting only individual persons or members or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions [*12] affecting

---

[1] The PSLRA requires plaintiffs to plead with particularity any alleged misrepresentations, misleading statements or omissions, including the reasons why plaintiffs think there was an omission or which statements were misleading and why.

2002 U.S. Dist. LEXIS 27594, *12

only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

SLUSA provides for mandatory removal and dismissal of a specific kind of class action:

(f) LIMITATIONS ON REMEDIES.--

(1) CLASS ACTION LIMITATIONS.--No covered class action based upon the statutory or common law of any state or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

(2) REMOVAL OF COVERED CLASS ACTIONS.-- Any covered class action brought in an State court involving a covered security, as set forth in paragraph (1), shall [*13] be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(1)(A), (B) & (2). Thus SLUSA authorizes the removal of all private actions that are actually traditional securities claims that fall within its ambit to federal court and makes the state law claims subject to dismissal. 15 U.S.C. § 78bb(f)(1)-(2). See, e.g., Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1341 (11th Cir. 2002); Patenaude v. Equitable Life Assurance Soc. of U.S., 290 F.3d 1020, 1023-24 (9th Cir. 2002); Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 109-10 (2d Cir. 2001).

Plaintiffs have emphasized that they are composed of only eight entities that do not seek damages on behalf of others similarly situated, and that the instant suit was not consolidated by the state court with any other state court securities actions. The Court agrees that because of these facts, G-02-299 is not a "covered class action"

under SLUSA, and therefore there is no preemption by the statute or federal-question [*14] jurisdiction based on such preemption. JPM cannot rely on the argument that once G-02-299 was consolidated with other Enron-related litigation in *Newby*, it became part of a covered class of more than fifty plaintiffs. This Court must have federal-question and removal jurisdiction at the time of removal before it has the power to consolidate this case with *Newby*.

Defendant's third purported ground for removal is "related to" bankruptcy jurisdiction under § 1334 because JPM "may have an action against Enron for indemnity or contribution." Plaintiffs, emphasizing that Enron's bankruptcy proceedings are in the Southern District of New York before United States Bankruptcy Judge Arthur Gonzales, and not in this Court, furthermore call the argument "a red herring because the controversy between Plaintiffs and JPM does not concern the same questions of fact or law as, and will not impact, Enron's bankruptcy proceeding. They argue that under JPM's bankruptcy jurisdiction theory, "the entire *Newby* action should immediately be transferred to the New York bankruptcy court where Enron's bankruptcy is pending." Motion to remand at 2. They also complain that "JPM provides only conclusory [*15] allegations concerning the potential for contribution and indemnity claims and fails to analyze each of American National's claims and the relationship of each claim to the bankruptcy proceeding." *Halper v. Halper, 164 F.3d 830, 838 (3d Cir. 1999)* (to determine the extent of the bankruptcy court's jurisdiction in each case, each of the claims presented must be examined to ascertain if it is core, non-core, or wholly unrelated to a bankruptcy case). [2] They maintain that their claims against JPM "are so remote from the Enron bankruptcy issues that it is inconceivable that American National's actions could interfere with or impact the bankruptcy proceedings." They also emphasize that JPM only alleges that his suit

_____

[2] JPM correctly objects that this case is not relevant to the issue before this Court because the Third Circuit was addressing the scope of the bankruptcy court's power to adjudicate core or non-core claims and the district court's standard of review, not whether a claim should be remanded to state court. Opposition at 18-19. This Court would refer the parties to *Wood v. Wood (In re Wood, 825 F.2d 90, 97 (5th Cir. 1987)*, in which the Fifth Circuit held that if a proceeding does not invoke a substantive right created by Title 11, is based on state law, and could exist outside of the bankruptcy, it is a non-core proceeding over which the bankruptcy court might have "related to" jurisdiction if the claim has a potential effect on the debtor's estate.

2002 U.S. Dist. LEXIS 27594, *15

"may" affect the bankruptcy proceeding, but fails to show an actual nexus between their specific state-law claims and the bankruptcy proceeding. *Specialty Mills, Inc. v. Citizens State Bank, 51 F.3d 770 (8th Cir. 1995).* They point out that JPM never sought to transfer the *Newby* action to the Southern District of New York and has not joined Enron and other defendants to this suit nor indicated that it will file third-party actions against [*16] them. Nor has it shown that its proposed contribution or indemnity claims, if they could be and are asserted, could conceivably affect the administration of the bankrupt estate, especially in light of the large number of secured/priority creditors and the limited pool of Enron assets.

 [*17] JPM responds that as holders of preferred stocks, bonds, and commercial paper of Enron, as recited in paragraph 18 of their petition, Plaintiffs are claimants in Enron's bankruptcy and this action will potentially affect those claims. Moreover, depending on the outcome of this action, which is permissible under Tex. Civ. Prac. & Rem. Code Ann. § 32.012 (Vernon's 2002), JPM may have rights to contribution directly from Enron's estate and from Enron's directors and officers, whose liability insurance policies of approximately $ 450 million are part of Enron's estate. Ex. E (Motion of Certain Present and Former Directors of Enron Corporation for Relief from the Automatic Stay to Obtain Payment and/or Advancement of Defense Costs under the Debtors' Directors and Officers Liability Insurance and ERISA Fiduciary Insurance Policies, filed in *In re Enron Corp., et al.,* Civil Action No. 01-16034 (Bankr. S.D.N.Y. Mar. 21, 2002)) to JPM's opposition (# 887). Any of these claims "could alter the debtor's rights, liabilities options, or freedom of action" or otherwise affect "the handling or administration of the [Enron] bankrupt estate." *Federal Deposit Ins. Corp. v. Majestic Energy Corp. (In re Majestic), 835 F.2d 87, 90 (5th Cir. 1988).* [*18] Thus Enron and its assets are potentially exposed to liability through this suit.

JPM also explains that it did not remove this action to the bankruptcy court in which the Enron Chapter 11 proceedings are pending because the policy behind the broadly defined "related to" bankruptcy jurisdiction is "to avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in efficient and expeditious resolution of all matters connected to the debtor's estate." *Feld v. Zale Corp. (In re Zale), 62 F.3d 746, 752 (5th Cir. 1995).* Noting that this Court is the central repository for the vast majority of Enron-related securities actions and the forum designated as the MDL venue for Enron litigation and pretrial proceedings, "in

order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of class certification), and conserve the resources of the parties, their counsel and the judiciary," in the words of the Joint Panel on Multidistrict Litigation, JPM maintains that Judge Gonzales has recognized that in the interests of justice and economic and efficient case administration this Court is the appropriate [*19] forum for certain adversary proceedings relating to the bankruptcy estate of Enron.

This Court agrees with JPM. While all federal courts are courts of limited jurisdiction, defined by the Constitution and statute, a bankruptcy court's jurisdiction is even more restricted and wholly defined by statute. *28 U.S.C. § 1334(b)* (granting jurisdiction to district courts and adjunct bankruptcy courts to hear proceedings "arising under," "arising in a case under" or "related to" a case under *Title 11 U.S.C.*); *Bass v. Denney (In re Bass), 171 F.3d 1016 (5th Cir. 1999).*

The test for "related to" bankruptcy jurisdiction is whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Canion, 196 F.3d 579, 585 (5th Cir. 1999); In re Wood, 825 F.2d 90, 93 (5th Cir. 1987)* (adopting, like the majority of circuit courts of appeals, [3] the test from *Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)* (holding that an action is "related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action [*20] (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate")). The Fifth Circuit construes the *Pacor* test as conjunctive: for jurisdiction, the court must find that the action conceivably could both alter the rights, obligations, and choices of action of the debtor and could have an effect on the administration of the estate. *In re Bass, 171 F.3d at 1022.* Certainty or likelihood of a successful outcome is not required. *In re Canion, 196 F.3d at 587* & n. 30.

Proceedings that are "related to" a bankruptcy case and are therefore within the ambit of federal bankruptcy jurisdiction, include (1) causes of action belonging to the debtor that become the property of the debtor's estate and (2) suits between or among third [*21] parties that

---

[3] *See Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.6, 131 L. Ed. 2d 403, 115 S. Ct. 1493 (1995)* (observing that the First, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits have adopted the *Pacor* test).

have an effect on the bankruptcy estate. Bankr. Code, 11 U.S.C. § 541; 28 U.S.C. § 1334(b); *Arnold v. Garlock, Inc., 278 F.3d 426, 434 (5th Cir. 2001)*, citing *Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.5, 131 L. Ed. 2d 403, 115 S. Ct. 1493 (1995)*. JPM's potential claims for contribution and indemnity fall within the second group. *Arnold, 278 F.3d at 434-35* (observing that a claim for contribution may be an adequate basis for "related to" bankruptcy jurisdiction); *In re Dow Corning, 86 F.3d 482, 490-94 (6th Cir. 1996)* (finding that claims for indemnification and contribution can affect the size of the debtor's estate, the duration of the bankruptcy proceedings, and the debtor's ability to reorganize); *Canion, 196 F.3d at 586* ("[A] claim between two nondebtors that will potentially reduce the bankruptcy estate's liabilities produces an effect on the estate sufficient to confer 'related to jurisdiction.'"); *Belcufine v. Aloe, 112 F.3d 633, 636-37 (3d Cir. 1997)* *(Pacor* test and court's finding that contractual indemnity claims conceivably [*22] could have an effect on the bankruptcy estate supported "related to" bankruptcy jurisdiction over suit between employees of bankrupt company and non-debtor officers). Clearly JPM's claims for contribution and indemnity both alter the rights, obligations, and choices of action of the debtor and have an effect on the administration of the estate and the debtor's reorganization. Moreover JPM is named as a defendant in the consolidated class action complaints in *Newby v. Enron Corporation,* H-0l-3624, and *Tittle v. Enron Corp.,* H-0l-3913, MDL 1446, raising the specter of a significant impact on Enron's bankrupt estate should JPM'5 potential claims for indemnity and contribution succeed.

Furthermore, the Court agrees that removal to this Court is appropriate under the unusual, if not unique, relationship that the collapse of Enron has created between Judge Gonzales' activities in the bankruptcy case in the Southern District of New York and the centralization of the Enron-related civil cases in this Court. Judge Gonzales and the undersigned judge have necessarily worked closely in administering and coordinating the proceedings, with Judge Gonzales recognizing the convenience and [*23] economy provided by this forum and transferring Enron-related cases and matters to Houston. This Court has no doubt that had this case, which shares some of the same common nucleus of facts at issue in MDL 1446, been removed to New York, it, too, would have been transferred here for coordination with MDL 1446, in which JPM is a named Defendant.

Alternatively, Plaintiffs have asked this Court to abstain

pursuant to *28 U.S.C. § 1334(c)*, which provides for both permissive and mandatory abstention in such circumstances as those present here:

> (1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

> (2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this [*24] section, the district court shall abstain from hearing such proceeding if an action is commenced and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Plaintiffs maintain that this suit satisfies the criteria for mandatory abstention under *§ 1334(c)(2)* because (1) they have made a timely motion, (2) the suit involves only state-law claims. (3) Defendant has removed on purported "related to" bankruptcy jurisdiction and not because the suit "arises in" or "arises under" title 11, (4) there is no federal jurisdiction without the asserted "related to" bankruptcy jurisdiction. (5) the suit was commenced in state court, (6) the state court suit may be timely adjudicated, and (7) the state had jurisdiction over all the claims. *In re Engra, Inc., 86 B.R. 890, 894 (Bankr. S.D. Tex. 1988)*; *In re Chiodo, 88 B.R. 780, 786-87 (Bankr. W.D. Tex. 1988)*.

Alternatively, Plaintiffs ask the Court to abstain in the interests of comity with the Texas courts and respect for Texas state law pursuant to *§ 1334(c)(1)*.

Plaintiffs maintain that remand based on either mandatory or permissive abstention is proper. *Southmark Corp. v. Coopers Lybrand, 163 F.3d 925, 929 (5th Cir. 1999)* [*25] (statutory abstention applies in the removal/remand context), *cert. denied, 527 U.S. 1004, 144 L. Ed. 2d 236, 119 S. Ct. 2339 (1999)*.

The party that moves for abstention has the burden of establishing that it is appropriate. *In re DeMert & Dougherty, Inc., 271 B.R. 821, 842 (Bankr. N.D. Ill. 2001)*.

Although JPM argues that mandatory jurisdiction under

§ 1334(c) is not applicable because there are other bases for jurisdiction than "related to" bankruptcy jurisdiction, this Court has found otherwise in rejecting its arguments in favor of supplemental jurisdiction and SLUSA preemption. Nevertheless, the Court agrees that Plaintiffs have conclusorily asserted, but failed to show that this action "can be timely adjudicated . . . in a State forum of appropriate jurisdiction" to warrant mandatory abstention here. 28 U.S.C. § 1334(c)(2).

Plaintiffs have the burden of demonstrating the timely adjudication element, but the "'naked assertion that the matter can be timely adjudicated in state court, without more, is insufficient to satisfy the requirement.'" Renaissance Cosmetics Inc. v. Development Specialists, Inc., 277 B.R. 5, 14 (S.D.N.Y. 2002), [*26] citing In re Allied Mech. and Plumbing Corp., 62 B.R. 873, 878 (Bankr. S.D.N.Y. 1986), and In re Burgess, 51 B.R. 300, 302 (Bankr. S.D. Ohio 1985). When the parties disagree whether an action can be timely adjudicated in state court, the moving party, here Plaintiffs, bears the burden of persuasion. DeMert & Dougherty, 271 B.R. at 843.

The transactions challenged in this suit are very complicated, highly sophisticated, and interrelated with numerous other parties named and issues raised in MDL-1446, which this Court has been presiding over for some time. This Court has set an expedited schedule coordinating pretrial matters and a December 1, 2003 trial date, which it is optimistic can be met. In contrast, G-02-299 was removed almost immediately from state court, which had minimal, if any, opportunity to review the substantive claims or become familiar with the law, while this Court has been involved in the substantive claims since early this year. Other member cases in Newby have asserted state-law claims, and JPM is a defendant in the consolidated action. Moreover, given the necessity of orderly proceedings in such a massive [*27] litigation, this Court, in aid of its jurisdiction, has had to enjoin state court cases from discovery that would interfere with that schedule. Thus there is a serious question whether this case could be adjudicated in a timely fashion in state court. Furthermore, in light of the number of claimants and the limited poo1 of Enron assets, settlement negotiations will be facilitated where the suits are in one court.

Finally, this Court finds that permissible abstention is not appropriate. In deciding whether the Court should exercise its discretion to abstain under § 1334(c)(1), it should consider twelve factors: (1) the effect on the efficient administration of the bankruptcy estate if the Court abstains; (2) the extent to which state-law issues predominate over bankruptcy issues; (3) whether the law is difficult or unsettled; (4) whether a related proceeding has commenced in state or other non-bankruptcy court; (5) whether there is another jurisdictional basis besides § 1334; (6) how closely related the suit is to the bankruptcy case; (7) the substance, as opposed to the form, of the action; (8) whether state-law claims can be severed from the core bankruptcy matters to allow judgments [*28] to be made by the state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that the commencement of the proceedings in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. Flores v. Baldwin, 2002 U.S. Dist. LEXIS 9539, No. CIV. A. 301CV2873P, 2002 WL 1118504, *6-7 (N.D. Tex. May 28, 2002), citing In re Republic Reader's Serv., Inc., 81 B.R. 422, 429 (Bankr. S.D. Tex. 1987). "Courts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." Chicago, Milwaukee, St. Paul & Pacific R. Co., 6 F.3d 1184, 1189 (7th Cir. 1993).

As with the issue of mandatory abstention, this Court finds that the highly unusual nature and size of the consolidated proceedings in MDL 1446 and the necessity for efficient administration in a single court deserve significant consideration. The Court notes that this suit was removed just after it was filed and thus the state court did [*29] not become familiar with the issues. In contrast, because of claims in the Enron-related suits before it, this Court has become very knowledgeable about the parties, the issues, and the law that are involved in various Plaintiffs' claims against JPM arising out of Enron's financial collapse. Even though the instant suit is based only upon state law, involves adjudication of rights between nondebtor parties, and is a "related to" or non-core proceeding, [4] it is intimately related to the other cases consolidated into Newby and will involve overlapping discovery. This Court, like the state court where the suit was commenced, is a convenient Texas forum. Should a trial be necessary and should this case not be returned to state court for such a proceeding, this Court can provide a jury trial. Furthermore, the addition of this suit will not

_____

[4] See Wood v. Wood (In re Wood), 825 F.2d 90, 96 (5th Cir. 1987).

burden this Court, but in fact greatly facilitate coordinating the litigation and possible settlement. For the same reasons that the Enron-related civil suits were consolidated in this Court for coordinated discovery and pretrial matters and that the Multi-District Litigation Panel designated this Court as the site for the Enron multi-district litigation, [*30] and to avoid duplicative efforts in the state court and interference with the orderly proceeding of a massive MDL litigation, this Court finds that the suit should proceed here. Furthermore, the presence of the MDL litigation and the policies behind it override any concerns that Defendant might be forum shopping; instead, these factors suggest that Plaintiffs were forum-shopping in filing their suit in state court after the consolidated *Newby* action had been created.

JPM has also moved to dismiss Plaintiffs' original petition on four grounds: (1) for the same reasons stated in JPM's motion to dismiss the *Newby* consolidated complaint (# 632); (2) dismissal of state-law claims pursuant to SLUSA, *15 U.S.C. § 78bb(f)* and *77p(c)*; (3) failure to plead fraud claims with particularity as required by *Fed. R. Civ. P. 9(b)*; and (4) failure to alleged key elements [*31] of their claims, specifically that JPM had a duty to disclose material facts relating to the Mahonia trades and failure to allege actual reliance on any statement or omission of JPM in purchasing Enron securities to support Plaintiffs' fraud claim.

The Court concludes that because Plaintiffs have asserted only state-law claims, which remain viable because they are not preempted by SLUSA, JPM's motion (# 632) to dismiss the *Newby* claims against it is not relevant. Furthermore, Defendant's second ground is now moot in light of this Court's determination that SLUSA did not preempt Plaintiffs' state-law claims.

Plaintiffs argue that dismissal pursuant to *Rule 9(b)* or *12(b)(6)* is improper. First, the petition was filed in state court under state-court pleading standards. Second, a complaint should not be dismissed under *Rule 12(b)(6)* "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. Moreover, they argue that they have not pled specific facts because JPM is in possession of the information and no discovery has been taken. When the information [*32] is only within the knowledge of the opposing party, *Rule 9(b)*'s

particularity-in-pleading requirement [5] may be relaxed. *Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1987)*; *Schilk v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974)*, cert. denied, 421 U.S. 976, 44 L. Ed. 2d 467, 95 S. Ct. 1976(1975); *The Cadle Co. v. Schultz, 779 F. Supp. 392* (N.D. Tex. 1991 ("if the information surrounding the allegations is peculiarly within the knowledge of the defendant, less detail is required in the complaint"); *Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 680 (6th Cir. 1974)* ("It is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. *Rule 9(b)* does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put the defendants on notice as to the nature of the claim.").

[*33] This Court agrees with Plaintiffs. *Rule 9* must be read in conjunction with *Rule 8*, under which a complaint need only provide the opposing party with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." A plaintiff satisfies *Rule 9* if he pleads the circumstances constituting the fraud sufficiently to allow the defendant to file an adequate answer. 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1298, at 415 (1969). Moreover, the Court notes that with JPM's role in the Enron collapse currently under investigation by Congress, information is being released daily about JPM's role in the debacle, enough to allow Plaintiffs to file an amended complaint that would pass muster. This is not a case subject to the PSLRA, and discovery will allow Plaintiffs to explore the facts relating to their claims more thoroughly.

Accordingly, for the reasons stated above, the Court concludes that it has "related to" bankruptcy jurisdiction over G-02-299 and that abstention is not warranted. It further determines that this action should not be dismissed at this juncture. Accordingly the Court

ORDERS that Plaintiffs' motion to remand (# 810) is DENIED and JPM'S [*34] motion to dismiss (# 870) is DENIED. Plaintiffs shall file an amended pleading within twenty days of receipt of this order.

SIGNED at Houston, Texas, this *9th* day of August, 2002.

---

[5] *Rule 9(b)* provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. . . ."

2002 U.S. Dist. LEXIS 27594, *34

MELINDA HARMON

UNITED STATES DISTRICT JUDGE

---

**End of Document**

## *State Farm Mut. Auto. Ins. Co. v. Complete Pain Sols., LLC*

United States District Court for the Southern District of Texas, Houston Division

July 18, 2024, Decided; July 18, 2024, Filed, Entered

CIVIL ACTION NO. 4:20-cv-2606

**Reporter**
2024 U.S. Dist. LEXIS 127107 *; 2024 WL 3488256

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, VS. COMPLETE PAIN SOLUTIONS, LLC, et al, Defendants.

**Counsel:** [*1] For State Farm Mutual Automobile Insurance Company, State Farm County Mutual Insurance Company of Texas, Plaintiffs: Adrian Jonak, Jared Thomas Heck, LEAD ATTORNEYS, PRO HAC VICE, Katten Muchin Rosenman LLP, Chicago, IL; Britt DeVaney, LEAD ATTORNEY, Katten Muchin et al, Chicago, IL; John T Lepore, LEAD ATTORNEY, Katten Muchin, Chicago, IL; Ross O Silverman, LEAD ATTORNEY, Chicago, IL; Jonathan L. Marks, Katten Muchin Rosenman, LLP, Chicago, IL; Rachel Malone Riley, Katten Muchin Rosenman LLP, Dallas, TX; Maxwell Micah Kessler, NISTICO, CROUCH & KESSLER, P.C., Houston, TX.

For Complete Pain Solutions LLC, now known as, Complete Pain Solutions PLLC, Defendant: Blake A Bailey, LEAD ATTORNEY, Phelps Dunbar LLP, Southlake, TX.

For ALJ Florence Sparrow, M.D., Defendant: Jason Murray Davis, LEAD ATTORNEY, Davis & Santos Attorneys & Counselors, P.C., San Antonio, TX; Caroline Newman Small, Davis & Santos, San Antonio, TX.

For See Loong Chin, M.D., Defendant: Robert G Smith, Jr, LEAD ATTORNEY, Mayer LLP, Houston, TX.

For MMRI Holdco LLC, now known as, MRI Holdco Rollover, LLC, Defendant: Forrest Jacob Wynn, LEAD ATTORNEY, Bryon A Rice, Hicks Davis Wynn PC, Houston, TX.

**Judges:** ANDREW S. HANEN, UNITED STATES [*2] DISTRICT JUDGE.

**Opinion by:** ANDREW S. HANEN

# Opinion

## ORDER

State Farm Mutual Automobile Insurance Company and State Farm County Mutual Insurance Company of Texas (collectively State Farm or Plaintiffs) filed this lawsuit against Dr. Alj Florence Sparrow ("Sparrow"), Dr. See Loony Chin ("Chin") (collectively "Defendant Doctors"), Complete Pain Solutions, PLLC ("Clinic") and MMRI Holdco Rollover LLC ("MMRI") (collectively "Defendants"). The Plaintiffs allege that Defendants engaged in a fraudulent scheme involving predetermined and medically unnecessary medical treatment as well as the creation of fraudulent records and bills used by their patients who were claimants in automobile insurance claims. Defendants denied these allegations. Plaintiffs filed suit alleging three causes of action: 1) two Racketeer Influenced and Corrupt Organization ("RICO") claims under *18 U.S.C. § 1962(c)* and *(d)* against the Defendant Doctors; and 2) one Texas common law claim for "money made and received" against all Defendants.

The complaint was based upon an investigation of almost 500 individual patients of the Clinic. Due to the size of this cohort and the expense involved to all parties in thoroughly and completely performing discovery for a 450-plus [*3] patient base, the Court ordered phased discovery to determine if there was enough facts to support the Plaintiffs' claims. The Plaintiffs chose approximately 50 patients on which to proceed in earnest and over time this number has been reduced to a "test group" of 27. The parties have investigated both the medical history of these parties and the related financial billing history related to these patients. Throughout this discovery period, the Plaintiffs have remained stalwart in their belief in the validity of their claims while the Defendants have been just as adamant that there is no evidence of any wrongdoing that rises to a level above surmise and speculation.

To test this position, Defendants have filed this Joint Motion for Summary Judgment (Doc. No. 129) to which

2024 U.S. Dist. LEXIS 127107, *3

Plaintiffs have responded (Doc. No. 146). Defendants have filed a joint reply (Doc. No. 156) and with the Court's permission, Plaintiffs' have filed a sur-reply (Doc. No. 165). Also pending and pertinent to the substantive motions are the Defendants' objections to the Plaintiffs' summary judgment evidence in which they literally object to almost every shred of evidence on which Plaintiffs rely (Doc. No. 155). The Plaintiffs' [*4] have responded in opposition to that motion (Doc. No. 166) and the Defendants have filed a joint reply (Doc. No 168) to that response.

## I. General Objections to Plaintiffs' Summary Judgment Evidence

While the Court understands the need to object to improperly presented summary judgment evidence, there are certain objections that the Court need not address specifically. Initially, the Defendants object in a number of places based upon the rule of optional completeness. This quite frankly is not a worthwhile objection at this stage in the proceeding. While it can be quite important at trial to ensure that a complete picture is placed before the fact finder, at the summary judgment stage, the opposing party need only attach the omitted portions to their reply to get the Court's attention.

Secondly, the Defendants' complain about undesignated witnesses acting as declarants in the Plaintiffs' response. Again, at this stage, the Court is more focused on the content of the proof. While it may need to address the alleged failure of the Plaintiffs to properly disclose an individual in a later hearing, the Court will not blankety disregard those declarations. It will consider the more specific [*5] objections concerning their content if they affect the Court's ruling.

More specifically, Defendants object to the declaration of Jared Heck, Plaintiffs' counsel, in that it goes well beyond the normal declaration to prove up certain discovery obtained in the case. This Court sustains these objections. The Court will not consider those paragraphs that purport to include what truly appears to be expert medical testimony and conclusions well beyond the knowledge of an experienced medical malpractice lawyer or even a doctor.

Next, the Court addresses two overlapping points the Defendants have made — both of which have merit. The first point concerns the fact that some exhibits or subparts of exhibits are not referenced anywhere in Plaintiffs' response. It is well settled that a court is under

no duty to sift through hundreds, or in this case, thousands of pages of exhibits to find evidence to support a parties' position. *Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003)*. Nevertheless, the failure to refer to an exhibit does not render the exhibit objectionable, it merely means the Court may or may not consider it based upon whether the Court finds the summary judgment evidence sufficient or finds it at all. The party proffering the exhibit [*6] is running the risk that the Court might not locate the evidence upon which that party relies. It is not the Court's error if a party elects not to be specific. This same rule applies when a party refers the Court to an exhibit that is lengthy and does not expressly supply the Court with a page cite. That violates this Court's rules, and more importantly, the Fifth Circuit's case law. Nevertheless, it does not make the exhibit improper—it just makes the brief poorly drafted, and it may ultimately cause that party to lose the motion. It is not the duty of the Court to search the record for specific evidence that may raise a fact issue.

Finally, the Court would be remiss if it did not point out that the Plaintiffs' approach in citing evidence is, at best, unsatisfactory. The Court will set out one example. In addressing the Defendants' argument that reliance was lacking, the response, in part, reads:

> Lastly, there is ample evidence from which a jury could conclude Plaintiffs relied on the bills and records submitted by Defendants in deciding to settle and pay claims, and thus their injury was caused by those bills and records. Defendants argue Plaintiffs did "not actually rely" on their [*7] bills because there is no testimony claims handlers consider a variety of information in deciding whether to pay or deny claims (Mot. 18-19) But the fact claim specialists considered multiple factors in their evaluation of claims does not mean they did not ***rely*** on Defendants' bills and records in settlement claims for particular amounts. <u>There is substantial evidence of this reliance.</u> (Ex. 61, 286; 14-25; 287; 1-15; Exs. 1-7.) <u>Thus, while reliance is not an element of Plaintiffs' RICO claims, there is more than enough evidence for the jury to conclude Plaintiffs relied on Defendants' bills and records and such bills and records caused Plaintiffs' injuries.</u> *See Sigma, 2017 U.S. Dist. LEXIS 237749, 2017 WL 11698455, at *6.*

(Doc. No. 146, p. 32) (emphasis added).

Most advocates would tell the Court what the controverting evidence is, or at least give the Court a hint. Here, for some reason counsel decided not to; and,

thus, even with page citations, the Court must somehow figure out what the controverting evidence is. When one follows the only specifically cited "evidence," there is a deposition excerpt that consists of four questions—all of which were leading and to which Defendants rightfully objected. While the answers to these questions did [*8] stand for the proposition for which they were cited, for this Court to consider them, the Plaintiffs must hope this Court makes the determination that the evidence is capable of being presented in an admissible form, despite the manner in which it was elicited. The remainder of the reference is to seven different exhibits from which apparently the Court is free to draw whatever conclusions it may or may not. This is a shoddy and haphazard approach. Most importantly, it needlessly taxes the very limited judicial resources available to this Court. Plus, this approach to responding to a summary judgment motion is far from effective.

## II. Legal Standard

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.: *Fed. R. Civ. R. 56(a)*. "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253, 261 (5th Cir. 2007)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex, 477 U.S. at 321-25*. The non-movant then must provide specific facts showing that there is a genuine dispute. [*9] *Id. at 324*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id. at 255*). The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable fact finder could find in favor of the nonmoving party. *Id. at 248*. It is, as set out above, the responsibility of the parties to

specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003)*. It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## III. Analysis

As noted above, Plaintiffs have pleaded three causes of action: two RICO claims based on federal law and a money had and received claim based on Texas common law. Defendants, in their motion, have contested all three. They attack the RICO claims on four different bases: 1) that Plaintiffs lack standing (primarily grounded in lack of causation and reliance); 2) that Plaintiffs have no evidence that [*10] the Defendant Doctors controlled the affairs of the Clinic; 3) that Plaintiffs have no evidence of mail fraud (because there was no fraudulent conduct and no intent to deceive); and 4) that Plaintiffs have no evidence of a conspiracy—hence no grounds for a claim under *§ 1962(d)*. With regard to the common law claim for "money had and received," the Defendants argue that it fails for three reasons: 1) the claims are barred by the applicable statute of limitations; 2) the claims are barred because a written contract precludes the applicability of the cause of action: and 3) that there is no evidence the "money" at issue belongs to the Plaintiffs. Obviously, the Plaintiffs disagree with all of these contentions; so the Court will address them one at a time starting with the RICO claim.

## A. RICO — *18 U.S.C. §§ 1962(c)* and *(d)*

The Plaintiffs have brought allegations under two sub-sections of the RICO statute. Those sub-sections are as follow:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering [*11] activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of *subsection (a)*, *(b)* or *(c)* of this section.

2024 U.S. Dist. LEXIS 127107, *11

*18 U.S.C. §1962 (c)* and *(d)*.

RICO provides pertinent definitions to guide its interpretation. Several are relevant here. In pertinent part, they are:

(1) "racketeering activity" means ... (B) any act which is indictable under the following provisions of title 18 ... *section 1341* (relating to mail fraud);
(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associate in fact although not a legal entity;
(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter, and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity

Another pertinent provision allows a private party to pursue a RICO cause of action. *Section 1964(c)* states:

(C) Any person injured in his business or property by reason of a violation of *section 1962* of this [*12] chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of *section 1962*. The exceptions contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case that statute of limitations shall start to run on the date on which the conviction becomes final.

Several principles derived from controlling case law inform this Court's analysis. First, the mail fraud statute (*18 U.S.C. § 1341*) applies to anyone who knowingly causes to be delivered by mail anything for the purpose of executing any scheme or intention to defraud. *United States v. Whitfield, 590 F.3d 325, 355 (5th Cir. 2009)*. An injured party must show the violation was the "but for" and "proximate cause" of the injury. *Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008)*. Generally, in cases of mail fraud, reliance need not be proven.

*Allstate Ins. Co. v. Plambeck, 802 F.3d 665, 676 (5th Cir. 2015)*.

As noted above, an enterprise may be made up of individuals "associated in fact although not a legal entity." An "associated in fact enterprise" 1) must have an existence [*13] separate and apart from the pattern of racketeering, 2) must be an ongoing organization, and 3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making process. *Calcasieu Marine Nat'l Bank v. Grant, 943 F.2d 1453, 1461 (5th Cir. 1991)*. While this routinely presents a barrier, here it is not a problem because the Complaint alleges that the Clinic, itself, is the enterprise.

With these general principles in mind, the Court reviews the actual allegations made by the State Farm entities. As noted, they alleged in their *§ 1962(c)* cause of action that the Clinic is the enterprise and that Drs. Sparrow and Chin are either associated with or employed by the Clinic/enterprise. They further allege that the Clinic's affairs are conducted through a pattern of racketeering through the creation and presentation of fraudulent bills and other documents for medical services that were either not legitimately performed or were not medically necessary. In turn, these fraudulent documents caused the Plaintiffs to mail the settlement checks. (Doc. No 1, p. 36). The RICO causes of action are alleged solely against the Defendant Doctors.[1]

Separately, the Plaintiffs allege the doctors conspired to conduct the affairs of the Clinic/enterprise [*14] through a pattern of racketeering consisting of repeated mail fraud violations (Doc. No. 1, p. 38). More specifically, they allege the doctors' acts of conspiracy involved the submitting (or assisting in submitting) fraudulent bills and related documentation which, in turn, resulted in the Plaintiffs mailing settlement checks.

1. A Discernable Proximately Caused Injury

A civil action under RICO may be brought by "[a]ny person injured in his business or property by reason of violation of RICO's substantive provisions. *Varela v. Gonzales, 773 F.3d 704, 707 (5th Cir. 2014)* (quoting *18 U.S.C. § 1964(c)*). Thus, a RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by reason* of the conduct constituting the violation. *Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S. Ct.*

---

[1] The only cause of action brought against all Defendants is the common law claim for "money had and received."

3275, 87 L. Ed. 2d 346 (1985) (emphasis added). To establish that an injury came about "by reason of a RICO violation a plaintiff must show that a predicate offense "not only was a 'but for' cause of his injury, but a proximate cause as well." *Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)*.

"In a string of cases, the Supreme Court has made it clear that proximate causation is lacking when the alleged harm is distinct from the alleged RICO violation." *Allstate Insurance Company v. Benhamou, 190 F.Supp.3d 631, 643 (S.D. Tex. 2016)* (citing *Hemi Group, LLC v. City of New York, N.Y., 559 U.S. 1, 10-11, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010)* and *Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460-61, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006)*).[2]

Defendants claim that the Plaintiffs cannot raise a fact issue that they have actually [*15] suffered any discernable, non-speculative "injury" that was proximately caused by the alleged racketeering actively and therefore, it lacks standing to assert a RICO claims under *18 U.S. C. § 1962(c)*. (Doc. No. 129, p. 11). Their arguments are based upon the assertion that Plaintiffs have no proof of causation, damages, or reliance. *Id.* at 19. The gist of Defendants' legal argument is that the Plaintiffs cannot establish (or in this context raise a fact issue) either the "but-for" causation or the "proximate cause" requirement with respect to their claimed injuries. The underlying factual basis of this contention consists of three parts. First, Defendants claim that Plaintiffs must prove that they would not have paid the claim *but for* Defendants' billing for unreasonable or medically unnecessary services. Second, they argue that State Farm has no evidence that the claimants (and their lawyers) would have accepted any lesser settlement amount. Finally, they contend that Plaintiffs have no evidence that anyone relied upon the fraudulent invoices. Defendants concede that Plaintiffs need not demonstrate their own reliance, but they interpret the *Bridge* option as requiring reliance by "*someone.*" *Bridge, 553 U.S. at 658*.

Plaintiffs, while [*16] conceding that it is their burden to

raise an issue of material fact as to causation, point out that the law does not require that the conduct be the sole cause—it need only be a substantial cause. They rely heavily on the Fifth Circuit analysis in *Plambeck*—a case with a somewhat similar factual background. *See Allstate v. Plambeck, 802 F.3d 665 (5th Cir. 2015)*. Citing *Plambeck*, Plaintiffs contend they need only demonstrate an issue of material fact that 1) Defendants' fraudulent conduct was a substantial factor in causing Plaintiffs' harm; 2) Plaintiffs were the targets of the scheme; 3) there was a direct relationship between the misconduct and the harm and that they were not harmed by some wild caprice of chance.

The Court finds that both sides are partially correct and both have set out certain "elements" that are not really elements of any known cause of action. For example, Defendants claim that Plaintiffs must prove they would not have settled the claims in question *but for* Defendants' conduct. This Court disagrees that the Plaintiffs have to prove that they would not have settled the claims. Plaintiffs must prove that they would not have paid as much as they did but for Defendants' conduct. On the other hand, this Court does [*17] not find the level of comfort that Plaintiffs seem to find in the *Plambeck* court's use of the phrase "caprice of chance." It is no more than a catchy turn of phrase. It does not eliminate the need for the proof of proximate cause. Further, the mere fact that the *Plambeck* court found the plaintiffs in that case satisfied their burden of proof does not automatically equate to a finding in this case that such evidence exists merely because the allegations are similar. The parties spend an inordinate amount of ink arguing over the concept of reliance. The Defendants' concede that the Plaintiffs need not rely on their representations, but argue that someone must have. Additionally, they postulate that Plaintiffs in an adversarial context cannot rely on their representations as a matter of law. *See, e.g. Davis v. Tex. Farm Bureau Ins., 470 S.W.3d 97, 109 (Tex. App.—Houston [1st Dist.] 2015, no pet.)*

These two positions have problems that are immediately evident. First, as a general proposition, even if the insurance company involved did not rely on the accuracy of the bills (and medical records), the claimant and his/her attorney, unless they are co-conspirators in the fraud, do. The claimants are seeking medical treatment. They are relying on the judgment and accuracy of the medical [*18] professionals involved. In the usual case, they do not diagnose their own condition; nor do they prescribe the treatment. Further, they neither prepare the medical bills or the records nor

---

[2] The Court quotes here in length and later in the opinion from the opinion written by its predecessor in *Allstate Insurance Co. v. Benhamou, 190 F.Supp.3d 631 (S.D. Tex. 2016)*. Since these quotes are merely setting out generally well-understood legal principles, the Court see no need for specific quotation marks or page cites.

2024 U.S. Dist. LEXIS 127107, *18

do they have any input into their contents. They rely on the medical professionals involved to provide treatment that complies with the standard of care and to document that treatment in a professional and accurate manner. The attorneys involved rely on those bills in presenting their clients' claims. Thus, in a normal case — even if the opposing side is skeptical of treatment provided or the medical bills provided or both — there are clearly others who do rely on their accuracy.

Again, addressing the "normal" situation, if the patients and attorneys did not rely on these records—in other words, knew they were inaccurate—and they presented these records to the opposing party's insurance company, then all parties involved (the doctors, the patients and the attorneys) would be committing fraud and the doctor and attorney would be guilty of unethical conduct and possibly criminal conduct.[3]

This Court reminds all involved that a treating physician is <u>not</u> a legal advocate. Even if he or she is later designated [*19] as a witness, a doctor must be truthful and accurate. Any lesser standard would not only undermine the judicial process, but also undermine the faith and respect that the public holds in two of this country's most important professions.

Having set out these general principles, the question of their applicability here and the actual resolution of the pending motions depends on the prevailing RICO law and the summary judgment evidence.

The Plaintiffs' response to Defendants' motion makes a point of stating "... causation inquiries are typically questions of fact for the jury to decide (citing authority)." (Doc. 146, p. 24). This is usually true. In the usual case, the non-movant in response to a summary judgment motions based upon causation usually sets out that evidence that establishes a material issue of fact. Plaintiffs in this case, rather than give the Court a hint of what this controverting evidence might be, sends the Court on a treasure hunt. While they refer this Court to certain exhibits, they do not describe what this Court should be looking for or specifically where it could be found.

That being said, the Court finds that there is evidence that raises a fact issue on the pertinent [*20] causation

issues regardless as to how they are framed with respect to the following claim numbers:

1. 534042R83
2. 534301R49
3. 53795R178
4. 538B38054
5. 538B36325
6. 53876Z922
7. 53694T538
8. 538T73214
9. 53975B823
10. 53982G721
11. 538H97142
12. 53827F925
13. 5315573H8
14. 5302686W6
15. 53885G845
16. 537T45899
17. 53711R457
18. 531041W81

With regard to the remaining claims out of the 27 currently at issue, the Court grants the Defendants' motion for summary judgment due to the lack of causation "but for" and proximate cause. Regardless of which standard is used the Plaintiffs have failed to raise an issue of material fact as to the other nine claims.[4]

2. Evidence that the Doctors "conducted the affairs" of the Clinic or that a conspiracy existed.

Defendant Doctors also claim that they are entitled to a summary judgment because there is no evidence that either was involved in conducting the affairs of the Clinic (enterprise). They correctly argue that the Supreme Court has held that one cannot be liable under *§ 1962(c)* unless one has participated in the operation or management of the enterprise. *Reves v. Ernst & Young, 507 U.S. 170, 182, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. They also correctly maintain that neither the mere provision of goods or services (in this case services) or mere existence [*21] of a business relationship does not impose RICO liability. *Allstate Ins. Co. v. Benhamou, 190 F.Supp.3d 631, 656 (S.D. Tex.*

---

[3] The logical result of Defendants' argument would be that in an adversarial situation, a physician has a license to be dishonest and commit fraud without consequence. This has never been the case.

[4] This Court assumes these numbers refer to individual claims — thus leaving nine claims without controverting summary judgment evidence. Neither side has explained to the Court how the claims are numbered or what these numbers represent. To the extent these claim numbers cover more than one claim — the Court denies the motion as to all claims covered by that number. Thus, it is conceivable there may not actually be nine claims as to which the Court has granted judgment.

2024 U.S. Dist. LEXIS 127107, *21

*2016)*.

Plaintiffs respond, first, that a defendant need not possess a title or label as a manager or supervisor to qualify as such under RICO. They emphasize that it was the doctors' medical treatment that was the lynchpin of the alleged scheme. Next, they refer this Court to the decision in *State Farm Automotive Ins. Co. v. Punjwani, 2019 U.S. Dist. LEXIS 223054, 2019 WL 7372215 at *4 (S.D. Tex. Dec 31, 2019)* and other cases with somewhat related allegations. *Punjwani*, while informative, does not control the situation here. First, the question there was not presented in the Defendants' actual motion to dismiss, but was raised in a reply brief. More importantly, it was raised in the context of a motion to dismiss, which merely analyses the allegation, not a summary judgment that actually focuses on the evidence. In that case, the judge concluded that the allegations were sufficient because the doctor was the individual that performed the unnecessary medical procedure and made the medical decisions that were central to the scheme. Further, he was paid on a fixed fee basis for each evaluation and injection he performed.

In order to determine what the phase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" [*22] in *18 U.S.C. § 1962(c)* means, the Supreme Court first examined the meaning of the terms "conduct" and "participate." *Reves v. Ernst & Young, 507 U.S. 170, 177-79, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. The Supreme Court concluded that "conduct," both as a noun and as a verb in the subsection, requires some level of direction while the word "participate" requires some part in that direction. *Id. at 179*. Although some part in directing the enterprise's affairs is required for liability, the Court likewise explained that the use of the words "participate" and "directly or indirectly" indicate that RICO liability is not limited to those with primary responsibility for the enterprise's affairs or a formal position in the enterprise. *Id.* Thus, lower rung participants in the enterprise who are under the direction of upper management as well as those "associated with" the enterprise who exert control over it can be liable. *Id. at 184*.

Although one need not be a ringleader, the Fifth Circuit has made clear that a defendant must have some supervisory involvement in an enterprise in order to satisfy *§ 1962(c)'s* conduct or participate requirement. *Plambeck, 802 F.3d at 675* (acknowledging that defendants had limited roles but nevertheless finding they "participated in

managing the enterprise with their supervisory roles in their respective parts of [*23] the scheme."). Thus, simply providing goods or services that ultimately benefit the enterprise will not subject one to liability. *In re MasterCard Intern. Inc., Internet Gambling Litig., 132 F.Supp.2d 468, 489 (E.D. La. 2001)*, *aff'd sub nom. In re MasterCard, Inc., 313 F.3d 257 (5th Cir. 2002)* (quoting *Amsterdam Tobacco, Inc. v. Philip Morris, Inc., 107 F.Supp.2d 210 (S.D.N.Y. 2000)*) (internal quotations marks omitted). Nor will merely having a business relationship with a RICO enterprise, *Compass Bank v. Villarreal, No. 10-8, 2011 U.S. Dist. LEXIS 48271, 2011 WL 1740270, at *13 (S.D.Tex. May 5, 2011)* (collecting cases), or simply contributing to the enterprise "with the knowledge of or willful disregard" for the other defendants' supposed criminal activity. *Gonzalez, 2011 U.S. Dist. LEXIS 16963, at *21*. Even the receipt of funds or materials on its own, without more, will not establish that a defendant actually operated the scheme to obtain those funds or materials. *Davis-Lynch, Inc. v. Moreno, 667 F.3d 539, 551 (5th Cir. 2012)*.

*Benhamou, 190 F.Supp.3d at 655*.

The Defendant Doctors here (Drs. Sparrow and Chin) were the sole medical providers that performed the allegedly unnecessary services. No other individuals were involved in the decisions as to the examinations performed, the diagnoses made, or the treatment. Neither doctor was supervised by any clinical personnel and both knew the Clinic was billing for their services. By virtue of their position, each doctor was in charge of their record keeping/documentation (even it if was delegated to someone else) and each made their own diagnoses and their own treatment plan and recommendations.

Given these [*24] facts and the experts' testimony concerning the fraudulent or sub-standard treatment, this Court finds there is sufficient evidence to raise a fact issue as to their role. First of all, the Court notes that *18 U.S.C. § 1962(c)* does not require that a defendant be the master mind or manage the enterprise or the scheme. It only requires that a person "conduct or participate, directly or indirectly" "in the conduct of the enterprise's affairs." The doctors' participation here was key. The alleged scheme could not have been successful without them. Moreover, according to their own brief, the Defendant Doctors were not supervised or told what to do. They made the very medical decisions over which the Plaintiffs are basing their

claims. That being the case, they cannot be considered low level employees or mere service providers.

Moreover, the Plaintiffs have proffered evidence that the Defendant Doctors have committed over 200 medically unnecessary and/or medically unsupportable procedures for which the Clinic billed. Finally, the bills (or at least some of them), while they were key to trigger payment, were created using the Defendants' names. While both Doctors deny having any involvement with the bills or [*25] the billing process, clearly they allowed the services to be billed using their names.

In order to demonstrate a RICO conspiracy under *§ 1962(d)*, a plaintiff must demonstrate that (1) two or more people agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense. *Chaney v. Dreyfus Serv. Corp., 595 F.3d 219, 239 (5th Cir. 2010)*. In the RICO criminal context, a person need not commit or agree to commit predicate acts to be held liable. *Salinas v. United States, 522 U.S. 52, 63-64, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)*. Nevertheless, to establish civil liability for RICO conspiracy, a claimant must allege injury from an act that is independently wrongful under RICO. *Beck v. Prupis, 529 U.S. 494, 507, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000)*. Thus, when a plaintiff fails properly to allege a violation of *§ 1962(c)*, his *§ 1962(d)* claim is without basis. *Bonton v. Archer Chrysler Plymouth Inc., 889 F.Supp. 995, 1005 (S.D. Tex. 1995)*; *Allstate Ins. Co. v. Donovan, 2012 U.S. Dist. LEXIS 92401, 2012 WL 2577546, at *15 (S.D. Tex. July 3, 2012)*; *North Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare, 2011 U.S. Dist. LEXIS 127526 , 2011 WL 5325785, at *15*, aff'd sub non *N. Cypress Med Ctr. Operating Co., Ltd. v. CIGNA Healthcare, 781 F.3d 182 (5th Cir. 2015)*.

This Court cannot hold as a matter of law that no conspiracy existed. There were multiple individuals and at least one, if not two entities, involved in the alleged activities that comprise the alleged RICO conspiracy. There is adequate evidence to justify the need for a decision by the finder of fact.

3. The Existence of Mail Fraud

The Defendant Doctors contend that they should prevail as a matter of law on the RICO [*26] claims because there is no evidence of mail fraud. Mail fraud is the sole *§ 1961* predicate act that Plaintiffs plead. If no mail fraud occurred, then no RICO claim can stand, regardless of whether pleaded under *§ 1962 (c)* or *(d)*. Defendants claim no mail fraud existed for two reasons: a) State

Farm cannot raise a fact issue as to a false or fraudulent representation; and b) it cannot raise a fact issue as to intent to deceive. The Court will address them together.

The Defendants acknowledge in their motions that Plaintiffs will respond to the motion with evidence containing expert testimony that the treatment they provided was unneeded, improperly supported and was rendered improperly. Plaintiffs have, indeed, responded with just such evidence. Defendants, however, claim that this evidence of improper care does not equate to fraud. If that were all of the evidence, Defendants would be right.

Secondly, Defendants argue that the Plaintiffs have no evidence that either Defendant had the requisite intent to deceive. To support these claims, they point out that the Defendant Doctors had no involvement in the actual billing, never received any instructions or directions from Clinic personnel as to the medical [*27] care in question. Further, neither doctor had any role in running the Clinic, funding the Clinic, or recruiting its patients. Moreover, the doctors claim that not only did they not have any operational role; they did not even have any knowledge of the Clinic's operations.

Plaintiffs have not responded with any evidence that could be described as direct evidence—although in most cases there is seldom direct evidence of intent or of the requisite knowledge that a representation was false at the time the representation was made. Plaintiffs respond by pointing to the evidence that the medical records and bills in over 450 cases are false or indicative of unnecessary treatment and by arguing that this is circumstantial evidence that the doctors were participating in a scheme to defraud rather than just a consistent inability to accurately diagnosis and treat. Moreover, their expert witness concluded each of over 250 charts contained the same diagnosis, the same prognosis and the same treatment. There is also evidence that their co-workers at the Clinic coordinated with various Plaintiffs' attorneys as to the care and treatment and billing of the patients. Plaintiffs also point out that the [*28] two doctors used a similar protocol that they instituted and for which the Clinic was compensated by using bills that purported to seek compensation for fraudulent and/or unnecessary treatment.

This Court finds this is sufficient circumstantial evidence from which a finder of fact would be justified in concluding that the necessary fraudulent intent was present. Summary judgment is therefore denied as to

2024 U.S. Dist. LEXIS 127107, *28

Plaintiffs' RICO claims.

**B. Money Had and Received**

All Defendants move for summary judgment on Plaintiffs' claims for money had and received. First, they contend that the claim is barred by the applicable statute of limitations. Next, they contend that the claim is barred because there is a written contract that precludes such a claim. Finally, they argue that any money held by the Defendants could not possibly belong to Plaintiffs.

1. Statute of Limitations

Defendants argue (and Plaintiffs concede in their response) that the applicable statute of limitations for a money had and received claims is two years. *Merry Homes v. Dao 359 S.W.3d 881, 882 (Tex. App.— Houston [14th] 2012, no pet.)* citing *Elledge v. Friberg— Cooper Water Supply Corp., 240 S.W.3d 869, 871 (Tex. 2007)*; *Pollard v. Hanschen, 315 S.W.3d 636, 641 (Tex. App.—Dallas 2010, no pet.)* This case was filed on July 23, 2020. Therefore, the controlling date is July 23, 2018. Thus, any claims maturing before that date are barred. Since State Farm paid all but [*29] four claims of the 27 claims under consideration prior to July 23, 2018, Defendants conclude those 23 are barred.

Plaintiffs, in response, concede that the two year statute of limitations applies and that it normally begins to run when the payment is made or, if paid indirectly, it begins to run when the money was received. *Tanglewood Terrace, Ltd. v City of Texarkana, 996 S.W.2d 330, 337 (Tex. App.—Texarkana 1999, no pet.)* Plaintiffs claim that the Defendants received the money indirectly and there does not appear to be any real dispute about this. It seems uncontroverted that the sums paid first were to the lawyer/client and then to the Clinic. Plaintiffs claim the vast majority of the payments were received by the Defendants within the two year period.[5] Neither side has provided specifics as to the individual payments and their dates.

In addition to the claim that Defendants have failed to establish their limitations defense as a matter of law, the Plaintiffs claim they are entitled to rely on the application

of the discovery rule in a fraudulent claim. They contend to prevail on their summary judgment, the Defendants needed to prove as a matter of law that they Plaintiffs, in the exercise of reasonable diligence, should have discovered the mail fraud.

The Supreme Court of Texas has [*30] squarely placed upon the defendant the burden of negating a discovery rule claim when moving for a summary judgment on the affirmative defense of statute of limitations.

> A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury. If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations.

*KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp., 988 S.W.2d 746, 747 (Tex. 1999)*; see also *Woods v. William M Mercer, Inc., 769 S.W.2d 515, 518 n. 2 (Tex. 1988)*.

As noted above, the parties disagree on whether the discovery rule tolls the statute of limitations. Defendants, in their motion for summary judgment, maintain that the discovery rule does not toll the statute of limitations here because as early as December 30, 2016, State Farm was aware of concerns regarding [*31] the medical necessity of the services billed through Complete Pain.[6] By contrast, State Farm contends that the discovery rule tolls the statute of limitations because it had not discovered, or concluded, that Defendants' conduct rose to the level of fraud until much later in its investigation.

---

[5] The Plaintiffs claim that the big pay-off for the Defendants came in 2019 when Holdco sold Memorial and received a substantial sum that was only made possible by the profitability of the Clinic which was made possible by the alleged RICO scheme. While this may be true, the Court questions whether Plaintiffs could lay claim to these sums.

[6] To support this proposition, they cite this Court to Exhibit A-3 at pp. 33-34 and A-5 at pp. 51:12-52:16. The Court's copy of Exhibit A-5 contains portions of a deposition of Michelle Yap. There is not enough context provided to the Court as to what the December 30, 2016 memo actually was, what it involved or what it concluded, but it does establish that by December 30, 2016, State Farm was concerned about the medical necessity of the services being provided by the Clinic. Moreover, by July 2017, outside attorneys had been engaged in this investigation.

As noted, the burden of proof of this affirmative defense is on the Defendants. That being the case, it is their burden to negate the discovery rule claim as a matter of law. As noted, a cause of action for money had and received accrues when the funds are transferred. *See Tanglewood Terrace, Ltd. v. City of Texarkana at 337* (citing *Amoco Prod Co. v. Smith, 946 S.W.2d 162, 163-64 (Tex. App.—El Paso 1997, no writ)*. Nevertheless, the date the legal injury is sustained is not necessarily the date the claim begins to accrue. *See TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 357 (5th Cir. 2008)* ("Under Texas law, the discovery rule is an exception to the general rule that a cause of action accrues when a wrongful act causes some legal injury."). Under the discovery rule, the limitations period may be tolled if the injury is inherently undiscoverable, meaning "it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *S. V v. R. V., 933 S.W.2d 1, 7 (Tex.1996)*. If the discovery rule is applicable, the statute of limitations will run "not from the date of the [defendant's] wrongful act or [*32] omission, but from the date the nature of the injury was or should have been discovered by the plaintiff." *Weaver v. Witt, 561 S.W.2d 792, 793-94 (Tex. 1977)*.

State Farm argues that Defendants have not met their summary judgment burden above. State Farm contends that the injury here is "inherently undiscoverable" because it is premised on fraudulent conduct that could not have been discovered. State Farm notes "opening an investigation into suspected fraud and retention of counsel to assist in that investigation does not equate to discovery of fraud." (Doc. No. 146 at 45). Thus, State Farm maintains that there is a genuine issue of fact as to when it became aware of the alleged fraud, and consequently, when it became aware of the nature of the injuries giving rise to the money had and received claims.

The Court finds that State Farm pleaded that the discovery rule applies, and that Defendants have not, as a matter of law, negated the application of the discovery rule. *See Taylor v. Trevino, 569 F. Supp. 3d 414, 442 (N.D. Tex. 2021)* (denying summary judgment on plaintiff's money had and received claim because the defendant had not established as a matter of law when plaintiff discovered or should have discovered the nature of its injury). Indeed, the factual record here demonstrates the existence [*33] of a factual dispute regarding when Plaintiffs discovered or should have discovered the nature of the injuries.

Some of the summary judgment evidence shows that on

May 8, 2017, Plaintiffs opened a project to investigate a potential "issue of concern" regarding the necessity of treatment rendered by Complete Pain. (Doc. No. 146, Ex. 54). State Farm Project specialist Michelle Yap managed the Complete Pain investigation, until she left State Farm in late 2018. She testified that, at the time of her departure, her investigation was "ongoing" and she had not reached any conclusion regarding: (1) whether Complete Pain's medical records "were based on templates"; (2) the "necessity of services" provided by Complete Pain; (3) any "improprieties with the billing practices" of Complete Pain; or (4) whether Complete Pain had committed fraud. (Doc. No. 146, Ex. 55, at 71:25; 72:1-4; 112:24-25; 113:1-16; 132:23-25; 133:1-5). According to Plaintiffs, their final determination that Defendants were engaged in fraud occurred when their legal department authorized the filing of the lawsuit, which was shortly before the actual filing on July 23, 2020. (Doc. No. 146, Ex. 58, at 33:17-25; 35:8-12; 85:15-23; [*34]  127:1-16.).

The Court finds that Defendants have not met their burden of negating the discovery rule as a matter of law and establishing that there is no genuine issue of material fact as to when State Farm discovered or should have discovered the nature of its injuries. The evidence presented by State Farm is enough to create a fact issue and survive summary judgment on this issue.

This Court also finds, given the lack of specific proof as to each individual claim and the lack of specificity as to the 2016-20 investigations contained in the summary judgment evidence this Court cannot rule in Defendants' favor as a matter of law. Regardless of whether the discovery rule applies, the application of the statute of limitations in this case seems to have a plethora of fact issues.

### 2. The Existence of a Written Contract

Defendants claim that the existence of a written agreement precludes the application of an equitable doctrine such as "money had and received." They use as authority the well-established rule in Texas that the existence of a written contract precludes a claim for equitable or quasi-contractual relief. When a valid contract covers the subject matter of the parties' dispute, there [*35] generally can be no recovery under a quasi-contractual theory. *Fortune Production Co. v Conoco Inc., 52 S.W. 3d 671, 684 (Tex. 2000)*. An action for money had and received is just such a quasi-contractual claim. *Humana, Inc. v Shrader & Associates, LLP, 584 B.R. 658, 686 (S.D. Tex. 2018)*. This Court cannot find fault with the Defendants' premise. Even the

Plaintiffs seem to acquiesce in the general application of the principle that a written contract precludes a recovery on a cause of action based upon a quasi-contractual or equitable basis.

The Plaintiffs contend, however, and this Court agrees, that there is no contract (at least one that has been included in the summary judgment evidence) upon which to base such an argument. The sole "contract" attached is a release (signed by Ashley N. Laneros and Jose E. Landeros) between the Laneros and Alan M. Roco pertaining to an accident that occurred on September 15, 2016. (Def. Ex. A-11). Neither the Plaintiffs nor the Defendants are parties to this release. The general rule in Texas is that quasi-contractual claims are barred if the claim is brought by a party to a contract that covers the subject matter of the suit extends not only to the signatories to the contract, but also where a plaintiff seeks to recover from a third party who benefitted from the contract. *ConocoPhillips Co. v. Koopmann, 542 S.W.3d 643, 2016 WL 2967689 at *14 (Tex. App.—Corpus Christi 2016, pet. denied)*. It is not clear, [*36] as a matter of law, that the Defendants benefitted from this contract. Certainly, the claimant (their patient or former patient) benefitted because his/her claims was paid, but it is unclear if any of the Defendants here benefitted from that release. First, it does not mention them and does not release them in any fashion. The Defendant Doctors were paid regardless of any payment to the claimant. The remaining Defendants were allegedly providing services under a letter of protection from the attorney. If this is the case, they would get paid regardless of whether a successful settlement was concluded. If true, they would not receive any benefit from the written contract/release. That being the case, this Court cannot grant them a judgment as a matter of law.

### 3. Plaintiffs Cannot Prove the Funds "Had and Received" Belong to It

Defendants also move for summary judgment based upon its claim that Plaintiffs are unable to establish their claim that the funds in question belong to them. This argument is based upon the manner in which the Clinic received the funds that it did. First, the funds were paid to the underlying claimant in exchange for that claimant releasing his/her claims. Then, [*37] either the claimants or their attorney paid the Clinic. Defendants point out correctly that the general rule in Texas is that title to money transfers when it is exchanged for valuable consideration, which in this instance would be the execution of the release. *H.E.B, LLC v. Ardinger,*

*369 S.W.3d 496, 508 (Tex. App.—Fort Worth 2012, no pet.)*. Second, Defendants argue that the Plaintiff cannot point to any specific amount of funds that are being claimed. Finally, Defendants point out that as to MMRI and the Defendant Doctors, this cause of action fails because these defendants never received any funds from the Plaintiffs.

Plaintiffs respond that Defendants' argument ignores the established law in this Circuit.

> [T]his Court has permitted insurance companies to recover money paid for fraudulent billing through money had and received claims. *See DAC Surgical Partners v. United Healthcare Servs., Inc., No. 4:11-CV-1355, 2019 U.S. Dist. LEXIS 120880, 2019 WL 3252343, at *5 (S.D. Tex. July 7, 2019 (citation omitted)* ("The amount that United overpaid based on Par and Euston's fraudulent misrepresentations belongs to United 'in equity and good conscience.'"); *Aetna Life Ins. Co. v. Won Yi, No. H-14-900, 2019 U.S. Dist. LEXIS 93425, 2019 WL 2355543, at *2 (S.D. Tex. June 4, 2019)* (concluding that insurance company met the requirements for money had a received claim by showing that the defendants were paid money for dishonest claims).

*Punjwani, 2019 U.S. Dist. LEXIS 223054, 2019 WL 7372215, at *5*.

Plaintiffs further point out that the money can be traced from State Farm to the Claimants and their attorneys to the Clinic and [*38] then it passed to MMRI. MMRI apparently kept all of the Clinic's profits. This Court finds these facts raise a fact issue as to the Clinic and MMRI, but not as to the Defendant Doctors. Plaintiffs admit that the doctors were "paid for their services at the time of service." (Doc. No. 146, p. 49).

This Court is not clear that this concession is accurate as to both Dr. Sparrow and Dr. Chin. Dr. Sparrow testified that at the time she was paid a flat rate based upon the procedure. (Doc. No. 129-2, p. 13). Dr. Chin testified he was paid a $300,000 annual salary by Texas Anesthesia Associates PLLC. (Doc. No. 129-2, pp. 182-83); Doc. No. 141-18, pp. 5, 7; Doc. No. 141-32, pp. 2-19). Dr. Chin had no understanding how Texas Anesthesia was reimbursed by the Clinic (Doc. No. 129-2, p. 183). Nevertheless, it is uncontroverted that neither doctor ever received funds directly or indirectly from the Plaintiffs. Furthermore, the funds the doctors received never came through the Clinic or MMRI as a result of a

2024 U.S. Dist. LEXIS 127107, *38

payment by either Plaintiff.

That being the case — while this Court denies the motion for summary judgment on the "money had and received" claims as to the Clinic and MMRI—it grants the motion [*39] as to Drs. Chin and Sparrow.

### IV. Conclusion

The Court grants the Defendants' Motion for Summary Judgment with regard to the "money had and received" cause of action as it applies to Dr. Alj Florence Sparrow and Dr. See Loony Chin. It denies the Motion as to as to the "money had and received" cause of action as it applies to Compete Pain Solutions LLC n/k/a Complete Pain Solutions PLLC and MMRI Holdco LLC n/k/a MRI Holdco Rollover LLC.

The Court grants the Motion for Summary Judgment as to RICO claims brought against Drs. Chin and Sparrow as to all 27 claimants in dispute except for those claimants represented by claim numbers 1) 534042R83; 2) 534301R49; 3) 53795R178; 4) 538B38054; 5) 538B36325; 6) 53876Z922; 7) 53694T538; 8) 538T73214; 9) 53975B823; 10) 53982G721; 11) 538H97142;

12) 53827F925; 13) 5315573H8; 14) 5302686W6; 15) 53885G845; 16) 537T45899; 17) 53711R457; and 18) 531041W81. Thus, the Plaintiffs may continue with their RICO claims for these listed claim numbers only.

SIGNED on this 18th day of July 2024.

/s/ Andrew S. Hanen

ANDREW S. HANEN

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# *State Farm Mut. Auto. Ins. Co. v. Kugler*

United States District Court for the Southern District of Florida

September 21, 2011, Decided; September 21, 2011, Entered on Docket

CASE NO. 11-80051-HURLEY

**Reporter**

2011 U.S. Dist. LEXIS 107005 *; 2011 WL 4389915

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE & CASUALTY COMPANY, plaintiffs, vs. JEFFREY KUGLER, M.D., JANE BISTLINE, M.D., and HELDO GOMEZ, M.D., JEFFREY L. KUGLER, M.D., P.A. a/k/a NATIONAL ORTHOPEDICS AND NEUROSURGERY, P.A., JANE E. BISTLINE, M.D., P.A., HELDO GOMEZ, M.D., P.A. and NORTH PALM NEUROSURGERY, P.L., 2047 PALM BEACH LAKES PARTNERS, LLC, a/k/a Palm Beach Lakes Surgery Center, GARY CARROLL, MARK IZYDORE, PALM BEACH PRACTICE MANAGEMENT, INC., and JONATHAN CUTLER, M.D., defendants.

**Subsequent History:** Later proceeding at *State Farm Mut. Auto. Ins. Co. v. Kugler, 840 F. Supp. 2d 1323, 2011 U.S. Dist. LEXIS 155836 (S.D. Fla., Dec. 22, 2011)*

Later proceeding at *State Farm Mut. Auto. Ins. Co. v. Kugler, 2012 U.S. Dist. LEXIS 207427 (S.D. Fla., Feb. 15, 2012)*

Motion denied by *State Farm Mut. Auto. Ins. Co. v. Kugler, 2012 U.S. Dist. LEXIS 192249 (S.D. Fla., June 11, 2012)*

Magistrate's recommendation at *State Farm Mut. Auto. Ins. Co. v. Kugler, 2012 U.S. Dist. LEXIS 192247 (S.D. Fla., July 2, 2012)*

**Counsel:** [*1] For State Farm Mutual Automobile Insurance Company, State Farm Fire & Casualty Company, Plaintiffs: Charles Chejfec, PRO HAC VICE, John W. Reale, PRO HAC VICE, Ross O. Silverman, PRO HAC VICE, Katten Muchin Rosenman LLP, Chicago, IL; Scott W. Atherton, David Ira Spector, Akerman Senterfitt, West Palm Beach, FL.

For Jeffrey Kugler, MD, Jeffrey L. Kugler, M.D., P.A., also known as National Orthopedics and Neurosurgery, P.A., Defendants: Cristopher Stephen Rapp, LEAD ATTORNEY, Jones Foster Johnston & Stubbs, West Palm Beach, FL; Robert William Wilkins, LEAD ATTORNEY, Jones, Foster, Johnston & Stubbs, P.A.,

West Palm Beach, FL.

For Jane Bistline, MD, Jane E. Bistline, M.D., P.A., Defendants: Anthony Conrad Vitale, LEAD ATTORNEY, The health Law Office of Anthony C. Vitale, P.A., Miami, FL.

For 2047 Palm Beach Lakes Partners, LLC, also known as Palm Beach Lakes Surgery Center, Jonathan Cutler, MD, Defendants: Robert N. Nicholson, LEAD ATTORNEY, Nicholson Law Group, Fort Lauderdale, FL.

For Gary Carroll, Mark Izydore, Palm Beach Practice Management, Inc., Defendants: Bruce David Green, LEAD ATTORNEY, Fort Lauderdale, FL; Steven Layne Robbins, LEAD ATTORNEY, West Palm Beach, FL.

For Heldo Gomez, [*2] MD, Heldo Gomez, M.D., P.A., North Palm Neurosurgery, P.L., Defendants: William Leon Richey, LEAD ATTORNEY, Miami, FL.

**Judges:** Daniel T. K. Hurley, United States District Judge.

**Opinion by:** Daniel T. K. Hurley

# Opinion

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

**THIS CAUSE** is before the court on the defendants' motions to dismiss the plaintiffs' amended complaint [DE # 20, 21, 25, 27, 33], the plaintiffs' response in opposition, and the defendants' reply. For reasons which follow, the court has determined to deny the motions.

## I. Background[1]

---

[1] The recited facts are drawn from the plaintiffs' operative

2011 U.S. Dist. LEXIS 107005, *2

Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (cumulatively "State Farm") allege that the twelve defendants participated in a conspiracy to defraud them, and other insurers like them, by performing medically unnecessary diagnostic tests and surgical procedures on persons involved in automobile accidents who are covered by State Farm insurance. [2] The diagnostic procedures [*3] in question are known as provocative discograms ("discograms") and the surgical procedures are known as percutaneous discectomies ("PDs"). [3] The total cost of a discogram and PD procedure, including professional and facility fees, typically exceeds

---

amended complaint, the allegations of which are accepted as true for purposes of passing upon this motion. *Florida Policy Council v. Freeman, 561 F.3d 1246 (11th Cir. 2009).*

[2] The persons involved are either State Farm insureds filing medical payment claims under their own personal injury protection (PIP) insurance (first party claims); persons not at fault/third parties seeking recovery for pain and suffering and other forms of non-economic damages, in addition to medical expenses and wage loss on bodily injury (BI) liability claims against State Farm as the insurance company for the at- fault driver (third party claims); or persons not at fault/State Farm insureds seeking to recover tangible and intangible damages pursuant to personal injury claims asserted against State Farm under their own uninsured/underinsured motorist insurance(UM)(where recovery on the BI claim against the at-fault driver is insufficient).

[3] A discogram is a diagnostic procedure used to identify discs that may be causing pain due to pathology in the disc. In this procedure, the doctor inserts a needle into the nucleus of the [*4] suspect disc and injects radiographic contrast. While injecting contrast, the doctor monitors the pressure building in the disc in pounds per square inch (psi). If the patient reports concordant pain, i.e. reproduction of usual pain, during pressurization of the disc up to a certain level of psi, that particular disc is considered positive (contributing to the patient's pain). If the patient does not report concordant pain during pressurization of the disc, that disc is considered negative (not contributing to the patient's pain). [Amended Complaint ¶¶ 34, 35].

If the discogram produces positive results, the patient is referred for percutaneous discectomy, a surgical procedure performed with the "Spine Wand," a long probe that is inserted into the nucleus of the disc. Radio frequency waves are emitted from the tip of the probe to dissolve a small amount of tissue from the nucleus, and thermal energy is used to stabilize the remaining disc material. The Spine Wand is then withdrawn from the disc. In theory, this procedure decompresses the disc, thereby removing unwanted pressure which a contained protrusion in the disc exerts on nerve roots. [Amended Complaint ¶ 51].

$50,000.00.

The procedures were [*5] performed at the Palm Beach Lakes Surgery Center in West Palm Beach, Florida, on at least 181 patients who were involved in auto accidents and made claims against State Farm or State Farm insureds. The defendants' scheme allegedly began in early 2004, and involved two levels of fraud. The first part involved the submission of fraudulent billings and supporting documentation for medically unnecessary discograms and PDs to State Farm through the patient's attorney, either in support of a direct claim for reimbursement by a State Farm insured (PIP), or a policy limits demand on behalf of an injured insured or third party claimant (UM or BI) [Amended Complaint, ¶ 58]. The second part of the scheme, beginning in approximately August, 2006, involved the use of false billing codes (CPT Codes) which materially misrepresented and exaggerated the seriousness of the PD procedures in order to justify imposition of higher fees collected by the defendants, while at the same time artificially inflating the value of the patient's corresponding PIP, UM or BI claim against State Farm for the benefit of the patient and the patient's attorney [Amended Complaint, ¶¶ 59-72]. State Farm alleges that the [*6] defendants' scheme has operated without interruption since 2004, fraudulently inducing it to pay in excess of $13 million dollars on various PIP, BI and UM insurance claims.

The operative amended complaint groups the defendants into five categories: (1) Dr. Jane Bistline, the doctor who performed at least 182 discograms and allegedly falsely reported positive results on virtually every patient to justify the need for medically unnecessary PDs, and Drs. Heldo Gomez (61 PDs) and Jeffrey Kugler (113 PDs), the physicians who allegedly performed medically unnecessary PDs based on Bistline's reports. Bistline also performed "surgery assists" and provided anesthesia services for PD patients of Drs. Gomez and Kugler at the Surgery Center, where she was employed as Medical Director; (2) 2047 Palm Beach Lakes Partners, LLC a/k/a Palm Beach Lakes Surgery Center ("the Surgery Center"), the out-patient surgery center which allegedly submitted fraudulent bills and related medical documentation for facility fees charged in connection with medically unnecessary discograms and PDs, which was owned in part by Drs. Gomez, Kugler and Dr. Jonathan Cutler; (3) Gary Carroll and Mark Izydore, two non-physicians [*7] who allegedly coordinated and exerted control over the activities and relationships among all of the defendants, as well as their relationships with the non-

2011 U.S. Dist. LEXIS 107005, *7

party personal injury attorneys who referred patients to the defendants, and Palm Beach Practice Management, Inc., a Florida corporation formed by Carroll and Izydore to funnel profits to themselves generated by the medically unnecessary PDs under the guise of "management fees" collected under their marketing contract with Dr. Kugler; [4] (4) Dr. Jonathan Cutler, a podiatrist and part owner of defendant Surgery Center who profited from substantial facility fees (typically in excess of $12,000) and material fees ($7500 per single use "Spine Wand" ) charged for each medically unnecessary PD performed at the Surgery Center. Cutler allegedly joined with non-parties Arthocare Corporation and Discocare to promote and market the "Spine Wand" as a fast and easy way to boost profits from personal injury claims to personal injury attorneys, doctors and surgery centers around the country. As sole owner of Discocare from December 2005 to December 2007 (when Arthocare purchased it for $25 million), he was allegedly responsible for generating [*8] misleading material bills for the Spine Wand, [5] and advocating false use of CPT Code 63056 to materially misrepresent the nature of PDs performed with the Spine Wand in order to fraudulently inflate the insurance reimbursement value of the procedure; (5) the professional associations employing the several physicians involved in the scheme which generated fraudulent bills and related medical documentation for medically unnecessary discograms and PDs performed by Drs. Bistline, Kugler and Gomez.

As a result of the coordinated efforts between these groups, Drs. Bistline, Gomez and Kugler performed over 1550 discograms and PDs at the Surgery Center between 2005-2008 — representing almost 30% of all

---

[4] Under the "Executive Management Agreement" between Palm Beach Pain Management Inc. (PBPM) and Dr. Kugler, PBPM was required to use its "best efforts" to market and sell the services of Jeffrey Kugler, M.D., P.A. in exchange for collecting 45-50% of the profits generated by Jeffrey L. Kugler, M.D., P.A. [Amended Complaint, ¶¶ 84-86].

[5] State Farm alleges that Cutler used Discocare as vehicle to bill $7454 for each Spine Wand used in each PD performed at the Surgery Center. To encourage State Farm and other insurers to pay this cost, Discocare allegedly submitted its bill to the insurer along with an invoice from Arthocare purporting to show that Discocare paid $7500 for the unit, when in reality [*9] there was no real expectation of payment on the part of Arthocare. Discocare also secured letters of protection from Surgery Center PD patients, creating a lien a lien in favor of Discocare against any recovery on the patient's personal injury claim [Amended Complaint ¶¶ 111-112].

percutaneous lumbar discectomies of any kind performed at every ambulatory surgery center in Florida during this period [Amended Complaint ¶ 31].

Through the coordination and oversight of Carroll and Izydore, who supplied ongoing patient referrals through favored personal injury attorneys, these five groups pursued the common purpose of facilitating the submission to State Farm of fraudulent bills for medical diagnostic tests and procedures that were not medically necessary. To accomplish this goal, they conducted the affairs of the defendant professional associations and medical corporations through a pattern of racketeering activity consisting of multiple violations of the federal mail fraud statute, using [*10] the patient's attorney as conduit to pass hundreds of fraudulent bills and related medical documentation to State Farm. On BI and UM claims, the attorney typically sent a demand letter to State Farm demanding full policy limits to avoid the risk and cost of a bad faith claim, and attached the defendants' medical bills and related medical documentation to substantiate those claims. On PIP claims, a request for medical payments coverage was supported by medical bills and related documentation generated by the defendants.

Relying on the defendants' bills and documentation submitted through this conduit, State Farm alleges it was fraudulently induced to pay over $13 million on PIP, UM and BI claims artificially inflated by the cost of the defendants' medically unnecessary medical diagnostic tests and procedures. [6] In an attachment to its amended complaint, State Farm lists 198 individual claims which it claims it was fraudulently induced to pay as a consequence of this scheme. [Amended Complaint, Exhibit A, RICO Events 1-198][DE# 19-1]. [7]

---

[6] Although the complaint does not specify the manner in which State Farm channeled payments on the various claims, presumably State Farm issued payment [*11] directly to the medical providers on first party (PIP) medical payment claims, while it issued a lump sum settlement check on third party claims to the patient's attorney, who was then responsible for channeling reimbursement to the medical providers for outstanding medical bills.

[7] The 198 individual claims are identified on this exhibit by claim number; date of service; discogram statistics (name of doctor; number of levels tested; number of positive levels reported; amount of professional charges); PD statistics (name of doctor; number of levels performed; CPT Code employed to describe the PD; amount of professional charges); amount of facility fee; name of patient's attorney; available policy limits; amount of insurance payment and type of coverage under

2011 U.S. Dist. LEXIS 107005, *11

Against this backdrop, State Farm seeks damages against all defendants under the Racketeer Influence and Corrupt Organizations Act ("RICO"), _18 U.S.C. §§ 1964(c)_ and _(d)_ (Counts 2 and 3), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), _Fla. Stat. § 501.201_ (Count 4), and state [*12] common law fraud and unjust enrichment causes of action (Counts 5 and 6). Additionally, State Farm seeks a declaration that it is not liable for payment on any as yet unpaid claims generated by the scheme under the Declaratory Judgment Act, _28 U.S.C. §2201_ (Count 1).

## II. Standard of Review

Under _Fed. R. Civ. P. 8(a)(2)_, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under _Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_, a complaint "does not need detailed factual allegations," but must state enough facts to state a claim to relief that is plausible on its face. In _Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed.2d 868 (2009)_, the Supreme Court clarified that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Id at 1949_.

In ruling on a motion to dismiss, the court generally accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. _Harris v. United Auto. Ins. Group, Inc., 579 F.3d 1227, 1230 (11th Cir. 2009)_; [*13] _Wilson v. Strong, 156 F.3d 1131, 1133 (11th Cir. 1998)_. However, this tenet is inapplicable to legal conclusions. _Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868_. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." _Id_.

Thus, in considering a motion to dismiss, a court should (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." _Kivisto v Miller, Canfield, Paddock and Stone, PLC, 413 Fed. Appx. 136 (11th Cir. 2011)_, quoting _Iqbal, 129 S. Ct. at 1950_. Further, the court may infer from the factual allegations in the complaint other

---

which payment was made (BI, UM or PIP) and date that bills and related medical reports were mailed to State Farm with attorney demand letter.

"obvious alternative explanation[s]," which suggest lawful conduct rather than the unlawful conduct urged by the plaintiff. _Id_.

Finally, where a claim is grounded in fraud, such as State Farm's RICO and common law fraud claims, the complaint must also comply with the heightened pleading requirements of _Fed. R. Civ. P. 9(b)_. _Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG, 341 Fed. Appx. 487 (11th Cir. 2009)_(unpub).

## III.  [*14] Discussion

## A. Civil RICO Claims

## 1. Substantive RICO claim under 1964(c)(Count 2)

Under _18 U.S.C. § 1962(c)_, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity or collection of unlawful debt." _18 U.S.C. § 1962(c)_.

Any person injured in his business or property by such racketeering activity has a civil cause of action for the recovery compensatory damages, treble damages and attorneys' fees. _18 U.S.C. § 1964(c)_. To establish a prima facie civil RICO claim, a plaintiff must allege: (1) a substantive predicate violation of _§1962_; (2) injury to his or her business or property, and (3) a causal connection between the racketeering activity and the injury. _Avirgan v. Hull, 932 F.2d 1572 (11th Cir. 1991)_; _Kramer v. Bachan Aerospace Corp., 912 F.2d 151, 154 (6th Cir. 1990)_.

To establish a substantive violation of _§ 1962_, the plaintiff must allege: (1) the conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. _Williams v. Mohawk Indus. Inc. 465 F. 3d 1277 (11th Cir. 2006)_; [*15] _RAO v BP Products North America, Inc., 589 F.3d 389 (7th Cir. 2009)_.

"Racketeering activity" includes specified predicate acts such as mail fraud or wire fraud. _18 U.S.C. §1961(1)_. "Mail fraud" or "wire fraud" occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. _American Dental Ass'n v._

2011 U.S. Dist. LEXIS 107005, *15

*Cigna Corp., 605 F.3d 1283 (11th Cir. 2010)*.

In order to successfully allege a "pattern" of racketeering activity, plaintiff must charge the commission of two or more predicate acts within a ten year time span that are related to each other and which amount to or pose a threat of continued criminal activity. *Jackson v Bellsouth Telecommunications, 372 F.3d 1250, 1264 (11th Cir. 2004)*; *American Dental, 605 F.3d at 1290-91*.

To plead "fraud" with particularity, as prescribed by *Rule 9(b)*, a civil RICO plaintiff must allege, as to each defendant: (1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which these statements misled the plaintiffs, and (4) what the defendants gained by the alleged fraud. *American Dental, 605 F.3d at 1291*. [*16] *See generally Brooks v. Blue Cross & Blue Shield, 116 F.3d 1364 (11th Cir. 1997)*. Where multiple defendants are involved, the complaint must not lump together all defendants, but rather must inform each defendant of the nature of his or her alleged participation in the fraud. *Ambrosia Coal & Construction Co. v. Pages Morales, 482 F.3d 1309, 1317 (11th Cir. 2007)*.

Under *18 U.S.C. § 1962(d)*, it is also illegal for anyone to conspire to violate one of the substantive provisions of RICO, including *§1962(c)*. A plaintiff can establish a RICO conspiracy in one of two ways: (1) by showing that the defendant agreed to the overall objection of the conspiracy or (2) by showing that the defendant agreed to commit two predicate acts. *American Dental, 605 F.3d at 1293*.

In this case, at Count 2 of its amended complaint, State Farm charges a substantive violation of *§ 1962(c)* against all defendants based on their coordinated roles in causing the submission of false and misleading medical bills and reports for medically unnecessary services allegedly rendered to patients pursuing personal injury (BI/UM) claims or medical payment insurance claims (PIP) against State Farm via an association-in-fact [*17] enterprise made up of all defendants. As to this substantive RICO claim, defendants argue that State Farm has failed to adequately plead:

(a) sufficient facts to state a claim to relief that is plausible on its face as required under *Rule 8(a)*, or to state with particularity the circumstances constituting

fraud as required by *Rule 9(b)*;

(b) the existence of an "association in fact" enterprise among the defendants which functions for some purpose other than for defendants to engage in racketeering activity and that has an existence distinct from that of the racketeering activity;

(c) each defendant's participation, direct or indirect, in the enterprise's affairs;

(d) economic damages to State Farm;

(e) proximately caused by the pattern of racketeering activity;

(5) economic injury to State Farm.

### a. *Rule 8(a)* and *Rule 9(b)* Pleading Requirements

State Farm's amended complaint, including the attached claim chart, describes each allegedly fraudulent claim in detail, providing (1) the precise misrepresentation at issue (i.e. the necessity for and positive results of discograms, the necessity for PDs and false use of CPT Codes to describe the PDs ; (2) the identity of the defendant(s) allegedly involved [*18] in each particular claim and misrepresentation; (3) the claim number; (4) the amounts billed and the dates the bills and reports were mailed to State Farm; (5) the number/level of discs tested by discogram and number/level of discs subjected to the PD procedure based on those tests; (6) the name of the patient's attorney; (7) the relevant policy limits; (8) the amount which State Farm actually paid on the claim and the type of coverage under which the claim was paid and (9) unusual medical reporting patterns from which fraudulent intent may be inferred. These allegations are sufficient to satisfy the plausibility and particularity requirements of *Rule 8(a)* and *Rule 9(b)*. *See e.g. AIU Insurance Co. v. Olmecs Medical Supply, Inc., 2005 U.S. Dist. LEXIS 29666, 2005 WL 3710370 (E.D.N.Y. 2005)*; *State Farm Mutual Auto Ins. Co. v. Weiss, 410 F. Supp. 2d 1146 (M.D. Fla. 2006)*; *Allstate Ins. Co v. Halima, 2009 U.S. Dist. LEXIS 22443, 2009 WL 750199 (E. D. N. Y. 2009)*; *State Farm Mut Auto Ins. Co v. CPT Medical Services, PC, 2008 U.S. Dist. LEXIS 71156, 2008 WL 4146190 (E. D. N. Y. 2008)*; *State Farm Mutual Auto Ins. Co. v. Makris, 2003 U.S. Dist. LEXIS 3374, 2003 WL 924615 (E.D. Pa. 2003)*. *See also Hill v. Morehouse Medical Associates, Inc., 2003 U.S. App. LEXIS 27956, 2003 WL 22019936 * 4-5 (11th Cir. 2003)* [Published in table format at *82 Fed. Appx. 213.*]; *United States ex rel. Harris v Bernad, 275 F. Supp. 2d 1 (D. D. C. 2003)*.

2011 U.S. Dist. LEXIS 107005, *18

**b.  [*19] Existence of an "Association-in-Fact" Enterprise**

RICO defines an "enterprise" to include "any individual, partnership, corporation association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. *United States v Turkette, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed.2d 246 (1981)*. An association in fact enterprise reaches a group of persons associated together for the common purpose of engaging in a course of conduct, and is proved by evidence of "an ongoing organization, formal or informal," as well as evidence "that the various associates function as a continuing unit." *Turkette 452 U.S. at 580, 583*; *452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246*.

An association in fact enterprise must have three structural features - a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose. *Boyle v United States, 556 U.S. 938 129 S. Ct. 2237, 2244-45, 173 L. Ed. 2d 1265*; *556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed.2d 1265 (2009)*(association-in- fact enterprise under RICO must have structure, but not necessarily a hierarchical structure, chain of command or other business-like attributes).

In this case, the overarching  [*20] RICO enterprise described in State Farm's amended complaint is an association-in-fact enterprise consisting of the individually named physicians responsible for performing the diagnostic tests and procedures in question, the corresponding professional associations which employed these physicians and billed for their services, the corporation which owned the out-patient surgery center where the discograms and PDs were performed, the physician who held an ownership interest in that entity, encouraged false use of CPT Codes to inflate billings generated at that facility and generated false or misleading bills on behalf of Discocare relating to Spine Wand charges payable to that corporation; the two non-physicians (Carroll and Izydore) responsible for supplying a steady chain of insured patients to Drs. Bistline, Kugler and Gomez via a network of referring personal injury attorneys and Palm Beach Pain Management Inc., the corporation through which Carroll and Izydore funneled the ill-begotten gains of the enterprise as profit to themselves.

All defendants, individually and collectively, fulfilled a role in the enterprise and depended on the participation of the others to pursue the common  [*21] goal of committing insurance fraud: Dr. Bistline knowingly performed medically unnecessary discograms to produce predetermined positive results; Drs. Kugler and Gomez knowingly performed the medically unnecessary PDs, relying on the predetermined positive results of discograms generated by Dr. Bistine; Jane Bistline PA, Jeffrey Kugler PA, Heldo Gomez PA, and North Palm Neurosurgery LLC knowingly created fraudulent bills for professional medical services for the unnecessary tests and procedures for submission to State Farm; the Surgery Center generated fraudulent bills for facility fees for the medically unnecessary procedures performed by Drs. Kugler and Gomez for submission to State Farm; Dr. Cutler knowingly encouraged and participated in false and misleading billing practices which promoted the goals of the enterprise and knowingly profited from the medically unnecessary PDs through his ownership interest in the Surgery Center and Discocare; the two non- physicians, Carroll and Izydore, coordinated the activities and relationships between all defendants and used Palm Beach Pain Management Inc. to siphon profits from the Surgery Center under guise of "management fees" charged to  [*22] Jeffrey Kugler P.A.

The association described in plaintiff's amended complaint qualifies as an association-in-fact RICO enterprise because it consisted of a group of individuals and entities that associated together for the common purpose of engaging in a course of fraudulent conduct that included defrauding State Farm into paying bills for medical testing and services that were not necessary. Boyle. The complaint describes the interrelationships between each set of defendants and their respective roles in the scheme; it also shows how the enterprise has functioned as a continuing unit since 2004 with longevity sufficient to permit its members to pursue the illicit purpose of the enterprise. These allegations are sufficient to describe the structure of an association-in-fact enterprise under *Boyle.* *AIU Insurance Co. v. Olmecs Medical Supply, Inc., 2005 U.S. Dist. LEXIS 29666, 2005 WL 3710370 (E. D. N. Y. 2005)*; *State Farm Automobile Insurance Co. v. Lincow, 715 F. Supp. 2d 617 (E.D. Pa. 2010)*.

**c. Individual Defendant Participation in Affairs of Enterprise**

In order to "participate, directly or indirectly, in conduct of [an] enterprise's affairs," within the meaning of the RICO statute, one must have some part in  [*23] either the management or the operation of the affairs of the

enterprise itself. *Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. While it is not necessary for any given defendant to have primary responsibility over the enterprises's affairs, or even hold a formal position in the enterprise, the plaintiff must show that the defendant took "some part" in directing those affairs. *Id. at 179*. Lower level participants under the direction of upper management may be found to satisfy this test where they "knowingly implement[]" and "make decisions" under the direction of upper management. *United States v Browne, 505 F.3d 1229 (11th Cir. 2007)*.

In this case, State Farm alleges that Drs Bistline, Kugler and Gomez each knowingly participated in the rendition of unnecessary medical testing and surgical procedures, and themselves submitted fraudulent bills for professional fees to State Farm through the professional medical associations by which they were employed; that Dr. Cutler participated through his ownership interest in the Surgery Center and Discocare, promotion of use of false CPT Codes to inflate billing for PDs and generation of fraudulent "Spine Wand" [*24] bills for submission to State Farm under guise of an out-of-pocket material fee which did not exist; and that Carroll and Izydore coordinated the activities of all defendants and siphoned off profits to themselves under guise of "management fees" billed to Jeffrey Kugler P.A.

These allegations sufficiently explain how each individual defendant participated in either the operation or management of the enterprise for purpose of satisfying *Reves*. *See e.g. State Farm Mut. Auto Ins. Co v. Weiss, 410 F. Supp. 2d 1146 (M.D. Fla. 2006)*(*Reves* satisfied where plaintiffs alleged that defendant physician decided what fraudulent diagnostic test to perform, marketed fraudulent tests to chiropractors, taught lay people how to read test results and prepare reports, and created boilerplate language for test reports submitted to insurance companies); *Allstate Ins. Co. v. Ahmed Halima, M.D., 2009 U.S. Dist. LEXIS 22443, 2009 WL 750199 *1, 4-6 (E. D. N. Y. 2009)*; *State Farm Mut. Auto Ins. Co v. CPT Medical Services, PC, 2008 U.S. Dist. LEXIS 71156, 2008 WL 4146190 *4-5, 10-13 (E. D. N. Y. 2008)*; *State Farm Mutual Auto Ins. Co. v. Makris, 2003 U.S. Dist. LEXIS 3374, 2003 WL 924615 (E.D. Pa. 2003)*. *See also Williams v Mohawk Indus., Inc., 465 F.3d 1277 (11th Cir. 2006)*(allegations showing [*25] "some direction over recruiters" held sufficient to satisfy operation or management requirement of *Reves*); *Coquina Investments v. Rothstein, 2011 U.S. Dist. LEXIS 7062, 2011 WL 197241 *3 (S.D. Fla. 2011)*(allegation that bank prepared misleading letters

to investors assuring them that their accounts were irrevocably "locked" and therefore safe when in fact co-defendant had access to accounts held sufficient to satisfy *Reves)*.

**d. Proximate Cause**

A civil RICO plaintiff must also show he or she is a person injured "by reason of" a defendant's racketeering activity. *18 U.S.C. § 1964(c)*. This is a proximate cause requirement, which, in the RICO context, requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed.2d 532 (1992)*; *Anza v Ideal Steel Supply Corp., 547 U.S. 451, 126 S. Ct. 1991, 164 L. Ed.2d 720 (2006)*(the "central question" in analyzing a RICO claim for proximate cause is "whether the alleged violation led directly to the plaintiff's injuries"). A link between the injury asserted and the injurious conduct which is too remote, purely contingent or indirect is insufficient to establish [*26] proximate cause under RICO. *Hemi Group, LLC v. City of New York, N.Y., ___ U.S. ___, 130 S. Ct. 983, 175 L.Ed.2d 943 (2010)*.

*Anza* requires an evaluation of the "motivating principle[s]" behind the directness component of the proximate cause requirement in the RICO context. *Williams v Mohawk Industries, Inc., 465 F.3d 1277 (11th Dir. 2006)*, citing *Anza 126 S. Ct. at 1997*. One motivating principle underpinning the proximate cause requirement derives from concerns over the difficulty of trying to ascertain damages caused by some remote action. A second motivating factor is the risk of duplicate recoveries. *Id* citing *Holmes, 503 U.S. at 269-70*.

Finding neither of these concerns implicated here, the court concludes that the allegations of State Farm's complaint supporting proximate cause are sufficient to withstand the current motion to dismiss. State Farm alleges that it paid over $13 million in settlement of PIP, UM and BI insurance claims in accordance with its contractual obligations to its insureds, making settlement decisions in direct reliance on fraudulent bills and medical documentation submitted by the defendants which had the effect of artificially inflating the value of the patient's [*27] personal injury claims. According to its complaint, the defendants' widespread scheme of knowingly subjecting automobile accident patients to unnecessary medical testing and surgical procedures had the purpose and direct result of increasing the amount of money State Farm was

induced to pay under time sensitive demand notices in order to settle insurance claims by or on behalf of its insureds. Thus, there is a direct and easily identifiable connection between the fraud at issue (submission of bills for unnecessary medical tests and procedures) and the plaintiff's injury (overpayment on first and third party insurance claims (PIP, UM, BI) based on fraudulent medical bills and reports).

Unlike the plaintiffs in *An za, Holmes* and *Hemi Group*, in this case State Farm is the direct target of the defendants' alleged fraud, and the financial loss asserted is a direct consequence of the alleged fraudulent conduct. The allegations of the complaint demonstrating these factors are sufficient to satisfy RICO proximate cause requirements. *See e.g. Williams v Mohawk Industries, Inc., 465 F.3d 1277 (11th Cir. 2006)*(employer's widespread scheme of knowingly hiring and harboring illegal workers had purpose [*28] and direct result of depressing wages paid to legal workers, who alleged a deprivation of individual and collective bargaining power and injury by direct and proximate reason of the employer's illegal conduct); *State Farm Mutual Automobile Ins. Co. v Lincow, 715 F. Supp. 2d 617, 634 n. 14 (E.D. Pa. 2010)*; *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C., 691 F. Supp. 2d 772 (N.D. Ill. 2010)*; *State Farm Mutual Automobile Ins. Co. v. Grafman, 655 F. Supp. 2d 212, 229 (E.D.N.Y. 2009)*; *State Farm Mutual Automobile Ins. Co. v. Abrams, 2000 U.S. Dist. LEXIS 1524, 2000 WL 152143 (N.D. Ill. 2000)*. The amended complaint alleges that State Farm was fraudulently induced to pay over $13 million dollars on first and third party insurance claims presented by the patient's attorney. To the extent those claims were made in reliance on the defendants' alleged fraudulent billing and medical reports, State Farm has suffered a direct and cognizable injury for which it may seek redress under the federal RICO statute.

There is no more directly injured party who could bring suit. The defendants posit that the affected patients are the ones most directly affected by the rendition of unnecessary and intrusive medical testing and surgical [*29] procedures. While the affected patients could theoretically sue for personal injuries suffered as a result of being subjected to unnecessary diagnostic testing and medical procedures, they could not sue to recover insurance benefits previously collected by defendants via the patient's State Farm PIP insurance or via third party UM/BI settlement proceeds paid by State Farm and distributed to defendants through the patient's attorney. *See e.g. Steele v. Hospital Corp. of America, 36 F.3d 69, 70 (9th Cir. 1994)*(insurance companies, not patients themselves, suffered financial loss from allegedly fraudulent health care billings; patients lacked standing under RICO if they paid none of the allegedly excessive charges out-of- pocket). As the party directly injured by the alleged fraudulent conduct, State Farm is entitled to recover to the extent its settlement decision making was influenced and distorted by false billings generated by the defendants. *See e.g. State Farm Mutual Auto. Ins. Co. v. Lincow, 715 F. Supp. 2d 617 (E.D. Pa. 2010)*; *State Farm Mutual Auto. Ins. Co. v Abrams, 2000 U.S. Dist. LEXIS 1524, 2000 WL 152143 (N.D. Ill. 2000)*.

The court accordingly concludes that complaint adequately alleges a causal relation [*30] between the defendants' conduct and State Farm's injuries which satisfies the RICO proximate cause pleading requirement at this juncture. *See Williams v Mohawk Industries, Inc., 465 F.3d 1277, 1288-89 (11th Cir. 2006)*. *See also BCS Services, Inc. v Heartwood 88, LLC, 637 F.3d 750 (7th Cir. 2011)*.

**e. Economic Injury**

A civil RICO plaintiff under *§§ 1964(c)* must show that the racketeering activity alleged caused him to suffer an economic injury. *Beck v. Prupis, 162 F.3d 1090 (11th Cir. 1998)*; *Sedima, S.P.R.L v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)*. This limitation on RICO standing has a "restrictive significance," *Reiter v Sonotone Corp., 442 U.S. 330, 339, 99 S. Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)* which helps to assure that RICO is not expanded to provide "a federal cause of action and treble damages to every tort plaintiff." *Oscar v University Students Co-op Ass'n, 965 F.2d 783, 786 (9th Cir.)*(en banc), *cert. den.*, *506 U.S. 1020, 113 S. Ct. 655, 121 L. Ed. 2d 581 (1992)*.

In this case, defendants argue that there are insufficient allegations of "economic injury" under the Eleventh Circuit's recent refinement of this RICO standing limitation set forth in *Ironworkers Local Union 68 et al. v AstraZeneca Pharmaceuticals, LP, 634 F.3d 1352 (11th Cir. 2011)*. [*31] In *Ironworkers*, the plaintiffs were health benefit plans who filed RICO claims against the manufacturer of a drug called "Seroquel," alleging that the manufacturer falsely represented to prescribing physicians that it was safer and more effective in treating certain off- label conditions than less expensive drugs used to treat the same conditions. Plaintiffs alleged that the physicians relied on those false

2011 U.S. Dist. LEXIS 107005, *31

representations in prescribing the drug, and, as a result, routinely prescribed Seroquel instead of cheaper alternatives for their patients. The plaintiff insurers alleged that they paid more for the Seroquel as a result of that scheme, and sought to recover the difference between what they paid for Seroquel and the cost of the cheaper alternative drugs.

In affirming the dismissal of the claim, the Eleventh Circuit found that plaintiffs failed to allege that they suffered any cognizable economic injury as a result of the defendants' conduct. It noted that Seroquel was listed on plaintiff's "drug formularies" or lists of drugs approved for coverage, thereby contractually obligating plaintiff to pay for all prescriptions of the drug under all circumstances. The court explained:

> The [*32] insurers, under the terms of the insurance policies, consciously exposed themselves to pay for all prescriptions of Seroquel, including those that were medically unnecessary or inappropriate - even if such prescription were birthed by fraud. In light of such broad exposure, conventionally a rational insurer would have charged its enrollees higher premiums than it would have if its policies offered more limited prescription drug coverage These higher premiums, in turn, would compensate the insurer for this increased number of prescription payments, including payments for prescriptions that were medically unnecessary or inappropriate. Moreover, to the extent the insurer's payments for medically unnecessary or inappropriate prescriptions exceeded the premiums charged, only actuarial errors would be to blame. Here, the insurers pled no facts to suggest that they somehow established premiums in a manner distinct from this conventional understanding; consequently, the district court had to dismiss their claims because they failed to allege plausibly that Astrazeneca's false representations caused them to suffer economic injury.

*Ironworkers, 634 F. 3d at 1360*. Because the insurers pled no [*33] facts suggesting that they established their rates in a manner inconsistent with the insurance industry's conventional rate-making procedures, the court inferred that it followed those procedures; because the insurers also listed Seroquel on a policy formulary, instead of requiring preauthorization review for off- label Seroquel use, the court further inferred that the insurers consciously chose to assume the risk of paying for all medically unnecessary or inappropriate prescriptions of

formulary listed drugs - like Seroquel - and that it adjusted its premiums upward to reflect the projected inflated value of claims likely to result from medically unnecessary or inappropriate prescriptions. On this twin predicate, the court concluded that the allegations of the complaint were insufficient so show a plausible economic injury caused by the manufacturer's false misrepresentations, and that plaintiffs therefore failed to meet their pleading burden under *Twombly* and *Iqbal.*

This case is distinguishable from *Ironworkers*, because, as State Farm notes, it did not unconditionally agree to pay for discograms and PDs regardless of medical necessity or fraud under its contractual obligation to its [*34] insureds; accordingly, there is no basis for inferring that State Farm factored the cost of medically unnecessary discograms and PDs into the premiums it charged its subscribers for PIP, UM or BI insurance.

In addition, unlike the plaintiffs in *Ironworkers*, in this case State Farm was the target of the alleged fraud and party to whom the defendants' misrepresentations were directed. While a determination of the alleged damages in *Ironworkers*, in contrast, would have required an analysis of the extent to which third parties (prescribing doctors) relied on the drug manufacturer's alleged misrepresentations when they prescribed Seroquel for their patients, with myriad other external forces potentially at play in that decision making process, in this case, the analysis would focus simply on the extent to which State Farm itself relied on the defendants' alleged fraudulent misrepresentations when it engaged in the settlement making decision process which resulted in its payment on the 198 BI, UM and PIP claims at issue in this suit.

In this situation, where the directly defrauded party presses a RICO claim against the alleged wrongdoer, there is no viable "pass on" defense, i.e. defendants [*35] cannot argue that plaintiffs not entitled to recover damages for costs which it has theoretically already passed on to its subscribers in the form of premium adjustments. *See e.g. Carter v. Berger, 777 F.2d 1173 (7th Cir. 1985)*(county was correct party to bring RICO claim for lost tax revenue against individual who fraudulently obtained lower tax assessment for property, even though county may have recouped the loss by raising the tax rate), citing and comparing *Hanover Shoe, Inc. v. United Shoe Machinery Corp, 392 U.S. 481, 488-95, 88 S. Ct. 2224, 2228-32, 20 L.Ed.2d 1231 (1968)*(direct purchaser may recover full overcharge from wrongdoer, trebled, for antitrust violation, even if it also recovered whole overcharge by raising its own

prices) with *Illinois Brick Co. v Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L.Ed. 2d 707 (1977)*(indirect purchaser recovers nothing, even if it bore the whole overcharge and even if direct purchaser did not sue). *See also County of Oakland v City of Detroit, 866 F.2d 839 (6th Cir. 1989)*(where county contracted with city, county was person injured in business or property with standing to bring RICO claim against city for alleged overcharges on sewage services [*36] allegedly resulting from price fixing conspiracy between city and others, despite fact that county may have passed overcharges on to municipal customers), *cert. den.*, *497 U.S. 1003, 110 S. Ct. 3235, 111 L.Ed.2d 747 (1990)*.

Because State Farm alleges it was the direct target and recipient of fraudulent bills and related medical documentation submitted by defendants in connection with unnecessary diagnostic tests and medical procedures allegedly performed by defendants throughout course of the fraudulent scheme alleged in the complaint, and that it was injured in its business or property when it paid first and third party insurance claims on behalf of its insureds in reliance on those bills and reports, the court finds the allegation of a cognizable economic injury which supports its standing to sue under RICO.

### B. RICO Conspiracy Claim under *§ 1964(d)*(Count 3)

To state a RICO conspiracy claim under *Section 1962(d)*, a plaintiff must allege, in addition to the substantive elements of a RICO claim, that each defendant "by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise." *Nasik Breeding & Research Farm Ltd v. Merck & Co., 165 F. Supp. 2d 514 (S.D.N.Y. 2001)*. [*37] An agreement may be manifested in one of two ways: (1) by showing an agreement on an overall objective, or (2) by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a "single objective" conspiracy. *United States v Starrett, 55 F.3d 1525 (11th Cr. 1995)*. Where there is no direct evidence of an agreement on an overall objective, the existence of the agreement may be established by circumstantial evidence of a scheme or inferences from the conduct of the alleged participant. *United States v. Lynch, 287 Fed. Appx. 66 (11th Cir. 2008)*; *Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935 (11th Cir. 1997)*.

In this case, State Farm has specifically details multiple

instances where defendants Bistline, Gomez and Kugler performed medically unnecessary tests and procedures which resulted in submission of fraudulent insurance claims to State Farm, and the manner in which their conduct was coordinated with that of other defendants who generated and oversaw a complex attorney referral network which funneled patients into the scheme; in addition, the complaint details the manner in which Dr. Cutler promoted use of false billing codes [*38] to boost the profitability of the PD procedure for attorneys and doctors, and also generated false and misleading billings for the Spine Wand used in PD procedures performed at the Surgery Center.

State Farm's allegation that all medical defendants participated in the creation and submission of multiple bills to State Farm based on fraudulent unnecessary medical testing and procedures over the 2005- 2008 time period is sufficient to show, at a minimum, that each defendant agreed to commit at least two predicate acts in furtherance of the fraudulent scheme. *Coquina Investments v Rothstein, 2011 U.S. Dist. LEXIS 7062, 2011 WL 197241 (S.D. Fla. 2011)*. The further allegation that the two non-physician defendants Carroll and Izydore were instrumental in creating and implementing the scheme, and contributed to its continuity by supplying a steady patient stream, all with full awareness that the scheme would ultimately result in rendition of unnecessary medical diagnostic testing and procedures and related mailing to State Farm of fraudulent medical bills on behalf of automobile accident patients, is sufficient to show their commission of at least two predicate acts of fraud in furtherance of the scheme. *See e.g. United States v. Marbella, 73 F.3d 1508 (9th Cir. 1996)*(mail [*39] fraud conviction based on mailing of fraudulent personal injury claims via settlement demand letter).

### C. Florida Common Law Fraud

As discussed above, State Farm adequately pleads the fraud allegedly committed by defendants, both in describing the alleged misrepresentations and attaching exhibits identifying the author and date of each alleged misrepresentation. Therefore, the court denies the motion to dismiss the common law fraud claims.

### D. Florida Unjust Enrichment

A cause of action for unjust enrichment includes the following elements: (1) plaintiff conferred a benefit on a

2011 U.S. Dist. LEXIS 107005, *39

defendant who has knowledge of that benefit; (2) defendant accepted and retained the benefit and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it. *Fito v Attorney's Title Ins. Fund, Inc., 83 So.3d 755, 2011 Fla. App. LEXIS 12521, 2011 WL 3477019 (Fla. 3d DCA Aug. 10, 2011)*.

The defendants argue that because the amended complaint does not allege that State Farm paid them directly, they could not have enjoyed the conferral of any benefit, thereby defeating the first element of this claim.

While State Farm may not have disbursed the $13 million paid on allegedly fraudulent PIP, UM [*40] and BI claims directly to the medical defendants, it is reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all medical lienors on the patient's behalf. *See e.g. MetraHealth Insurance Co. v. Anclote Psychiatric Hospital, Ltd., 1997 U.S. Dist. LEXIS 18690, 1997 WL 728084 *8 (M.D. Fla. 1997)*(cause of action for unjust enrichment does not require that defendants individually receive payments directly from plaintiff).

## E. Florida FDUPTA

*Section 501.212(4)(a)* of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) provides that "FDUTPA does not apply to any person or activity regulated under laws administered by the Office of Insurance Regulation or the Financial Services Commission." In this case, defendants allege that State Farm's activities are regulated by the Office of Insurance Regulation and that FDUTPA therefore has no facial applicability to the claims asserted here.

This argument loses sight of State Farm's status as the plaintiff alleging a violation of the FDUTPA against various medical providers and certain lay intermediaries [*41] based on the defendants' participation in an allegedly fraudulent billing scheme. These defendants and fraudulent billing activities are not regulated by the Office of Insurance regulation, and therefore, the FDUTPA potentially applies to the conduct described in State Farm's complaint.

Moreover, that the non-physician defendants (Carroll, Izydore and Palm Beach Pain Management) did not sell

products or services directly to State Farm, or receive direct payments directly from State Farm, does not preclude assertion of the FDUTPA claim against them individually. *Allstate Ins. Co. v Palterovich, 653 F. Supp. 2d 1306 (S.D. Fla. 2009)*.

## F. Affirmative Defenses

Finally, defendants contend plaintiff's claims are time barred on their face and/or barred by the Florida litigation privilege, warranting dismissal of all claims for failure to state a claim upon which relief may be granted.

### 1. Litigation Privilege

As initial matter, it is questionable whether the Florida litigation privilege has any applicability to the plaintiffs' federal RICO claims, *see e.g. Steffes v. Stepan Co., 144 F.3d 1070 (7th Cir. 1998)*(state absolute litigation privilege purporting to confer immunity from suit cannot defeat [*42] federal cause of action under Title VII and ADA); *Gerber v Citigroup Inc., 2009 U.S. Dist. LEXIS 11657, 2009 WL 248094 (E.D. Cal. 2009)*(federal RICO claims preempted California litigation privilege); *Acosta v Campbell, 2005 U.S. Dist. LEXIS 39889, 2006 WL 146208 (M.D. Fla. 2006)*; *Pescatrice v. Orovitz, 539 F. Supp. 2d 1375 (S.D. Fla. 2008)*, or to the presuit claims negotiation activity described in the plaintiff's complaint. *Compare Trent v. Mortgage Electric Registration Systems, Inc., 618 F. Supp.2d 1356 (M.D. Fla. 2007)*(Florida litigation privilege not applicable to presuit communications that are not required by law) *with Pledger v. Burnup Sims, Inc. 432 So.2d 1323 (Fla. 4th DCA 1983)* (presuit settlement communications might sometimes be considered acts "necessarily preliminary to" judicial proceedings).

The court need not resolve these issues here, because even if the privilege attaches, there are material questions of fact attending to its application under the circumstances alleged, making it premature to decide whether defendants' actions satisfy the criteria of a qualified privilege and, if so, whether circumstances exist which allow State Farm to overcome the privilege. *See e.g. Silver v Levinson, 648 So.2d 240 (Fla. 3d DCA 1995)*; *Axelrod v Califano, 357 So.2d 1048 (Fla. 1st DCA 1978)*.

### 2. [*43] Statute of Limitations

2011 U.S. Dist. LEXIS 107005, *43

A *Rule 12(b)(6)* dismissal based on the statute of limitations is proper only if it is "apparent from the face of the complaint" that the claim is time barred. *La Grasta v First Union Securities, Inc., 358 F.3d 840 (11th Cir. 2004)*. State Farm's civil RICO and state law claims are subject to a four year statute of limitation, but the perimeters of this limitations period are appropriately defined by reference to the delayed discovery doctrine, *Hearndon v Graham, 767 So.2d 1179 (Fla. 2000)*(accrual of fraud claims delayed until plaintiff knew or reasonably should have known of injury) and the doctrine of equitable tolling. *Grossman v Greenberg, 619 So.2d 406 (Fla. 3d DCA 1993)*(statute of limitations is tolled where defendant has engaged in fraudulent concealment).

Both doctrines implicate factual issues which the court cannot resolve on a motion to dismiss. Therefore, the court shall deny the motion to dismiss based on these affirmative defenses.

**IV. Conclusion**

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The defendants' motions to dismiss the plaintiffs' amended complaint [DE# 33, 21, 20, 27, 25 ] are **DENIED.**

2. The defendant Jane Bistline, M.D.'s motion to [*44] take judicial notice of certain administrative proceedings filed against Drs. Bistline and Kugler before the Florida Department of Health [DE# 29] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach Florida this 21st day of September, 2011.

/s/ Daniel T. K. Hurley

Daniel T. K. Hurley

United States District Judge

**End of Document**

## *State Farm Mut. Auto. Ins. Co. v. Punjwani*

United States District Court for the Southern District of Texas, Houston Division

December 31, 2019, Decided; December 31, 2019, Filed

CIVIL ACTION NO. H-19-1491

**Reporter**

2019 U.S. Dist. LEXIS 223054 *; 2019 WL 7372215

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, Plaintiffs, v. NOORUDDIN S. PUNJWANI, M.D., PAIN ALLEVIATION & INTERVENTIONAL NEEDS, PLLC, BARKETALI M. ROOPANI, ANIL B. ROOPANI, and SOHAIL B. ROOPANI, Defendants.

**Counsel:** [*1] For State Farm Mutual Automobile Insurance Company, State Farm County Mutual Insurance Company of Texas, Plaintiffs: Eric Tomas Gortner, Jared Thomas Heck, Katten Muchin et al, Chicago, IL; Ross O Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Emily Lauren Travis, Locke Lord LLP, Houston, TX United Sta.

For M.D. Nooruddin S. Punjwani, Defendant: Mark Stephen Armstrong, LEAD ATTORNEY, Polsinelli PC, Houston, TX; Todd W Mensing, LEAD ATTORNEY, Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C., Houston, TX; Sammy Ford, IV, Ahmad Zavitsanos Anaipakos Alavi & Mensing PC, Houston, TX.

For Pain Alleviation & Interventional Needs, LLC n/k/a Pain Alleviation & Interventional Needs, PLLC, Barketali M. Roopani, Anil B. Roopani, Sohail B. Roopani, Defendants: Mark Stephen Armstrong, LEAD ATTORNEY, Lauren E Tucker McCubbin, Polsinelli PC, Houston, TX.

**Judges:** EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** EWING WERLEIN, JR.

# Opinion

## MEMORANDUM AND ORDER

Pending is Defendant Nooruddin S. Punjwani's Motion to Dismiss (Document No. 14) and Defendants Pain Alleviation & Interventional Needs, PLLC, Barketali M.

Roopani, Anil B. Roopani, and Sohail B. Roopani's Motion to Dismiss (Document No. 15). After carefully considering [*2] the motions, response, replies, and applicable law, the Court concludes for the reasons that follow that both motions should be denied.

I. Background

Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm County Mutual Insurance Company of Texas (collectively "State Farm") allege that Defendants Nooruddin S. Punjwani, M.D. ("Dr. Punjwani") and Pain Alleviation & Interventional Needs, PLLC ("PAIN") engaged in a fraudulent scheme involving medically unnecessary treatment of motor accident victims. State Farm alleges it paid hundreds of allegedly fraudulent claims for medical services, including unnecessary medical evaluations, spinal injections, and related procedures, performed at PAIN locations by Dr. Punjwani on accident victims who submitted claims for insurance benefits under State Farm policies.[1] PAIN was formed as a Texas limited liability company in July 2015, and its sole members from formation through about June 2018 were Defendants Barketali Roopani and his sons, Anil B. Roopani and Sohail B. Roopani (collectively, "the Roopanis").[2] Dr. Punjwani has performed evaluations and injections at PAIN since its formation, and he is paid a fixed fee for every evaluation [*3] and injection he performs.[3]

According to State Farm, Dr. Punjwani and PAIN prepared fraudulent examination reports, MRI interpretive reports, and operative reports that purported to show that accident victims suffered serious injuries

---

[1] Document No. 1 ¶ 1 (Compl.).

[2] Id. ¶ 19. Currently, another son of Barketali Roopani, Rahil B. Roopani, M.D., is the sole member of PAIN, which after reorganization is now a PLLC. Rahil Roopani is not a party to this suit.

[3] Id. ¶ 18.

requiring the need for invasive treatment.[4] Dr. Punjwani allegedly performed the same cursory examination on each accident victim and prescribed an allegedly medically unnecessary series of three interlaminar epidural steroid injections ("ESIs") for virtually all patients with neck and/or back pain.[5] State Farm alleges that the serial ESIs were performed to inflate the potential value of the accident victims' insurance claims.[6] Dr. Punjwani billed for fluoroscopic guidance along with the ESIs, allegedly inflating the cost of the procedures, but there are no records or films of actual fluoroscopies, which is contrary to basic medical standards.[7]

As part of the diagnostic process, Dr. Punjwani interpreted MRI films and allegedly made an identical positive spinal injury diagnosis for each of the hundreds of accident victims.[8] He then used these findings as justification for the medically unnecessary invasive ESIs.[9] State Farm alleges that the boilerplate [*4] operative reports for the ESIs show that Dr. Punjwani made the same predetermined, non-specific diagnosis of each patient who received ESIs.[10]

State Farm alleges that at least as early as August 2015, Dr. Punjwani and PAIN began to enrich themselves through the victims' insurance claims made to State Farm.[11] Dr. Punjwani and PAIN created the bills for the allegedly unnecessary services and sent them to personal injury attorneys who then included the bills in demand packages for claims.[12] This scheme involved both (i) bodily injury claims made by accident victims who were not substantially at fault to the

insurance companies of the at-fault drivers and (ii) underinsured/uninsured motorist claims made by accident victims to their own insurance companies if they were unable fully to recover from the at-fault drivers' insurance companies.[13] State Farm alleges that Dr. Punjwani and PAIN's scheme was designed to induce State Farm to rely on the fraudulent bills and reports from Dr. Punjwani and PAIN to settle the bodily injury and underinsured/uninsured motorist claims with higher than warranted settlement offers.[14] The scheme was employed with knowledge that Texas insurance law subjects insurers [*5] to substantial liability for failing to accept reasonable settlement demands within policy limits on bodily injury claims or for not acting in good faith to provide a settlement when liability is reasonably clear.[15] As a result of the scheme, State Farm seeks damages of more than $3 million from Defendants for settlements of bodily injury claims and underinsured/uninsured motorist claims paid as a result of fraudulent treatments of the claimants by Dr. Punjwani and PAIN.[16]

State Farm alleges against Dr. Punjwani a claim under the _Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq.,_ and alleges against all Defendants a claim for money had and received. Defendants move to dismiss State Farm's claims under _Rule 12(b)(6)_ for failure to state a claim.[17]

II. Legal Standard

_Rule 12(b) (6)_ provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b) (6). When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. _See Scheuer v. Rhodes, 416_

---

[4] Id. ¶ 8.

[5] Id. 129. State Farm alleges that a routine series of three ESIs is never medically indicated, according to guidelines published by various medical organizations, because patients should be assessed after each ESI to determine if an additional injection is needed. Id. ¶ 30.

[6] Id. ¶ 3.

[7] Id. ¶ 60.

[8] Id. ¶¶ 3, 51.

[9] Id. ¶ 3.

[10] Id. ¶¶ 58-59.

[11] Id. ¶¶ 7, 11.

[12] Id. ¶ 8; id., ex. 5.

---

[13] Document No. 1 ¶ 4.

[14] Id. ¶ 9.

[15] Id. ¶ 5-6. _See G. A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 548 (Tex. Comm'n App. 1929, holding approved)_ (holding that insurance companies have a duty to accept reasonable offers to settle within policy limits); _Tex. Ins. Code § 541.060(a) (2) (A)_ ("It is an . . . unfair or deceptive act or practice in the business of insurance to . . . fail[] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear.").

[16] Document No. 1 ¶ 10.

[17] Document Nos. 14, 15.

*U.S. 232, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)*, abrogated on other grounds by *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence [*6] to support the claims. Id.

In considering a motion to dismiss under *Rule 12(b)(6)*, the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint. *See Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997)*. To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. While a complaint "does not need detailed factual allegations . . .[the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly, 127 S. Ct. at 1964-65*.

III. Discussion

A. RICO

"Claims under RICO, *18 U.S.C. § 1962*, have three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009)* (quoting *Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007)*). "A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal [*7] activity." *Snow Ingredients, Inc. v. SnoWizard, Inc., 833 F.3d 512, 524 (5th Cir. 2016)* (quoting *St. Germain, 556 F.3d at 263*). Dr. Punjwani argues that Plaintiff failed to plead its RICO claim with particularity as required by *Rule 9 (b)* ; "failed to plead any one RICO predicate act, let alone a pattern of racketeering activity"; and failed to allege any "enterprise.[18]

1. State Farm's Complaint meets the *Rule 9(b)* pleading standard.

Title *18, United States Code Section 1961(1)* lists a number of predicate acts, including wire fraud and mail fraud. RICO claims based on predicate acts of fraud are subject to the heightened pleading requirements of *Rule 9(b)*. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1138-39 (5th Cir. 1992)*. Under *Rule 9(b)*, parties "must state with particularity the circumstances constituting fraud or mistake." *FED. R. CIV. P. 9(b)*. To meet this standard, Plaintiff should "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Sullivan v. Leor Energciy, LLC, 600 F.3d 542, 551 (5th Cir. 2010)* (quoting *ABC Arbitrage v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002))*.

Dr. Punjwani argues that State Farm generally fails to allege any fraudulent activity because State Farm does not identify a single patient of PAIN who did not receive the treatment for which payment was sought and provides no factual basis for its contention that the services provided by Dr. Punjwani were unnecessary. However, State Farm's principal allegation is not that patients [*8] did not receive the treatment they sought from Dr. Punjwani and PAIN but rather that Dr. Punjwani and PAIN conducted illegitimate evaluations and made predetermined recommendations for medically unnecessary ESIs. State Farms's Complaint describes this scheme at length and provides detailed appendices that identify and illustrate the alleged fraudulent scheme, including initial exam reports, MRI reports, operative reports, and demand packages containing settlement information for the claims at issue.[19] State Farm's detailed allegations and appendices provide ample notice of the specifics of Dr. Punjwani's allegedly fraudulent conduct and are sufficiently particularized to satisfy *Rule 9(b)*. *See Allstate Ins. Co. v. Benhamou, 190 F. Supp. 3d 631, 659-60 (S.D. Tex. 2016)* (Harmon, J.) (concluding that detailed allegations of unnecessary treatment and inflated services leading to higher insurance claims "make the predicate acts alleged by Plaintiff plausible") (quoting *Adhikari v. Daoud & Partners, 697 F. Supp. 2d 674, 693 (S.D. Tex. 2009)* (Ellison, J.)).

2. State Farm sufficiently pleads predicate acts under RICO.

State Farm alleges that Dr. Punjwani's actions in the fraudulent scheme led to repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, one of the

---

[18] Document No. 14 at 7, 9.

[19] Document No. 1, exs. 1-33.

2019 U.S. Dist. LEXIS 223054, *8

predicate acts that may support a RICO violation.[20] Mail fraud requires "(1) a scheme [*9] to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Traxler, 764 F.3d 486, 488 (5th Cir. 2014)*. Dr. Punjwani allegedly submitted "fraudulent bills and supporting documentation for evaluations and injections which either were not performed, were not legitimately Dr. Punjwani argues that State Farm's pleadings do not state predicate acts of mail fraud because State Farm makes no factual allegations that Dr. Punjwani himself fraudulently used the mail. However, to state a claim for mail fraud, "the defendant need not personally effect the mailing. It is sufficient that the defendant . . . 'act with knowledge that the use of the mails will follow in the ordinary course of business.'" *Traxler, 764 F.3d at 488* (quoting *Pereira v. United States, 347 U.S. 1, 74 S. Ct. 358, 363, 98 L. Ed. 435 (1954)*; *see also Schmuck v. United States, 489 U.S. 705, 109 S. Ct. 1443, 1447, 103 L. Ed. 2d 734 (1989)* (requiring only that "the use of the mails is a part of the execution of the fraud") (citation omitted). State Farm's allegations that it used the mail to pay for the alleged fraudulent claims for unnecessary treatment, as anticipated by Punjwani, adequately allege fraudulent use of the mail.

Dr. Punjwani additionally argues that State Farm's pleadings fail to allege with any specificity that Dr. Punjwani acted with the specific intent to deceive, the third element of the predicate [*10] act of mail fraud. *See United States v. Plato, 593 F. App'x 364, 369 (5th Cir. 2015)* ("This court additionally recognizes a specific-intent requirement that the defendant . 'acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself.'") (quoting *United States v. Akpan, 407 F.3d 360, 370 (5th Cir. 2005)*). However, in Plato, the Fifth Circuit found that the misrepresentations for which the defendant was responsible were "ample evidence for a reasonable jury to find . . . [defendant's] specific intent to defraud." *Id. at 371*. Fraudulent intent similarly can be plausibly inferred from State Farm's Complaint and attached appendices that highlight the pattern of numerous cases in which Dr. Punjwani and PAIN allegedly provided fraudulent diagnoses and medically unnecessary treatment. *See Allstate Ins. Co. v. Plambeck, 802 F.3d 665, 675 (5th Cir. 2015)* (finding that circumstantial evidence that defendants participated in a scheme to defraud insurance companies was enough to prove intent for

mail fraud). State Farm has plausibly pled predicate acts of mail fraud that support its RICO violation claim.

3. <u>State Farm sufficiently pleads that PAIN is an enterprise under RICO</u>.

Dr. Punjwani argues that State Farm's RICO claim fails because PAIN is not an enterprise. To establish RICO liability, [*11] the plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Benhamou, 190 F. Supp. 3d at 648*. An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. *See also Akin v. O-L Invs., Inc., 959 F.2d 521, 533 (5th Cir. 1992)* ("[A]n 'enterprise' can include a corporation or other legal entity."); *B. Choice Ltd. v. Epicentre Dev. Assocs. LLC, No. H-14-2096, 2016 U.S. Dist. LEXIS 91635, 2016 WL 3911123, at *14 (S.D. Tex. May 12, 2016)* (Johnson, J.) ("An enterprise can be a formal organization that is itself a legal entity or an informal, nonlegal group known as an association-in-fact.").

State Farm adequately alleges that PAIN is an enterprise, as defined under *§ 1961(4)*, because of PAIN's status as a legal entity, which was initially organized and operated as a limited liability company and was later reorganized to be operated on an ongoing basis as a professional limited liability company.[22] *See B Choice Ltd., 2016 U.S. Dist. LEXIS 91635, 2016 WL 3911123, at *14* (finding that "Plaintiff has properly alleged the existence of a RICO enterprise" when Plaintiff had alleged that the Defendant LLC was "an ongoing legal entity").

Dr. Punjwani also argues for the first time in his [*12] reply brief that State Farm has not alleged facts showing that Dr. Punjwani had any managerial or supervisory role at PAIN in order to satisfy the participation and conduct requirement of RICO. *See 18 U.S.C. § 1962(c)* ("It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs."). Regarding the element of participation, a "nexus between the defendant, the enterprise, and the racketeering activity" is required, which "establish[es] by proof that the defendant has in fact committed the racketeering acts alleged, that the defendant's association with the enterprise facilitated

---

[20] Id. ¶ 73.

[22] Document No. 1 ¶¶ 71, 73.

2019 U.S. Dist. LEXIS 223054, *12

the commission of the acts, and that the acts had some effect on the enterprise." *Akin, 959 F.2d at 533-34*. The RICO statute requires that the defendant have "*some part in directing the enterprise's affairs*," but "RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Reves v. Ernst & Young, 507 U.S. 170, 113 S. Ct. 1163, 1170, 122 L. Ed. 2d 525 (1993)*. State Farm alleges that Dr. Punjwani, while working at PAIN, regularly initiated examinations and recommended and performed the medically unnecessary ESIs at the heart of the scheme. Because Dr. Punjwani was the sole individual [*13] making medically unnecessary treatment decisions central to the allegedly fraudulent scheme, the participation element has been pled sufficiently. Dr. Punjwani's motion to dismiss the RICO claim is denied.

B. Money Had and Received

All Defendants move to dismiss State Farm's claim for money had and received.[23] They argue that State Farm failed to identify fraudulent behavior that led to money received by Defendants; that even if Defendants received funds as result of fraudulent conduct, there is no liability because State Farm did not make any direct payments to Defendants; and that the chain of events alleged in the Complaint is too attenuated to create a plausible inference that any settlement money paid by State Farm for the claims at issue belongs in equity and good conscience to State Farm.

State Farm seeks to recover from Defendants the money that PAIN received from the allegedly fraudulent claims at issue.

> The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him. Again, it has been declared that a cause of action [*14] for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff.

*Bank of Saipan v. CNG Fin. Corp., 380 F.3d 836, 840 (5th Cir. 2004)* (quoting *Staats v. Miller, 150 Tex. 581, 243 S.W.2d 686, 687-88 (Tex. 1951))*. State Farm

alleges that it conferred a benefit upon Defendants by paying to personal injury claimants who sought treatment from Dr. Punjwani and PAIN more that $13 million to settle their bodily injury and uninsured motorist claims.[24] State Farm further alleges that PAIN and Dr. Punjwani's fraudulent bills and supporting reports induced State Farm to settle bodily injury and underinsured/uninsured motorist claims that it may not have settled otherwise, and that it paid more to settle these claims than it would have if it had known that the bills were fraudulent and the treatments medically unnecessary.[25] PAIN allegedly received its payments for the claimants and their personal injury attorneys; Dr. Punjwani allegedly received his payments from PAIN for each examination and the multitude of ESIs he performed on claimants as part of the scheme; and the Roopanis, as PAIN's sole members, in turn allegedly received [*15] PAIN's profits from the fraud. Under similar circumstances, this Court has permitted insurance companies to recover money paid for fraudulent billing through money had and received claims. *See DAC Surgical Partners v. United Healthcare Servs., Inc., No. 4:11-CV-1355, 2019 U.S. Dist. LEXIS 120880, 2019 WL 3252343, at *5 (S.D. Tex. July 7, 2019)* (citation omitted) ("The amount that United overpaid based on Par and Euston's fraudulent misrepresentations belongs to United 'in equity and good conscience.'"); *Aetna Life Ins. Co. v. Won Yi, No. H-14-900, 2019 WL 2355543, at *2 (S.D. Tex. June 4, 2019)* (concluding that insurance company met the requirements for a money had a received claim by showing that the defendants were paid money for dishonest claims). Therefore, State Farm has adequately pled fraudulent behavior that led to money received by Defendants.[26]

---

[24] Document No. 1 ¶ 78.

[25] Id.

[26] The Roopanis argue that State Farm does not allege any wrongful conduct by *them*, but State Farm does not need to allege that the Roopanis committed any wrongdoing other than receiving money from PAIN's fraudulent billing. *See, e.g.*, *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex., No. H-11-2086, 2012 U.S. Dist. LEXIS 102789, 2012 WL 3028107, at *4 (S.D. Tex. July 24, 2012)* ("A cause of action for money had and received is not based on wrongdoing but instead, 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'") (quoting *Doss v. Homecomings Fin. Network, Inc., 210 S.W.3d 706, 711 (Tex. App.-Corpus Christi 2006, pet. denied))*.

---

[23] Document Nos. 14, 15.

2019 U.S. Dist. LEXIS 223054, *15

Defendants argue that State Farm did not make direct payments to them and that the chain of events alleged in the Complaint is too attenuated. However, for a money had and received claim, a plaintiff does not need to prove that the defendant received money directly from the plaintiff. *See Bank of Saipan, 380 F.3d at 843* (allowing a money had and received claim against a defendant who did not receive money directly from [*16] plaintiff). Moreover, the payments to Defendants relate directly to Defendants' alleged scheme to seek inflated payments for the fraudulent treatments, and therefore are not too attenuated. Courts in other circuits have allowed unjust enrichment claims--with elements similar to Texas's money had and received claim--against medical providers who allegedly engaged in fraud schemes nearly identical to the one alleged in this case. *See, e.g., State Farm Mut. Ins. Co. v. Elite Health Ctrs., Inc., No. 16-13040, 2017 U.S. Dist. LEXIS 82736, 2017 WL 2351744, at *10 (E.D. Mich. May 31, 2017)* (denying motion to dismiss when plaintiff alleged that "fraudulent services were billed, the dates of the services and the amounts billed" and "that it would be inequitable to allow the individual defendants to retain the benefit of payments made for services that were not rendered or were not medically necessary"); *State Farm Mut. Auto. Ins. Co. v. Kugler, No. 11-80051, 2011 WL 4389915, at *12 (S.D. Fla. Sept. 21, 2011)* ("While State Farm may not have disbursed the $13 million paid on allegedly fraudulent . . . claims directly to the medical defendants, it is reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all medical lienors on the patient's behalf.").

Finally, the [*17] Roopanis argue that the Texas Business Organizations Code precludes State Farm's claim against them. *See Tex. Bus. Orgs. Code § 21.223(a)* ("A holder . . . an owner . . . or a subscriber . . . may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation . . . on the basis of actual or constructive fraud."); *§ 101.002* (applying *§ 21.223* to limited liability companies); *§ 101.114* ("[A] member or manager is not liable for a debt, obligation, or liability of a limited liability company."). These statutory provisions are facially inapplicable because State Farm does not allege that the Roopanis are liable for PAIN's contractual obligation, debt, or liability. Instead, State Farm alleges that the Roopanis received State Farm's money as "a portion of the funds obtained through Dr. Punjwani and P.A.I.N.'s

fraudulent scheme.[27]

The cases on which the Roopanis rely dismissed claims when the plaintiffs did not plead facts alleging that the LLC member defendants individually received plaintiffs' money through the LLC. *See Bates Energy Oil & Gas v. Complete Oilfield Servs., 361 F. Supp. 3d 633, 675-76 (W.D. Tex. 2019)* (dismissing a money had and received claim when plaintiff failed to allege facts showing that defendant individually received plaintiff's money); *Luppino v. York, No. SA-16-CV-00409-RCL, 2017 U.S. Dist. LEXIS 221246, 2017 WL 8161008, at *8 (W.D. Tex. Nov. 27, 2017)* [*18] (concluding that merely stating that plaintiff had invested money in an LLC in which defendants allegedly received a portion of plaintiff's investment money through other entities is "insufficient to sustain a claim for money had and received," and plaintiff's failure to plead that his money had passed through the entities to defendants was a factor in dismissal). Here, in contrast, State Farm alleges that the Roopanis, as sole members of PAIN, actually received State Farm's funds channeled through PAIN from the allegedly fraudulent insurance claims. This is sufficient to state a claim for money had and received.

IV. Order

For the reasons set forth above, it is

ORDERED that Defendant Nooruddin S. Punjwani's Motion to Dismiss (Document No. 14) and Defendants Pain Alleviation & Interventional Needs, PLLC, Barketali M. Roopani, Anil B. Roopani, and Sohail B. Roopani's Motion to Dismiss (Document No. 27) are DENIED. It is further

ORDERED that the temporary stay of discovery ordered on August 23, 2019, is LIFTED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 31st day of December, 2019.

/s/ Ewing Werlein, Jr.

EWING WERLEIN, [*19] JR.

UNITED STATES DISTRICT JUDGE

---

[27] *Id.* ¶¶ 19-22.

**End of Document**

### *United Healthcare Servs., Inc. v. Rossel*

United States District Court for the Northern District of Texas, Dallas Division

July 23, 2024, Decided; July 23, 2024, Filed

Case No. 3:21-cv-1547-L-BT

**Reporter**
2024 U.S. Dist. LEXIS 177289 *

UNITED HEALTHCARE SERVICES, INC. and UNITEDHEALTHCARE INSURANCE COMPANY, Plaintiffs, v. JEREMY ROSSEL, AMIR MORTAZAVI, CARY ROSSEL, ARVIN ZEINALI, YAN NAROSOV, and SEMYON NAROSOV, Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Partial summary judgment denied by, Summary judgment granted by, in part *United Healthcare Servs. Inc. v. Rossel, 2024 U.S. Dist. LEXIS 175446 (N.D. Tex., Sept. 27, 2024)*

**Prior History:** *United Healthcare Servs., Inc. v. Rossel, 2024 U.S. Dist. LEXIS 51188, 2024 WL 1252365 (N.D. Tex., Mar. 21, 2024)*

**Counsel:** [*1] For United Healthcare Services Inc, UnitedHealthcare Insurance Company, Plaintiffs: Shawn D Scott, LEAD ATTORNEY, Joseph James Minock, Nicole Marie Bigman, Scott Preston Kerew, Sinton Scott Minock & Kerew, Atlanta, GA; Adam Joseph Sinton, Benjamin Daniel Van Horn, Sinton Scott Minock & Kerew, Denver, CO; Andrew G Jubinsky, Figari & Davenport LLP, Dallas, TX; Timothy A Daniels, Figari Davenport, LLP, Dallas, TX.

For Jeremy Rossel, Defendant: John Anthony Scully, LEAD ATTORNEY, Nisha P Byers, Cooper & Scully PC, Dallas, TX; John D Volney, Lynn Tillotson Pinker and Cox LLP, Dallas, TX.

For Amir Mortazavi, Defendant: Michael S Alfred, LEAD ATTORNEY, VerisLaw, PLLC, Colleyville, TX; John D Volney, Lynn Tillotson Pinker and Cox LLP, Dallas, TX.

For Cary Rossel, Defendant: John Anthony Scully, LEAD ATTORNEY, Nisha P Byers, Cooper & Scully PC, Dallas, TX; John D Volney, Lynn Tillotson Pinker and Cox LLP, Dallas, TX.

For Arvin Zeinali, Defendant: Andrew Baxter Ryan, LEAD ATTORNEY, Ryan Law Partners LLP, Dallas, TX; John D Volney, Lynn Tillotson Pinker and Cox LLP, Dallas, TX.

For Yan Narosov, Defendant: John D Volney, Lynn

Tillotson Pinker and Cox LLP, Dallas, TX.

Semyon Narosov, Defendant, Pro se, [*2] Irving, TX.

For Critical Healthcare Management, LLC, ThirdParty Defendant: Michael Charles Elliott, LEAD ATTORNEY, McGuireWoods LLP, Dallas, TX.

**Judges:** REBECCA RUTHERFORD, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** REBECCA RUTHERFORD

## Opinion

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court are (i) Defendants Cary Rossel and Jeremy Rossel's (the "Rossel Defendants") Motion for Summary Judgment (ECF No. 679), and (ii) Plaintiffs UnitedHealthcare Services, Inc. and UnitedHealthcare Insurance Company's Motion for Partial Summary Judgment Against Defendants Amir Mortazavi and Arvin Zeinali (ECF No. 681). For the reasons set forth below, the undersigned finds and concludes that Plaintiffs fail to raise a genuine dispute of material fact as to certain of their fraud-based claims against the Rossel Defendants. Therefore, the undersigned recommends that the District Judge **GRANT**, in part, the Rossel Defendants' Motion and **DISMISS** with prejudice Plaintiffs' claims for fraud by nondisclosure and for violations of the Texas Uniform Fraudulent Transfer Act. The undersigned further recommends that the District Judge decline to make credibility determinations and indulge inferences [*3] in Plaintiffs' favor pertaining to Mortazavi and Zeinali's invocation of their *Fifth Amendment* rights and, thus, the District Judge should **DENY** Plaintiffs' Motion for Partial Summary Judgment Against Mortazavi and Zeinali.

2024 U.S. Dist. LEXIS 177289, *3

## Background

### A. <u>Procedural History</u>

In late November 2016, the government obtained an indictment against two majority owners of Next Health LLC—Defendants Semyon Narosov and Andrew Hillman—charging them with operating a kickback scheme at Forest Park Medical Center Dallas. *See United States of America v. Alan Andrew Beauchamp, et al.*, No. 3:16-cr-0516 (N.D. Tex). On January 26, 2017, Plaintiffs—a payor of health benefits that administers and insures health and welfare benefit plans—sued Next Health LLC and affiliated entities (collectively, "Next Health") for a variety of claims related to a multi-million-dollar healthcare fraud involving alleged false claims seeking payment for lab tests and prescription medications. *See United Healthcare Services, Inc., et al. v. Next Health, LLC, et al.*, No. 3:17-cv-00243 (N.D. Tex.) (the "Next Health litigation"), Compl., ECF No. 1.

On September 30, 2019, Plaintiffs sought leave to file their First Amended Complaint in the Next Health litigation, [*4] adding as individual defendants executives associated with Next Health, including Narosov and Hillman, as well as Cary Rossel, Jeremy Rossel, Amir Mortazavi, Arvin Zeinali, and Yan Narosov (collectively, the "Executive Defendants"). *Next Health*, No. 3:17-cv-00243, Mot. for Leave to Amend, ECF No. 293. With respect to the Executive Defendants, Plaintiffs sought to add claims for fraud and fraudulent nondisclosure; conspiracy to commit fraud; fraudulent transfers; and violations of *18 U.S.C. § 1962(c)*. On January 7, 2020, the Court granted Plaintiffs' motion, and Plaintiffs filed their First Amended Complaint. *Next Health*, No. 3:17-cv-00243, First Am. Compl., ECF No. 348.

In July 2021, United States District Judge Ada E. Brown severed Plaintiffs' claims against the Executive Defendants, giving rise to the instant lawsuit. *Next Health*, No. 3:17-cv-00243, Order, ECF No. 613. The Second Amended Complaint filed in the Next Health litigation, *see Next Health*, No. 3:17-cv-00243, ECF No. 584, became the live pleading in this severed action. Following Judge Brown's recusal, the matter was reassigned to United States District Judge Sam A. Lindsay who has referred the matter to the undersigned for pretrial management [*5] under *28 U.S.C. § 636(b)*.

*See* ECF Nos. 621, 672.[1]

The Rossel Defendants now move for summary judgment as to all Plaintiffs' claims against them, and Plaintiffs move for partial summary judgment as to their fraud claims against Defendants Mortazavi and Zeinali. In addition, the Rossel Defendants, as well as Mortazavi and Zeinali, have filed evidentiary objections.

### B. <u>Facts</u>[2]

### 1. *Plaintiffs' Payment of Next Health Claims*

Plaintiffs made payments to labs and pharmacies owned and operated by Next Health LLC based on information in claims submitted to them by Defendants. UHC000076148, UHC000076149, UHC000076150, UHC000076151, UHC000076152, UHC000076153, UHC000076154, UHC000489322 (UHC Lab Claim Data), UHC000485731, UHC000485732, UHC000485733, UHC000485734 (UHC Pharma Claim Data) (collectively, "UHC Claim Data").[3]

---

[1] The *Next Health* case was reassigned to United States District Judge Brantley Starr who, in March 2023, granted Plaintiffs' motion for case-ending sanctions against Next Health and its collective of licensed laboratories and pharmacies, struck those parties' pleadings, granted summary judgment against Next Health on Plaintiffs' fraud claims, and granted default judgment for Plaintiffs. *See United Healthcare Servs., Inc. v. Next Health LLC, 2023 U.S. Dist. LEXIS 47219, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023)*. Judge Starr treated Plaintiffs' summary judgment motion on the fraud claims as unopposed, noting that Next Health provided a one-page, "limited response" which stated only that "[Next Health] has no representatives or employees who can assist or direct any actions of counsel [which] ethically precludes . . . the formation of any substantive response." *United Healthcare Servs., Inc. v. Next Health LLC, 2023 U.S. Dist. LEXIS 47219, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023)*. On June 27, 2023, Judge Starr entered a final judgment in Plaintiffs' favor against Next Health for over $120 million. *See Next Health*, 3:17-cv-00243, Final J., ECF No. 750.

[2] This section sets forth the facts in accordance with the summary judgment standard summarized *infra*. The recitation of the facts draws from the uncontested evidence contained in the summary judgment record provided by the parties, and evidence to which the undersigned has overruled a party's objection.

[3] Plaintiffs have manually filed the UHC Claim Data under seal with the Court per ECF No. 690.

To timely process the volume of claims Plaintiffs receive, they must rely on providers to submit claims that contain true, accurate, and complete information. Tobin Decl. ¶ 4, ECF No. 706-5 at 45.[4] Plaintiffs rely on the information contained in claims to make payment determinations on those claims. *Id.* ¶ 5. The representations in each claim are material to this payment determination [*6] because they allow Plaintiffs to determine whether benefits need to be paid, and, if so, the amount of, and to whom, those benefits should be paid. *Id.*

Next Health labs and pharmacies submitted thousands of claims to Plaintiffs for payment. UHC Claim Data (filed manually under seal). Each claim submitted by a Next Health lab represented that the lab services listed therein had been ordered by a licensed medical provider and that the provider chose the listed diagnosis codes that support the services (i.e., their medical necessity). *Id.* The representation in Next Health lab claims that the lab services were ordered by a licensed medical provider is material to Plaintiffs' payment determinations as they would not pay for lab services not ordered by a licensed medical provider. Wilson Dep. 78, ECF No. 706-2 at 147; Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

None of the lab or pharmacy claims Next Health submitted to Plaintiffs disclosed that the referring/prescribing provider had a financial interest in the claim. UHC Claim Data (filed manually under seal). Plaintiffs do not pay for lab services or prescriptions that were ordered by a physician with a financial interest in the ancillary provider [*7] billing for those services/prescriptions. Pls.' Resp. to Mortazavi's Second Set of Interrog. 20, ECF No. 706-6 at 42-44; Tobin Decl. ¶ 6, ECF No. 706-5 at 45; UHC000492491 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 6. If Plaintiffs knew the lab services or prescriptions listed were induced by kickbacks, they would not have paid the amounts listed in the claims. Wilson Dep. 79, ECF No. 706-2 at 148; Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

By submitting claims to Plaintiffs, Next Health pharmacies—required to collect co-payments from patients—represented that they collected patient co-pays related to the patient and prescription listed in the claims. UHC Pharma Claim Data (filed manually under seal); UHC000492439 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 4. Whether a co-pay for a prescription has been collected from a patient is material because Plaintiffs do not pay pharmacy benefits unless a patient has paid their co-pay. Tobin Decl. ¶¶ 5, 6, ECF No. 706-5 at 45. If Plaintiffs knew that a co-pay had not been collected, they would not have made a payment to the pharmacy submitting the claim. Tobin Decl. ¶ 6, ECF No. 706-5 at 45; Anderson Dep. 63-65, ECF No. 706-2 at 8-10.

[*8] **2. Next Health and its Founders, Executives, and Marketers**

Next Health LLC began to operate in January 2015. Cary Dep. 61, ECF No. 706-2 at 36. It was the parent company for several licensed subsidiary entities that sought payments, in the form of claims for healthcare benefits, from Plaintiffs, including (a) five licensed laboratory entities: United Toxicology, LLC; US Toxicology, LLC; Medicus Laboratories, LLC; American Laboratories Group, LLC (ALG); and True Labs, LLC, and (b) at least four Class A licensed pharmacies entities. Next Health was also the parent of dozens of shell companies—both syndicated, unlicensed labs and Class G pharmacies—that Next Health and its executives used to disguise kickbacks to physician referral sources by characterizing those kickbacks as distributions on those physicians' investments in the shell companies. S. Narosov Factual Resume ¶¶ 3(a), 10, ECF No. 706-5 at 48, 49; S. Narosov Dep. 25, 30, 32, ECF No. 706-2 at 93-95; Cary Dep. 11, ECF No. 706-2 at 27; Cary Dep. Ex. 1 (NH-00494287) (Legal Entity Org. Chart), ECF No. 706-2 at 157; Jeremy Dep. 65, 196, 251, ECF No. 706-2 at 48, 74, 75; Anderson Dep. 17, ECF No. 706-2 at 3.

Defendant Semyon Narosov [*9] was a founder of Next Health and on its Board of Managers. In 2018, Narosov (as well as Andrew Hillman) pleaded guilty to using Next Health to launder money derived from healthcare fraud. *See generally* Plea Agreement, *U.S. v. Semyon Narosov, Andrew Hillman*, No. 3:18-CR-0475-JJZ, 2018 WL 11193541, ECF Nos. 8, 9 (N.D. Tex. Sept. 24, 2018).

Defendant Cary Rossel was a founder of Next Health and a member of its Board of Managers, as well as a part owner of Next Health, a general partner in Next

---

[4] Citations to the summary judgment record and the parties' briefing refer to the CM/ECF page number at the top of each page rather than page numbers at the bottom of each filing. Except where otherwise noted, citations in this Background section are to the Appendix to Plaintiffs' Response to Motion for Summary Judgment filed by Defendants Cary Rossel and Jeremy Rossel (ECF No. 706-1 through 706-8) (Pls.' Summ. J. Resp. App.).

Health subsidiary Pharma Holdings US, and he received distributions for his ownership. Cary 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 39; Cary Dep. Ex. 5, ECF No. 706-2 at 158. Cary assisted in creating the organizational structure of Next Health and its subsidiaries. Yan Dep. 24-25, ECF No. 706-2 at 155-56.

Defendant Jeremy Rossel was Next Health's Chief Financial Officer and, starting in August 2016, he was also a member of its Board of Managers. Jeremy 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 41; Jeremy Dep. 37, ECF No. 706-2 at 46. Jeremy was a part owner of Next Health and received distributions for his ownership. Cary Dep. Ex. 5, ECF No. 706-2 at 158-86; Jeremy Dep. 43, ECF No. 706-2 at 47. Jeremy was generally responsible for Next Health and its subsidiaries' bookkeeping and payment [*10] processing between bank accounts and to third parties. Jeremy Dep. 65, 73, ECF No. 706-2 at 48, 51.

Defendant Amir Mortazavi held the titles of Next Health's Director of Pharmacy, Chief Commercial Officer, and Chief Development Officer. 03/15/2021 Mortazavi Resp. to Interrog. 1, Appendix to Plaintiffs' Motion for Partial Summary Judgment against Defendants Amir Mortazavi and Arvin Zeinali (Pls.' Summ. J. App.), ECF No. 682-3 at 2. Mortazavi held an ownership interest in Next Health through a company called AM Healthcare Holdings, LLC. BVA 01636, ECF No. 682-3 at 110. In addition to salary, he received distributions from Next Health through AM Healthcare Holdings. *See, e.g.*, NH-00222735, ECF No. 682-3 at 144.

Defendant Arvin Zeinali was the director of Next Health's Pharmacy division responsible for managing Next Health pharmacists across multiple locations, and an owner of Next Health through a company called ISM Holdings, LLC. S. Narosov Dep. 190:24-191:4, ECF No. 682-2 at 18; 4/12/2021 Zeinali Resp. to Interrog. 1, ECF No. 682-3 at 3; Zeinali 00000025, ECF No. 682-3 at 196. In addition to salary, he received distributions from Next Health through ISM Holdings. *See, e.g.*, NH-00222735, [*11]  ECF No. 682-3 at 144.

Erik Bugen was a Next Health marketer, who founded the Austin Drug and Rehabilitation Foundation (a/k/a "ADAR Group" or "ADAR") with Kirk Zajac, which Bugen used to create and operate a set of clinics in Austin and Houston where staff collected urine and saliva specimens that were tested at Next Health labs. Bugen Decl. ¶ 3, ECF No. 706-5 at 28.

### 3. The ADAR Group

Bugen and Zajac paid multiple doctors to use the doctors' signatures and NPI numbers to order laboratory testing from Next Health for samples collected in Austin and Houston. Bugen Decl. ¶¶ 3, 4, ECF No. 706-5 at 28-29. Claims submitted to Plaintiffs by Next Health labs based on tests that were originated by the ADAR Group falsely identified the physicians associated with ADAR as the referring physician that ordered the lab services listed in the claim. UHC Claim Data (filed manually under seal). Patients, however, did not see doctors prior to obtaining testing, did not receive the results, did not consult with doctors after test results were received, and did not know the real reason why their samples were taken and sent to Next Health laboratories. Bugen Decl. ¶ 4, ECF No. 706-5 at 28-29. Next Health executives, [*12]  including Jeremy Rossel, knew that Bugen was not a medical provider. Jeremy Dep. 113, ECF No. 706-2 at 56.

In June 2015, Bugen began sending Next Health urine specimens so that Next Health could perform lab tests and bill payers for performing those tests. Bugen Decl. ¶ 9, ECF No. 706-5 at 30-31; Jeremy Dep. 92, ECF No. 706-2 at 55. In August 2015, Bugen communicated with Next Health executives about Next Health helping him purchase a "sober living home" to be used to house people with commercial medical insurance from whom he could collect lab specimens that would be sent to Next Health labs for testing. Bugen Decl. ¶¶ 11-12, ECF No. 706-5 at 31-32. Jeremy Rossel countersigned the documents enabling Bugen to purchase the home and wired Bugen the money for the purchase. Jeremy Dep. Ex. 1 (NH-00684699-NH-00684715) and Ex. 2 (NH-00235880—NH-00235881), ECF No. 706-4 at 12-28, 29-30; Jeremy Dep. 76, 82-83, ECF No. 706-2 at 52-54.

In September 2015, Jeremy met with Bugen in Dallas and, after the meeting, Jeremy wrote to Bugen: "I hope you enjoyed your visit and have a better appreciation of the opportunity we have in front of us." Jeremy Dep. Ex. 3, 706-4 at 31. During the same month, Bugen [*13]  wrote to Next Health executives, including Jeremy, to persuade Next Health to loan him money to purchase a second sober living home that he would fill with people with commercial medical insurance from whom he would collect lab specimens and send them to Next Health labs. Bugen Decl. ¶¶ 13, 15, ECF No. 706-5 at 31-32; NH-00679720, ECF No. 706-7 at 98.

Bugen e-mailed Jeremy and other Next Health executives, stating that he was putting earnest money

down on a property which could hold twenty more patients. Bugen stated that he was "sticking with United clients . . . to keep the model of United clients a little less noticeable by United Healthcare." Jeremy Dep. Ex. 4, ECF No. 706-4 at 32-33; Jeremy Dep. 148-49, ECF No. 706-2 at 66-67.

Next Health arranged to pay the ADAR group commissions of 35% of net income it received from the amounts paid on claims; the commissions to be paid to Bugen were based on the number of tests that the ADAR group referred to Next Health; and the arrangement precluded Bugen from sending samples for testing to other labs. Jeremy Dep. 126-28, 135, 140, 261, ECF No. 706-2 at 58-60, 62, 65, 80. Jeremy facilitated and authorized the payments of commissions to Bugen [*14] and the ADAR group. Jeremy Dep. 266-67, ECF No. 706-2 at 81-82.

On September 8, 2015, Jeremy sent the Next Health executives a commission report for the ADAR program that discussed options regarding a second deal with Bugen, based on how much Next Health paid Bugen in the first deal, for sending samples that could be tested at Next Health labs. Jeremy Dep. Ex. 9 (NH-00235785-NH-00235792), ECF No. 706-4 at 34-40; Jeremy Dep. 130, ECF No. 706-2 at 61.

On September 28, 2015, Jeremy e-mailed other Next Health executives concerning the second loan provided to Bugen, noting that both sober living homes would be subject to a trust, with Cary acting as the trustee. Jeremy Dep. Ex. 11 (NH-00088149), ECF No. 706-4 at 41; Jeremy Dep. 137-38, ECF No. 706-2 at 63-64.

In November 2015, Jeremy and Cary were included in discussions concerning the financial importance of Next Health's relationship with Bugen. Jeremy Dep. Ex. 13 (NH-00233747), ECF No. 706-24 at 42-43. Later that month, Jeremy and Cary were copied on the closing documents for one of Bugen's sober homes. Jeremy Dep. Ex. 14, ECF No. 706-5 at 1-6.

In December 2015, Jeremy worked to advance a $150,000 commission to the ADAR group to assist Bugen. [*15] Jeremy Dep. Ex. 15 (NH00234991), ECF No. 706-5 at 7-8; Jeremy Dep. 175, 180, ECF No. 706-2 at 70-71; NH-00235295, ECF No. 706-6 at 104. Next Health also purchased a third home for Bugen and ADAR. Bugen Decl. ¶ 24, ECF No. 706-5 at 35. Jeremy testified that he recalls Next Health purchasing three different homes for Bugen and that he "lead the execution of these [loan] transactions." Jeremy Dep. 122, 155, 158, ECF No. 706-2 at 57, 68-69.

Between June 2015 and May 2016, Next Health paid Bugen—in transactions approved by Jeremy—more than $2,278,000 in cash and another $1,000,000 used to purchase three properties, which payments were made in exchange for sending Next Health requests for testing. Bugen Decl. ¶ 33, ECF No. 706-5 at 36.

In May 2016, after Next Health found out that Bugen and ADAR were the subject of a CBS News investigation, Jeremy signed documents on behalf of Next Health releasing Bugen from the liens on the three homes Next Health purchased for him, rather than accelerating the loans. Jeremy Dep. Ex. 16 (NH-00056955), ECF No. 706-5 at 9; Jeremy Dep. 180-81, ECF No. 706-2 at 71-72.

In May 2016, Jeremy's team calculated that, through its relationship with Bugen and ADAR, Next [*16] Health had received $14,510,183 in insurance payments; of that, more than $13 million had been paid by Plaintiffs. NH-00213878, ECF No. 706-6 at 103 (e-mail); NH-00213879 (spreadsheet attached to e-mail with "Collection Summary" tab showing calculation of UHC payments) (previously filed manually under seal).

### 4. Kickback-Induced Lab Claims

Next Health labs submitted thousands of claims to Plaintiffs for lab services referred by physicians who were, directly or indirectly, paid by Next Health to induce those referrals. Graves Report, Ex. 3.1, ECF No. 707-6 at 10 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health) and Ex. 4.1, ECF No. 706-6 at 29 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 92, ECF No. 706-2 at 105. None of these claims disclosed that the referring physician was paid by Next Health to induce the lab order. UHC Lab Claim Data (filed manually under seal).

Next Health paid kickbacks to referring physicians through sham investment distributions from subsidiaries that sounded like labs but were not licensed to perform any services (including [*17] Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology) and marketing commissions paid to marketers (including Brigham Buhler's entity, BLB Premiere). Graves Report, Ex. 3.1, ECF No. 706-6 at 10 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health), and Ex. 3.2, ECF No. 706-6 at 24 (citing Next Health financial distribution report to total

payments Next Health made to marketers).

Jeremy oversaw and directed the accountants and finance employees who worked to process these payments to route them through Next Health's various subsidiaries. Jeremy Dep. 49-50, 68-69, 75-79, ECF No. 706-2 at 49-50, 68-69, 75-79; Ex. 26 to Cary Dep., ECF No. 706-4 at 3-5; NH-01656701, ECF No. 706-4 at 10-11; NH-00894260, ECF No. 706-7 at 99; NH-00894261 (Next Health Distribution Summary filed manually under seal).

Jeremy also was involved in a "lab consolidation plan" under which high-volume physician referral sources would be paid more and low-volume physician referral sources were no longer permitted to invest or received a lower percentage or return on their investment. NH-00172606, ECF No. 706-6 at 88 (cover [*18] e-mail); NH-00172607, ECF No. 706-6 at 89 (describing plan to move high-performing physician referral sources to new syndicated lab); NH-00172608 (filed manually under seal).

Jeremy participated in making payments to marketing referral sources, which, in turn, paid kickbacks to physicians that sent Next Health labs referrals. One such relationship was with Brigham Buhler and BLB Premier. *See, e.g.*, NH-00211588, ECF No. 706-6 at 97 (Jeremy overseeing wire of $1.2 million payment to BLB); NH-00209382, ECF No. 706-6 at 93 (cover e-mail); NH-00209383, ECF No. 706-6 at 94 (example of monthly kickback payment).

Jeremy also was involved in the payment of medical directorship wages to physicians with high referral volume. *See, e.g.*, NH-00649081, ECF No. 706-7 at 97 (cover e-mail); NH-00649082 (filed manually; spreadsheet attached to email showing monthly rates medical directors were paid and the Next Health labs they were "sending [referrals] to"); NH-00394935, ECF No. 706-6 at 107 (terminating medical directorships in syndicated labs with no referral volume).

UHC paid Next Health labs United Toxicology, US Toxicology, Medicus, and ALG millions of dollars for lab services induced by kickbacks [*19] disguised as investment distributions. Graves Report Ex. 4.1, ECF No. 706-6 at 29-36 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims from invested physician referral sources).

*5. Submission of Claims Falsely Representing that*

**Patients Paid Co-pays**

Next Health's Chief Compliance Officer Chris Anderson testified that (1) it was impermissible for a pharmacy entity to not collect co-pays from patients but instead for a pharmacy to provide those funds on behalf of patients; and (2) he came to learn that Next Health was nevertheless providing funds to pay for co-pays for prescriptions to provide false documentation that co-pays were being paid by patients. Anderson Dep. 13, 64-65, 75-76, 82, 86-87, ECF No. 706-2 at 2, 9-10, 11-12, 15-17. Narosov acknowledged that it was illegal for Next Health to use gift or debit cards to pay for patients' copay obligations, but that Next Health did so. S. Narosov Dep. 131, ECF No. 706-2 at 108; S. Narosov Factual Resume ¶ 7, ECF No. 706-5 at 49. Narosov also confirmed that he caused Next Health to funnel a portion of fraud proceeds through a series of shell corporations to charitable organizations, [*20] which then paid the co-pay on prescriptions, to falsify co-pay documentation to satisfy payor audits. S. Narosov Factual Resume ¶ 6, ECF No. 706-5 at 49. According to Narosov, at least 85% of the pharmacy claims submitted to Plaintiffs falsely represented that the member paid a co-pay. S. Narosov Dep. 125-26, ECF No. 706-2 at 106-07.

Anderson testified that Allan Cohen and Karynn Harvard of Next Health reported to Cary and that Cary was approving payments for the Bishop program (by which money was funneled from Next Health to Bishop Jerry Maynard through a Patient Assistance Program (PAP)), using shell entities LLC RX and Meds Direct Rx, after which Bishop Maynard's charity, City of Life, would issue checks to cover otherwise unpaid co-pays. Anderson Dep. 79-80, 90-91, ECF No. 706-2 at 13-14, 18-19. Anderson further testified that payments were being made under Cary's direction. Anderson Dep. 96-97, ECF No. 706-2 at 20-21.

Cary stated that he knew that "without the PAP program, we are out of business." Cary Dep. Ex. 22, ECF No. 706-3 at 24. A text message from Cary to Narosov reflects Cary stating that Cary "sent josh another invoice from Allan for another donation that had been made [*21] to the church." Cary Dep. Ex. 25, ECF No. 706-3 at 27. Cary approved most of the payments through LLX Rx and Meds Direct Rx that ultimately led to City of Life covering the unpaid co-pays. Cary Dep. Exhs. 8, 14, 15, 17, 18, 19, 20, 24, 25, 26, ECF No. 706-3 at 7, 8, 14-15, 16-17, 18-19, 20-21, 25-26, 27, 28. Cary also received text updates from Allan Cohen showing payments from Meds Direct Rx to Bishop Jerry

Maynard. Cary Dep. Ex. 16, ECF No. 706-3 at 11. And Cary sent personal wires to LLC Rx. Cary Dep. Ex. 27, ECF No. 706-4 at 11.

When Anderson confronted Cary, Cary admitted to Anderson that he had authorized the payments. Anderson Dep. 99-100, 103, ECF No. 706-2 at 22-24. Anderson testified that Cary undermined his compliance efforts. Anderson Dep. 160, ECF No. 706-2 at 25.

Jeremy was also aware of the PAP and that it was related to Meds Direct Rx. Jeremy Dep. 274-76, 280-84, ECF No. 706-2 at 83-85, 86-90. In September 2016, Next Health accounting personnel asked Jeremy to approve payments to Meds Direct Rx, stating that his father—Cary—was requesting he make the payment. Jeremy Dep. Ex. 21, ECF No. 706-5 at 10; Cary Dep. Ex. 26, ECF No. 706-3 at 28-29. In October 2016, Jeremy approved [*22] additional payments to Meds Direct Rx for over $170,000. Jeremy Dep. Ex. 22 (NH-01471409 - NH-01471412), ECF No. 706-5 at 12-15.

In total, Plaintiffs paid four Next Health pharmacies a total of at least $38,035,647, at least 85% of which was based on the false representation that copays had been collected from the patients listed in the claims submitted by that pharmacy. UHC Pharma Claim Data; Graves Report ¶ 166, ECF No. 706-6 at 9; S. Narosov Dep. 125-26, ECF No. 706-2 at 106-107.[5]

**Legal Standard**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. _Fed. R. Civ. P. 56(a)_; _Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_; _Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998)._ A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a

verdict in favor of the nonmoving party. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_. When ruling on a summary judgment motion, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. _Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)_. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. _Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)_; _Anderson, 477 U.S. at 254-55_.

Once the moving [*23] party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. _Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)_. On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure _all_ of the essential elements of the claim or defense to warrant judgment in his favor." _Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986)_ (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" _Matsushita, 475 U.S. at 587_ (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a summary judgment motion. _Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996)_. Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. _See Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994)_.

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. _Ragas, 136 F.3d at 458_. _Rule 56_ does not impose [*24] a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. _Id._; _see also Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)_. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." _Anderson, 477 U.S. at 248_. If the nonmoving party fails to make a showing

---

[5] The factual record, viewed in the light most favorable to Plaintiffs, includes evidence supporting the Rossel Defendants' involvement in other fraudulent schemes related to Next Health. To preserve scarce judicial resources, this recommendation only addresses those alleged Next Health schemes necessary to resolve the Rossel Defendants' pending summary judgment motion. Thus, the omission in the factual recitation of background facts concerning a particular Next Health scheme does not prevent Plaintiffs from presenting admissible evidence at trial related to other alleged schemes.

sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex, 477 U.S. at 322-23*.

**Preliminary Matters**

The Rossel Defendants object to several pieces of evidence Plaintiffs submitted in support of their response to the Rossel Defendants' summary judgment motion. *See* Reply Br. in Support of Cary Rossel and Jeremy Rossel's Mot. for Summ. J. (Rossel Defs.' Reply Br.) 8-10, ECF No. 719. In addition, Defendants Zeinali and Mortazavi object to evidence Plaintiffs submitted in support of their motion for partial summary judgment as to their fraud claims against Zeinali and Mortazavi. *See* Zeinali's Opp'n to Pls.' Mot. for Partial Summ. J. (Zeinali Resp. Br.) 31-34, ECF No. 704; Mortazavi's Br. in Support of Resp. to Pls.' Mot. for Partial Summ. J. (Mortazavi [*25] Resp. Br.) 10-12, ECF No. 712. The Rossel Defendants also adopt and incorporate Zeinali's objections. *See* Rossel Defs.' Reply Br. 8. Because the evidentiary objections largely overlap, the Court may consider them together.

To promote efficiency, the Court should consider only the objections to evidence necessary to the determination of the pending motions for summary judgment. If the recommendation relies on evidence but does not discuss an objection, the undersigned considered both the evidence proffered and objections, and, to the extent portions of the evidence are relevant, admissible, and necessary to the resolution of particular issues, these objections are overruled. To the extent the recommendation does not rely on other evidence about which either party complains, the objections are denied as moot. *Accord Balfour Beatty Rail, Inc. v. Kan. City S. Ry. Co., 2012 U.S. Dist. LEXIS 106574, 2012 WL 3100833, at *20 (N.D. Tex. July 31, 2012)* (Lindsay, J.).

**1. Plaintiffs' Claims Data, Documents Produced by Next Health During Discovery, Summary Charts**

As previously explained, *see supra* note 3, Plaintiffs manually filed certain claims data reflecting, among other things, payments made to Defendants based on information in lab and pharmacy claims submitted to them by Defendants. In addition, Plaintiffs' evidence includes [*26] the OptumRx 2016 Provider Manual (UHC000492439), as well as documents produced by Next Health during discovery including, among others,

Commission Reports e-mails (UHC000492491) and United Toxicology's attorneys' e-mails with attachments (UHC000493777; UHC000493784; UHC000493875; UHC000493980; UHC000494067). Plaintiffs' evidence also includes two summary charts, "UHC Summary Ex.1 - *Fed. R. Evid. 1006*" and "UHC Summary Ex. 2 - *Fed. R. Evid. 1006*."[6]

The Rossel Defendants argue that these exhibits have not been properly authenticated and are hearsay. Rossel Defs.' Reply Br. 8. Zeinali and Mortazavi make similar objections to Next Health documents included in Plaintiffs' appendix in support of their motion for partial summary judgment. Zeinali Resp. Br. 32; Mortazavi Resp. Br. 10-11. Plaintiffs counter that "Next Health's documents could be properly authenticated at trial" and that the contents of the Next Health documents "are not hearsay, fall under one of the exceptions to hearsay, or contain content that could be elucidated at trial through other means," including here "qualified as business records or statements of party opponents." Reply Br. in Support of Pls.' Mot. Partial Summ. J (Pls.' Reply Br.) 12 (citing *Fed. R. Evid. 801(d)*, *803(6)*), [*27] ECF No. 718.

"At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town, 870 F.3d 380, 384 (5th Cir. 2017)* (citing *Fed. R. Civ. P. 56(c)*; *Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017)*; *LSR Consulting, LLC v. Wells Fargo Bank, N.A., 835 F.3d 530, 534 (5th Cir. 2016)*).

As the Fifth Circuit explained in *Maurer*, after "a 2010 revision to *Rule 56*, materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence.'" *870 F.3d at 384* (emphasis in original; internal quotations and citations omitted). This "flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and

---

[6] Summary charts pursuant to *Fed. R. Evid. 1006* are admissible "as long as the summary is not otherwise objectionable, for example, because it contains hearsay." *Encompass Office Sols., Inc. v. Conn. Gen. Life Ins. Co., 2017 U.S. Dist. LEXIS 120212, 2017 WL 3268034, at *n.4 (N.D. Tex. July 31, 2017)* (Lindsay, J.) (compiling cases). Movants contend the above-referenced summary charts are comprised of hearsay evidence (Next Health entities' banking transactions) that are not properly authenticated by affidavit or testimony of a custodian.

2024 U.S. Dist. LEXIS 177289, *27

expense it takes to authenticate everything in the record." *Id.* Furthermore, "[a]uthentication is a low burden," *Allen v. Hays, 812 F. App'x 185, 193 (5th Cir.*

2020), that can be satisfied in a variety of ways, including through "testimony by a witness with knowledge," *Fed. R. Evid. 901(b)(1)*; "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," *id.* R. 901(b)(4); the presence of a seal and signature, *id.* R. 902(1); and the presence of a signature and certification, *id.* R. 902(2).

While the deficiencies noted by Rossel [*28] Defendants, Zeinali, and Mortazavi may well warrant exclusion at trial, at the summary-judgment stage, some or all of the objected-to statements may be admissible under an exception to the hearsay rule. *See, e.g., Fed. R. Evid. 803(1)*, *(2)* and *(3)*. Some may be admissible for a non-hearsay purpose. *See Fed. R. Evid. 801(c)*. The Defendants may raise their hearsay objections to specific evidence at trial. But at this summary-judgment phase, Defendants have not shown that Plaintiffs will be unable to introduce the information Defendants identify as hearsay in an acceptable format at trial or that Plaintiffs will not be able to authenticate this information at trial.[7] Accordingly, the objections are **OVERRULED**.

### 2. Expert Report of Dean Graves

The Rossel Defendants, Zeinali, and Mortazavi argue that the Expert Report of Dean Graves is hearsay and inadmissible. *See* Rossel Defs.' Reply Br. 8; Zeinali Resp. Br. 33. A party may support or dispute summary judgment using unsworn expert reports, provided their opinions reflected in an expert report are "capable of being presented in a form that would be admissible in evidence." *Patel v. Tex. Tech. Univ., 941 F.3d 743, 746-47 (5th Cir. 2019)*. Graves is an expert and Plaintiffs contend he "can provide the same opinions expressed in his report at trial, so his [*29] report is competent summary judgment evidence, and [Defendants] have not shown otherwise." Pls.' Reply Br. 15. In light of *Patel*, and Plaintiffs' representation that Graves can perform the same analysis contained in his report and present it to the jury from the witness stand at trial, the objection to Dean Graves's Expert Report is

OVERRULED.

### 3. Semyon Narosov's and Vinson Woodlee's Factual Resumes

The Rossel Defendants assert that the Factual Resumes filed in support of Narosov's and Woodlee's guilty pleas are hearsay because they are not sworn to and do not follow the federal rules regarding an admissible declaration. Rossel Defs.' Reply Br. 10. They further argue that the statements made in the Factual Resumes are not stated to be based on personal knowledge. *Id.* Defendants Zeinali and Mortazavi object to Woodlee's Factual Resume on similar grounds. Zeinali Resp. Br. 32-33; Mortazavi Resp. Br. 11.

A sworn statement does not need to be an affidavit or declaration to be competent summary judgment evidence. *See Fed. R. Civ. P. 56(c)(1)*. Moreover, courts in this circuit have referred to Factual Resumes in support of guilty pleas in determining motions for summary judgment. *See, e.g., Longinos-Ruiz v. United States, 2013 U.S. Dist. LEXIS 62185, 2013 WL 1785380, at *1 (N.D. Tex. Apr. 1, 2013)* (Means, J.); *Mori Seiki USA, Inc. v. McIntyre,* 2008 WL 577283, at *2 (N.D. Tex. Mar. 4, 2008) (Boyle, J.); *United States v. Tarango-Pena, 173 F. Supp. 2d 588, 591 (E.D. Tex. 2001)* [*30] .

Here, even though the Factual Resumes are not affidavits or declarations, they are sworn statements. In his plea agreement, Narosov signed and attested that he would "give complete and truthful information and/or testimony concerning [his] participation in the offense" (Narosov Plea Agreement, No. 3:18-CR-00475-JJZ, ECF No. 7 ¶ 7), which included his signed Factual Resume supporting that plea (Pls.' Summ. J. App., ECF No. 682-2 at 71-77). Similarly, Woodlee signed and attested in his plea agreement that he would "give complete and truthful information and/or testimony concerning [his] participation in the offense" (Woodlee Plea Agreement, No. 3:20-CR-00384-N, ECF No. 27 at ¶ 9), which included his signed Factual Resume supporting that plea (Pls.' Summ. J. App., ECF No. 682-2 at 78-92). Thereafter, both Narosov and Woodlee appeared and testified under oath at hearings under *Federal Rule of Criminal Procedure 11.* With respect to both individuals, a court determined that each understood the government's right to use against him any statement he made under oath in a prosecution for perjury, that his plea was voluntary, and that there was a factual basis for his plea. *See Fed. R. Crim. P.*

---

[7] Although Plaintiffs only responded to Zeinali's and Mortazavi's objections, this analysis applies equally to the Rossel Defendants' objections based on hearsay and lack of authentication.

*11(b)(2)-(3)*.

For these reasons, Narosov's and Woodlee's respective [*31] Factual Resumes are competent summary judgment evidence, and the objections are **OVERRULED**.

### 4. Discovery Responses

The Rossel Defendants argue, with respect to Plaintiffs' own answers to interrogatories, that Plaintiffs' answers are inappropriate evidence for summary judgment because they are unverified and not based on personal knowledge. Rossel Defs.' Reply Br. 8-9.

*Rule 56* specifically approves of citation to materials in the record, including admissions and interrogatory answers to make assertions of fact in support of a summary judgment motion. *Fed. R. Civ. P. 56(c)(1)(A)*. Responses to interrogatories must be verified by the responding party's signature. *Fed. R. Civ. P. 33(b)(5)*. Unverified answers to interrogatories and interrogatories not based on personal knowledge proffered by a nonmovant are not competent summary judgment evidence. *Brady v. Blue Cross & Blue Shield of Texas, Inc., 767 F. Supp. 131, 135 (N.D. Tex. 1991)* (Fitzwater, J.); *Magana v. Tarrant/Dallas Printing Inc., 1998 U.S. Dist. LEXIS 13411, 1998 WL 548686, at *5 (N.D. Tex. Aug. 21, 1998)* (Fitzwater, J.); *Tesco Corp. v. Weatherford Int'l, Inc., 904 F. Supp. 2d 622, 636 (S.D. Tex. 2012)*.

Plaintiffs rely on several of their own interrogatory answers to support their factual allegations. *See* Pls.' Resp. to Cary Rossel's 9/15/2023 Interr. & Pls.' Resp. to Jeremy Rossel's 9/27/2023 Interr., Pls.' Summ. J. Resp. App., ECF No. 706-6 at 63-71; Pls.' Resp. to Amir Mortazavi's First Set of Interr., Pls.' Summ. J. App., ECF No. 682-3 at 38-55. These responses contain [*32] no signature page and are unverified. Plaintiffs' responses to Mortazavi's second set of interrogatories, however, are verified. *See* Pls.' Summ. J. App., ECF No. 682-3 at 66-83; *see generally Fed. R. Civ. P. 33(b)(5)* (requiring both person providing answers and attorney posing objections to sign interrogatory responses).

Accordingly, the Rossel Defendants' objection to Plaintiffs' reliance on their own unverified responses to interrogatories is **SUSTAINED**. However, the Rossel Defendants' objection to Plaintiffs' responses to Mortazavi's second set of interrogatories is **OVERRULED**, because those responses are verified.

Insofar as the Rossel Defendants object to these same exhibits based on lack of personal knowledge, however, they have not identified specific passages of Plaintiffs' interrogatory responses they contend are not based on personal knowledge and, therefore, these objections are **OVERRULED**. *See Watts v. L-3 Commc'ns Corp., 2013 U.S. Dist. LEXIS 102169, 2013 WL 3789868, at *5 (N.D. Tex. July 22, 2013)* (Fish, J.) (overruling "generic objection" to lack of personal knowledge where movant failed to identify "objectionable portions" of affidavit).

Finally, Defendants Zeinali and Mortazavi object to Plaintiffs' citation to other parties' verified answers to interrogatories and requests for admission. Zeinali Resp. [*33] Br. 33; Mortazavi Resp. Br. 11-12. These objections are **OVERRULED**. *See Fed. R. Civ. P. 56(c)(1)(A)* (approving of citation to materials in the record, including admissions and interrogatory answers, to make assertions of fact in support of a summary judgment motion).

### 5. Declarations of Kelly Tobin, Erik Bugen, and Vinson Woodlee

The Rossel Defendants object to multiple statements throughout the Declarations of Kelly Tobin, Erik Bugen, and Vinson Woodlee. Under *Rule 56(c)(4)*, if a party uses affidavits or declarations to support or oppose a summary judgment motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Fed. R. Civ. P. 56(c)(4)*.

The Rossel Defendants make various objections to multiple statements in Kelly Tobin's Declaration, including that such statements are not based on personal knowledge, are speculative, and are conclusory. Rossel Defs.' Reply Br. 10. They object that Paragraph 6 of Tobin's declaration contains retrospective comments about what Plaintiffs "would have" done had they known of certain Next Health actions. *Id.* They also object to paragraphs 7 and 9-11, although Tobin's Declaration only has six [*34] paragraphs.

In her Declaration, Tobin states under penalty of perjury that "her statements . . . are based on [her] personal knowledge gathered during the course of [her] employment as an insurance investigator during the past 20 years." Tobin Decl. ¶ 1, Pls.' Summ. J. Resp. App., ECF No. 706-5 at 45. The Rossel Defendants

objections to Tobin's Declaration have no merit. Rather, the Declaration appears to adequately meet the standards of _Rule 56(c)_. Accordingly, the Rossel Defendants' objections to Tobin's Declaration are **OVERRULED**.

The Rossel Defendants object to numerous statements in Erik Bugen's Declaration, contending that "several parts of it are conclusory and contain hearsay. Many of the allegations alluded to in the declaration rely on statements made by Rob Close, Jen Sears, and Alle Byesda, and are hearsay and inadmissible." Rossel Defs.' Reply Br. 9 (objecting to ¶¶ 6, 7, 8, 9, 10, 11, 12, 13, 20 of Bugen's Declaration). They also object that "[o]ther allegations also rely on statements made by Amir Mortizavi and are hearsay." _Id._ (objecting to ¶ 15 of Bugen's Declaration).

As a threshold matter, the Rossel Defendants object that portions of Bugen's Declaration are conclusory. This [*35] objection is vague and unsupported by any reference to Bugen's ten-page Declaration and, therefore, need not be considered by the Court. In any event, the objection lacks merit and is **OVERRULED**.

Further, it does not appear that Plaintiffs rely on any hearsay within Bugen's Declaration to demonstrate an issue of material fact relevant to the Court's analysis of the pending motions, but to the extent there is reliance on hearsay within Bugen's Declaration that does not fall within a hearsay exception, the objection is **SUSTAINED**.

The Rossel Defendants object to Corey Dudley's Declaration "as the documents cited to by Mr. Dudley are not included as evidence and are therefore hearsay and not competent summary judgment evidence." Rossel Defs.' Reply Br. 9. Additionally, they object to Dudley's quotations of Nick Austin's statements that Next Health was "working to set up another lab to accession/process/bill through" and that the tests were "going to come through U. Tox." as hearsay. _Id._ (citing Dudley Decl. ¶ 11, ECF No. 706-5 at 40).

Plaintiffs have not responded to this objection. The undersigned has examined the summary judgment record and is unable to locate the documents cited by Dudley [*36] in his Declaration. The Rossel Defendants' objection to all the documents cited by Dudley in his Declaration—to the extent those documents are not included in the summary judgment record—is **SUSTAINED**. Similarly, the Rossel Defendants' objection to Dudley's quotations of Nick Austin's statements as hearsay is **SUSTAINED**.

**Analysis**

### A. <u>The Rossel Defendants' Motion for Summary Judgment</u>

The Rossel Defendants move for summary judgment on two grounds: (1) Plaintiffs have no evidence as to numerous elements of their claims for fraud and fraudulent nondisclosure; conspiracy to commit fraud; fraudulent transfers; and violations of _18 U.S.C. § 1962(c)_; and (2) limitations bars Plaintiffs' fraud and civil RICO claims. Rossel Defs.' Summ J. Br. 8-10, ECF No. 680.

As an initial matter, prior to addressing the merits, Plaintiffs urge that the Rossel Defendants' "no evidence" summary judgment motion should be denied "on its face" because it is not supported by record evidence and, therefore, the Rossel Defendants have not satisfied their initial burden as the moving party. _See_ Pls.' Summ. J. Resp. Br. 33-34, ECF No. 709. Such motions, Plaintiffs argue, are "pleadings that may be filed in state court, but not federal court." [*37] _Id._ (citation omitted). Plaintiffs further contend that because the Rossel Defendants have offered "no evidence—not even an affidavit of denial by either of them—that undermines the merits of UHC's fraud, conspiracy, fraudulent transfer, and RICO claims" they have failed, "under the appropriate federal standard, to provide record evidence demonstrating the absence of a genuine dispute of material fact [and] [t]he motion should be denied on its face for this reason alone." _Id._

In response, the Rossel Defendants assert that they have met their initial burden because they "pointed . . . to the absence of evidence supporting certain essential elements of Plaintiffs' claims[,]" and contend that Plaintiffs' "argument on this point should be disregarded." Rossel Defs.' Reply Br. 11 (citations omitted).

In _Austin v. Kroger_, the Fifth Circuit responded to the contention that federal law does not allow so-called "no evidence" summary judgment motions by explaining that

> it has long been the rule that when the nonmovant has the burden of proof at trial, the moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to the nonmovant, with an allegation that [*38] the nonmovant has failed to establish an element essential to that party's case.

*Austin v. Kroger Texas L.P., 864 F.3d 326, 335 (5th Cir. 2017)*. In a footnote, the Fifth Circuit highlighted an "important distinction:"

> [W]hile it is true that a movant cannot support a motion for summary judgment with a conclusory assertion that the nonmovant has no evidence to support his *case*, a movant may support a motion for summary judgment by pointing out that there is no evidence to support a *specific element* of the nonmovant's claim.

*Id. at 335 n.10* (original emphasis) (citation omitted). Thus, the Fifth Circuit concluded in *Austin* that "[the movant] satisfied its summary judgment burden when it alleged that there was no evidence of causation—an essential element to [the nonmovant's] ordinary negligence claim." *Id. at 335*. Based on the defendant's motion, Austin, the nonmovant, "was required to present causation evidence to survive summary judgment." *Id.*

Federal courts in Texas applying this "important distinction" concur finding that "such a motion can be proper when correctly pled." *Slaughter v. Walmart, Inc., 2023 U.S. Dist. LEXIS 61252, 2023 WL 2783262, at *3 (E.D. Tex. Apr. 4, 2023)* (citations omitted), *accepted by 2023 U.S. Dist. LEXIS 71085, 2023 WL 3060788 (E.D. Tex. Apr. 22, 2023)*; *see, e.g.*, *Bell v. Marmaxx Operating Corp., 2021 U.S. Dist. LEXIS 225627, 2021 WL 5505561, at *2 (N.D. Tex. Nov. 23, 2021)* (Starr, J.) (finding that where summary judgment movant alleged there was no evidence of the specific element of causation, burden shifted to the nonmovant to [*39] show evidence of causation); *Cid v. Wal-Mart Stores E. Inc., 2020 U.S. Dist. LEXIS 113428, 2020 WL 3485622, at *2 (N.D. Tex. May 18, 2020)* (Cummings, J.) (noting that "in the realm of premises liability, a no evidence motion for summary judgment is feasible—so long as the movant points out that there is no evidence to support a specific element of the nonmovant's claim).

The Rossel Defendants' motion, by essentially stating that there is no evidence for almost all of the elements for every one of Plaintiffs' claims, "blurs the line-drawing set out in *Austin* and risks making *Rule 56*'s other summary judgment burden-shifting mechanisms obsolete." *Hanan v. Crete Carrier Corp., 2020 U.S. Dist. LEXIS 671, 2020 WL 42269, at *2 (N.D. Tex. Jan. 3, 2020)* (Boyle, J.) (citing *Fed. R. Civ. P. 56(c)(1)(A)-(B)*). Nevertheless, the Court should not deny the motion out of hand, as—in certain instances—the Rossel Defendants meet the letter of what *Austin* requires by pointing to specific elements of the various claims

against them and asserting that Plaintiffs have no evidence to support that specific element. *See generally* Rossel Defs.' Summ. J. Br. 21-30. Under *Austin*, therefore, the Court should find that the Rossel Defendants' summary judgment motion is sufficient—barely—to shift the burden to Plaintiffs to show they have evidence of the various elements of their claims. *See Austin, 864 F.3d at 335*.

### 1. Plaintiffs' Fraud Claims

Plaintiffs allege a complex and wide-ranging fraudulent scheme [*40] comprised of misrepresentations and failures to disclose in connection with the submission of lab and pharmacy bills for payment. *See, e.g.*, Sec. Am. Compl. ¶¶ 295-300. Plaintiffs further allege that the "Next Health Executives," including the Rossel Defendants, are responsible for the allegedly fraudulent misrepresentations, directly or under an alter ego theory of liability. *Id.* ¶¶ 355-56.

In support of their summary judgment motion, the Rossel Defendants argue that that (1) "Plaintiffs' fraud claims are time barred because they were not brought within the four-year statute of limitations"; and (2) "Plaintiffs' claims of fraud and fraudulent nondisclosure against Defendants, individually, fail because Plaintiffs have no evidence of one or more of the elements of each cause of action." Rossel Defs.' Summ. J. Br. 13. They also argue that "[a]s a matter of law, Plaintiffs could not have justifiably relied on billing submitted after they were on notice of alleged billing fraud." *Id.* And, they assert, Plaintiffs' theory of alter ego liability fails. *Id.*

#### a. Liability as Principals for Fraud

The Rossel Defendants assert that they may not be held liable for fraud they allegedly committed through [*41] Next Health unless Plaintiffs can show that they acted as Next Health's alter ego. *See* Rossel Defs.' Summ. J. Br. 27-28. The Rossel Defendants have made this same argument before. *See* Cary Br. Supp. Mot. to Dismiss at 8-9, ECF No. 424.

Judge Brown, however, in denying the Executive Defendants' motions to dismiss Plaintiffs' fraud claims, set forth the applicable law and rejected the notion that piercing the corporate veil was the only means to hold the Executive Defendants liable for fraud in conjunction with Next Health:

> Each party to a fraudulent scheme is responsible

for the acts of others in furtherance of the scheme. *In re Arthur Andersen LLP, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding)*. Thus, a defendant may be liable for fraud without making any fraudulent representations where he "allegedly participated in the fraudulent transactions and reaped the benefits," even by silent acquiescence. *Id.; see Indep. Receivables Corp. v. Precision Recovery Analytics, Inc., No. 1:11-CV-008-LY, 2012 U.S. Dist. LEXIS 208124, 2012 WL 12874526, at *6 (W.D. Tex. May 16, 2012)*; *ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*, No. H-10-2841, 2011 WL 13247456, at *3 (S.D. Tex. July 25, 2011). Further, "[a] corporation's [agent] is personally liable for tortious acts which he directs or participates in during his employment." *O'Hare v. Graham, 455 F. App'x 377, 380 (5th Cir. 2011)* (quoting *Leyendecker & Assoc., Inc. v. Wechter, 683 S.W.2d 369, 375 (Tex. 1984)*); *see also Portlock v. Perry, 852 S.W.2d 578, 582 (Tex. App.—Dallas 1993, pet. denied)* ("corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the conduct, either actual or constructive"). [*42]

*United Healthcare Services, Inc. v. Next Health, LLC, 2021 U.S. Dist. LEXIS 36084, 2021 WL 764035, at *5 (N.D. Tex. Feb. 26, 2021)* (Brown, J.).

The Rossel Defendants provide no basis for the undersigned to deviate from Judge Brown's analysis. Further, the undersigned agrees with Plaintiffs that the cases cited by the Rossel Defendants do not undermine the legal principles set forth by Judge Brown. *See Taylor v. Rothstein Kass & Co., PLLC, 2020 U.S. Dist. LEXIS 17435, 2020 WL 554583, at *9 (N.D. Tex. Feb. 4, 2020)* (dismissing receiver's claim against auditor for "participation in a fraudulent scheme" where receiver failed to allege with particularity that auditor engaged in fraud, but only alleged that auditor issued a clean audit opinion despite the red flags)[8] ; *In re GTG Sols., Inc.,*

---

*642 S.W.3d 41, 45 (Tex. App.—El Paso 2021)* (discussing veil-piercing standard); *Mills v. City of Port Arthur Tex., 2006 U.S. Dist. LEXIS 88140, 2006 WL 3531460, at *9-10 (E.D. Tex. Dec. 4, 2006)* (refusing to hold a city liable for alleged conduct of economic development corporation under alter-ego theory), *aff'd*, 234 F. App'x 285 (5th Cir. 2007).

Finally, in response to the Rossel Defendants' summary judgment motion, Plaintiffs make clear that they are not "trying to pierce the corporate veil (as Defendants posit). Rather, [they] are suing Rossel Defendants for their direct participation in the fraud." Pls.' Summ. J. Resp. Br. 37.

*b. The Rossel Defendants fail to establish as a matter of law that Plaintiffs' fraud claims are barred by the applicable statute of limitations.*

In Texas, "[a] person must bring [a] suit on [fraud] actions not later than [*43] four years after the day the cause of action accrues." *Tex. Civ. Prac. & Rem. Code § 16.004(a)(4)*. "Generally, causes of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Hooks v. Samson Lone Star, Ltd. P'ship, 457 S.W.3d 52, 57 (Tex. 2015)* (cleaned up). But "[b]ecause fraud vitiates whatever it touches, the statute of limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it." *Id.* (cleaned up). Although the date a cause of action accrues is normally a question of law, the determination of when the fraud might have been discovered through the exercise of reasonable diligence is generally a fact issue. *Id. at 57-58*. Nevertheless, in some circumstances where there is actual or constructive notice or when information is "readily and publicly available," a court may determine, as a matter of law, that the exercise of reasonable diligence would have led to the discovery of the wrong within the statutory period and, thus, the accrual of the fraud claim is not tolled. *Id. at 57-59*.

Plaintiffs' fraud claims as against the Rossel Defendants involve alleged misrepresentations that occurred between 2015 and 2016. The Second Amended Complaint breaks these misrepresentations into [*44] several discrete groups:

    i. claims submitted by Next Health subsidiaries for lab services or prescriptions that were ordered by physicians who received kickbacks disguised as investment distributions from a Next Health

---

[8] In *Taylor*, Judge Fitzwater noted that, "it is not clear that Texas law recognizes a cause of action for 'participation in fraud' that is separate from a direct claim for fraud or conspiracy," and that a plaintiff likely has to plead that a party "himself engaged in fraudulent conduct with the requisite knowledge and intent." *Taylor v. Rothstein Kass & Co., PLLC, 2020 U.S. Dist. LEXIS 17435, 2020 WL 554583, at *7 (N.D. Tex. 2020)*.

subsidiary;

ii. claims submitted by Next Health subsidiaries for lab services or prescriptions that were purportedly ordered by Dr. Kim, Dr. Parameswara, Dr. Rao, or Dr. Sozi;

iii. claims submitted by ALG after July 12, 2016, for lab services that were not actually ordered from, or performed by, ALG; and

iv. claims submitted by True Labs after September 1, 2016, for lab services that were not actually ordered from, or performed by, True Labs.

Sec. Am. Compl. ¶¶ 380, 381; *id.* at Exhs. A-C, ECF Nos. 584-1 through 584-3; Exhs. G-I, ECF Nos. 584-7 through 584-9. Notably, as to those groups of alleged misrepresentations occurring within the limitations period—any time on or after September 30, 2015 [four years before Plaintiffs sought leave to amend the pleadings to add the Executive Defendants]—there is no limitations issue.

The Rossel Defendants urge that, as a matter of law, "Plaintiffs' fraud claims are time-barred because they are based on allegedly fraudulent activities Plaintiffs [*45] knew of or should have discovered by exercising reasonable diligence by at least July 20, 2015, more than four years before the date on which Plaintiffs filed their motion for leave to amend to add [the Executive] Defendants—September 30, 2019." Rossel Defs.' Summ. J. Br. 15. In support, the Rossel Defendants cite a July 20, 2015 National Benefit Integrity MEDIC Complaint Form (MEDIC Complaint) prepared by Optum, "a division of United Healthcare Group," and produced by Plaintiffs. *See* Rossel Defs.' Summ. J. App., ECF No. 680-1 at 34-35. An Optum employee filed the MEDIC Complaint with Health Integrity, LLC, a contractor for Centers for Medicare and Medicaid, "to report complaints of fraud, waste, and abuse in Medicare Parts C & D Programs," and specifically to report that Cigna's Special Investigations Unit suspected that Josh Daniel and United Toxicology, LLC were using fraudulent billing practices for patients receiving healthcare benefits through Medicare Parts C and D. *Id.* at 34-35. The MEDIC Complaint alleges that United Toxicology was billing the insurance company "excessive fees" for drug testing services while "waiving any cost share of the customer." *Id.* at 35. After receiving [*46] the complaint, the Cigna investigators called United Toxicology and confirmed that "the customers were neither receiving a bill nor expected to pay their cost share for drug testing services . . . [United Toxicology] consider[ed] the insurance payment as payment in full." *Id.*

The Rossel Defendants contend that "[t]he MEDIC Complaint put Plaintiff United Healthcare on notice of the alleged fraud as to Next Health and its executives. . . . [and] their fraud claims against all of Next Health's executives, including [the Rossel] Defendants, began to accrue on July 20, 2015, at the latest, for any alleged billing fraud." Rossel Defs.' Summ. J. Br. 17.

In addition, the Rossel Defendants point to certain entries in Plaintiffs' privilege log which they argue suggest that Next Health entities were being investigated prior to September 2015. *Id.* at 18-19 (citing Rossel Defs.' Summ. J. App., ECF No. 680-1 at 36-45). They also refer to deposition testimony of Plaintiffs' corporate representative, Jonathan Wilson, who, when confronted with the MEDIC Complaint, agreed that it concerned similar types of allegations related to failure to collect customer co-pays for services rendered, albeit not in [*47] regard to commercial insurance and involving a different entity, Cigna. *Id.* at 17 (citing Rossel Defs.' Summ. J. App., ECF No. 680-1 at 28-29).

Plaintiffs counter that the "Rossel Defendants offer no authority for the proposition that dissimilar fraud allegations suspected by one organization (here, Cigna) begins the statute of limitations for any possible fraud-based claims that may be asserted by another (here, UHC)." Pls.' Summ. J. Resp. Br. 52. Plaintiffs also assert that the Rossel Defendants ignore that Plaintiffs "did investigate concerns regarding individual Next Health laboratories as they arose[] and did not conclude at any time prior to September 30, 2015 [four years before they sought leave to amend the pleadings to add the Executive Defendants], that the fraudulent representations or omissions at issue in this case had occurred." *Id.* at 53. Plaintiffs argue based on the summary judgment evidence that, "[a]t the earliest, [their] fraud claim accrued in January of 2016 when [they] conducted [their] onsite investigation of United Toxicology (after being invited by counsel for United Toxicology who all the while assured [them] that United Toxicology's operations were entirely [*48] above board)." *Id.* Thus, Plaintiffs contend, because they "sued the Rossel Defendants within four years of [the] site inspection, [their] fraud claim is not time barred." *Id.* Although Plaintiffs address the MEDIC Complaint and Wilson's deposition testimony, they fail to address the various entries in their privilege log highlighted by the Rossel Defendants.

The question of whether Plaintiffs' claims are, in fact, time-barred turns on when Plaintiffs discovered or, by the exercise of reasonable diligence, should have

2024 U.S. Dist. LEXIS 177289, *48

discovered the alleged fraud. Plaintiffs argue that they did not know and could not have known of the fraud until January of 2016. Pls.' Summ. J. Resp. Br. 53. In support, Plaintiffs provide undisputed evidence that in August of 2015, they placed United Toxicology on prepayment review based on a tip that United Toxicology was a lab on paper only. Pls.' Summ. J. Resp. App., ECF No. 706-2 at 142-43. In early September of 2015, attorneys for United Toxicology contacted Plaintiffs' legal department and advised that United Toxicology was considering pursuing litigation to force Plaintiffs to reprocess and pay unpaid claims. *Id.* at 144. Attorneys for United Toxicology invited [*49] Plaintiffs to visit the United Toxicology facility to allay the concern that the lab did not exist. *Id.* at 121, 146. The invitation for an on-site visit was accompanied by assurances from United Toxicology's counsel in the fall and winter of 2015 that then-existing allegations were false and the result of a dispute with disgruntled employees. *Id.* at 146; UHC000493980 (sealed), ECF No. 707-1 at 6.

By January of 2016, and at the direction of Plaintiffs' legal department, the prepayment review flag on United Toxicology's claims was lifted and Plaintiffs' Special Investigations Unit (SIU) opened an investigation of United Toxicology in advance of conducting an on-site visit to confirm that it was, in fact, a brick-and-mortar lab. Pls.' Summ. J. Resp. App., ECF No. 706-2 at 120, 144-45. During the January 21, 2016 on-site inspection, Plaintiffs' SIU investigators learned that United Toxicology was in the same building and shared the same common area as two other functioning laboratories, US Toxicology and Medicus, that were also owned by "Next Health." *Id.* at 122-24. Following the United Toxicology on-site inspection, Plaintiffs' SIU opened an investigative file for Next Health-owned lab [*50] US Toxicology in February 2016. *Id.*

Later, in the spring and summer of 2016, Plaintiffs began receiving member and customer complaints about claims for unwanted testing performed by United Toxicology, ultimately leading to the discovery of the ADAR Group. *Id.* at 125, 127-30, 140, 153. Following investigation, Plaintiffs connected US Toxicology to Medicus, in addition to United Toxicology, and it stopped paying claims from all three laboratories. *Id.* at 151-52. Following further meetings with United Toxicology's attorneys, and threats of litigation for stopped payments, on January 26, 2017, Plaintiffs brought this lawsuit and on September 30, 2019, sought leave to add the Executive Defendants.

This evidence, and the reasonable inferences it supports, gives rise to factual disputes material to determining when Plaintiffs' fraud claims accrued. As the Fifth Circuit has recognized, determining when a plaintiff was on inquiry notice of fraud is a "fact-intensive inquiry . . . typically appropriate for consideration by a jury." *See Margolies v. Deason, 464 F.3d 547, 553 (5th Cir. 2006)* (interpreting almost identical language in the statute of limitations for claims under the *Texas Blue Sky Laws, Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(2)*). "Unless the evidence is such that reasonable minds may not differ [*51] as to its effect, the question as to whether a party has exercised diligence in discovering fraud is for the jury." *Id.* (quoting *Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 740 (1944)*).

"In moving for summary judgment on the time bar issue, [the Rossel Defendants] assumed the burden of conclusively establishing that [Plaintiffs] knew or should have known, with the exercise of reasonable diligence, of the alleged fraud." *See id. at 554* (quotation marks omitted). The summary judgment evidence, taken in the light most favorable to Plaintiffs, does not conclusively establish that Plaintiffs knew or should have known about the alleged fraud before September 30, 2015, which is four years before they sought leave to amend the pleadings to add the Rossel Defendants. In addition, the summary judgment evidence detailed above is sufficient to raise the factual dispute as to whether fraudulent concealment tolls accrual of the statute of limitations. These factual disputes preclude the dismissal of Plaintiffs' fraud claims on summary judgment.

For these reasons, the District Judge should deny the Rossel Defendants' summary judgment motion insofar as they seek dismissal of Plaintiffs' fraud claims as time-barred.

*c. Plaintiffs raise a genuine dispute of material [*52] fact as to each element of their fraud claim.*

To prevail on a fraud claim based on an affirmative misrepresentation, a plaintiff must prove "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastic Corp. USA v. Presidia Eng'rs & Contractors, 960 S.W.2d 41, 47 (Tex. 1998)* (citation omitted); *see also JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C., 546 S.W.3d 648, 653 (Tex. 2018)*

(same).

With respect to fraud, the Rossel Defendants attack each element. Rossel Defs.' Summ. J. Br. 22-23. Here, viewing all the above-cited evidence in the light most favorable to Plaintiffs, Plaintiffs have presented evidence sufficient to raise a genuine dispute of material fact as to each element of their fraud claim.

i. Misrepresentations

First, Plaintiffs have provided enough evidence to raise a genuine dispute of material fact that the Rossel Defendants participated in or facilitated three types of misrepresentations: for claims generated by the ADAR Group, misrepresentations that patients had seen actual medical providers; misrepresentations that patients were paying pharmacy co-pays; and misrepresentations that disguised the identities of labs performing services. *See supra* Sec. B.1—B.5. [*53]

Plaintiffs have also provided sufficient evidence that these misrepresentations were material to payment determinations because, had Plaintiffs known the truth, they would not have paid the claims submitted with false information. *See* Wilson Dep. 78-79, ECF No. 706-2 at 148; Tobin Decl. ¶ 6, ECF No. 706-5 at 45; Anderson Dep. 63-65, ECF No. 706-2 at 8-10; Pls.' Resp. to Mortazavi's Second Set of Interrog. 20, ECF No. 706-6 at 42-44; UHC000492491 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 6.

ii. Intent

As to the element of intent, the Rossel Defendants' criticism of circumstantial evidence is misguided: "[s]ince intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986)*. Regardless, Plaintiffs provide enough evidence to create a genuine factual dispute regarding the Rossel Defendants' scienter.

First, Jeremy Rossel led Next Health's purchase of sober living facilities for Bugen and the ADAR Group and approved commissions based on referrals from the ADAR Group. *E.g.*, Jeremy Dep. Ex. 1 (NH-00684699-NH-00684715) and Ex. 2 (NH-00235880—NH-00235881), ECF No. 706-4 at 12-28, 29-30; Jeremy Dep. 76, 82-83, ECF No. 706-2 at 52-54. In May [*54] 2016, after Next Health learned that Bugen and ADAR were the subject of a CBS News investigation, Jeremy signed documents on behalf of Next Health releasing Bugen from the liens on the three homes Next Health purchased for him, rather than accelerating the loans.

Jeremy Dep. Ex. 16 (NH-00056955), ECF No. 706-5 at 9; Jeremy Dep. 180-81, ECF No. 706-2 at 71-72. Based on an e-mail from Bugen, Jeremy also knew that Bugen was "sticking with United clients . . . *to keep the model of United clients a little less noticeable by United Healthcare.*" Jeremy Dep. Ex. 4, ECF No. 706-4 at 32-33 (emphasis supplied); Jeremy Dep. 148-49, ECF No. 706-2 at 66-67.

There is also evidence from which a reasonable juror could find that Jeremy was involved in making payments to marketing referral sources, which, in turn paid kickbacks to physicians that sent Next Health labs referrals. One such relationship was with Brigham Buhler and BLB Premier. *See, e.g.*, NH-00211588, ECF No. 706-6 at 97 (Jeremy overseeing wire transfer of $1.2 million kickback payment to BLB); NH-00209382, ECF No. 706-6 at 93 (cover e-mail); NH-00209383, ECF No. 706-6 at 94 (example of monthly kickback payment).

Evidence further shows that [*55] Jeremy made payments to third-party shell entities that passed along money to the Bishop used to disguise the payment of co-pays. Jeremy Dep. 274-76, 280-84, ECF No. 706-2 at 83-85, 86-90; Jeremy Dep. 21, ECF No. 706-5 at 10; Cary Dep. Ex. 26, ECF No. 706-3 at 28-29; Jeremy Dep. 22 (NH-01471409 - NH-01471412), ECF No. 706-5 at 12-15.

Next, Cary Rossel served as trustee on the sober homes purchased for the ADAR Group. Jeremy Dep. Ex. 11 (NH-00088149), ECF No. 706-4 at 41; Jeremy Dep. 137-38, ECF No. 706-2 at 63-64. In November 2015, Jeremy and Cary were included in discussions concerning the financial importance of Next Health's relationship with Bugen. Jeremy Dep. 5, 13 (NH-00233747), ECF No. 706-24 at 42-43. Later that month, Jeremy and Cary were copied on the closing documents for one of Bugen's sober homes. Jeremy Dep. Ex. 14, ECF No. 706-5 at 1-6.

Cary was the general partner of Pharma Holdings US, which was the managing member of Next Health's Class G pharmacies, which were used to pay pharmacy-related kickbacks. *E.g.*, Cary 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 39; Cary Dep. Ex. 5, ECF No. 706-2 at 158.

Cary recognized the importance of the Bishop co-pay [*56] scheme stating that he knew that "without the PAP program, we are out of business." Cary Dep. Ex. 22, ECF No. 706-3 at 24. Cary directed and approved of the majority of payments made to third-party shell

2024 U.S. Dist. LEXIS 177289, *56

companies that were used to disguise the payment of co-pays. *E.g.*, Anderson Dep. 96-97, ECF No. 706-2 at 20-21; Anderson Dep. 99-100, 103, ECF No. 706-2 at 22-24; Cary Dep. Ex. 25, ECF No. 706-3 at 27 (text message from Cary to Narosov reflecting Cary stating that he "sent josh another invoice from Allan for another donation that had been made to the church."); Cary Dep. Exhs. 8, 14, 15, 17, 18, 19, 20, 24, 25, 26, ECF No. 706-3 at 7, 8, 14-15, 16-17, 18-19, 20-21, 25-26, 27, 28; Cary Dep. Ex. 16, ECF No. 706-3 at 11; Cary Dep. Ex. 27, ECF No. 706-4 at 11.

Cary also undermined Anderson's compliance efforts with respect to the copay scheme and others in Anderson's role as Chief Compliance Officer at Next Health. Anderson Dep. 160, ECF No. 706-2 at 25.

Although the Rossel Defendants assert in their reply brief that these, and other schemes set forth in the undisputed material facts in Plaintiffs' summary judgment response brief, were "normal business operations," Rossel Defs.' Reply Br. [*57] 22, viewing this and other summary judgment evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude from this circumstantial evidence that Jeremy and Cary had knowledge of the fraud perpetrated by Next Health and facilitated and participated in the various fraudulent schemes, Jeremy in his role as Next Health's Chief Financial Officer and, starting in August 2016, as a member of its Board of Managers, and Cary as a founder of Next Health and a member of its Board of Managers, as well as a part owner of Next Health, and a general partner in Next Health subsidiary Pharma Holdings US, the managing member of Next Health's Class G pharmacies, which were used to pay pharmacy-related kickbacks.

iii. <u>Reliance</u>

The Rossel Defendants also contend that they are entitled to summary judgment on Plaintiffs' fraud claims based on billings after July 20, 2015, because "as a matter of law[,] Plaintiffs could not have justifiably relied on representations from anyone at Next Health." Rossel Defs.' Summ. J. Br. 23 (cleaned up). Although "[j]ustifiable reliance usually presents a question of fact . . . the element can be negated as a matter of law when circumstances exist under [*58] which reliance cannot be justified." *United Healthcare Servs. Inc. v. Synergen Health, LLC, 2023 U.S. Dist. LEXIS 109458, 2023 WL 4186370, at *2 (N.D. Tex. June 26, 2023)* (Starr, J.) (quoting *JPMorgan, 546 S.W.3d at 654*). The Rossel Defendants contend that those circumstances are present here, where Plaintiffs have a sophisticated fraud

department that discovered red flags, such that, "[a]t the very latest, Plaintiffs knew of allegations of billing fraud by United Toxicology and its parent, Next Health, by July 20, 2015, which precludes Plaintiffs from having 'justifiably relied' on Next Health's entities' billing from that date forward." Rossel Defs.' Summ. J. Br. 25.

In *Synergen Health, LLC*, Judge Starr acknowledged and rejected similar arguments made by Synergen in support of its argument that, as a matter of law, Plaintiffs' reliance was not justified. *See Synergen Health, LLC, 2023 WL 4186370, at *2-3* (rejecting argument that UHC's justifiable reliance could be categorically negated by touting UHC's fraud department and investigation into United Toxicology). There, Synergen argued Plaintiffs failed to demonstrate justifiable reliance—like the Rossel Defendants do here—pointing to UHC's sophistication, dedicated SIU, and its previous investigation of United Toxicology. *Id.* In denying Synergen's summary judgment motion, Judge Starr stated as follows concerning justifiable reliance:

[I]n 2015, [UHC] . . [*59] . began denying claims from the U[nited] T[oxicology] laboratory, opened an investigation, and commenced payments only after determining that U[nited] T[oxicology] was an actual laboratory. But the U[nited] T[oxicology] laboratory allegations—misrepresenting that a fake laboratory is a real laboratory—involve a different type of fraud than the kind of which United now [alleges.] . . . Accordingly, the Court cannot conclude, as a matter of law, that there is [no] actual reliance on [United's] part. That's a fact issue for the jury.

*Id. at *3* (internal quotations omitted). Judge Starr further found that UHC's suspicions concerning United Toxicology in August of 2015 were not "strong enough for the Court to conclude that, as a matter of law," UHC did not justifiably rely on later-submitted claims using the Next Health lab billing credentials. *Id.* Judge Starr's analysis in *Synergen Health, LLC* is persuasive, and, even taking into account certain factual dissimilarities between this matter and the *Synergen* case, the question of whether Plaintiffs' reliance was justified is a matter for the jury.[9]

_____

[9] The Rossel Defendants cite two cases to support their argument that Plaintiffs could not have justifiably relied on misrepresentations about lab and pharmacy claims. *See* Rossel Defs.' Summ. J. Br. 24-25 (citing *Lewis v. Bank of Am. NA, 343 F.3d 540, 547 (5th Cir. 2003)*; *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C., 546 S.W.3d 648, 656*

2024 U.S. Dist. LEXIS 177289, *59

iv. <u>Causation / Damages</u>

Plaintiffs also have provided sufficient evidence to raise a genuine dispute of material [*60] fact that the fraudulent schemes at issue caused them to pay millions of dollars they otherwise would not have based on the fraudulent claims submitted. *E.g.,* NH-00213878, ECF No. 706-6 at 103 (e-mail), NH-00213879 (excel attached to e-mail with "Collection Summary" tab showing calculation of UHC payments) (previously filed manually under seal); Graves Report Ex. 4.1, ECF No. 706-6 at 29-36 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims based on prescriptions from physicians getting paid by Next Health through sham investment distributions); Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' fraud claim.

*d. Plaintiffs fail to raise a genuine dispute of material fact as to their fraud by nondisclosure claim.*

With respect to fraud by nondisclosure, the Rossel Defendants attack each element. Rossel Defs.' Summ. J. Br. 26-27. Here, even viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to present evidence sufficient to raise a genuine dispute of material fact as to each element [*61] of their fraud by nondisclosure claim.

To establish a claim for fraud by nondisclosure, Plaintiffs must show:

(1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in

injury.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC, 572 S.W.3d 213, 219-20 (Tex. 2019)*.

"As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford v. Vento, 48 S.W.3d 749, 755 (Tex. 2001)* (citation omitted). "[T]he existence of a duty to disclose is a question of law that must be decided by the court, not by the jury." *Mercedes-Benz USA, LLC v. Carduco, Inc., 583 S.W.3d 553, 562 (Tex. 2019)*, *reh'g denied* (Oct. 18, 2019). A duty to disclose arises in four circumstances:

(1) there was a fiduciary or other special relationship requiring disclosure, (2) the defendant discovered new information that made an earlier representation misleading [*62] or untrue, (3) the defendant created a false impression by making a partial disclosure, or (4) the defendant voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

*Guevara v. Lackner, 447 S.W.3d 566, 578 (Tex. App.—Corpus Christi-Edinburg 2014, no pet.)*.

In their response brief, Plaintiffs argue that the Rossel Defendants "failed to disclose that the claims they caused to be submitted to UHC were the result of lab and pharmacy-based kickback schemes they administered, which were designed to pay physicians in exchange for their referral of lab specimens and ordering pharmacy prescriptions." Pls.' Summ. J. Resp. Br. 39. Plaintiffs assert that Defendants had a duty to disclose these facts but fail to cite to any evidence in support of this position. Even assuming the existence of a duty to disclose, in their response, Plaintiffs also fail to cite to evidence showing that Defendants "knew that plaintiff was ignorant of or did not have the opportunity to discover" the material facts allegedly not disclosed. *See Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 341 (5th Cir. 2008)*. Other than mentioning this element in conclusory fashion, Plaintiffs do not address it in their response brief. *See* Pls.' Summ. J. Resp. Br. 38-39. Plaintiffs rely on the pre-severance memorandum opinion regarding a motion to dismiss [*63] on the pleadings to bolster their fraud by nondisclosure claim. *See* Pls.' Summ. J. Resp. Br. 39. But motions to dismiss and motions for summary judgment "are governed by

(Tex. 2018)"). But, as Plaintiffs contend, these cases are distinguishable as "this is not a case where [Plaintiffs] blindly relied on representations without justifications." Pls.' Summ. J. Resp. Br. 43. Also, unlike in *Lewis*, there is evidence that Next Health labs "enshrined themselves in a cloak of (feigned) trustworthiness on exactly the information they were submitting[.]" *Id.* And, unlike here, "the parties in *Orca* also had relatively equal access to the information claimed to have been misrepresented." *Id.*

different legal standards[;]" *Lexxus Int'l, Inc. v. Loghry, 512 F. Supp. 2d 647, 649 (N.D. Tex. 2007)* (Lindsay, J.), the former relying entirely on the face of the complaint and the latter weighing the evidence. *See Doe v. Univ. of N. Tex. Health Sci. Ctr., 2023 U.S. Dist. LEXIS 141245, 2023 WL 5200666, at \*2 (N.D. Tex. Aug. 14, 2023)* (O'Connor, J.) ("[A] Rule 12(b)(6) . . . motion only entails an examination of the sufficiency of the pleadings. In contrast, a summary-judgment motion typically is based on the pleadings as well as any affidavits, depositions, and other forms of evidence relevant to the merits of the challenged claim or defense that are available at the time the motion is made.") (citation omitted).

For these reasons, Plaintiffs have failed to raise a genuine dispute of material fact with respect to each element of their fraud by nondisclosure claim and, therefore, the District Judge should grant the Rossel Defendants' no-evidence motion for summary judgment on this claim.

## 2. Plaintiffs' Claims for Conspiracy to Commit Fraud

With respect to the Rossel Defendants, Plaintiffs' conspiracy claims relate to allegations concerning their participation in the scheme to submit claims containing misrepresentations [\*64] that lab services were ordered by doctors associated with the ADAR Group. *See* Sec. Am. Compl. ¶¶ 395-400.

Unlike the crime of conspiracy, civil conspiracy is not an independent cause of action. *Berry v. Lee, 428 F. Supp. 2d 546, 561 (N.D. Tex. 2006)*. Instead, civil conspiracy operates as a derivative tort that allows the plaintiff to hold one conspiracy participant liable for the torts committed by another participant if the torts were committed in furtherance of an unlawful conspiracy. *Id. at 561-62* (citing *Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996)*; *Berry v. Golden Light Coffee Co., 160 Tex. 128, 327 S.W.2d 436, 438 (Tex. 1959)*). As a derivative tort, a plaintiff must plead and prove another substantive tort upon which to base a civil-conspiracy claim. *Id. at 562*. A finding of civil conspiracy imposes joint and several liability on all co-conspirators for any actual damages resulting from the acts in furtherance of the conspiracy. *Chu v. Hong, 249 S.W.3d 441, 445 (Tex. 2008)*. Therefore, once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination. *Id.*

A civil-conspiracy action has five elements:

(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are [\*65] taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.

*First United Pentecostal Church of Beaumont v. Parker, 514 S.W.3d 214, 222 (Tex. 2017)*.

The Rossel Defendants challenge the second and third elements, stating that Plaintiffs have "no evidence [they] were aware of the alleged harm when they voted to approve loans and took actions relating to the trust holding properties." Rossel Defs.' Summ. J. Br. 30. The Rossel Defendants contend that "[t]hese actions are legitimate business endeavors and show no awareness of any agreement or meeting of the minds to engage in the wrongful conduct cited by Plaintiffs." *Id.* They also assert that Plaintiffs "have no evidence that at the time of the alleged meeting [with Bugen] that Jeremy knew of the design to further an illicit conspiracy to defraud Plaintiffs" and that "Jeremy's presence at such a meeting would *not necessarily* mean he was privy to any designs of Erik Bugen or any other Next Health executive." *Id.* (emphasis supplied).

Plaintiffs counter that "the summary judgment standard isn't about what might 'not necessarily' be[]" and contend that the circumstantial evidence here is such that a reasonable jury could conclude that the Rossel Defendants conspired with Bugen to submit fraudulent [\*66] claims to Plaintiffs as part of the ADAR scheme. *See* Pls.' Summ. J. Resp. Br. 46.

As with the intent element of Plaintiffs' substantive fraud claims, "a conspiracy is proved by circumstantial evidence." *In re Enron Corp. Sec., Derivative & ERISA Litig., 623 F. Supp. 2d 798, 812 (S.D. Tex. 2009)*. While conspiracy may be shown by circumstantial evidence, proof of material facts "may not be established by piling inference upon inference." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 858 (Tex. 1968)*.

Plaintiffs provide evidence that Jeremy met with Bugen during the early stages of the ADAR scheme, that he cemented that relationship by financing three pieces of real estate for Bugen (and later forgiving the loans), with Cary agreeing to act as trustee for the properties, and that he incentivized Bugen to send specimens to Next Health by paying kickbacks based on a deal that

2024 U.S. Dist. LEXIS 177289, *66

prevented Bugen from sending samples to other labs. *See, e.g.*, Pls.' Summ. J. Resp. App., ECF No. 706-2 at 52-56, 58-72, 80-82; ECF No. 706-4 at 12-43; ECF No. 706-5 at 1, 7, 9, 30-32, 35-36; ECF No. 706-6 at 103-04.[10]

On this record, the Rossel Defendants' contention that "mere presence at a company meeting and assisting in seemingly-legitimate business endeavors are at least just as consistent with a lawful purpose as with allegedly conspiring to submit fraudulent claims [*67] to [Plaintiffs]" is not well-taken. Rossel Defs.' Reply Br. 27 (internal quotation marks and citation omitted). Viewing all evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, Plaintiffs have presented evidence sufficient to raise a genuine dispute of material fact as to the second and third elements of their civil conspiracy claim.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' claims of conspiracy to commit fraud.

### 3. Plaintiffs' Fraudulent Transfer Claims

The Rossel Defendants move for summary judgment on Plaintiffs' fraudulent transfer claims. Rossel Defs.' Summ. J. Br. 30-34. In the Second Amended Complaint, Plaintiffs allege that two sets of transfers are fraudulent: (1) cash transfers from ALG, Medicus, US Toxicology, United Toxicology, True Labs, Apex Pharma, Dallasite, Executive Healthcare, and Total Pharma to Next Health from 2015 to 2017 (Category 1 Transfers); and (2) cash transfers from Next Health to Next Health Executives from 2016-2018 (Category 2 Transfers). *See* Sec. Am. Compl. ¶¶ 458-480.

The applicable state law is the *Texas Uniform Fraudulent Transfer Act (TUFTA), Tex. Bus. & Com. Code § 24.001 et seq.* "The purpose [*68] of TUFTA is to prevent debtors from defrauding creditors by placing assets beyond their reach." *Tow v. Amegy Bank N.A., 498 B.R. 757, 767 (S.D. Tex. 2013)* (internal quotations and citations omitted). TUFTA first requires that a "transfer [is] made or [an] obligation [is] incurred by a debtor." *Tex. Bus. & Com. Code § 24.005(a).* TUFTA

recognizes two categories of voidable fraudulent transfers: actual fraudulent transfers, *id. § 24.005(a)(1)*; and constructive fraudulent transfers, *id. §§ 24.005(a)(2)*, *24.006(a).* "[T]he elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Matter of Life Partners Holdings, Inc., 926 F.3d 103, 117 (5th Cir. 2019)* (citation omitted); *see Tex. Bus. & Com. Code § 24.005(a)(1).* To determine actual intent, a court may consider a non-exclusive list of factors, also known as "badges of fraud," set out in *section 24.005. Id.; see Tex. Bus. & Com. Code § 24.005(b).* A transfer is not voidable if the recipient took it in good faith and for value. *Tex. Bus. & Com. Code § 24.009.*

Constructive fraud occurs when a transfer was made without the debtor receiving a reasonably equivalent value in exchange and the debtor either:

> (A) was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business [*69] transaction; or
> (B) intended to incur, or believed or unreasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id. § 24.005(a)(2).*

In support of their summary judgment motion, the Rossel Defendants contend Plaintiffs have no evidence they were a "creditor" when the transfers alleged to be fraudulent were made and "no evidence that any transfers to [them] were made with the actual intent to hinder, delay, or defraud Plaintiffs." Rossel Defs.' Summ. J. Br. 30, 32-33.

In response, Plaintiffs argue that

> [t]he Court has already entered judgment against the Lab and Pharmacy Entities and Next Health and Pharma Holdings US on UHC's fraudulent transfer claims—meaning those entities' intent has been conclusively established as a matter of law. (*See* Final Judgment, Doc. 750, No. 3:17-cv-00243-X (N.D. Tex.) (entering final default judgment against Next Health and Lab and Pharmacy Entities, finding them liable on same Second Amended Complaint, Doc. 584, that is the operative pleading in this case).) This default judgment

---

[10] This evidence consists primarily of Erik Bugen's statements in his Declaration, Jeremy's testimony at his deposition as well as exhibits to his deposition transcript, discovery responses, and exhibits manually filed with the Court.

establishes as fact the allegations supporting UHC's fraudulent transfer claims—that, at the time of the transfers, that UHC was [*70] (and remains) a "creditor," Next Health and Lab and Pharmacy Entities were (and remain) "debtors," and that those "debtors" transferred assets away with the intent to defraud UHC.

Pls.' Summ. J. Resp. Br. 47-48. Plaintiffs assert that, in light of Judge Starr's Final Judgment in the Next Health litigation, there is "no need to engage in the 'badges of fraud' analysis of the intent of 'debtors' Next Health, Pharma Holdings US, and Lab and Pharmacy Entities." *Id.* at 48. They also maintain, without providing any citations to the summary judgment record in support, that, even were the Court to examine the "badges of fraud," "[t]here is no question that the 'debtors' at issue fraudulently transferred assets away." *Id.* at 48.

In reply, the Rossel Defendants argue that the "[b]ecause the judgment against Next Health as to fraudulent transfer was entered upon default, it can have no precedential effect in a subsequent action." Rossel Defs.' Reply Br. 28 (citation omitted). They also contend that "Plaintiffs have failed to identify any indication of fraudulent intent, other than the fact that some transfers referenced were made after Plaintiffs had filed this lawsuit." *Id.*

For the reasons that [*71] follow, the Court should find that Plaintiffs have failed to provide evidence sufficient to raise a genuine dispute of material fact regarding actual fraudulent transfer or constructive fraudulent transfer.

First, Plaintiffs assert that the Final Judgment entered by Judge Starr in a different case establishes the "actual intent" element of their TUFTA claim without explaining how a default judgment in a separate lawsuit, against different defendants, applies here. *See* Pls.' Summ. J. Resp. Br. 47-48. Further, and as previously explained, *see supra* note 1, in the Next Health case, Judge Starr granted summary judgment against Next Health on Plaintiffs' fraud claims and granted default judgment for Plaintiffs. *See United Healthcare Servs., Inc. v. Next Health LLC, 2023 U.S. Dist. LEXIS 47219, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023).* Judge Starr treated Plaintiffs' summary judgment motion on the fraud claims as unopposed, noting that Next Health provided a one-page, "limited response" which stated only that "[Next Health] has no representatives or employees who can assist or direct any actions of counsel [which] ethically precludes . . . the formation of

any substantive response." *Id.* On June 27, 2023, Judge Starr entered a "default judgment against Rob Close, Next Health, and the Lab Defendants in the amount [*72] of $90,252,091," and a "default judgment in the amount of $128,287,738.03 against the Entity Defendants, jointly and severally." *See Next Health*, 3:17-cv-00243, Final J., ECF No. 750 at 3.

"Issue preclusion, or collateral estoppel . . . promotes the interests of judicial economy by treating specific issues of fact or law that are validly and necessarily determined between two parties as final and conclusive." *United States v. Shanbaum, 10 F.3d 305, 311 (5th Cir. 1994).* "It is the general rule that issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *Arizona v. California, 530 U.S. 392, 414, 120 S. Ct. 2304, 147 L. Ed. 2d 374 (2000)* (citations omitted) (cleaned up). "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." *Id.* (citation omitted). Because the Final Judgment upon which Plaintiffs rely was entered upon default, it can have no precedential effect in this separate and subsequent action. *See id.* It is, therefore, not valid evidence of "actual intent" for the purposes of Plaintiffs' summary judgment motion.

With respect to Plaintiffs' remaining arguments, as the Rossel Defendants correctly note, Plaintiffs attempt to satisfy the "actual [*73] intent" element "by offering several statements without supporting them with sufficient evidence." Rossel Defs.' Reply Br. 28. Other than noting that some transfers referenced were made after Plaintiffs had filed this lawsuit, *see* Pls.' Resp. Br. 48, Plaintiffs fail to provide any citation to the summary judgment record.

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas, 136 F.3d at 458.* "*Rule 56* does not impose a duty on the court to sift through the record in search of evidence to support the nonmovant's opposition to the summary judgment motion. *Clayton v. U.S. Xpress, Inc., 538 F. Supp. 3d 707, 711 (N.D. Tex. 2021)* (Lindsay, J.) (cleaned up) (citations omitted). Here, Plaintiffs have failed to identify specific evidence in the record and to articulate the precise manner in which that evidence supports their fraudulent transfer claim as against the Rossel Defendants.

For these reasons, the District Judge should determine

that the Rossel Defendants are entitled to judgment as a matter of law on Plaintiffs' fraudulent transfer claims and grant their request for summary judgment as to these claims.[11]

### 4. Plaintiffs' Civil RICO Claims

The Rossel Defendants [*74] move for summary judgment with respect to Plaintiffs' civil RICO claims on the basis that (1) Plaintiffs' claims under RICO are barred by the statute of limitations; and (2) Plaintiffs have no evidence establishing that they took any action related to Next Health with the intent to defraud. Rossel Defs.' Summ. J. Br. 10.

*a. The Rossel Defendants fail to establish as a matter of law that Plaintiffs' civil RICO claims are barred by the applicable statute of limitations.*

The statute of limitations for RICO is four years. *Rotella v. Wood, 528 U.S. 549, 553, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)*. The Fifth Circuit "abides by the rules of injury discovery and separate accrual for RICO claims." *Lewis v. Danos, 83 F.4th 948, 955 (5th Cir. 2023)*. "Under the 'injury discovery' rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury" and, "when a pattern of RICO activity causes a continuing series of separate injuries, the 'separate accrual' rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury." *Id.* (citation omitted). Discovery of a civil RICO injury can be delayed or prevented by affirmative acts of concealment on the part of a defendant. *Id. at 955* ("[T]he defendant must be guilty of some trick or contrivance [*75] tending to exclude suspicion and prevent inquiry.") (citations omitted). Under the fraudulent concealment doctrine, "the limitations period is tolled until the plaintiff

_____

[11] Plaintiffs request permission to file a partial affirmative motion for summary judgment against the Rossel Defendants, contending that, with respect to the Category 2 Transfers, "[t]here is no set of facts that [the] Rossel Defendants could supply that would prevent them from being liable under *Section 24.009(b)(2)*." Pls.' Summ. J. Resp. Br. 49 note 5. Plaintiffs contend that "because Next Health's intent with respect to those transfers has been established, Rossel Defendants are liable as a matter of law." *Id.* at 49. Because Plaintiffs rely on the default judgment in the Next Health litigation to establish intent on their TUFTA claims, the District Judge should reject Plaintiffs' request.

discovers, or with reasonable diligence should have discovered, the concealed fraud." *Id.*

In support of their argument that Plaintiffs' civil RICO claims are time-barred, the Rossel Defendants contend "there is significant evidence that shows Plaintiffs knew or should have known, on or before July 20, 2015[,] of its alleged injury of paying allegedly fraudulent bills . . . ." Rossel Defs.' Summ. J. Br. 34. Here, for the reasons previously stated in the Court's analysis rejecting the Rossel Defendants' argument that Plaintiffs' fraud claims were time-barred as a matter of law, *see supra* Sec. A.1.b, the Court should find that whether Plaintiffs exercised reasonable diligence in their efforts to investigate if they were a victim of—or had been injured by—the allegedly fraudulent conduct, is a question of fact for the jury.

*b. Plaintiffs have introduced sufficient evidence from which a reasonable jury could infer that the Rossel Defendants intended to commit wire fraud by submitting fraudulent claims to Plaintiffs.*

"Violation [*76] of the wire-fraud statute requires the specific intent to defraud, i.e., a conscious knowing intent to defraud." *United States v. Mann, 493 F.3d 484, 493 (5th Cir. 2007)*. Mail fraud violations also require specific intent. *United States v. Nguyen, 504 F.3d 561, 568 (5th Cir. 2007)*. "[A] defendant acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Akpan, 407 F.3d 360, 370 (5th Cir. 2005)* (cleaned up) (citation omitted).

"Circumstantial evidence can be sufficient to prove fraudulent intent in mail and wire fraud cases." *Crowe v. Henry, 115 F.3d 294, 297 (5th Cir. 1997)*. Considering the evidence submitted by Plaintiffs within the context of the difficult evidentiary issues involved (i.e., questions of knowledge and intent), it appears that material questions of fact exist as to the contested element of intent to defraud and there is sufficient evidence from which a reasonable jury could infer that the Rossel Defendants intended to commit wire fraud (by facilitating the submission of fraudulent lab and pharmacy claims to Plaintiffs). *See supra* Sec. B.1—B.5.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' civil RICO claims.

2024 U.S. Dist. LEXIS 177289, *76

## B. Plaintiffs' Motion for Partial Summary [*77] Judgment Against Amir Mortazavi and Arvin Zeinali

Plaintiffs seek summary judgment as to their fraud claims against Defendants Mortazavi and Zeinali, contending that (1) because Mortazavi and Zeinali refused to answer questions or provide any discovery based on the assertion of their *Fifth Amendment* privilege against self-incrimination, the Court should draw an adverse inference against them in this civil case; and (2) that adverse inference, combined with other evidence that each helped orchestrate numerous fraudulent schemes, is sufficient for the Court to grant summary judgment in Plaintiffs' favor as to their fraud claims. Pls.' Summ. J. Br. 6-8, ECF No. 682. With respect to their fraud claims, Plaintiffs seek an award of damages against Mortazavi in the amount of $54,239,661 and against Zeinali in the amount of $32,330,300. *Id.* at 47.

Zeinali and Mortazavi respond that, although the Court may draw an adverse inference, summary judgment is not appropriate here because, among other reasons,[12] Plaintiffs' motion asks the Court to make credibility determinations concerning several critical witnesses and indulge inferences in Plaintiffs' favor, which it may not do on summary judgment. Zeinali Resp. Br. [*78] 18; Mortazavi Resp. Br. 28-30.

"[I]t is well settled that the *Fifth Amendment* does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Hinojosa v. Butler, 547 F.3d 285, 291 (5th Cir. 2008)* (citing *Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)*). "While parties are free to invoke their *Fifth Amendment* right in civil cases, a court is equally free to draw adverse inferences from that invocation." *Vestas-Am. Wind Tech., Inc. v. Salazar, 2021 WL 1399296, at *3 (N.D. Tex. Feb. 1, 2021)*

(Hendrix, J.); *see also State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 119 (5th Cir. 1990)* (declining to draw an adverse inference based on party's invocation of the privilege because the opposing party had "failed to present any other evidence to bolster the inference").

As to each of the fraudulent schemes alleged in the Second Amended Complaint against Mortazavi and Zeinali (four of which pertain to Mortazavi and two of which pertain to Zeinali),[13] Plaintiffs' motion for partial summary judgment relies heavily on Narosov's deposition testimony, Bugen's declaration, and Woodlee's declaration. As noted herein, all three of these witnesses are convicted felons: Narasov pleaded guilty to money laundering and health care fraud, *see U.S. v. Semyon Narosov, Andrew Hillman*, No. 3:18-CR-0475-JJZ (N.D. Tex.); and Bugen and Woodlee pleaded guilty to healthcare fraud, *see U.S. v. Bugen*, 3:17-CR-00370-D [*79] (N.D. Tex.) and *U.S. v. Woodlee*, 3:20-CR-00384-N (N.D. Tex.).

Pursuant to *Federal Rule of Evidence 609(a)(1)(A)*, at trial, Narosov's, Bugen's, and Woodlee's convictions would be admissible so that co-defendants, including Mortazavi and Zeinali, would be able to "attack[ ]" their "character for truthfulness." *Fed. R. Evid. 609(a)(1)(A)*; *see also* Fifth Circuit Pattern Jury Instructions (Civil Cases) *Impeachment by Witness's Felony Conviction* (June 2020), available at https://www.lb5.uscourts.gov/juryinstructions/ (last accessed 07/22/24) (instructing the jury that, "in weighing the credibility of a witness[,]" a felony conviction "is one of the circumstances you may take into account in determining the weight to give [that witness's] testimony."). And Plaintiffs fail to persuade the undersigned that Mortazavi and Zeinali should not have that opportunity in this case, where Plaintiffs seek an award of damages against Mortazavi in the amount of $54,239,661 and against Zeinali in the amount of $32,330,300, *see* Pls.' Summ. J. Br. 47, based largely on the testimony of Narosov, Bugen, and Woodlee.

In addition, with respect to their fraud claims against Mortazavi, Plaintiffs rely extensively on the deposition testimony of one of the Directors of Sirius

---

[12] In his response brief, Mortazavi also asserts that he "adopts and incorporates" the statute of limitations argument "filed by Defendants Cary and Jeremy Rossel[.]" Mortazavi Resp. Br. 7, 27. In addition, in their respective response briefs, Mortazavi and Zeinali request that the Court grant summary judgment in their favor because Plaintiffs lack evidence of damages. Mortazavi Resp. Br. 41; Zeinali Resp. Br. 31. The dispositive motions deadline was November 15, 2023. ECF No. 662 at 2. Mortazavi and Zeinali failed to move on any grounds. On this record, the Court should decline to address these attempts to seek untimely relief.

---

[13] These alleged schemes are the ADAR scheme (against Mortazavi); the Class G kickback-induced pharmacy scheme (against Mortazavi and Zeinali); the kickback induced lab claim scheme (against Mortazavi); and the co-pay scheme, involving the submission of claims falsely representing that patients had paid copays (against Mortazavi and Zeinali).

2024 U.S. Dist. LEXIS 177289, *79

Laboratories, [*80] Jen Sears. Mortazavi has provided evidence from which a reasonable juror could question Sears's credibility. Specifically, Sears filed for bankruptcy and Plaintiffs have a $13 million claim against her in the bankruptcy action. Sears Dep. 114:20-24, App. to Mortazavi's Opp'n to Pls.' Mot. for Partial Summ. J. (Mortazavi Resp. App.), ECF No. 713 at 32. At the time of Sears's deposition, Plaintiffs' claim in bankruptcy had been pending for approximately three or four years. Sears Dep. 145:7-12, ECF No. 713 at 39. When asked at the end of her deposition if she had any "agreements" with Plaintiffs concerning the pursuit of their claim in the bankruptcy, Sears said no. Sears Dep. 115:5-8, ECF No. 713 at 32. Upon further questioning, however, she testified as follows:

Q. Do you have any agreements with United Healthcare concerning their pursuit of the claim against you in bankruptcy?

A. No.

Q. Okay. Do you have any verbal understanding that they will not oppose the discharge of the United Healthcare claim in bankruptcy in exchange for your testimony today?

A. They never said they would expunge it. They told me that it would be a conversation and we will see where it goes.

Q. So they said there [*81] will be a conversation about that after you gave your testimony today as to whether they would expunge or agree to discharge the claim in bankruptcy; is that right?

A. That's correct.

Sears Dep. 115:5-20, ECF No. 713 at 32. In addition, Sears testified that Plaintiffs' attorney had not explained to her why Plaintiffs had not dismissed their $13 million claim against her before she gave her deposition. Sears Dep. 145:3-6, ECF No. 713 at 39.

Sears also acknowledged that she had a written employment agreement with Next Health that was marked as Exhibit 18 to her deposition. Sears Dep. 120:1-9, ECF No. 713 at 33; Sears Employment Agreement, ECF No. 713 at 33. Paragraph 29 of her employment agreement obligated her to report misconduct or violations of law in real time. Sears Dep. 120:10-12, ECF No. 713 at 33. The day of her deposition, however, was the first time that she reported alleged misconduct or violations of law.

In reply, Plaintiffs highlight Sears's deposition testimony that she was there to tell the truth and ask the Court to conclude that "she had no financial incentive to lie." Pls.' Reply Br. 10-11, ECF No. 718 (citing Sears Dep. 121)

("I've been wanting to talk to people about [*82] this. Like I have my truth. . . . I can just tell my truth. I mean I don't know if you can use it or not, but it's just the truth and that's it."). It is not for the Court, however, to make credibility determinations about Sears or her possible financial motivations or incentives to provide testimony favorable to Plaintiffs about Mortazavi, as that is the province of the jury. See *Liberty Lobby, 477 U.S. at 255* ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Mortazavi has also provided the deposition testimony of Chris Anderson, Chief of Compliance for Next Health, who testified that Mortazavi cooperated and received guidance from the compliance department, and that he had a "hands on" approach with respect to certain compliance issues. Anderson Dep. 188:8-12, 190:22-191:2, and Exhs. 18 and 19 thereto, ECF No. 713 at 631-32, 736, 741.

Zeinali highlights certain testimony provided by Narosov at his deposition from which a reasonable juror could potentially infer that Zeinali did not have the requisite intent to defraud. Narosov testified that Next Health kept some of its business practices hidden from Zeinali. [*83] Narosov Dep. 210:14-25, App. to Zeinali's Opp'n to Pls.' Mot. for Partial Summ. J. (Zeinali Resp. App.), ECF No. 704-2 at 34 ("[S]ome things were hidden from Arvin [Zeinali]."). Narosov also testified that Zeinali objected to pharmacy business practices that pushed medically unnecessary prescriptions onto patients. Specifically, Narosov testified that Zeinali and others would be "yell[ed] at" by Hillman to "automatically refill[] prescriptions without seeking approval from patients." Narosov Dep. 248:13-15, ECF No. 704-2 at 40. Zeinali "did not like" this automatic refill practice, so he "attempted to stop" it by "saying" to Hillman "that he can't do that." Narosov Dep. 250:17-251:16, ECF No. 704-2 at 41-42.

Viewing all the facts and drawing all reasonable inferences in favor of the nonmoving parties, whether Mortazavi and Zeinali had knowledge of, or participated in, fraudulent misrepresentations and nondisclosures concerning lab and pharmacy claims, and had the requisite intent, will ultimately depend on credibility determinations in the province of the jury, not the Court. Even were the Court to exercise its discretion to draw an adverse inference against Mortazavi and Zeinali, the [*84] remaining evidence upon which Plaintiffs rely, coupled with the adverse inference, is insufficient on this record for the Court to conclude that Plaintiffs have

2024 U.S. Dist. LEXIS 177289, *84

demonstrated beyond peradventure all the elements of their fraud claims against Mortazavi and Zeinali.

For these reasons, the District Judge should DENY Plaintiffs' Motion for Partial Summary Judgment Against Amir Mortazavi and Arvin Zeinali (ECF No. 681).

**Recommendation**

For the above-stated reasons, the undersigned recommends that the District Judge:

(1) **GRANT** Defendants Cary Rossel and Jeremy Rossel's Motion for Summary Judgment (ECF No. 679) with respect to Plaintiffs' fraud by nondisclosure and fraudulent transfer (TUFTA) claims, which should be dismissed with prejudice, and **DENY** the motion in all other respects; and

(2) **DENY** Plaintiffs' Motion for Partial Summary Judgment Against Amir Mortazavi and Arvin Zeinali (ECF No. 681).

**SO RECOMMENDED**.

July 23, 2024.

/s/ Rebecca Rutherford

REBECCA RUTHERFORD

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

## *Vanderbilt Mortg. & Fin., Inc. v. Flores*

United States District Court for the Southern District of Texas, Corpus Christi Division

May 6, 2010, Decided; May 6, 2010, Filed

CIVIL ACTION NO. C-09-312

**Reporter**

2010 U.S. Dist. LEXIS 44335 *

VANDERBILT MORTGAGE AND FINANCE, INC., Plaintiff, VS. CESAR FLORES, et al, Defendants.

**Subsequent History:** Dismissed by, in part *Vanderbilt Mortg. & Fin., Inc. v. Flores, 2010 U.S. Dist. LEXIS 87630 (S.D. Tex., Aug. 25, 2010)*

**Prior History:** *Vanderbilt Mortg. & Fin., Inc. v. Flores, 2010 U.S. Dist. LEXIS 161488 (S.D. Tex., Feb. 3, 2010)*

**Counsel:** [*1] For Vanderbilt Mortgage and Finance, Inc., Plaintiff: Jorge C Rangel, LEAD ATTORNEY, The Rangel Law Firm, Corpus Christi, TX; Cristina Espinoza Rodriguez, Stephen G Tipps, Baker & Botts, Houston, TX; Jaime Santiago Rangel, Rangel Law Firm PC, Corpus Christi, TX; James W Upton, Upton Mickits & Heymann, LLP, Corpus Christi, TX; Jennifer Anne Powis, Baker Botts LLP, Houston, TX; Kenneth Clifford Littlefield, Upton Mickits et al, Corpus Christi, TX.

For Cesar Flores, Alvin E King, Defendants: Baldemar F Gutierrez, LEAD ATTORNEY, Attorney at Law, Alice, TX; J. Javier Gutierrez, The Gutierrez Law Firm, Inc., Alice, TX.

For Arturo Trevino, Intervenor Plaintiff: David L Rumley, LEAD ATTORNEY, Wiginton Rumley Dunn LLP, Corpus Christi, TX.

For Clayton Homes, Inc., CMH Homes, Inc., Intervenor Defendants: Jorge C Rangel, LEAD ATTORNEY, The Rangel Law Firm, Corpus Christi, TX; Cristina Espinoza Rodriguez, Stephen G Tipps, Baker & Botts, Houston, TX; Jaime Santiago Rangel, Rangel Law Firm PC, Corpus Christi, TX; James W Upton, Upton Mickits & Heymann, LLP, Corpus Christi, TX; Jennifer Anne Powis, Baker Botts LLP, Houston, TX; Kenneth Clifford Littlefield, Upton Mickits et al, Corpus Christi, TX.

For [*2] Kevin T Clayton, Intervenor Defendant: Jorge C Rangel, LEAD ATTORNEY, The Rangel Law Firm, Corpus Christi, TX; Cristina Espinoza Rodriguez, Baker Botts, Houston, TX.

For Benjamin Joseph Frazier, Intervenor Defendant: Patton G Lochridge, LEAD ATTORNEY, Carlos R Soltero, McGinnis Lochridge et al, Austin, TX.

For Vanderbilt Mortgage and Finance, Inc., Intervenor Defendant: Jorge C Rangel, LEAD ATTORNEY, The Rangel Law Firm, Corpus Christi, TX; Cristina Espinoza Rodriguez, Baker Botts, Houston, TX; Jennifer Anne Powis, Baker Botts LLP, Houston, TX.

For Maria M Trevino, Intervenor: David L Rumley, LEAD ATTORNEY, Wiginton Rumley Dunn LLP, Corpus Christi, TX.

**Judges:** Janis Graham Jack, United States District Judge.

**Opinion by:** Janis Graham Jack

# Opinion

### *ORDER*

On this day came on to be considered the following motions:

> 1. Intervenor Defendants CMH Homes, Inc. ("CMH"), Clayton Homes, Inc. ("Clayton Homes") (collectively "Clayton Defendants"), Kevin T. Clayton ("Clayton"), and Vanderbilt Mortgage and Finance, Inc.'s ("Vanderbilt"), Motions to Dismiss Under *Rule 9(b)* or, in the Alternative, Repleading and for a RICO Case Statement ("*Rule 9(b)* Motions"). [1] (D.E. 60; D.E. 67.)

> 2. Intervenor Defendant Clayton's Motions to Dismiss for [*3] Lack of Personal Jurisdiction ("*Rule 12(b)(2)* Motion"). [2] (D.E. 59; D.E. 66.)

---

[1] Intervenor Defendants filed Unopposed Motions for Leave to Reply in Further Support of the *Rule 9(b)* Motions. (D.E. 76; D.E. 87.) The Motions for Leave are granted.

[2] Intervenor Defendants filed Unopposed Motions for Leave to Reply in Further Support of the **Rule 12(b)(2)** Motions. (D.E.

For the reasons stated below, the Court DENIES Clayton's *Rule 12(b)(2)* Motions (D.E. 59, 66), DENIES IN PART and GRANTS IN PART Intervenor Defendants' *Rule 9(b)* Motions without prejudice (D.E.60, 67), and ORDERS Intervenor Plaintiffs to file amended pleadings that complies with the requirements of *Rule 9(b)* and *Rule 8(a)* within fourteen (14) days of this Order.

## I. Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. § 1331*, federal question, as Intervenor Plaintiffs bring a cause of action under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961-1968* ("RICO"). (D.E. 41; D.E. 57)

## II. Factual Background

The following factual background is derived from Intervenor Plaintiffs' Intervenor Complaints (D.E. 41; D.E. 57) and does [*4] not represent the Court's factual findings in this matter.

This federal cause of action in this case arises out of Intervenor Defendants' alleged widespread scheme to sell manufactured homes via "land in lieu transactions," wherein they would enter into contracts with individuals for the sale of manufactured homes, but would often use as collateral land owned by someone other than the individual purchasing the manufactured home in question. In this scheme, the Clayton Homes Defendants would allegedly forge deeds and falsely notarize documents to make it appear that landowners signed over to Intervenor Defendants an interest in their property as collateral for the purchase of the manufactured home. Clayton Homes allegedly paid its employees to become notaries, but provided no training and encouraged employees to notarize documents in which they had a financial interest. (D.E. 41 at 4-5; D.E. 57 at 3-4.)

Intervenor Plaintiffs Arturo Trevino and Maria Trevino signature was allegedly forged onto a real estate documents on or about January 7, 2002, Intervenor Defendants filed documents with the Jim Wells County, Texas Clerk's office that fraudulently conveyed ownership and/or interest in [*5] land situated in Jim Wells County, representing that Intervenor Defendants had a valid lien, interest, or ownership in that property.

(D.E. 41 at 4; D.E. 57 at 3.) Intervenor Defendants did not disclose to the property owner that these fraudulent documents were filed, and instead instructed the Clerk to return the fraudulent documents back to Clayton Homes rather than the landowner. Clayton Homes CEO Kevin Clayton was named as trustee on the Deed of Trust. Kevin Clayton allegedly encouraged the sale of manufactured homes at any cost to insure a profit. (D.E. 41 at 4; D.E. 57 at 4.)

Intervenor Plaintiffs allege that the fraudulent transactions were completed at the Clayton Homes sales center, rather than an independent title company, which allowed Intervenor Defendants to continue their fraudulent activity. Intervenor Plaintiffs further allege that Intervenor Defendants were able to conduct business in this manner because Vanderbilt, the lender, was part of the criminal enterprise. (D.E. 41 at 4-9; D.E. 57 at 4-8.)

Intervenor Plaintiffs state that Intervenor Defendants' fraud was uncovered in litigation from 2003 to 2005. In this litigation, Intervenor Defendants' employees testified [*6] that they forged customer signatures, forged notary signatures, and even forged dead people's signatures on many documents. Intervenor Plaintiffs contend that, when this evidence came to light, Intervenor Defendants entered into confidential settlements with only those customers who discovered the fraud. Intervenor Defendants believed that there were thousands of other customers who had not discovered the fraud. Rather than notify these other customers, they filed deed releases in dozens of Texas counties releasing installment contracts as "paid in full," but without informing the customers. Despite filing the releases, Intervenor Defendants allegedly continued to collect payments on debts no longer due. Fraud victims exist in dozens of Texas counties, according to Intervenor Plaintiffs. Intervenor Plaintiffs allege that the secret releases were filed as part of a criminal and fraudulent enterprise created to cover up fraud and alter government documents. (D.E. 41 at 7-9; D.E. 57 at 7-9.)

Intervenor Plaintiffs allege that many of the loans at issue were sold to the Federal National Mortgage Association, or Fannie Mae, for hundreds of millions of dollars without disclosing the fraud [*7] and forgery involved in the transactions and without disclosing that the collateral used to secure the loans had been released. Intervenor Plaintiffs state that Berkshire Hathaway, the parent company of the Intervenor Defendants, owned a percentage of Fannie Mae at the time. Intervenor Plaintiffs further allege that Berkshire Hathaway knew the loans sold to Fannie Mae were

77; D.E. 86.) The Motions for Leave are granted.

based upon fraudulent transactions and knew that the loans were no longer secured by real property, but never disclosed this knowledge to Fannie Mae. (D.E. 41 at 9-10; D.E. 57 at 9.) Intervenor Plaintiffs allege that Intervenor Defendants Clayton Homes, CMH, and Vanderbilt operate as a single business enterprise involved in the producing, selling, marketing, financing, and insuring of manufactured homes. (D.E. 41 at 6; D.E. 57 at 5-6.)

At the time of the alleged commission of the fraud described above, Intervenor Plaintiffs state that John Wells was the manager of the Corpus Christi store where the fraud was occurring. He was also a business partner of Clayton Homes. As a partner, Wells had the authority to fire employees and make business decisions for the benefit of the rest of his partners. He knew about the fraud [*8] but did nothing to stop it, and rather assisted in it. (D.E. 57 at 6-7.)

Intervenor Plaintiffs state the following causes of action: (1) violation of *Section 12.002 of the Texas Civil Practice and Remedies Code* (filing fraudulent documents related to land), (3) fraud, (4) civil conspiracy, and (5) RICO violations. (D.E. 41 at 10-18; D.E. 57 at 10-16.) Intervenor Plaintiffs seek actual and punitive damages, along with attorneys' fees. (D.E. 41 at 18; D.E. 57 at 17.)

### III. Procedural Background

On August 4, 2009, Vanderbilt brought suit in state court against Cesar Flores and Alvin King, seeking to foreclose their home. (D.E. 11, Ex. A.) On September 18, 2009, Flores and King counter-sued, alleging in part that Vanderbilt had violated RICO. (D.E. 11, Ex. B.) On October 26, 2009, Maria Trevino intervened, impleading Clayton Homes, Inc., CMH Homes, Kevin Clayton, John Wells, and Benjamin Joseph Frazier. (D.E. 1, Ex. B.) Maria Trevino brought both RICO and state claims against the newly impleaded defendants and against Vanderbilt. (D.E. 1, Ex. B.) CMH Homes removed this action to this Court on November 17, 2009 asserting federal question jurisdiction. (D.E. 1.) On February 16, 2010, Arturo [*9] Trevino filed a separate intervention bringing similar RICO and state claims against the Intervenor Defendants. (D.E. 41.)

On March 9, 2010 and March 22, 2010, Intervenor Defendant Kevin Clayton filed his *Rule 12(b)(2)* Motions against Intervenor Arturo Trevino (D.E. 59), and Intervenor Maria Trevino respectively (D.E. 66.)

Thereafter, on March 9, 2010, Intervenor Defendants Vanderbilt, Kevin T. Clayton, Clayton Homes, and CMH filed the *Rule 9(b)* Motions against the action by Intervenor Arturo Trevino. (D.E. 60.) On March 22, 2010, Intervenor Defendants filed the *Rule 9(b)* Motions against the action by Intervenor Maria Trevino. (D.E. 67.)

### IV. Discussion

In this Order, the Court addresses both the *Rule 12(b)(2)* Motions and the *Rule 9(b)* Motions. As jurisdictional matters must be resolved first, the Court first turns to the *Rule 12(b)(2)* Motions. *See, e.g., United States v. Texas Tech University, 171 F.3d 279, 285 n.9 (5th Cir. 1999)* ("[C]ourts must . . . decide issues of personal jurisdiction before ruling on the merits.").

### A. Clayton Homes' *Rule 12(b)(2)* Motion (D.E. 12)

#### 1. *Rule 12(b)(2)* Standard

*Federal Rule of Civil Procedure 12(b)(2)* governs dismissal for "lack of personal jurisdiction." [*10] *Fed. R. Civ. P. 12(b)(2)*. "Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists. The plaintiff need not, however, establish jurisdiction by a preponderance of the evidence; a prima facie showing suffices. This court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv N' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006)* (internal citations omitted).

#### 2. Personal Jurisdiction Over RICO Claims

In his *Rule 12(b)(2)* Motions, Kevin T. Clayton argues that this Court has no basis upon which to exercise personal jurisdiction over it. Clayton first contends, in effect, that the Court should not apply Fifth Circuit precedent providing for nationwide personal jurisdiction in cases brought under a statute, such as RICO, providing for nationwide service of process. (D.E. 59 at 5-8; D.E. 66 at 5-8.) Clayton then argues that he lacks sufficient minimum contacts with the State of Texas to allow for the exercise of personal jurisdiction over him. (D.E. 59 at 10-17; D.E. 66 at 10-17.) Clayton claims

2010 U.S. Dist. LEXIS 44335, *10

 [*11] that he is a resident of Tennessee, maintains no real or personal property in Texas, and only takes sporadic business trips to Texas. (D.E. 59 at 2; D.E. 66 at 1-2.) Clayton therefore contends that there is no basis for specific or general personal jurisdiction in this Court. (D.E. 59 at 2, 5-17; D.E. 66 at 1, 5-17.)

### a. Minimum Contacts with the United States

Although personal jurisdiction is generally established based upon a defendant's minimum contacts with a particular state, there are exceptions to this rule. One such exception applies in cases brought under federal statutes providing for nationwide service of process, as the Fifth Circuit has explained. In *Busch v. Buchman, Buchman & O'Brien, 11 F.3d 1255 (5th Cir. 1994)*, a lawsuit brought under the 1934 Securities Exchange Act, *15 U.S.C. § 78a et seq.*, the court concluded that a federal district court in Texas had personal jurisdiction over a New York defendant. The court explained, "[i]n cases where a state is attempting to get extraterritorial jurisdiction over a defendant, the inquiry is whether the defendant has had minimum contacts with the state. **And, when a federal court is attempting to exercise personal jurisdiction over** [*12] **a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States.**" *Id. at 1258* (emphasis added). While a subsequent Fifth Circuit panel in *Bellaire General Hospital v. Blue Cross Blue Shield of Michigan, 97 F.3d 822 (5th Cir. 1996)* questioned the nationwide service of process holding in *Busch*, [3] this Court is bound by *Busch*. In the Fifth Circuit, "one panel may not overrule the decision, right or wrong, of a prior panel in the absence of an intervening contrary or superseding decision by the court en banc or the Supreme Court." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 334 n.4 (5th Cir. 2010).*

---

[3] In *Bellaire*, the court applied *Busch*, but noted its disagreement. The court stated, [*13] "[a]lthough we dutifully apply *Busch*, we emphasize our disagreement with it to the extent it concludes that the proper personal jurisdiction test in a national service of process case is whether minimum contacts exist between the individual and the national sovereign. We view personal jurisdiction and service of process as conceptually distinct issues. We fail to apprehend how personal jurisdiction can be separated from due process by Congressional enactment of nationwide service of process provisions." *97 F.3d at 826* (internal citations omitted). The decision also cites Judge Garza's dissenting opinion in *Busch*. *Id.*

As there is no intervening Supreme Court or Fifth Circuit en banc decision, the *Busch* decision controls. Thus, in any suit brought under a statute providing for nationwide service of process, a court need only conclude that Clayton has sufficient minimum contacts with the United States as a whole, not with any state in particular. *Busch, 11 F.3d at 1258*.

In light of *Busch*, the next question is whether RICO in fact provides for nationwide service of process, and thus allows for the exercise of personal jurisdiction based upon a defendant's minimum contacts with the United States as a whole. The service of process provision of RICO, *18 U.S.C. § 1965*, provides:

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be  [*14] summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.
>
> . . .
>
> (d) All other process in any action or proceeding under this chapter may be served on any person in any district in which such person resides, is found, has an agent, or transacts his affairs.

*18 U.S.C. § 1965(b), (d).* Although the Fifth Circuit has not expressly decided this issue, many courts within this Circuit and elsewhere have concluded that RICO provides for nationwide service of process. *See, e.g., David v. Signal Intern., LLC, 588 F. Supp. 2d 718, 727 (E.D. La. 2008)* ("RICO has a special nationwide service of process provision."); *Oblio Telecom, Inc. v. Patel, F. Supp. 2d    , 2008 U.S. Dist. LEXIS 94138, 2008 WL 4936488, at *4 (N.D. Tex. Nov 18, 2008)* (RICO "does provide for nationwide service of process."); *Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 782 (N.D. Tex. 2008)* ("[T]he ends of justice require application of *§ 1965(b)*'s nationwide service of process provision."); *Paolino v. Argyll Equities, L.L.C., 401 F. Supp. 2d 712, 716 (W.D. Tex 2005)* ("[P]ursuant to *18 U.S.C. § 1965(b)*, RICO's nationwide service of process provision, the ends of justice  [*15] require that the other parties be brought before this Court."); *see also Cory v. Aztec Steel Building, Inc., 468 F.3d 1226, 1230 (10th Cir. 2006)*; *PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 71 (2d Cir. 1998)*; *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc., 788 F.2d 535, 538-39 (9th Cir. 1986)*; *Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671-72*

*(7th Cir. 1987)*. Consistent with these decisions, and the language of *Section 1965(b)* and *(d)*, allowing for service in "any district court," or "any judicial district," the Court concludes that RICO provides for nationwide service of process.

Therefore, consistent with *Busch*, the Court must look only to whether Intervenor Defendant Clayton has sufficient minimum contacts with the United States as a whole. *11 F.3d at 1258*. There is no dispute that it has such contacts. (D.E. 59 at 2 (Clayton "resides and works in Tennessee"); D.E. 66 at 1-2 (same).) As such, the Court must conclude that it has personal jurisdiction over Intervenor Defendant Clayton, based upon the nationwide minimum contacts analysis applicable in RICO cases.

**b. Due Process Considerations**

Despite this Court's obligation to apply [*16] *Busch*, Clayton argues that *Section 1965* allows for the Court to exercise jurisdiction over it only if "it is shown that the ends of justice require [it]." (D.E. 59 at 7; D.E. 66 at 7.) The "ends of justice," according to Clayton, is similar to "the broad notions of substantial justice and fair play." (D.E. 59 at 7-8 (citing *Allstate Ins. Co. v. Plambeck, D.C., 2009 U.S. Dist. LEXIS 10302, 2009 WL 347423, at *3)*; D.E. 66 at 7-8 (same).) In this case, Clayton argues that "[t]he exercise if personal jurisdiction over Mr. Clayton simply because he is a citizen of the United States and a claim under [RICO] has been alleged impugns Mr. Clayton's liberty interest and offends traditional notions of fair play and justice." (D.E. 59 at 2; D.E. 66 at 1.) Clayton states that "[e]xercising personal jurisdiction over Mr. Clayton, who also lacks meaningful contacts with the State of Texas, would be unfair and improper even pursuant to RICO." (D.E. 59 at 8; D.E. 66 at 8.)

Under well established Supreme Court precedent, concepts of "fair play" and "substantial justice" are essentially part of the due process analysis. *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* ("The [*17] strictures of the *Due Process Clause* forbid a state court to exercise personal jurisdiction over Asahi under circumstances that would offend '"traditional notions of fair play and substantial justice."'"); *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 464, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* ("The question presented is whether this exercise of long-arm jurisdiction offended 'traditional conception[s] of fair play and substantial justice' embodied in the *Due*

*Process Clause of the Fourteenth Amendment*."). Thus, the question is whether exercise of personal jurisdiction in this case would comport with due process considerations.

Intervenor Defendants are correct that "the expansive minimum contacts test under a nationwide service of process provision does not obviate due process concerns." *Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 782 (N.D. Tex. 2008)*. Nevertheless, as the Fifth Circuit in *Busch* explained, "while the *Due Process Clause* must be satisfied if a forum is to acquire personal jurisdiction over a defendant, sovereignty defines the scope of the due process test." *11 F.3d at 1258*. The *Busch* court concluded that due process considerations were satisfied in a nationwide service of process statute, [*18] stating, "[g]iven that the relevant sovereign is the United States, it does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing within the United States." *Id.; see also, e.g., IBEW-NECA Southwestern Health and Benefit Fund v. Tafoya, 2001 U.S. Dist. LEXIS 13559, 2001 WL 1042733, at *3 (N.D. Tex. Aug. 21, 2001)* ("Under the *Busch* standard, [defendant's] United States residency eliminates any due process concerns. Further, applying the *Busch* standard to [defendant] does not offend traditional notions of fair play and substantial justice."); *S.E.C. v. Cook, 2001 U.S. Dist. LEXIS 11326, 2001 WL 896923, at *2 (N.D. Tex. Aug. 2, 2001)* ("[I]f the relevant sovereign is the United States, it does not offend the traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing in the United States. . . . Under the *Busch* rationale, [defendant's] United States residency destroys any due process concerns, and the traditional notions of fair play and substantial justice will not be offended by this Court's exercise of personal jurisdiction."). In light of *Busch*, the Court concludes that due process considerations involved with the [*19] exercise of personal jurisdiction over Clayton are satisfied when jurisdiction is based upon nationwide minimum contacts.

As the Court need only conclude that Intervenor Defendant Clayton has sufficient minimum contacts with the United States, it need not consider Intervenor Defendant's arguments regarding its lack of minimum contacts with the State of Texas. (D.E. 59 at 5-17; D.E. 66 at 5-17.) The Court concludes that it has personal jurisdiction over Intervenor Defendant Clayton, on the basis of Intervenor Plaintiffs' RICO claims.

### 3. Pendent Personal Jurisdiction Over Non-RICO Claims

Having concluded that the Court has personal jurisdiction over Intervenor Defendant Clayton on the basis of the RICO cause of action, the Court must next determine whether it has personal jurisdiction with respect to Intervenor Plaintiffs' other claims, namely *Section 12.002 of the Texas Civil Practice and Remedies Code*, common law unfair debt collection, common law fraud, and civil conspiracy (the "non-RICO claims").

The Court's personal jurisdiction over Intervenor Plaintiffs' non-RICO claims is governed by the principle of pendent personal jurisdiction. As one court has recently explained, pendent personal [*20] jurisdiction "exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008)* (citing *United States v. Botefuhr, 309 F.3d 1263, 1272-73 (10th Cir. 2002)*); *see also Conwill v. Greenberg Traurig, L.L.P., 2009 U.S. Dist. LEXIS 119214, 2009 WL 5178310, at *8 (E.D. La. Dec. 22, 2009)* (discussing pendent personal jurisdiction); *Pinnacle Label, Inc. v. Spinnaker Coating, LLC, 2009 U.S. Dist. LEXIS 106135, 2009 WL 3805798, at *6 (N.D. Tex. Nov. 12, 2009)* (same). In other words, "once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction. A defendant who already is before the court to defend a federal claim is unlikely to be severely inconvenienced by [*21] being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim. Notions of fairness to the defendant simply are not offended in this circumstance." *Rolls-Royce Corp., 576 F. Supp. 2d at 783* (internal citations omitted).

Although the Fifth Circuit has not yet expressly ruled on pendent personal jurisdiction, other circuits to consider the issue have uniformly approved pendent personal jurisdiction. *See, e.g., Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1181 (9th Cir. 2004)*; *Robinson Eng'g Co., Ltd. Pension Plan & Trust v. George, 223 F.3d 445, 449-50 (7th Cir. 2000)*; *Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1362 (Fed. Cir. 2001)*; *ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir. 1993)*; *Oetiker v. Jurid Werke, G.m.b.H., 556 F.2d 1, 4, 181 U.S. App. D.C. 124 (D.C. Cir. 1977)*. Courts in the Fifth Circuit have also adopted and applied pendent personal jurisdiction. *See In re Enron Corp. Secs., 465 F. Supp. 2d 687, 705 n.30 (S.D. Tex. 2006)*; *see also, e.g., Rolls-Royce Corp., 576 F. Supp. 2d at 783*; *Conwill, 2009 U.S. Dist. LEXIS 119214, 2009 WL 5178310, at *8*; *Oblio Telecom Inc. v. Patel, F. Supp. 2d , 2008 U.S. Dist. LEXIS 94138, 2008 WL 4936488, at *5 (N.D. Tex. Nov. 18, 2008)*.

The [*22] exercise of pendent personal jurisdiction is within the Court's discretion, and depends on whether the state law claims arise out of the same nucleus of operative fact as the RICO claim, which gives rise to personal jurisdiction. *Rolls-Royce Corp., 576 F. Supp. 2d at 784* ("[I]f plaintiff's remaining claims arise out of the same nucleus of operative fact as its RICO claims it is within the court's discretion to exercise pendent personal jurisdiction over them."). In this case, there is little doubt that all claims arise from the same nuclear of operative facts: all claims derive from Intervenor Defendants' alleged fraudulent scheme involving the sale of manufactured homes, fraudulent signatures and notarizations, and the continued collection of loan repayments despite filing releases stating that the loans had been "paid in full." (D.E. 41 at 7-9; D.E. 57 at 7-9.) The RICO and non-RICO based claims are very closely related. This Court will therefore, in its discretion, exercise pendent personal jurisdiction over Intervenor Defendant Clayton with respect to Intervenor Plaintiffs' non-RICO claims.

Based on the foregoing discussion, the Court concludes that it has personal jurisdiction [*23] over Intervenor Defendant Clayton for all of Intervenor Plaintiffs' causes of action, and DENIES Intervenor Defendant's Motions to Dismiss for Lack of Personal Jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)*. (D.E. 59; D.E. 66.)

### B. Intervenor Defendants' *Rule 9(b)* Motions (D.E. 60, 67)

### 1. Applicable Law

"A dismissal for failure to plead fraud with particularity under *Rule 9(b)* is treated as a dismissal for failure to state a claim under *Rule 12(b)(6)*." *U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 185 n.8 (5th Cir. 2009)*. *Federal Rule of Civil Procedure 9(b)* provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*. "What constitutes 'particularity' will necessarily differ with the facts of each case. At a minimum, *Rule 9(b)* requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. Put simply, *Rule 9(b)* requires 'the who, what, when, where, and [*24] how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003)*; *see also Kanneganti, 565 F.3d at 186*.

The Fifth Circuit has explained, "[i]n cases of fraud, *Rule 9(b)* has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later. We apply *Rule 9(b)* to fraud complaints with 'bite' and 'without apology,' but also aware that *Rule 9(b)* supplements but does not supplant *Rule 8(a)*'s notice pleading. *Rule 9(b)* does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Kanneganti, 565 F.3d at 186* (*citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). Where a plaintiff has alleged fraud against multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Thornton v. Micrografx, Inc., 878 F. Supp. 931, 938 (N.D. Tex. 1995)*.

## 2. Fraud Claims are Insufficient

Intervenor Defendants argue that the Complaint insufficiently alleges [*25] "the who, what, where, when and why" of the predicate fraudulent acts for the RICO claims. Intervenor Defendants claim that Intervenor Plaintiffs have failed to specifically allege each Intervenor Defendant's role in the fraud and failed "to specify what subsections of RICO they believe were violated." (D.E. 60 at 13-15; D.E. 67 at 13-16.) This Court agrees.

A review of the Complaint shows several deficiencies in Intervenor Plaintiffs' allegations of fraud and RICO violations. First, although Intervenor Plaintiffs' Complaint makes general allegations of fraud, Intervenor Plaintiffs fail to specify, for example, when the fraud was committed, by whom, and how that fraud affected Intervenor Plaintiffs. *See Thornton, 878 F. Supp. at 938*. Intervenor Plaintiffs' Complaint only provides one specific date and fails to specify when the manufactured home was sold or when the release was filed. (D.E. 41 at 4; D.E. 57 at 3.) Second, while the Complaint makes several general allegations of fraud, it often fails to specify the role each Intervenor Defendant played in the alleged scheme. For example, the Complaint states in general terms that the Defendants "filed in Jim Wells County, Texas fraudulent [*26] court documents . . . with the intent that the document . . . evidenced a valid lien or claim against real property by [Intervenor] Defendants." (D.E. 41 at 10; D.E. 57 at 10.) Third, where Intervenor Plaintiffs have specified certain fraudulent acts, some of these acts seem to have no apparent basis in the context of this case, such as *18 U.S.C. § 1543*, forgery of passports. [4] (D.E. 41 at 15; D.E. 57 at 14.) In short, Intervenor Plaintiffs have failed to plead the "particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *J.M. Huber Corp., 343 F.3d at 724*.

## 3. Intervenor Plaintiffs Must Replead Fraud Claims

Intervenor Plaintiffs' pleading deficiencies do not, however, warrant dismissal. "While courts routinely dismiss causes of action without leave to replead when they grant motions to dismiss for failure to state a claim, there is a general consensus that plaintiffs should be provided with an opportunity to amend their complaint to meet *Rule 9(b)*'s requirements before ordering dismissal." *Ryan v. Brookdale Int'l Sys., Inc., 2007 U.S.*

---

[4] The Court also notes that Plaintiffs fail to specify the subsections of RICO under which they are filing suit. (D.E. 41 at 14-17; D.E. 57 at 14-17.) Under *Rule 8(a)(2)*, a plaintiff must submit "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Because Plaintiffs fail to specify each RICO subsection under which they are bringing suit, they have not complied with the pleading requirements. *See, e.g., City of Driscoll, Texas v. Saenz, 2007 U.S. Dist. LEXIS 3690, 2007 WL 173232 (S.D. Tex. Jan. 17, 2007)* [*27] (ordering plaintiff to replead RICO allegations stating which subsection or subsections were allegedly violated by the defendants).

2010 U.S. Dist. LEXIS 44335, *27

_Dist. LEXIS 82359, 2007 WL 3283655, at *7 (S.D. Tex. Nov. 6, 2007)_; _see DB Western, Inc. - Texas v. Invista, S.A. R.L., 2009 U.S. Dist. LEXIS 94977, 2009 WL 3297297, at *2 (S.D. Tex. Oct. 13, 2009)_ (holding that complaint did not comply with _Rule 9(b)_, and ordering plaintiff to replead); _see also U.S. ex rel. Williams v. Bell Helicopter Textron, Inc., 417 F.3d 450, 456 (5th Cir. 2005)_ (finding that "dismissal with prejudice . . . was unwarranted where . . . claims were dismissed on a _Rule 12(b)(6)_ motion based on a lack of specificity in the complaint as required by _Rule 9(b)_."). _Federal Rule of Civil Procedure 15(a)_ "reject[s] the approach [*28] that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept[s] the principle that the purpose of pleading is to facilitate a proper decision on the merits." _Ryan, 2007 U.S. Dist. LEXIS 82359, 2007 WL 3283655 at *7_. Thus, "there is a strong presumption in favor of granting leave to amend." _Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 291 (5th Cir. 2006)_. In light of these considerations, the Court will provide Intervenor Plaintiffs an opportunity to amend their pleading with respect to their common law fraud claims and fraud based RICO claims to comply with the pleading standards established in _Federal Rules of Civil Procedure 8(a)_ and _9(b)_. Intervenor Plaintiffs must file an Amended Complaint within fourteen (14) days of this Order.

**4. RICO Case Statement**

Although Intervenor Plaintiffs' fraud based RICO claims contain certain deficiencies and must be repled, the Court must decline Intervenor Defendants' request to require Intervenor Plaintiffs to file a RICO Case Statement. (D.E. 60 at 16-20; D.E. 67 at 16-20.)

In certain cases, a court will require a plaintiff alleging violations of RICO to file a RICO Case Statement after the filing of a complaint. _See,_ [*29] _e.g._, Local Rules, United States District Court for the Southern District of Florida, Rule 12.1 (requiring RICO Case Statement thirty days after filing); RICO Standing Order, United States District Court for the Eastern District of Louisiana (requiring RICO statement twenty days after entry of Standing Order). The contents of the RICO Case Statement vary depending on the court or the District, but generally include specifics "regarding the time, place or manner of specific actions" taken by Intervenor Defendants giving rise to the RICO claim. _Brown v. Coleman Investments, Inc., 993 F. Supp. 416, 427 (M.D. La. 1998)_; _see, e.g._, Local Rules, United States District Court for the Southern District of Florida, Rule 12.1; RICO Standing Order, United States District Court for the Eastern District of Louisiana.

A case statement "is a useful, sometimes indispensable, means to understand the nature of the claims asserted and how the allegations satisfy the RICO statute." _Marriott Bros. v. Gage, 911 F.2d 1105, 1107 (5th Cir. 1990)_ (citing _Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989)_; _Old Time Enters. V. Int'l Coffee Corp., 862 F.2d 1213 (5th Cir. 1989))_. When required, a RICO Case Statement [*30] is "filed pursuant to counsel's _Fed. R. Civ. P. 11_ obligation to make a reasonable investigation of the facts underlying his complaint." _Clark v. Douglas, 2008 U.S. App. LEXIS 113, 2008 WL 58774, at *3 (5th Cir. Jan. 4, 2008)_; _Chapman & Cole v. Itel Container Int'l, 865 F.2d 676, 685 (5th Cir. 1989)_.

In this case, Intervenor Defendants argue that the Complaint "fails to assert any matter with specificity but rather relies solely upon allegations against all of the Intervention Defendants and asserts that all of them conspired to file releases of liens." (D.E. 60 at 16; D.E. 67 at 16.) Intervenor Defendants cite many different decisions around the nation that have required RICO case statements. (D.E. 60 at 17 & n.5; D.E. 67 at 17 & n.5.) Intervenor Defendants contend that the Complaint has multiple shortcomings when compared to the usual level of specificity required by a RICO Case Statement, and conclude that Intervenor Plaintiffs "should be required to submit a RICO case statement that would provide some detail -- some allegations of the who, what, when, where and how -- for their serious allegations of fraud underpinning a RICO violation." (D.E. 60 at 19; D.E. 67 at 19.)

Unlike other local rules, the Southern [*31] District of Texas Local Rules do not require a RICO Case Statement, and few cases within this District have ordered the filing of a formal RICO Case Statement, even though in some instances they have ordered repleading of RICO claims. _See Saenz, 2007 U.S. Dist. LEXIS 3690, 2007 WL 173232, at *8_ (repleading of RICO claims); _Porter v. Shearson Lehman Bros., Inc., 802 F. Supp. 41, 64 (S.D. Tex. 1992)_ (ordering RICO Case Statement). Beyond these general considerations, the Court also notes that this is not a particularly complex RICO case. The case involves six Intervenor Defendants, two Intervenor Plaintiffs, and several specific allegations of wrongdoing arising out of one fraudulent scheme. RICO Case Statements generally require significant details that may be unnecessary and unavailable at this stage of the proceedings, and would impose an unwarranted burden upon Intervenor

2010 U.S. Dist. LEXIS 44335, *31

Plaintiffs. *See* Local Rules, United States District Court for the Southern District of Florida, Rule 12.1 (requiring detailed responses to sixteen sets of questions); Local Rules, United States District Court for the Southern District of Georgia, Appendix (requiring detailed responses to twenty sets of questions); RICO Case Standing Order, [*32] Northern District of Texas (requiring detailed responses to twenty sets of questions). In short, the Court does not see the need for a RICO Case Statement here.

Given the foregoing considerations, the Court must deny Intervenor Defendants' request for a RICO Case Statement in this action. (D.E. 60 at 16-20; D.E. 67 at 16-20.)

## V. Conclusion

For the reasons stated above, the Court DENIES Intervenor Defendant Clayton's *Rule 12(b)(2)* Motions. (D.E. 59; D.E. 66.) The Court DENIES IN PART and GRANTS IN PART Intervenor Defendants' *Rule 9(b)* Motions without prejudice. (D.E. 60; D.E. 67.) The Court ORDERS Intervenor Plaintiffs to file an amended pleading that complies with the requirements of *Rule 9(b)* and *Rule 8(a)* within fourteen (14) days of this Order.

SIGNED and ORDERED this 6 day of May, 2010.

/s/ Janis Graham Jack

Janis Graham Jack

United States District Judge

**End of Document**